# 23-1642

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

The Satanic Temple, Inc.,
*Plaintiff-Appellant,*

*vs.*

City of Boston,
*Defendant-Appellee.*

On appeal from the United States District Court
for the District of Massachusetts

(District Court case no. 21-cv-10102)

The Honorable Angel Kelley, U.S. District Judge, presiding

## BRIEF OF APPELLANT THE SATANIC TEMPLE

Matt Kezhaya                    matt@kezhaya.law
Bar # 1208974                              (479) 431-6112

150 S. Fifth Street, Suite 1850, Minneapolis, MN 55402

## CORPORATE DISCLOSURE STATEMENT

1. Plaintiff-Appellant The Satanic Temple, Inc. is a nonprofit religious corporation with no parent corporations and no publicly held corporation owns 10% or more of Plaintiff-Appellant's stock.

2. As a nonprofit religious corporation, Plaintiff-Appellant has neither stock nor owners.

Respectfully submitted on December 22, 2023,

By:  */s/ Matt Kezhaya*

Matt Kezhaya (# 1208974)
KEZHAYA LAW PLC
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone:  (479) 431-6112
email:  matt@kezhaya.law

## TABLE OF CONTENTS

Corporate disclosure statement ...................................................... 2

Table of contents ......................................................................... 3

Table of authorities ..................................................................... 5

Reasons why oral argument should be heard .................................. 10

Jurisdictional statement .............................................................. 11

Statement of the issues................................................................ 12

Statement of the case ................................................................. 13

    1: Factual background............................................................. 13

    1.1: The Temple is a recognized and sincere religion. ............................ 13

    1.2: Boston extends whim-based invitations to bless its meetings.............. 13

    1.3: The prayers are subject to preliminary review. .................................. 14

    1.4: The blessings are "sermons" and directed at the audience. ............... 14

    1.5: The audience is sometimes directed to stand for the sermons............ 15

    1.6: The Temple issued three requests for equal access from 2016 - 2018. . 16

    1.7: Michelle Wu modified the custom to exclude the Temple. ................ 18

    2: Procedural history ............................................................... 18

    2.1: The District Court prohibits Wu's deposition.................................... 19

    2.2: Relying on Wu hearsay, summary judgment granted to the City. ....... 21

Summary of the argument ........................................................... 22

Argument.................................................................................. 23

    1: Boston's prayer custom violates the Establishment Clause. ................... 23

    Standard of review................................................................... 23

    1.1: The custom controls prayer, proselytizes, and excludes out-groups.... 24

    1.2: Boston's custom discriminates against dissenting religions. ............... 38

    2: A requirement of palatability burdens unpopular beliefs....................... 42

    3: Wu was subject to a deposition............................................ 46

    Standard of review................................................................... 47

    3.1: Boston stipulated Wu would testify and declared Wu a witness.......... 47

3.2: Wu was not a "high ranking government official."............................. 50

3.3: Wu had unique personal knowledge. ................................................. 54

3.4: The District Court should have taken an adverse inference................ 55

Conclusion / prayer for relief ....................................................................... 56

## Table of authorities

**Cases**

*Adelson v. Hananel*,
   641 F. Supp. 2d 65 (D. Mass. 2009) .......................................55

*Am. Legion v. Am. Humanist Ass'n*,
   139 S.Ct. 2067 (2019) ...................................................... 24, 30

*Anderson v. Cryovac, Inc.*,
   805 F.2d 1 (1st Cir. 1986) .........................................................51

*Att'y Gen. v. Desilets*,
   418 Mass. 316, 636 N.E.2d 233 (1994) ...................................41

*Ayala-Gerena v. Bristol Myers-Squibb Co.*,
   95 F.3d 86 (1st Cir. 1996) .................................................. 46, 47

*Bogan v. City of Bos.*,
   489 F.3d 417 (1st Cir. 2007)............................................... 52, 53

*Burns v. Johnson*,
   829 F.3d 1 (1st Cir. 2016).........................................................38

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993)....................................................36, 38, 39

*Curtis v. Sch. Comm. of Falmouth*,
   420 Mass. 749 (1995)...............................................................44

*Davila v. Corporacion De Puerto Rico Para La Difusion Publica*,
   498 F.3d 9 (1st Cir. 2007).........................................................55

*Everson v. Bd. of Ed. of Ewing Twp.*,
    330 U.S. 1 (1947)........................................................25, 26, 34

*Fedele v. Sch. Comm. of Westwood*,
    412 Mass. 110 (1992)............................................................ 44

*Gillette v. United States*,
    401 U.S. 437 (1971) ............................................................. 31

*Gundy v. City of Jacksonville Fla.*,
    50 F.4th 60 (11th Cir. 2022) .................................................. 28

*Hassan v. City of New York*,
    804 F.3d 277 (3d Cir. 2015) .................................................. 36

*Jones v. Clinton*,
    72 F.3d 1354 (8th Cir. 1996) ................................................. 50

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022) ......................................................... 31

*Krupien v. Ritcey*,
    112 N.E.3d 302 (2018)................................................... 41, 42

*Larson v. Valente*,
    456 U.S. 228 (1982) ............................................................. 27

*Lund v. Rowan Cnty., N. Carolina*,
    863 F.3d 268 (4th Cir. 2017) ......................................... passim

*Lynch v. Donnelly*,
    465 U.S. 668 (1984) ............................................................. 27

*Magazu v. Dep't of Child. & Fams.*,
    473 Mass. 430 (2016) ........................................................... 42

*Marsh v. Chambers*,
   463 U.S. 783 (1983) .................................................................. 32

*Milazzo v. KG Enterprises, Inc.*,
   No. CIV. 97-649-SD,
   1999 WL 1327394 (D.N.H. Feb. 16, 1999) ............................. 47

*Mu v. Omni Hotels Management Corporation*,
   882 F.3d 1 (1st Cir., 2018) ...................................................... 23

*Pac. Indem. Co. v. Deming*,
   828 F.3d 19 (1st Cir. 2016) ..................................................... 23

*Rubin v. City of Lancaster*,
   710 F.3d 1087 (9th Cir. 2013) ................................................. 30

*S.L. ex rel. Lenderman v.*
   *St. Louis Metro. Police Dep't Bd. Of Commissioners*,
   No. 4:10-CV-2163 CEJ,
   2011 WL 1899211 (E.D. Mo. May 19, 2011) .......................... 51

*Satanic Temple, Inc. v. City of Bos., MA*,
   No. 21-CV-10102-ADB,
   2021 WL 3079868 (D. Mass. July 21, 2021) ........................... 18

*Stepanischen v. Merchants Despatch Transp. Corp.*,
   722 F.2d 922 (1st Cir. 1983) ................................................... 29

*The Satanic Temple, Inc. v. City of Scottsdale*,
   No. 18-CV-00621-PHX-DGC,
   2020 WL 587822 (D. Ariz. Feb. 6, 2020) ............................... 12

*Town of Greece, N.Y. v. Galloway*,
   572 U.S. 565 (2014) ...................................................... passim

*United States v. Trump*,
  No. 23-3190,
  2023 WL 8517991 (D.C. Cir. Dec. 8, 2023) ............................ 51

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ........................................................ 31, 36

*Wallace v. Jaffree*,
  472 U.S. 38 (1985) ................................................................ 25

*Walz v. Tax Comm'n of City of New York*,
  397 U.S. 664 (1970) .............................................................. 26

*Watson v. Jones*,
  80 U.S. 679 (1871) ................................................................ 25

*Williamson v. Brevard Cnty.*,
  928 F.3d 1296 (11th Cir. 2019) .......................................... 31, 38

*Zorach v. Clauson*,
  343 U.S. 306 (1952) .............................................................. 26

## Statutes

28 USC § 1291 ........................................................................ 10

28 USC § 1331 ........................................................................ 10

28 USC § 1337 ........................................................................ 10

42 USC § 1983 ........................................................................ 10

Acts of 1951, c. 376, s. 1.11 .................................................... 52

**Rules**

FRAP 4 ..................................................................... 10

FRCP 26.................................................................... 48

FRCP 30.................................................................... 49

**Treatises**

*6 Treatise on Const. L.* § 21........................................... 24

*Wright & Miller*, 8A Fed. Prac. & Proc. Civ. § 2102 (3d ed.)........ 48

**Constitutional Provisions**

U.S. Const. amend. I................................................... 25

U.S. Const. amend. XIV ............................................... 25

U.S. Const. art. IV .................................................... 31

### REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

At issue in this case is a challenge to Boston's legislative prayer custom. The Establishment Clause question merits oral argument because the constitutional contours of government-sponsored prayer ceremonies present an issue of first impression in this circuit. Additionally, the invitation mechanism at issue is the subject of a circuit split.

## JURISDICTIONAL STATEMENT

For review is an order granting summary judgment and two orders prohibiting the deposition of a declared witness whose subjective intent was the ultimate question of fact.

The District Court had federal question jurisdiction over the Establishment Clause claim. 28 USC § 1331; 42 USC § 1983. Similarly, the District Court had supplemental jurisdiction over the Massachusetts free exercise claim. 28 USC § 1337.

The summary judgment order and judgment were both entered on July 31, 2023. (Ad. 20), (Ad. 51). The deadline to notice an appeal was 30 days later, on August 30. FRAP 4(a). The notice was filed on August 2. (Appx. 914).

The summary judgment order fully and finally resolved the dispute. The order left no open claims and left no remaining defendants. Because a notice of appeal was timely filed after a final order, this Court has appellate jurisdiction under 28 USC § 1291.

## STATEMENT OF THE ISSUES

1: Boston's prayer custom violates the Establishment Clause.

 *Am. Legion v. Am. Humanist Ass'n*, 139 S.Ct. 2067 (2019)

 *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565 (2014)


2: A requirement of palatability burdens unpopular beliefs.

 *Att'y Gen. v. Desilets*, 418 Mass. 316, 636 N.E.2d 233 (1994)

 *Magazu v. Dep't of Child. & Fams.*, 473 Mass. 430 (2016)


3: Wu was subject to a deposition.

 *Milazzo v. KG Enterprises, Inc.*,

 No. CIV. 97-649-SD,

 1999 WL 1327394 (D.N.H. Feb. 16, 1999)

 *Jones v. Clinton*, 72 F.3d 1354, 1358 (8th Cir. 1996)

## STATEMENT OF THE CASE

For review is a summary judgment order resolving against Establishment Clause and Massachusetts free exercise challenges to Boston's legislative prayer custom. Entailed in this review are orders prohibiting the deposition of a declared witness. The parties are The Satanic Temple, Inc. and the City of Boston, Massachusetts.

## 1: Factual background

### 1.1: The Temple is a recognized and sincere religion.

The Temple is a nontheistic religious organization which has already established its bona fides of sincerity and religiosity. *The Satanic Temple, Inc. v. City of Scottsdale*, No. 18-CV-00621-PHX-DGC, 2020 WL 587822, at *7 (D. Ariz. Feb. 6, 2020). As a result, these issues were undisputed below. (Appx. 975).

### 1.2: Boston extends whim-based invitations to bless its meetings.

Boston is a world-renowned city which needs no introduction. At the beginning of its city meetings, Boston holds a customary legislative prayer to bless the occasion. (Ad. 23). The prayer is

officiated by a religious leader chosen by a rotating councilor. The councilor has plenary authority over who to invite. It was undisputed below that the invitations are "whim-based." (Appx. 972). Boston's own attorney accurately described the invitation as a political "reward." (Appx. 962, 984).

### 1.3: The prayers are subject to preliminary review.

On at least two occasions, the prayers were subjected to a preliminary review by Boston officials. (Appx. 800, 804).

### 1.4: The blessings are "sermons" and directed at the audience.

The blessings sometimes take the form of "sermons." (Appx. 842) ¶ 21. In one such sermon, the speaker asked of the God of Abraham to "order their [the councilors'] steps" and to direct them "how to pray."[1] In another, a different speaker states "We pray especially for the City of Boston"[2] and "Holy spirit we invite You to

---

[1] https://www.youtube.com/watch?v=T1rDy1ioPnE at 7:00 – 7:30 (cited at Appx. 846-847).

[2] https://www.youtube.com/watch?v=qb5iu6B1TxA (at 8:40-45).

give them the wisdom that they do not possess within themselves."[3]
The councilors cannot be both the "we" and the "they" simultane-
ously. The audience is part of "we," whether they like it or not.

*1.5: The audience is sometimes directed to stand for the sermons.*

Additionally, the audience is sometimes directed to stand for the
sermons. On two occasions of record, the audience was explicitly
directed to stand. (Appx. 805) ("I would like all councilors, all
guests, colleagues to please rise as Councilman O'Malley comes for-
ward to give us an … invocation"); see also (Appx. 907):[4]

> At this time, I would like our guests to
> please rise as Councilor Essaibi-George
> comes up to introduce our clergy for the
> day. After the invocation is delivered, I
> would ask that everyone remain standing
> as Councilor Essaibi-George leads us in the
> pledge of allegiance.

Councilor Essaibi-George explained that the audience is

---

[3] Id., at 8:07-8:26

[4] https://www.youtube.com/watch?v=NTXFgOjpbTE (at 1:35-
1:45)

generally expected to stand for the prayers, although "whoever's leading the body[] sometimes phrases it in different ways." (Appx. 885), 115:24-25.

### 1.6: The Temple issued three requests for equal access from 2016 - 2018.

In 2016, a representative of the Temple emailed then-Councilor Mark Ciommo to request an invitation. (Ad. 26). The same representative requested invitations from then-councilors Tito Jackson and Michelle Wu. (Id.). None of these councilors were willing to extend an invitation. Wu is the only one who responded, with a statement that she has a "long list" of people she would like to invite but that there are limited opportunities to extend an invitation. (Id.). The Temple was not on Wu's list.

In 2017, the same representative issued another request for invitation; this time to several councilors. (Id.). One of the receiving councilors was Annissa Essaibi-George. (Ad. 27). She "declined" to issue an invitation because she found it "absurd" that the Temple felt entitled to an invitation on equal terms as those religious leaders

who she found to be "amazing." (Appx. 659, at ¶ 38); (Appx. 762). Because she did not find the Temple or its leaders to be "amazing," she would not issue an invitation. (Ibid.)

Another one of the receiving councilors was Tim McCarthy. Councilor McCarthy told NBC Boston that he would never consider inviting someone from the Temple because he did not recognize any "positive impact" on his family or himself, personally. (Appx. 763).

NBC Boston requested a comment on the matter because a public outcry had taken place at the very notion of a Satanic group having equal access to engage in the government-sponsored practice of religion. (Appx. 763); (Appx. 792-798). A Catholic majority dominates Boston politics. (Appx. 903). Several members of the public informed Boston of their religious objections to the Temple's equal inclusion. (Appx. 792-798). Again, the Temple did not receive an invite.

In 2018, the Temple issued its final request for equal inclusion in the prayer ceremony. (Ad. 27). The City again declined, (id.), which

prompted this litigation.

*1.7: Michelle Wu modified the custom to exclude the Temple.*

In 2017, unbeknownst to the Temple, its request for equal inclusion prompted Michelle Wu to review Boston's prayer custom for "best practices." (Appx. 788). Prior to this review, people who received an invitation also received payment. (Appx. 787). Wu put a stop to the practice of paying people to bless the meeting. (Appx. 791).

## 2: Procedural history

Litigation ensued in 2021. (Ad. 28). The Temple asserted three federal question counts: (1) violation of the Establishment Clause; (2) violation of hybrid rights under the Free Speech Clause and the Free Exercise Clause; and (3) violation of the Equal Protection Clause. (Id.). The Temple also asserted a count under Massachusetts's free exercise guarantee. (Id.).

At the pleadings stage, the District Court dismissed the hybrid-rights claim upon a finding that the Temple lacked a Free Speech

injury because the prayer opportunity is government speech. *Satanic Temple, Inc. v. City of Bos., MA*, No. 21-CV-10102-ADB, 2021 WL 3079868, at *3–4 (D. Mass. July 21, 2021). The District Court also dismissed the Equal Protection count. *Id.*, at *6-7. Neither decision is contested on appeal.

### 2.1: The District Court prohibits Wu's deposition.

In the Rule 16.1 report, the parties agreed to increase the standard number of depositions to accommodate depositions of all the Councilors. (Appx. 45-46) ("There are 13 Councilors, each of which has discoverable knowledge for their reasons not to invite a representative from Plaintiff.") Boston followed up this stipulation with initial discovery disclosures, which identified Michelle Wu as a witness it may rely upon to support its defenses. (Appx. 869) ("Councilor Wu is expected to have discoverable information regarding the City's invocation speaker selection practices and Plaintiff's 2018 requests to deliver an invocation.")

But when the Temple noticed Wu's deposition, Boston reneged.

To alleviate the need of emergency motion proceedings, Boston proposed to reschedule the deposition sufficiently into the future to allow briefing in the ordinary course. (Appx. 57). The Temple agreed. (Appx. 59). Boston again reneged. (Appx. 61). Boston's brief in support of its emergency motion for protective order states that it had no intention of producing Wu for a deposition absent a court order. (Appx. 55).

The sole basis for Boston's motion for protective order was an evidence-free claim that then-Councilor Wu is a high-ranking government official. (Appx. 52). The Temple objected that there was no evidence to support that novel claim, and that city legislators are not "high-ranking government officials." (Ad. 2). The District Court granted Boston's motion on undue burden grounds, not due to Wu's purported status as a high-ranking government official, and categorically excluded any deposition of Wu by stating that her subjective intent was no longer relevant. (Ad. 10); (Ad. 13).

Prompted by the District Court (Ad. 17), the Temple moved for reconsideration based on a showing that Wu had unique personal

knowledge in the case which was unattainable by the City's Rule 30(b)(6) deponent, and that Wu's subjective intent was the case-dispositive inquiry. (Appx. 83). That was denied. (Ad. 19).

*2.2: Relying on Wu hearsay, summary judgment granted to the City.*

The City and the Temple cross-moved for summary judgment. (Ad. 29). The Temple objected to Boston's motion, in part, because it was prevented from obtaining discovery on Wu's subjective intent. (Appx. 865-866). Based on a finding that the Temple failed to present evidence that the City's "decision not to extend an invitation" to the Temple was "motivated by animus or bias," the District Court granted summary judgment to the City. (Ad. 35). The District Court's opinion relied on a hearsay statement by Wu. (Ad. 34).

## SUMMARY OF THE ARGUMENT

The Establishment Clause requires legislative prayers to be an honest endeavor to achieve inclusivity and nondiscrimination. But to Boston's official prayer czars, the invitation is a "reward" reserved for friends and political allies alone. The evidence below unequivocally showed that the prayer opportunity is a "sermon," one predicated upon a pre-prayer review, and one directed at an audience after they are first asked to stand. Asking for equal inclusion, the Temple was rebuffed for its "absurd" sense of "entitlement."

This case presents a veritable checklist of what legislative prayers may not be. Yet the District Court granted Boston summary judgment upon a finding that "intentional discrimination" necessarily requires proof of evil motive, whether "animus or bias." No case law supports this finding; the inquiry is to intent, not motive. It was no accident that the Temple is excluded from the prayer custom, that exclusion was the product of a considered, thoughtful, and public rejection. The Court should reverse and remand for judgment in favor of the Temple; or at least for trial proceedings.

## Argument

### 1: Boston's prayer custom violates the Establishment Clause.

The District Court reversibly erred when it granted Boston's motion for summary judgment on the Establishment Clause claim. First, because Boston's invocation practice is an endorsement of favored religions. Second, because Boston discriminates against politically disfavored religions.

The District Court reached its erroneous conclusion by turning the standard on its head. The Court should reverse and remand for entry of judgment in favor of the Temple if it finds the record shows a facial constitutional violation. Otherwise, it should reverse and remand for trial proceedings to determine whether there is an as-applied constitutional violation.

*Standard of review*

For review is a grant of summary judgment. This Court reviews such orders de novo, examining the record in the light most favorable to the non-moving party. *Pac. Indem. Co. v. Deming*, 828 F.3d 19,

22 (1st Cir. 2016). On appeal from cross-motions for summary judgment, the standard does not change. *Id.*, at 23. The Court still views each motion separately and draws all reasonable inferences in favor of the respective non-moving party. *Id.*

Upon a motion for summary judgment, a court's role is to determine whether there is a genuine issue of material fact and, if not, whether the movant is entitled to judgment as a matter of law. *Mu v. Omni Hotels Management Corporation*, 882 F.3d 1, 5 (1st Cir., 2018). An issue is "genuine" when a rational factfinder could resolve it either direction. *Id.* A fact is "material" where its existence or non-existence could change a case's outcome. *Id.*

*1.1: The custom controls prayer, proselytizes, and excludes out-groups.*

For the reasons below, the District Court should have found that there are no genuine issues of material fact and Boston's prayer scheme is unconstitutional. If the Court agrees, it should reverse and remand for entry of judgment in favor of the Temple.

At issue is the constitutionality of a legislative prayer custom.

Being a government-sponsored practice of religion, such a custom is constitutional only if it "stands out as an example of respect and tolerance for differing views, an honest endeavor to achieve inclusivity and nondiscrimination, and a recognition of the important role that religion plays in the lives of many Americans." *Am. Legion v. Am. Humanist Ass'n*, 139 S.Ct. 2067, 2089 (2019). Boston strenuously contended below that its direct control over prayer was entitled to a presumption of constitutionality. (Appx. 941); *accord. id.*, at 2082 (plurality opinion) (under Part II-A). Boston's contention is rooted in non-precedent. *Id.*, at 2073 ("Justice ALITO announced … an opinion with respect to Part[] II-A); *6 Treatise on Const. L.* § 21.3(e) (discussing *Am. Legion*):

> Justice Kagan, who supplied the fifth vote, declined to join the part of Justice Alito's opinion suggesting that the Court adopt a "presumption of constitutionality for longstanding monuments, symbols, and practices" combined with history-and-tradition analysis and a rule that benign acknowledgements of religion's place in society are permissible.

*1.11: Governments may not control or endorse religious practices.*

The right to be free from government-sponsored religion is rooted in the Establishment Clause of the First Amendment, which applies to the States and all political subdivisions through the Due Process Clause of the Fourteenth Amendment. U.S. Const. amend. I; U.S. Const. amend. XIV § 1; *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1 (1947).

This fundamental right protects the conscience of the infidel and the atheist just as well as that of any other religious viewpoint. *Wallace v. Jaffree*, 472 U.S. 38, 52 (1985). It is not the product of 21st century "political correctness," that our constitution protects non-believers' and dissidents' rights to believe – or not – in accordance with their own conscience. *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 620 n. 1 (2014) (Kagan, J., dissenting). Rather, protecting *all* citizens' rights to believe – or not – has always been the heritage of this country. *Id.*; *accord Watson v. Jones*, 80 U.S. 679, 728 (1871) ("The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect"). This fundamental right to be

free from government-sponsored religion was recognized during a pivotal moment in the American Experiment. Prior to its recognition, "zealous sectarians entrusted with governmental power to further their causes would sometime torture, maim, and kill those they branded 'heretics,' 'atheists' or 'agnostics.'" *Zorach v. Clauson*, 343 U.S. 306, 319 (1952) (Black, J., dissenting). Seeing that the United States would be a country comprised of "many fighting sects," the founding generation resolved to sever the historical tie between Church and State. *Id.* It is only through a policy of government neutrality for religion – both as between religion and non-religion, and as among religions – that the seeds of religious discrimination may never again be planted. *Everson*, 330 U.S. at 15–16.

Under the Establishment Clause, governments may not control prayer, not even surreptitiously by controlling who gives a customary blessing over government meetings. *Town of Greece*, 572 U.S. at 586. To do so runs afoul of the Establishment Clause rule against excessive government entanglement with religion. *Id.*; *accord. Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 674 (1970). To that

end, when governments begin their public meetings with a prayer ceremony, the opportunity to give the prayer must be made available equally to all interested participants. *Town of Greece*, 572 U.S. at 585–86. This is in keeping with the Establishment Clause requirement that politicians and voters "accord to their own religions the very same treatment given to small, new, or unpopular religions." *Larson v. Valente*, 456 U.S. 228, 245 (1982). This is not optional, the very bedrock of our society "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984).

The insurmountable Establishment Clause problem is that Boston controls the prayer. The prayer opportunity is predicated on an invitation by a Councilor, who holds unfettered discretion as to receives invite. (Appx. 656, at ¶¶ 11-13). Boston does not accept requests for an invitation. Id., at ¶ 14. Boston admitted at the hearing that these are whim-based invitations. (Appx. 972). This invitation-only scheme is anathema to the prohibition against government control over prayer. Obviously, an invitation to an imam will not

result in a benediction to Vishnu. For the same reason, invitations extended to rabbis and priests/pastors never result in venerating the "Luciferian impulse to eat of the tree of knowledge." (Appx. 880).

This point is case dispositive, and it requires entry of judgment for the Temple. *See Lund v. Rowan Cnty., N. Carolina*, 863 F.3d 268, 275 (4th Cir. 2017). There, the Fourth Circuit noted the unconstitutionality of a prayer scheme in which the government's commissioners "maintained exclusive and complete control over the content of the prayers." *Id.*, at 281. The same is true here. By exercising exclusive control over who gives the prayer, Boston controls the content of the prayer. *See Gundy v. City of Jacksonville Fla.*, 50 F.4th 60, 79 (11th Cir. 2022) (control over the speaker "inherently exhibits governmental control over the invocation messages.")

To effectuate its control over prayer, Boston reviews prayers beforehand. (Appx. 800, 804). Despite this clear evidence of pre-prayer review, the District Court held that there was "no evidence" the councilors reviewed the prayers beforehand. (Ad. 43). This was error for three reasons.

*First*, the Temple produced written evidence that prayers were submitted in advance of the meetings. (Appx. 800, 804). The District Court simply ignored inconvenient evidence.

*Second*, if the District Court was unpersuaded by the evidence, the standard requires affirmative proof that the movant produce proof that Boston did *not* review prayers. *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 930 (1st Cir. 1983) (reversing summary judgment where movant "never carried its initial burden as the moving party of proving that no genuine issue of material fact existed.") Boston offered no affidavits, no testimony, and no other materials to substantiate that claim. That proposition was not even an asserted point of material fact on which there could be no genuine dispute. See (Appx. 654).

*Third*, the cited evidence doesn't support the claim. (Ad. 43). That Rousseau *usually* writes her own invocations does not negate the possibility that the invocations must meet the approval of her patron. The word "usually" does not negate the possibility that her patron *sometimes* had a hand in writing the invocations.

In summary, Boston's custom wholly fails to conform to the Establishment Clause standard of being an "honest endeavor to achieve inclusivity and nondiscrimination." *Am. Legion*, 139 S.Ct. at 2089. There are no neutrality-enforcing safeguards and there is no effort to achieve inclusivity; Boston does not accept requests for an invitation. *Contra. Rubin v. City of Lancaster*, 710 F.3d 1087, 1097 (9th Cir. 2013) (prayer custom saved by "a litany of neutrality-enforcing safeguards," "proactive measures to deliver on its promise of inclusivity, and a disclaimer which stressed "nonsectarian aims"). Rather than pretend there is no religious gerrymander at play, Boston's officials decried the Temple's demand for equal inclusion as "absurd" (Appx. 762). To these officials, the constitutional right to nondiscrimination only has teeth if it is backed by sufficient voters. This view defies our society's most basic principle that fundamental rights are purposefully *not* subject to majoritarian rule. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("no official, high or petty, can prescribe what shall be orthodox in … religion"); *Lund v. Rowan Cnty., N. Carolina*, 863 F.3d 268, 282

(4th Cir. 2017) ("political division along religious lines … is a threat to the normal political process"); *Town of Greece*, 572 U.S. at 566 ("the First Amendment is not a majority rule"); *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2427 (2022) ("the Establishment Clause does not include anything like a 'modified heckler's veto'"); U.S. Const. art. IV, cl. III (prohibiting religious tests).

The undisputed body of evidence clearly showed that Boston's officials regularly make an intentional choice about which religious tradition may bless a government meeting. This picking and choosing among religious beliefs stands in direct conflict with the Establishment Clause. *See Gillette v. United States*, 401 U.S. 437, 451 (1971); *Williamson v. Brevard Cnty.*, 928 F.3d 1296, 1315–16 (11th Cir. 2019) (prayer selection scheme unconstitutional because of "the Board's practices of picking and choosing which religions to invite and which to reject."). The fact alone that Boston selects prayers by unconstrained whim required a judgment for the Temple. The District Court erred by denying the Temple's motion.

*1.12: The prayer opportunity is exploited to proselytize.*

Further, the District Court should have granted the Temple's motion because the prayer opportunity is exploited to proselytize. *See Marsh v. Chambers*, 463 U.S. 783, 794–95 (1983) (the Establishment Clause does not allow the prayer opportunity to "proselytize or advance any one, or to disparage any other, faith or belief").

To ascertain whether a prayer custom is being exploited to proselytize, courts inquire into who the audience is. *Town of Greece*, 572 U.S. at 587 (plurality op.) (constitutional prayer schemes are directed at the lawmakers, not the public). In *Lund*, the Fourth Circuit focused on the fact that, on at least three instances from 2007 to 2013, the audience was invited to pray. *Lund*, 863 F.3d at 286-87. For the *Lund* Court, it was "perhaps even dispositive" that the audience was directed to participate. *Lund*, 863 F.3d at 287.

As the District Court acknowledged, Boston sometimes directs the audience to participate in the prayer. (Ad. 45); see also (Appx. 805) ("I would like all councilors, all guests, colleagues to please rise

as Councilman O'Malley comes forward to give us an inmoe – invocation.") Counselor Essaibi-George testified that "there's an expectation that people generally stand during the prayer." (Appx. 885), lines 116:4-5. Had the District Court correctly applied the standard, it would have found that this expectation is rooted in a communication from the Council President: "At this time I would like the guests [to] please rise as Councilor Essaibi-Geroge comes up to introduce our clergy for the day … and remain standing as Councilor Essaibi-George leads us in the Pledge of Allegiance." (Ad. 45, at n. 9). It was a material departure from neutrality when the government officer which oversees a meeting commands the audience to participate in a religious ceremony. To overcome this testimony, the District Court minced the phrasing "whoever's leading the body[] sometimes phrases it in different ways" and "Sometimes … whoever's in the chamber is not necessarily asked, [they] stand on their own" to mean that there is not a *consistent* request from lawgivers to stand for the invocation. (Ad. 45, at n. 9). Yet Boston's statement of undisputed material facts does not support the

proposition that the audience is not directed to stand. (Appx. 654). Here again, the District Court erred by taking all ambiguities of record in the light most favorable to the movant.

Similarly, the District Court found it important that the audience was directed to stand for both the invocation and the pledge of allegiance. (Ad. 45, at n. 9). But consolidating the prayer with a public display of patriotism is the Establishment Clause problem. It is a communication from the government to the audience that prayer and patriotism go hand in hand. This is the exact opposite of what the Constitution requires. *Everson*, 330 U.S. at 15 (that notion violates the bar against laws which "aid all religions").

The District Court also openly acknowledged that the prayer opportunity sometimes takes the form of "a sermon." (Ad. 23). When the government engages in outright preaching under color of law, the Establishment Clause is violated. *Lund*, 863 F.3d 281 (prayer practice unconstitutional because the Board was "elbow-deep in the activities banned by the Establishment Clause—selecting and prescribing sectarian prayers"). The District Court did not, however,

openly acknowledge the content of those sermons. Curiously absent from the District Court's opinion was any discussion about the September 2016 prayer, in which the government-approved speaker sought of the God of Abraham to "order their [the councilors'] steps" and to direct them "how to pray."[5] Because these sermons are directed at the audience, Boston's prayer custom is proselytizing in nature.

*1.13: Intentional discrimination does not require proof of motive.*

Underpinning the District Court's opinion is an expectation that, absent a sworn confession of religious animus, there is no such thing as religious discrimination. (Ad. 35) (judgment for Boston because there was no evidence that "the decision not to extend an invitation to TST was motivated by animus or bias.") This is error because there is a difference between "intent" and "motive." *Hassan v. City of New York*, 804 F.3d 277, 297-298 (3d Cir. 2015). The "intent"

---

[5] https://www.youtube.com/watch?v=T1rDy1ioPnE at 7:00 – 7:30 (cited at Appx. 846-847).

inquiry asks whether one religious group was treated differently "intentionally or accidentally." *Id.* The "motive" inquiry, on the other hand, asks "why?" *Id.*

The law does not ask whether the discriminatory policy is further the product of malice. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) ("The Clause "forbids subtle departures from neutrality") and *id.*, at 540 (the evidentiary focus is on "objective factors" to show "because of" not "in spite of"). This is because the law cares about actions, not the inner life of man. *Barnette*, 319 U.S. at 655 (Frankfurter, J., dissenting) ("Law is concerned with external behavior and not with the inner life of man."). The inquiry ends upon purposeful exclusion. *Town of Greece*, 572 U.S. at 571 ("The town at no point excluded or denied an opportunity to a would-be prayer giver"); *Am. Legion,* 139 S.Ct. at 2089 ("honest endeavor to achieve inclusivity and nondiscrimination").

The question before the District Court was *whether* religions are all being treated the same. *Why* Boston excludes particular religions is irrelevant to the Establishment Clause question. Here, the record

very clearly showed that councilors were confronted with the question of whether to invite a representative of the Temple and unanimously chose not to extend an invitation. For three years, prior to litigation, the Temple asked for equal inclusion. At 35 meetings per year, this is over 100 opportunities to invite the Temple. Meanwhile, preferred ministers received repeated invites. The decision to not invite the Temple was considered, purposeful, and intentional, it was not an accident.

### 1.2: Boston's custom discriminates against dissenting religions.

Alternatively, the Court may elect to take a narrower path to reversal. For the reasons below, the District Court should have found that the Temple at least presented sufficient evidence that a trial was warranted. If the Court agrees, it should reverse and remand for trial proceedings.

### 1.21: Two counselors publicly stated they will never invite the Temple.

A trial is warranted because of contemporaneous statements from decisionmakers that the Temple is not receiving an invite

because of disagreement with the viewpoint. *Lukumi Babalu Aye*, 508 U.S. at 540; see also *Burns v. Johnson*, 829 F.3d 1, 9 (1st Cir. 2016) ("A plaintiff is entitled to prove discrimination by circumstantial evidence alone.")

Two councilors made public statements which articulate that the Temple will never have an opportunity to bless the ceremony so long as they are in control of the prayer opportunity. (Appx. 762-763) and (Appx. 890), lines 164:3-6 (agreeing that "if you were a councilor as you sit here today, you still would not invite TST"); *accord. Brevard Cnty.*, 928 F.3d at 1315 (it was unconstitutional to "categorically exclude certain faiths" by working from a list of volunteers that excluded whole classes of congregations.") By identifying and targeting a particular group for exclusion from the prayer ceremony, Councilors Essaibi-George and McCarthy revealed that Boston's prayer custom contemplates and allows religious discrimination.

Councilor Essaibi-George specifically testified that the decision over who to invite was a question of politics. The record shows that

the Temple is an unpopular religion, with substantial public commentary being sent to the publicly elected officials urging them to exclude the Temple from equal access. Without citation to authority, the District Court stated that it is "not willing" to consider these public statements in the discrimination analysis. (Ad. 36). The District Court was wrong to ignore this evidence. In ascertaining religious discrimination, courts regularly consider not only the conduct of government officials, but also conduct of the public. *E.g.*, *Lukumi Babalu Aye*, 508 U.S. at 541 (noting "significant hostility exhibited by residents"); *Lund*, 863 F.3d at 282 (noting that a dissenter was "booed and jeered by the audience").

*1.22: Wu changed the pray-for-pay policy to prevent equal access.*

It is no accident that the Temple cannot obtain an invite. When the Temple first asked for equal inclusion, then-Councilor Wu reviewed the prayer scheme for "best practices." Upon ascertaining that Boston's then-prevalent custom of paying its invited ministers might result in a judgment for the Temple, Wu changed the policy.

Here again, we see that Boston's officials contemplated the possibility of equal inclusion for the Temple and took considered actions to avoid that outcome.

When governments change the rules to prevent equal access, intentional discrimination is found. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). The District Court resisted argument upon a finding that there was no departure from the normal procedural sequence. (Ad. 36-37). But changing the normal procedural sequence *is* a departure from the norm. The testimony plainly states that this rule-change was done for the improper purpose of avoiding an order directing the Temple's inclusion in the prayer ceremony.

*1.23: Boston itself does not want equal access for the Temple.*

Nor is Boston's ongoing decision to preclude the Temple the product of a few wayward officials. Boston's own attorney explicitly stated that it does not want to include the Temple in the prayer ceremony. (Appx. 927), lines 16-20. The official statement of policy as

to who may give the prayer specifically excludes a particular religion. That is not an accident, it is intentional discrimination.

## 2: A requirement of palatability burdens unpopular beliefs.

The District Court also reversibly erred by granting Boston summary judgment on the Massachusetts free exercise claim. (Ad. 48-49). Under the Massachusetts constitution, free exercise principles do not rely upon another constitutional right before strict scrutiny attaches. *See Att'y Gen. v. Desilets*, 418 Mass. 316, 323, 636 N.E.2d 233, 237 (1994) (rejecting, on state-law grounds, *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872 (1990)). Instead, the test requires the plaintiff make an initial showing that it has "(1) a sincerely held religious belief, which (2) conflicts with, and is thus burdened by, the State requirement." *Krupien v. Ritcey*, 112 N.E.3d 302, 307 n. 9 (2018). After which showing, the defendant must show both "(3) the requirement pursues an unusually important governmental goal, and that (4) an exemption would substantially hinder the fulfillment of the goal." *Id.* This is strict scrutiny. *Id.*, 112 N.E.3d

at 308 n. 10.

Massachusetts has already resolved that the initial threshold is shown when religious beliefs conflict with State requirements for a government benefit. *Magazu v. Dep't of Child. & Fams.*, 473 Mass. 430 (2016). There, applicants to be foster parents had a religiously rooted desire to use corporal punishment to discipline foster children. That desire was in conflict with and therefore burdened by a State prohibition against the use of corporal punishment in foster homes. The plaintiffs made the initial showing, and the case turned on the State's reason for the requirements. 473 Mass. at 444–46.

At issue is an intangible government benefit which is conditioned upon religion. At the summary judgment hearing, Boston accurately used the word "reward" three times to describe the invitation. (Appx. 962, 984). The benefits of participating in this prayer ceremony are many: it is universally deemed an "honor" to participate (Appx. 808), participation includes pre-meeting "coffee and schmoozing" (Appx. 777), and the particular religion is given a government platform to share its message. (Ad. 37). Had any of

Boston's councilors found the Temple's religion to be tolerable, that benefit would have been given over. But because the Temple is a politically disfavored religion, the Temple is unable to access these benefits. Thus, to access this benefit, the Temple would have to change its beliefs and practices to suit the majority's sensitivities.

The District Court did not address *Magazu*. Instead, it held that there was no free exercise violation because there was no showing that the Temple's "right to maintain its religion has not been hampered." (Ad. 49). This is circular reasoning and says nothing of the burden imposed by the Councilors' political machinations for the Temple to conform to majoritarian religious preferences. See (Appx. 892), lines 170:8-14 ("Politics is very much a part of every decision I made as a city councilor" Q: "Including in who to invite. Correct?" A: "Of course."). For so long as Boston's prayer selection scheme is predicated on politics, there is a forced choice to either conform to the majority or forfeit the potential for a "reward." (Appx. 984).

Nor are the District Court's cited cases of any relevance. The

District Court cited *Curtis v. Sch. Comm. of Falmouth*, 420 Mass. 749 (1995). There, parents had a free exercise objection to the availability of condoms in school. Their argument amounted to an assertion that the Government should conduct its own internal affairs in ways that comport with their religious beliefs. *Id.*, at 762. Unlike there, Boston *does* impose a penalty for the Temple's religious beliefs by conditioning receipts of the benefits of public recognition on conformity to majoritarian religious preferences. In Boston, that would mean conformity to Catholicism (EF 113, at 42), which is directly contrary to the beliefs and practices of The *Satanic* Temple.

The District Court's second cited case has even less relevance. *Fedele v. Sch. Comm. of Westwood*, 412 Mass. 110 (1992). There, a high school girl sought to impose a "free exercise" demand upon the State to transport her to a private all-male high school. While she had a free exercise right to choose her religion, "she does not possess a right to compel the school committee to subsidize her choice." *Id.* It is unclear why the District Court cited this case. The Temple does not ask for a subsidy, it asks for a strict scrutiny

justification as to why Boston conditions the benefit of public recognition on minimal tolerance of a particular religion. There is no strict scrutiny justification here, the only explanation given to date is that this is "the way we've always done" it. (Appx. 676); but see *Town of Greece*, 572 U.S. at 576 ("*Marsh* must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation.")

The District Court erred when it failed to find that conditioning a reward on political palatability burdens the viewpoint of religious dissidents. The Court should remand for judgment in favor of the Temple unless Boston can survive strict scrutiny.

### 3: Wu was subject to a deposition.

Last, the Court should reverse the order for summary judgment because the Temple was precluded from essential testimony from a declared witness: Michelle Wu. As grounds to prohibit the Wu deposition, the District Court claimed that Wu was a "high-ranking government official" because she was a "rising political leader" on

account of her election from Councilor to Mayor. (Ad. 11). Subse-

quently, the District Court relied on a hearsay statement from Wu

in resolving to grant Boston's motion for summary judgment. (Ad.

34) (citing Appx. 724). Because the Temple was prevented from de-

posing this necessary witness, the summary judgment order was re-

versible error.

### Standard of review

At issue is a protective order preventing a deposition, which is

reviewed for an abuse of discretion. *Ayala-Gerena v. Bristol Myers-*

*Squibb Co.*, 95 F.3d 86, 91 (1ˢᵗ Cir. 1996). This Court will intervene

in discovery matters "only upon a clear showing of manifest injus-

tice, that is, where the lower court's discovery order was plainly

wrong and resulted in substantial prejudice to the aggrieved party."

*Id.* The same standard applies to a district court's denial of a Rule

56(f) motion. *Id.*

### 3.1: Boston stipulated Wu would testify and declared Wu a witness.

The orders prohibiting Wu's deposition were all an abuse of

discretion, chiefly, because they disregarded the parties' written stip-
ulation that all councilors – Wu included – would testify and that
Wu was a declared defense witness.

### 3.11: Boston stipulated all Councilors, including Wu, would testify.

Our legal system encourages stipulations because, otherwise,
courts would be "inundated with discovery motions." *Milazzo v. KG
Enterprises, Inc.*, No. CIV. 97-649-SD, 1999 WL 1327394, at *2
(D.N.H. Feb. 16, 1999). As recognized there, courts cannot expect
counsel to make and rely upon stipulations if they are "unwilling to
generally enforce discovery stipulations." *Id.* Boston stipulated that
all of the councilors would be deposed in the Rule 16.1 report.
(Appx. 45-46)("There are 13 Councilors, each of which has discov-
erable knowledge for their reasons not to invite a representative
from Plaintiff.")

But Boston reneged on this stipulation when it came time for Wu
to be deposed. In a footnote, Boston stated that it would not produce
Wu absent a court order. (Appx. 55). The District Court should

have summarily rejected the motion because Boston had already stipulated that Wu would be deposed. Instead, it refused to enforce a written and filed discovery stipulation.

*3.12: Wu was a declared witness for the defense.*

Not only was Wu's deposition the subject of a stipulation, Boston designated Wu as an individual likely to have discoverable information and which Boston may use to support its defenses. FRCP 26(a)(1)(A)(i); (Appx. 869) ("Councilor Wu is expected to have discoverable information regarding the City's invocation speaker selection practices and Plaintiff's 2018 requests to deliver an invocation.")

The right to depose a declared witness predates our modern rules of civil procedure. *Wright & Miller*, 8A Fed. Prac. & Proc. Civ. § 2102 (3d ed.) ("The federal rules treat discovery before trial in exactly the same way as taking testimony at the trial, and any person may be called for a discovery examination who could be called as a witness at the trial itself") (quoting Sunderland, *Discovery before Trial*

*under the New Federal Rules*, 15 Tenn.L.Rev. 737 (1939)). Our modern rules do not disturb that right. FRCP 30(a)(1). The orders precluding Wu's deposition were a manifest abuse of discretion because Boston declared Wu a trial witness.

### 3.2: Wu was not a "high ranking government official."

Rather than enforce a written and filed stipulation or consider that Wu was a declared witness, however, the District Court barred Wu's deposition upon a finding that she is a "rising political leader." (Ad. 11). There are four problems with precluding the Temple from this evidence.

### 3.21: The District Court never analyzed whether Wu meets the test.

*First*, it is irrelevant whether Wu was a "rising political leader" because the requisite finding was that Wu is a "high-ranking government official." This was the sole ground for Boston's motion (Appx. 49), yet the order specifically evaded making this finding. (Ad. 13) ("The Court finds no need to delve into the issue of whether Wu is or was a 'high ranking government official.'")

Wu's purported "high-ranking government official" status only arose later, in a directive that the Temple file a motion to reconsider which establishes Wu's "*unique* relevance to this case." (Ad. 17) (emphasis in original). In accordance with this order, the Temple comprehensively demonstrated why Wu was of unique relevance. Appx. 83. In the order denying that motion to reconsider, however, the District Court circularly held that Wu is a high-ranking government official. (Ad. 19).

At no point below did the District Court provide analysis as to why Wu, a Councilor at the relevant time, was protected by the "high-ranking government official" doctrine. The finding that Wu is a rising political leader is no adequate substitute, for the rule of law demands that even rising political leaders must sit for a deposition. *Jones v. Clinton*, 72 F.3d 1354, 1358 (8th Cir. 1996) ("the President, *like all other government officials*, is subject to the same laws that apply to all other members of our society") (emphasis added), aff'd, 520 U.S. 681 (1997); cited below at Appx. 66; *see also United States v. Trump*, No. 23-3190, 2023 WL 8517991, at *29 (D.C. Cir. Dec. 8,

2023) (Former President must stand trial under the same procedures that govern all other criminal defendants: "That is what the rule of law means.")

*3.22: Boston offered no evidentiary support for the proposition.*

*Second*, the District Court was forced to circularly assume that Wu was a "high-ranking government official" because Boston did not give any evidentiary support to found a proper analysis. (Appx. 64-65). Boston had the burden of proof to substantiate the claim that Wu was a "high-ranking government official." *S.L. ex rel. Lenderman v. St. Louis Metro. Police Dep't Bd. Of Commissioners*, No. 4:10-CV-2163 CEJ, 2011 WL 1899211, at *3 (E.D. Mo. May 19, 2011) (FEMA failed to establish an employee as a high-ranking official and thus did not establish good cause for issuance of a protective order); *see also Anderson v. Cryovac, Inc.*, 805 F.2d 1, 8 (1st Cir. 1986). Because Boston failed to adduce any evidence as to the nature of Wu's job function or the time requirements of that job function, the District Court should have rejected the proffered conclusion

summarily.

*3.23: The doctrine protects top-level executives; Wu was a legislator.*

*Third*, the District Court could not provide an analysis because Wu did not meet the standard. The doctrine at issue generally prohibits "top executive department officials" from being called to testify to their "reasons for taking official action." *Bogan v. City of Bos.*, 489 F.3d 417, 423 (1ˢᵗ Cir. 2007).

As a councilor, Wu was not a top-level executive because her role was legislative in nature. See Acts of 1951, c. 376, s. 1.11 ("There shall be … a city council of nine members which shall be the *legislative* body of the city") (emphasis added). Because Wu was not being called to testify about any executive actions, top-level or otherwise, the doctrine did not apply. It was a manifest abuse of discretion for the District Court to find otherwise.

*3.24: The doctrine is not retroactive; Wu's election is irrelevant.*

*Fourth*, Wu's "rising political leader" status notwithstanding, the doctrine is not retroactive. Not even the sitting President of the

United States enjoys immunity from generally applicable laws about his pre-election conduct. *Jones v. Clinton*, 72 F.3d 1354, 1358 (8th Cir. 1996), aff'd, 520 U.S. 681 (1997). If the law applies equally to even those who enjoy President-elect status, then it must also apply equally to all notwithstanding mayor-elect status.

### 3.3: Wu had unique personal knowledge.

Even if the District Court was correct to conclude that Wu is a "high-ranking government official," lack of evidence and lack of legal analysis notwithstanding, that does not end the inquiry. For even a "high-ranking government official" must testify where the official has first-hand knowledge related to the claim being litigated and no other persons can provide the necessary information. *Bogan*, 489 F.3d at 423. For three reasons, the Temple showed that Wu had unique personal knowledge about the facts at issue in this litigation.

### 3.31: At issue was a religious discrimination claim.

First, at issue is a religious discrimination claim. The District Court granted Boston summary judgment because the Temple

could not show "animus" or "bias" was the underlying motivation for the decision to not extend an invitation. Glossing over the legal error in requiring proof of malice as opposed to intentional discrimination (§ 1.13), the fact remains that it was impossible for the Temple to show Wu's subjective intent without deposing Wu. Only Wu can speak to her subjective intent, anyone else can only testify to hearsay and speculation.

*3.32: Wu led Boston's efforts to prevent the Temple from equal access.*

Additionally, Wu led Boston's efforts to prevent the Temple from equal access. As shown on Boston's privilege log, Wu was the only councilor who consulted with the lawyers about constitutional "best practices" in a legislative prayer custom. (Appx. 79-80) Clearly, Wu took the lead on modifying the custom to allow in other religions while excluding the Temple.

*3.4: The District Court should have taken an adverse inference.*

If the District Court was not inclined to allow a deposition of Wu, its only other choice was to take an adverse inference. *Adelson*

*v. Hananel*, 641 F. Supp. 2d 65, 77 (D. Mass. 2009) ("A party is entitled to an adverse inference because of a missing witness only if that witness is under the 'exclusive control' or is 'peculiarly available' only to the opposing party.") Instead, the District Court relied on a hearsay statement from Wu to support the summary judgment. (Ad. 34) (citing Appx. 724). The District Court erred by ignoring the "black-letter law that hearsay evidence cannot be considered on summary judgment." *Davila v. Corporacion De Puerto Rico Para La Difusion Publica*, 498 F.3d 9, 17 (1st Cir. 2007).

## CONCLUSION / PRAYER FOR RELIEF

**WHEREFORE** the Court should reverse and remand with instructions to enter judgment in favor of the Temple; or, at least, hold a trial on the merits. Any remand for trial should further direct entry of an adverse inference or an order for a deposition of Michelle Wu.

Respectfully submitted on January 3, 2024,

By:   */s/ Matt Kezhaya*
Matt Kezhaya (# 1208974)
KEZHAYA LAW PLC
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone:   (479) 431-6112
email:   matt@kezhaya.law

## CERTIFICATE OF SERVICE

NOTICE IS GIVEN that I, Matt Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on January 3, 2024, which sends service to registered users, including all other counsel of record in this cause. Paper copies to follow based on the Clerk's instructions. *s/ Matt Kezhaya*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of FRAP 32 (an opening brief may not exceed 13,000 words) because, excluding the parts of the document exempted by FRAP 32(f), this document contains **7,697** words.

This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because this document has been prepared in a proportionally spaced typeface using MS Office 365 in 14pt "Calisto MT" font. Headers are in 15pt "Calisto MT" font.

The electronic version of the brief has been scanned for viruses and is virus-free. *s/ Matt Kezhaya*

# Addendum contents

| Dkt. | Title | Page |
|------|-------|------|
| 47 | Memorandum and Order on Defendant City of Boston's Emergency Motion for Protective Order and Motion to Quash Regarding the Deposition of City Councilor at Large Michelle Wu | 2 |
| 63 | Order on Motion to Quash Wu Deposition | 17 |
| 78 | Order on Motion to Reconsider Wu Orders | 19 |
| 119 | Memorandum and Order on Cross-Motions for Summary Judgment | 20 |
| 120 | Judgment | 51 |

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

THE SATANIC TEMPLE, INC.,    )
       )     Case No. 21-CV-10102-AK
    Plaintiff,    )
       )
    v.    )
       )
CITY OF BOSTON, MA,    )
       )
    Defendant.    )
       )

## MEMORANDUM AND ORDER ON DEFENDANT CITY OF BOSTON'S EMERGENCY MOTION FOR PROTECTIVE ORDER AND MOTION TO QUASH REGARDING THE DEPOSITION OF CITY COUNCILOR AT LARGE MICHELLE WU

**A. KELLEY, D.J.**

Currently pending before the Court is Defendant City of Boston's ("Defendant" or "the City") Emergency Motion for Protective Order and Motion to Quash Regarding the Deposition of City Councilor At Large Michelle Wu. [Dkt. 33 ("Def.'s Mot.")]. For the reasons set forth below, Defendant's motion is <u>GRANTED</u>. Additionally, Defendant's request for costs and attorneys' fees is <u>GRANTED</u>, with the amount to be determined pending further motion by Defendant and subsequent litigation.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The City's motion [Def.'s Mot.] arises out of a subpoena that Plaintiff The Satanic Temple ("Plaintiff" or "TST") served on then-City Councilor At Large Michelle Wu, in connection with litigation wherein Plaintiff has challenged the constitutionality of the Boston City Council's invocation selection policy. TST filed this action on January 20, 2021 [Dkt. 1],

1

**Ad. 2**

challenging the constitutionality of Defendant's legislative prayer selection process under both the First and Fourteenth Amendments to the United States Constitution, as well as the Free Exercise Clause of the Massachusetts Constitution. [Dkt. 2 ("Compl.") at ¶¶ 74–109; Dkt. 16 ("Am. Compl.") at ¶¶ 74–117].

The Boston City Council has a "longstanding tradition" of beginning its legislative sessions with invocations or prayers [Dkt. 34 ("Def.'s Mem. Supp. Mot.") at 1], with each City Councilor selecting a guest invocation speaker on a rotating basis for each session [id.; Am. Compl. at ¶¶ 2, 8]. Per the Amended Complaint, TST is a religious organization headquartered in Salem, MA and with a Boston area membership of 2,449 [id. at ¶¶ 20–21]. TST initiated this litigation to challenge the City Council's tradition and its repeated denials of TST's requests to deliver the invocation in 2016–2018 [id. at ¶¶ 12, 23; Dkt. 16-1]. TST has alleged that these denials and the City's legislative prayer practice violate the Establishment Clause of the First Amendment (Count 1), the Free Speech Clause and Free Exercise Clause of the First Amendment (Count 2), the Equal Protection Clause of the Fourteenth Amendment (Count 3), and the Free Exercise Clause of the Massachusetts Constitution (Count 4), essentially by failing to provide equal or proportional opportunities for participation by all religious groups. [Am. Compl. at ¶¶ 105–11]. Following the City's filing of a Motion to Dismiss the Amended Complaint [Dkt. 17], the Court dismissed Counts 2 and 3 on July 21, 2021 [Dkt. 21], leaving Counts 1 and 4 active claims in this litigation.[1]

On August 26, 2021, the parties submitted a joint proposed pretrial schedule containing, in relevant part, a September 9, 2021 deadline for initial disclosures and a November 19, 2021 deadline for any amendments to pleadings, with a deadline the following year for the completion

---

[1] Specifically, the Court dismissed TST's Free Speech and Free Exercise claim (Count 2) for lack of standing [Dkt. 21 at 8], and dismissed TST's Equal Protection Clause claim (Count 3) for failure to state a claim [id. at 15].

of all discovery by October 26, 2022. [Dkt. 25]. On August 30, 2021, the Court entered an order

adopting these discovery deadlines. [Dkt. 26].

     Withing two months of the Court's scheduling order, on October 27, 2021 the City filed

its Emergency Motion for Protective Order and Motion to Quash Regarding the Deposition of

City Councilor At Large Michelle Wu. [Def.'s Mot.]. On October 22, 2021, Plaintiff had served

a deposition subpoena on Councilor Wu (hereinafter "Mayor Wu" in light of her current position

and title)[2] for her appearance on November 2, 2021 at 9:00 am, at The Satanic Temple's

headquarters in Salem, MA. [Dkt. 34-1 ("Def.'s Mem. Supp. Mot. Ex. 1")]. November 2, 2021

was the date of Boston's local elections, in which Mayor Wu was a mayoral candidate on the

ballot. [Def.'s Mem. Supp. Mot. at 3]. The City states that upon receiving the deposition notice,

it informed Plaintiff that Mayor Wu would be unavailable that day, and asserts that Plaintiff's

counsel stated he was unwilling to reschedule the noticed deposition date. [Id.]

     On October 27, 2021, the parties conferred pursuant to Local Rule 7.1, though their

accounts of this conference differ. [Def.'s Mem. Supp. Mot. at 3; Dkt. 35]. In his October 28,

2021 filing requesting a briefing schedule on the City's emergency motion, Plaintiff's counsel

stated the City "proposed to alleviate the emergency by rescheduling the deposition sufficiently

into the future to allow briefing this issue in the ordinary course of time." [Dkt. 35]. He then

claims the City "reneged" on that agreement when it refused to provide actual dates for Mayor

Wu's deposition. [Id.] However, in the email exchange Plaintiff's counsel attached to his filing,

counsel for the City stated the City "*maintains* that it will not produce Ms. Wu to testify without

a court order in this matter" [Dkt. 35-2] (emphasis added), and in its memorandum supporting its

emergency motion, the City states that at the October 27, 2021 conference, it "again informed

---

[2] Ms. Wu was elected and sworn in as Mayor of Boston between the time of Plaintiff's filing of opposition to the
City's motion, and the City's filing of their reply. [Dkt. 43 at 1].

**Ad. 4**

Plaintiff of Councilor Wu's unavailability and [the City's] position with respect to the deposition of Councilor Wu" [Def.'s Mem. Supp. Mot. at 3].

Following Plaintiff's request for a briefing schedule and in light of the imminence and significance of the noticed deposition date, on October 28, 2021, the Court ordered Plaintiff to file a statement limited to the issue of "why the deposition of Councilor Michelle Wu was scheduled for November 2, 2021," and set a standard briefing schedule for the remaining, non-emergency issues raised in the City's motion—specifically the motion for a protective order. [Dkt. 36]. On October 29, 2021, Plaintiff's counsel filed two letters with the Court: one objecting to the Court's order [Dkt. 37], and another submitted in compliance with the order and providing an explanation for noticing Mayor Wu's deposition for Election Day [Dkt. 38].

Based on Plaintiff's failure to provide any compelling justification for noticing Mayor Wu's deposition for Election Day (not to mention his admitted intent to invite maximum inconvenience, political attention, and media scrutiny of TST's litigation through the deposition notice) [Dkt. 38], along with the obvious hardship posed to Mayor Wu, on October 29, 2021 the Court issued an order granting in part the City's motion, "solely with regard to prohibiting Plaintiff's deposition of Councilor Michelle Wu on November 2, 2021 as noticed," and reserving judgment on the motion as a whole pending further briefing [Dkt. 40]. This Memorandum and Order addresses the Motion for a Protective Order.

In accordance with the Court's ordered briefing schedule, Plaintiff filed opposition to the City's motion on November 12, 2021 [Dkt. 42 ("Pl.'s Opp'n")], and the City filed its reply on November 26, 2021 [Dkt. 43 ("Def.'s Reply")]. Plaintiff then filed a sur-reply that same day [Dkt. 44], which the Court struck from the record [Dkt. 45], due to Plaintiff's failure to seek

leave to file additional papers beyond those set by the Court's briefing schedule and by the Local Rules.

## II.   LEGAL STANDARD

Fed. R. Civ. P. 26(b)(1) permits parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case…." Fed. R. Civ. P. 26(b)(1). See also KinectUs LLC v. Bumble Trading LLC, No. 21-MC-91665-ADB, 2021 WL 6066539, at * 2 (D. Mass. Dec. 22, 2021). Moreover, "[a]s the Supreme Court has instructed, because 'discovery itself is designed to help define and clarify the issues,' the limits set forth in Rule 26 must be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case.'" In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig., No. MDL 13-2419-FDS, 2013 WL 6058483, at *3 (D. Mass. Nov. 13, 2013) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)); see also Green v. Cosby, 152 F. Supp. 3d 31, 34 (D. Mass. 2015), modified on reconsideration, 160 F. Supp. 3d 431 (D. Mass. 2016); Cabi v. Boston Children's Hosp., No. 15-CV-12306-DJC, 2017 WL 8232179, at *1 (D. Mass. June 21, 2017).

Accordingly, litigants may serve subpoenas on third parties as per Fed. R. Civ. P. 45, but the subpoena "must fall within the scope of proper discovery under Fed. R. Civ. P. 26(b)(1)." Cates v. Zeltiq Asethetics, Inc., No. 20-MC-91234, 2020 WL 5517457, at *2 (D. Mass. Sept. 14, 2020) (quoting Green, 152 F. Supp. 3d at 34).

Notwithstanding the general latitude afforded parties seeking relevant information during discovery, the Court is required by Fed. R. Civ. P. 26(b)(2)(C) to "limit the frequency or extent of discovery otherwise allowed by the [Rules of Civil Procedure] or by local rule if it determines

that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Cabi, 2017 WL 8232179, at *2 (quoting Fed. R. Civ. P. 26(b)(2)(C)).

In order to minimize excessive expense, delay, and potential abuse of process, the Federal Rules of Civil Procedure therefore grant the courts the authority to, "for good cause, issue a [protective] order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including ... forbidding the disclosure [or] discovery." Cabi, 2017 WL 8232179, at *2 (quoting Fed. R. Civ. P. 26(c)(1)(A)).

Relatedly, under Rule 45, the Court "'must quash or modify a subpoena that: ... subjects a person to undue burden' on timely motion from a party or non-party." KinectUs, 2021 WL 6066539, at *2 (quoting Fed. R. Civ. P. 45(d)(3)(A)(iv)). When ruling on such a motion, the Court must "weigh the need of the party seeking discovery against any undue hardships created by permitting it," and consider the potential discovery's "relevance, the requesting party's need, the breadth of the request, and the burden imposed." Id. (quoting Green, 152 F. Supp. 3d at 36). "A finding of good cause must be based on a particular factual demonstration of potential harm, not on conclusory statements." Peoples v. Time Warner Cable, Inc., No. 3:16-CV-11398-MGM, 2017 WL 2836991, at *2 (D. Mass. June 30, 2017) (quoting Anderson v. Cryovac, Inc., 805 F.2d 1, 7 (1st Cir. 1986)).

**Ad. 7**

### III.    DISCUSSION

As per the Court's October 29, 2021 order [Dkt. 40] allowing the City's motion to quash the deposition subpoena solely with regard to the November 2, 2021 deposition date, the Court has already found that under the standards set by Federal Rules of Civil Procedure 26(c) and 45(d), Plaintiff's deliberate scheduling of Mayor Wu's deposition for Election Day for the Mayoral race created an impermissible undue burden.

The City asserts there are readily available alternative sources of the "discoverable information" Mayor Wu might possess (namely, the 47 total individuals named in Defendant's initial disclosures) [Def.'s Mem. Supp. Mot. at 2–3, 5]. It also argues the lack of any mention of Mayor Wu in Plaintiff's complaint supports the City's claim that Plaintiff's intent has been to harass Mayor Wu rather than to pursue discoverable information relevant to this litigation challenging the City Council's legislative prayer scheme. [Id. at 2, 6]. In further support of its claim of harassment, the City cites Plaintiff's disinterest even in deposing those City Councilors it does name in its complaint [id. at 3], and the evident targeting of Mayor Wu for an Election Day deposition so early in discovery due to her then-status as one of Boston's only two candidates for mayor [id. at 6]. Moreover, the City asserts Mayor Wu is a high-ranking government official (and that she was as City Councilor as well), affording her extra protections from litigation discovery absent personal involvement or demonstrated need. [Id. at 4].

Following Plaintiff's filing of the aforementioned letter objection and explanatory letter, Plaintiff filed opposition focusing heavily on the question of whether and when Mayor Wu would qualify as a "high-ranking government official," and arguing Mayor Wu "has unique knowledge about the facts" [Pl.'s Opp'n at 9], due to her having declined to invite TST to give

the invocation, her recounting of the City Council's invocation policy in an email, and her
presence on the City's privilege log [id. at 10–11].

For the reasons discussed below, the Court finds the weighing of potential burdens and
alternatives under Fed. R. Civ. P. 26(b)(2)(C), as well as the imposition of undue burden and
annoyance under Fed. R. Civ. P. 26(c)(1) and 45(d)(1), necessitates limiting discovery by issuing
a protective order to preclude Plaintiff's deposition of Mayor Wu.

### A. Mayor Wu's Relevance to this Litigation – Analysis under Fed. R. Civ. P. 26(b)(2)(C)

While the City does not dispute that Mayor Wu may possess relevant knowledge or
information regarding the City Council's invocation practice [Dkt. 43, Def.'s Reply at 2], it
makes numerous arguments directing to less burdensome sources of the same information, and
Mayor Wu's overall lack of relevance to the instant litigation. See generally [Dkt. 34, Def.'s
Mem. Supp. Mot.; Def.'s Reply].

Under Fed. R. Civ. P. 26(b)(2)(C), the Court is obligated to limit otherwise allowable
discovery if, in relevant part, it determines the information "can be obtained from some other
source that is more convenient, less burdensome, or less expensive," or if "the party seeking
discovery has had ample opportunity to obtain the information by discovery in the action." Fed.
R. Civ. P. 26(b)(2)(C). In a case upholding the validity of subpoenas of non-parties even where
the information sought was alleged to be publicly available, one District of Massachusetts court
explained the standard as follows: "If the material sought by subpoena is readily available, either
from a party to the action or from a public source, obtaining it through subpoena on a nonparty
often will create an undue burden. The mere availability of the documents from another source,
however, does not preclude a subpoena directed to a nonparty if the party serving the subpoena

can show that it is more expeditious to obtain the documents from a witness." In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig., No. MDL 13-2419-FDS, 2013 WL 6058483, at *7 (D. Mass. Nov. 13, 2013) (quoting Gray v. Town of Easton, No. 3:12cv166, 2013 WL 2358599, at *3 (D. Conn. May 29, 2013)). Accordingly, where the information sought in this case is not only readily available from up to 47 other people, but also where the particular nonparty subpoena at issue burdens the City's highest-ranking official and was largely issued as a publicity stunt, it is not difficult to find undue burden in favor of a protective order.

When the City provided Plaintiff a list of 47 individuals who might possess relevant information, it provided readily available alternatives that would be "more convenient, less burdensome, [and] less expensive." Fed. R. Civ. P. 26(b)(2)(C). Moreover, the City correctly points out that Plaintiff's primary surviving claim under the Establishment Clause of the First Amendment ultimately hinges on an analysis of the constitutionality of the invocation practice itself. [Def.'s Reply at 2–3]. This is as distinct from Plaintiff's claims under the Equal Protection Clause, which, had they survived the City's motion to dismiss, would have required an inquiry into potential impermissible selective treatment by the City Councilors. [Dkt. 21 at 14; Def.'s Reply at 2–3]. Because the Court dismissed the Equal Protection claim in July 2021, the only relevant and discoverable information to be obtained from current or former City Councilors would be of a relatively general nature regarding the Council's prayer scheme, which further diminishes the importance of Mayor Wu's testimony and indicates this information could easily be provided by lower-ranking government officials. Notably, TST has failed to allege anything to the contrary in support of its surviving claims.

In an attempt to claim Mayor Wu does possess unique knowledge regarding this litigation, TST asserts that her inclusion as the only then-City Councilor on the City's privilege

log, despite not being the only Councilor from whom TST sought an invocation invitation, "suggests that Wu had the most involved role among the Councilors in determining that TST shall not be invited." [Pl.'s Opp'n at 11]. The Court is entirely unpersuaded by this conclusory assumption. For example, it is just as likely (and just as privileged and therefore undiscoverable) that Mayor Wu was actually the most concerned with ensuring the City Council's legislative prayer scheme provided opportunity for participation by minority religious groups. Moreover, despite noting it directed its requests for an invitation to multiple City Councilors besides Mayor Wu, TST is notably silent in its opposition filing as to who those Councilors are, and why none of them have been noticed for depositions despite the purported imperative of deposing Mayor Wu as based on her time on the Council. [Id.]

Finally, while the discovery process is still newly underway, TST still *has* "ample opportunity to obtain the information by discovery in the action" under Fed. R. Civ. P. 26(b)(2)(C). As such, its conduct in noticing Mayor Wu's deposition for Election Day so quickly, and intentionally doing so in order to attract publicity and tarnish the reputation of a rising political leader [Dkt. 38], demonstrates further violation of Rule 26(b)(2)(C).

### B. Undue Burden Imposed by Plaintiff's Deposition of Mayor Wu – Analysis under Fed. R. Civ. P. 26(c)(1) and 45(d)(1)

In addition to the burdens imposed by Plaintiff's noticing of Mayor Wu's deposition already discussed above, it is worth highlighting the City's claim that requiring Mayor Wu to participate in a deposition "in this discovery process will in fact interfere with her government responsibilities" [Def.'s Reply at 2], as well as its recognition that, were every Boston City Councilor to be deposed "regarding every invitation extended to an invocation speaker, 'such

officials [would] spend an inordinate amount of time tending to pending litigation' rather than running the government'" [id. (quoting United States v. Morgan, 313 U.S. 409, 422 (1941))].

In order for undue burden to justify the issuance of a protective order, there must be a finding of "good cause[,] [which] must be based on a particular factual demonstration of potential harm, not on conclusory statements." Peoples v. Time Warner Cable, Inc., 2017 WL 2836991, at *2. Yet in addition to the interference with local government—a harm which cannot be overlooked amidst a catastrophic, years-long global pandemic—the City also enumerates how Plaintiff's counsel's admissions regarding his motives for noticing Mayor Wu's deposition when and how he did constituted harassment of Mayor Wu, improperly shifted attention towards the irrelevant subject of Mayor Wu's "personal ambitions," and redirected City resources away from the elections and other City business and towards responding to Plaintiff's bad-faith deposition notice. [Dkt. 43 at 6].

Moreover, unlike in many cases where motions for protective orders under Rules 26 and 45 were at least partially denied, Defendant's objections to Plaintiff's subpoena have nothing to do with many of the most readily given—and difficult to verify—reasons for seeking such a protective order, such as confidentiality or party desires to prevent access to certain documents or communications. See, e.g., In re New England Compounding Pharmacy, Inc., 2013 WL 6058483, at *11 (seeking to avoid, *inter alia*, disclosure of proprietary business information); Green v. Cosby, 152 F. Supp. 3d 31, 36 (D. Mass. 2015), modified on reconsideration, 160 F. Supp. 3d 431 (D. Mass. 2016) (seeking to avoid disclosure of marital communications and embarrassment associated with questions regarding infidelity); Peoples, 2017 WL 2836991, at *4 (seeking to avoid opposing party access to documents they could then use "to try and elicit admissions" pertaining to the case). Not only are these bases often able to be easily remedied

11

with a confidentiality agreement or protective order prescribing specific practices for handling information, but they are also much more readily employed in bad faith—that is, to actually avoid disclosure of relevant information—than the City's arguments in its motion here. The City appears to be in full cooperation with Plaintiff in the discovery process insofar as it involves the actual business of discovery—the compiling of relevant, not overly burdensome information for the purposes of litigation.

The Court finds no need to delve into the issue of whether Wu is or was a "high ranking government official," whether as Mayor or City Councilor, due to Mayor Wu's absence from Plaintiff's allegations in its Complaint, the lack of any compelling reasons to believe Mayor Wu possesses relevant information personally, as well as Plaintiff's admitted intent to depose Mayor Wu solely for political and publicity-related reasons. The Court's ordinary obligations to limit discovery as per Rules 26 and 45 apply fully and sufficiently here, and weigh in favor of the issuance of a protective order without reaching that definitional question—though Plaintiff's stated desire to target Mayor Wu due to her status as a mayoral candidate certainly supports this Court's finding of undue burden, annoyance, and oppression in violation of Rule 26(c)(1).

Independent of a potential deponent's profession or media exposure, it is in exceptionally bad faith to intentionally notice a deposition for a date and time when a party knows the deponent will be unavailable or greatly inconvenienced. In his explanatory letter to the Court, Plaintiff's counsel states that he, as an attorney, has "a sworn duty to do anything short of breaking the law to see to it that my client's goals are recognized." [Dkt. 38 at 2]. Yet this is not the case. Rules such as the Massachusetts Rules of Professional Conduct (and other states' equivalents), various ethics rules and guidelines, and the Rules of Civil Procedure govern attorney and litigant conduct in all sorts of ways that reach beyond conduct that is simply

Ad. 13

illegal—and they do so precisely to prevent the type of abuse of process Plaintiff's counsel has employed here.

### C.  Awarding of Costs and Fees Related to this Motion

Defendant asserts Plaintiff's conduct with regard to noticing Mayor Wu's deposition is in violation of Fed. R. Civ. P. 45(d)(1) [Dkt. 34, Def.'s Mem. Supp. Mot. at 6], and requests reasonable attorneys' fees and costs in the present motion [Dkt. 33, Def.'s Mot. at 1].

Under Fed. R. Civ. P. 45(d)(1), the Court "*must* enforce [the] duty [to avoid imposing undue burden or expense on a person subject to subpoena] and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply." Fed. R. Civ. P. 45(d)(1) (emphasis added). For all the reasons discussed above, Plaintiff's failure to comply with Rule 45 here is evident to this Court. Moreover, it appears as though Plaintiff was trying to force the City to commit to producing Mayor Wu as part and parcel of the parties' attempted negotiations to amend the noticed deposition date and therefore avoid filing of the present motion on an emergency basis, though it was not clearly portrayed that way in Plaintiff's submission requesting a briefing schedule [Dkt. 35]. The Court asked for a statement on why Plaintiff's counsel noticed Mayor Wu's deposition for Election Day precisely to get at the 'emergency' basis issue—an issue Plaintiff's counsel himself asked the Court to address [Dkt. 35]. Despite Plaintiff's counsel's claim that the City "reneged" on a deal to produce Mayor Wu for a deposition on a different date [Dkt. 35], what the record [Dkt. 35-2] actually appears to show is that the City sought to avoid filing their motion on an emergency basis, and reached out to Plaintiff's counsel to request Mayor Wu's deposition be noticed for a date further in the future so as to accomplish this.

**Ad. 14**

The City was entitled to take issue with both the timing of the noticed deposition *and* the fact Mayor Wu was noticed at all—and Plaintiff's attempts to conflate these issues and to portray the City as having "reneged" are disingenuous and distracting. The awarding of costs and fees to Defendant is well warranted here. In addition to Plaintiff's admitted, impermissible motives behind its deposition notice to Mayor Wu, TST's conduct here forced briefing of this motion, some of which was on an emergency basis, to occur much earlier in the discovery process than it would have otherwise, if it would have taken place at all. Motion practice on a compressed timeline or where ultimately unnecessary to the litigation at hand inherently puts more burden on parties and attorneys, and the Federal Rules of Civil Procedure make explicit their purpose to thwart abusive discovery and other litigation practices.

In addition, Plaintiff's assertion that the City cannot be entitled to attorneys' fees due to the fact Defendant's attorneys "are public employees who are paid a salary… [and] not charging an hourly rate to bring the motion" is nothing short of absurd. [Dkt. 42, Pl.'s Opp'n at 12]. That a party's attorneys are paid from public coffers does not mean their time, efforts, and resources are therefore to be subject to unfettered abuse of process. The argument put forth by Plaintiff's counsel here would incentivize private attorneys and those charging the highest rates to engage in abusive discovery practices and file frivolous motions for the sole purpose of billing their clients and draining opponents' resources. Moreover, the Court is persuaded by Defendant's assertion that allowing depositions under circumstances where counsel has acknowledged impermissible motives would create perverse incentives for potential litigants, encouraging legal action merely to harass or gain access to government officials or candidates. [Def.'s Mem. Supp. Mot. at 6]. This, along with Plaintiff's counsel's abovementioned failure to acknowledge any of the myriad rules intended to guide and govern his conduct as an attorney, supports the awarding

of costs and fees to Defendant on this motion. Pending submissions by Defendant and adjudication of the amount to be awarded, the parties are expected to continue diligently engaging in discovery, with the hope that Plaintiff will dispense with impermissible antics and abusive tactics.

## IV.    CONCLUSION

The surviving claims in this matter represent an issue of first impression in the First Circuit. As the Court noted in its decision on Defendant's Motion to Dismiss [Dkt. 21 at 12], it is not at all clear whether the invocation practice of the City Council violates the First Amendment, meaning Plaintiff has brought a meaningful legal challenge with potentially broad effect. Distracting from the significance of that challenge with tactics Plaintiff's counsel facially admitted to employing in order to get the attention of the public and the City's now highest-ranking government official does a disservice to the gravity of the constitutional claims at issue.

For the foregoing reasons, Defendant City of Boston's Motion for Protective Order and Motion to Quash Regarding the Deposition of City Councilor At Large Michelle Wu [Dkt. 33] is **GRANTED**.  Defendant City of Boston's request for reasonable attorneys' fees and costs is likewise **GRANTED** and the amount shall be evaluated and assessed at the conclusion of discovery.  At this stage, the parties shall continue in discovery to meet the October 26, 2022 deadline.

**SO ORDERED.**

April 6, 2022                                        /s/ Angel Kelley
                                                    ANGEL KELLEY
                                                    U.S. DISTRICT JUDGE

15

**Ad. 16**

9/16/22, 6:43 PM    Kezhaya Law LLC Mail - Activity in Case 1:21-cv-10102-AK The Satanic Temple, Inc. v. City of Boston, Order on Motion to Quash

 Gmail

**Sonia A. Kezhaya <sonia@kezhaya.law>**

## Activity in Case 1:21-cv-10102-AK The Satanic Temple, Inc. v. City of Boston, Order on Motion to Quash
1 message

**ECFnotice@mad.uscourts.gov** <ECFnotice@mad.uscourts.gov>                    Fri, Sep 16, 2022 at 11:18 AM
To: CourtCopy@mad.uscourts.gov

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

United States District Court

District of Massachusetts

### Notice of Electronic Filing

The following transaction was entered on 9/16/2022 at 12:18 PM EDT and filed on 9/16/2022
**Case Name:**          The Satanic Temple, Inc. v. City of Boston,
**Case Number:**       1:21-cv-10102-AK
**Filer:**
**Document Number:** 63(No document attached)

Docket Text:
**District Judge Angel Kelley: ELECTRONIC ORDER entered. Defendant's [57] MOTION to Quash and Defendant's [62] Emergency MOTION to Quash *Deposition Subpoena to Mayor Wu* are GRANTED. In light of the Court's prior Orders granting the City's motion for a protective order prohibiting the deposition of Mayor Wu [see Dkt. 47] and denying Plaintiff's motion for a certificate of appealability [see Dkt. 51], the deposition of Mayor Wu as noticed may not go forward. The proper avenue for Plaintiff to seek modification of the terms of the Protective Order is through a motion for reconsideration. Any motion for reconsideration must state which additional facts, adduced through discovery in the intervening months, have materially changed the circumstances such that the deposition of Mayor Wu is now necessary. Such a motion must specify how such facts were adduced, what efforts the parties have made to discover the information Plaintiff seeks through the avenues permitted by the Protective Order, why the other witnesses the City has identified cannot be sources of this information and, why, on the basis of such newly discovered facts, there is reason to believe that Mayor Wu's testimony will be of *unique* relevance to this case. Moreover, such a motion must further demonstrate that the above factors supporting modification outweigh the potential for the deposition to be harassing, duplicative, and unduly burdensome. See Fed. R. Civ. P. 26(b) and 45(d).**

**The parties, particularly Plaintiff's counsel, are further ORDERED to cease filing unsolicited status reports with the Court, as these reports have not provided the Court with any relevant information other than indicia that Plaintiff has not read or complied with its previous orders. The Court takes no action on Defendant's motion for sanctions at this time, but will consider imposition of sanctions if Plaintiff's counsel continues to indicate to the Court that he is not complying with orders or conducting discovery in good faith.**

**Ad. 17**

9/18/23, 6:40 PM    Kezhaya Law PL : Mail - Activity in Case 1:21-cv-10102-AK The Satanic Temple, Inc. v. City of Boston, Order on Motion to ...

Case: 23-1642    Document: 00118092023    Page: 75    Date Filed: 01/04/2024    Entry ID: 6614205

**(Kelly, Danielle)**

**1:21-cv-10102-AK Notice has been electronically mailed to:**

Nicole M. O'Connor     nicole.oconnor@boston.gov

Nailah A. Freeman     nailah.freeman@boston.gov

Brendan Durrigan     brendandurriganesq@gmail.com

Robert S. Arcangeli     robert.arcangeli@boston.gov

Matt Kezhaya     matt@crown.law, sonia@kezhaya.law

**1:21-cv-10102-AK Notice will not be electronically mailed to:**

**Ad. 18**

| | |
|---|---|
| **From:** | ECFnotice@mad.uscourts.gov |
| **To:** | CourtCopy@mad.uscourts.gov |
| **Subject:** | Activity in Case 1:21-cv-10102-AK The Satanic Temple, Inc. v. City of Boston, Order on Motion for Reconsideration |
| **Date:** | Friday, December 23, 2022 2:49:31 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### United States District Court

### District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered on 12/23/2022 at 3:48 PM EST and filed on 12/23/2022

**Case Name:**       The Satanic Temple, Inc. v. City of Boston,
**Case Number:**    1:21-cv-10102-AK
**Filer:**
**Document Number:** 78(No document attached)

**Docket Text:**
**District Judge Angel Kelley: ELECTRONIC ORDER entered. Plaintiff's [66] Motion for Reconsideration of [47] Protective Order is DENIED.  As the Court previously ordered, [see Dkt. 63], it will only entertain a motion to reconsideration if facts have materially changed the circumstances such that the deposition of Mayor Wu is now necessary.  Plaintiff is required to show, among other factors, why "the other witnesses the City has identified cannot be sources of this information." Further, "the practice of calling high ranking government officials as witnesses" is discouraged, absent "extraordinary circumstances."  See Bogan v. City of Boston, 489 F.3d 417, 423 (1st Cir. 2007). This type of discovery is permitted "only where it is shown that other persons cannot provide the necessary information."  Id.**

**Here, Plaintiff did not depose the Rule 30(b)(6) representative whom the City designated as the person with knowledge of Mayor Wu's subjective intent.  It relies on the statements of other witnesses instead of, as the [63] order requires, first developing testimony from the appropriate designee.  The Court will not modify its protective order in the absence of evidence that Plaintiff has complied with its [63] order, and that the Rule 30(b)(6) designee cannot provide specific information that is necessary to the resolution of Plaintiff's claims.**

**(Lara, Miguel)**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| The Satanic Temple, Inc., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | Civil Action No. 21-CV-10102-AK |
| v. ) | |
| ) | |
| City of Boston, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## MEMORANDUM AND ORDER
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

**A. KELLEY, D.J.**

Plaintiff The Satanic Temple, Inc. ("TST"), brings this suit against Defendant City of

Boston (the "City"), alleging that the Boston City Council (the "City Council") violated TST's

First Amendment rights under the United States Constitution and its free exercise rights under

the Massachusetts Constitution when City Councilors did not extend an invitation to TST or

allow its request to give the invocation before the start of one of its weekly meetings.  Both

parties have filed motions for summary judgment.  [See Dkt. 98; Dkt. 101].  For the following

reasons, the City's motion for summary judgment [Dkt. 98] is **GRANTED**, and TST's motion

for summary judgment [Dkt. 101] is **DENIED**.

## I.      BACKGROUND

In evaluating the cross-motions for summary judgment, the Court relies on the parties'

statements of material facts, responses thereto, and any attached exhibits the parties have

submitted.  [See Dkt. 100; Dkt. 104; Dkt. 110; Dkt. 112].  The Court accepts as true each

material fact to the extent it has not been disputed by the opposing party and considers contested

each material fact that either party has disputed.  Unless otherwise noted, the facts below are

undisputed.

### A.  Invocations at City Council Meetings

City Council holds meetings every week, usually on Wednesday, except on holidays or

when otherwise ordered.  [Dkt. 112 at ¶¶ 2-3].  There are approximately thirty-five meetings per

year.  [Id. at ¶ 4].  Time is set aside at the beginning of each meeting for an invited member of

the public, often clergy, to say a few words.  [Id. at ¶ 5].  These invocations have been given at

City Council meetings, or prior iterations of the City's local government, since the 1800s.[1]  [Id.

at ¶ 1].  At the beginning of the calendar year, City Council staff prepares a schedule of dates for

City Council meetings, including the name of the City Councilor responsible for securing an

invocation speaker for each meeting.  [Id. at ¶ 8].  While the staff attempts to assign the same

number of dates to each City Councilor, it is not always possible.  [Id. at ¶ 7].

The selection of the invocation speaker is left to the discretion of individual City

Councilors and their staffs.  [Id. at ¶ 11].  An individual must receive an invitation from a City

Councilor to offer an invocation prior to Council meetings, and the City Council does not take

requests to give an invocation.  [Id. at ¶ 13].  There are no guidelines or rules governing whom a

City Councilor may invite to give an invocation, and no formal, written policy exists.  [Id. at

¶ 12].  The City states that invocation invitations are "based upon personal relationships the

Councilors have and the work that the individual invitee does in the district or for their

constituents."  [Id. at ¶ 18].  In 2016, in response to TST's first request for an invitation to give

the invocation, Michelle Wu ("Wu"), a former City Councilor who is now the Mayor of Boston,

described the practice, in writing:

---

[1] The City had an alderman form of local government, not a city council, prior to 1909.  [Dkt. 112 at ¶ 1].

[E]ach Councilor has the chance to invite 2-3 faith leaders per year to deliver the opening invocation at one of our Council meetings. The invitations are often used to recognize faith leaders who are active in the community and organizations that are representative of their districts. There is no restriction or criteria based on any Councilors' religious preferences. Many of us have a long list of folks we'd like to invite but haven't been able to accommodate.

[Dkt. 100-11 at 2]. Another City employee separately explained that Councilors "have invited members from their district . . . who are active in their neighborhood and engaged community members in addition to being members of the clergy." [Dkt. 104-1 at 23].

Other City Council members and their staff describe the invocation invitations in similar terms. Christine O'Donnell ("O'Donnell"), who is the Compliance Director and counsel for the City Council, explained in a deposition that "the invitations for the invocation are based upon personal relationships the [C]ouncilors have," in other words, "people that they have relationships with because of their districts. It might be work that the individual does in their districts or does for their constituents. That has been the policy." [Dkt. 100-1 at 52:22-24, 53:7-12]. When asked whether there was a basis for limiting who may participate in the invocations, O'Donnell responded, "It's by invitation. So, the limit would be if you don't get an invitation, you don't give the invocation." [Id. at 152:20-153:1]. TST has characterized the selection process as City Councilors "extend[ing] invites only to their friends and political allies." [Dkt. 110 at ¶ 2].

One invocation speaker, Anne Marie Rousseau ("Rousseau"), gave an invocation annually from 2012 to 2020 at the invitation of former Councilor Matt O'Malley ("O'Malley"). [Dkt. 112 at ¶ 17]. In addition to volunteering for Councilor O'Malley's campaign, Rosseau was co-chair of the Ward 11 Democratic Committee, co-founded JP Progressives, a "local community-based organization [] concerned about issues and electing progressive candidates," and worked at Metro Housing Boston. [Dkt. 100-7 at 7:17-22, 8:1-2]. She was also an on-call

minister at Hope Central Church in Jamaica Plain, which is affiliated with the United Church of Christ and the Disciples of Christ, and she had been a chaplain at another organization.  [Id. at 7:23-8:1, 9:9-13, 11:13-20].  Rosseau also "knew the councilor personally" and "had interacted with him many times."  [Id. at 8:3-4].  When extending an invitation to a different community leader to give the invocation at a meeting, former City Councilor Kim Janey acknowledged that the "Unitarian Universalist Urban Ministry, under [the reverend's] leadership, is deeply active in the Roxbury community, providing and hosting [a] wide array of services and events.  [The reverend's] work to restore the First Church of Roxbury, and continued efforts to reinvigorate the building, are evidence of this commitment to social justice and service."  [Dkt. 100-8 at 3].

Former Councilor Janey explained to one invocation speaker that "[o]pening our meetings with prayer provides the Council with a moment of meditation and reflection as we address the important work before us as a body."  [Id.].  The content of the invocations is written or determined by the invited speaker.  [Dkt. 112 at ¶ 22].  The invocations may take the form of a "blessing," "opening remarks," "a prayer," "a sermon," a "poem," a "reflection," or "something like that."  [Dkt. 112 at ¶¶ 21, 29; see Dkt. 100-6 at 107:15-25].  The majority of invocations have been given by individuals from a variety of Christian denominations, but there have "also been a number of representatives from other types of religions," including rabbis and an imam.  [Dkt. 112 at ¶¶ 24-26].  There have also been "some laypeople" or "non-religious speakers," including individuals from organizations doing work within the community, who have given invocations.  [Id. at ¶¶ 24, 27-28].  For example, the City Clerk has given several invocations, usually reading from a "book of reflections," and a leader of the Boston Debate League, who was also in divinity school, gave an invocation.  [Id. at ¶¶ 30-31].

TST provides video evidence of one invocation given at a City Council meeting.  See https://www.youtube.com/watch?v=qb5iu6B1TxA ("August 2021 Video").  In that video clip, the City Council is called to order and roll call occurs.  Id. at 3:00-3:45.  The City Councilor who invited the invocation speaker then introduces the speaker, who founded a church in Boston and served on several boards of directors in Boston.  Id. at 4:03-5:57.  The speaker, who is a pastor, then takes the microphone.  In addition to welcoming remarks, she references the Bible and states, "Let us pray," before she gives a prayer.  Id. at 6:24.  She states that she "pray[s] for each member of the Boston City Council" and asks for the Lord to give them "understanding," "wisdom," and "knowledge" as they proceed with their duties.  Id. at 7:17-9:49.  The meeting then proceeds with the Pledge of Allegiance and the first order of business.  Id. at 9:56-10:43.  Contrary to TST's characterization in its statement of facts, the video shows that the audience is not instructed to stand for the invocation, nor are they directed to participate in the prayer.  [See Dkt. 110 at ¶¶ 1, 4].

There are two other videos of City Council meetings mentioned briefly in the parties' papers.  One is referenced by the City in its statement of facts, and it is of an imam who gave the invocation in April 2023.[2]  See https://www.youtube.com/watch?v=Ti7QMgpUK8Q &list=PLQaoo0hI2DAjk5JId3kvv1N3WJt8GgBFr&index=24 ("April 2023 Video").  The meeting proceeds much as the other did—the City Clerk conducts roll call, the City Councilor introduces the speaker, and the speaker gives the invocation.  The imam opens by stating that he always greets "the audience" by saying, in Arabic, "Peace be upon you."  Id. at 5:30-5:44.  He then proceeds to read from the Koran and gives a few remarks at the end.  In those remarks, he states that it is "incumbent upon you [the City Councilors], as our representatives, to get to know

---

[2] The imam had previously been invited to give the invocation by Councilor Charles Yancey, who left City Council in 2015.  [Dkt. 112 at ¶ 26].

one another, not in the superficial way . . . because you represent me and us," and "the more you get to know each other outside of the walls of the City Hall, the more you all can come together . . . [and] we'll get the benefit of your relationship." Id. 8:35-9:34.  At no point in the video, which begins prior to the roll call, are people instructed to stand.  Still, after reading from the Koran, the imam states, "You can sit down now," which suggests that people were standing and may have done so of their own volition.  Id. at 6:58.

The other video is cited by TST in a footnote in its response to the City's statement of facts.  [See Dkt. 112 at ¶ 31 n.1].  In that video, which is from a September 2016 City Council meeting, the City Clerk does roll call, the City Councilor introduces the speaker, and the speaker gives the invocation.  See https://www.youtube.com/watch?v=T1rDy1ioPnE ("September 2016 Video").  At this meeting, the City Councilor instructs everyone to stand for the invocation and the Pledge of Allegiance.  Id. at 1:50-1:59.  The speaker, who was involved in several nonprofits and studying at divinity school, speaks about the mission of the Boston Debate League.  She then instructs everyone to bow their heads before offering a prayer that thanks the Lord for the City Councilors' service, asking the Lord to remind the Councilors that "nothing is too hard for [them]" and if they "humble themselves" before the Lord, they will be lifted up.  Id. at 5:57-9:57.  She asks for guidance to allow the City Council to be "the best politicians, the best governing body that this nation has ever seen."  Id.

Invocation speakers previously received a stipend from the City.  [Dkt. 112 at ¶ 9].  One invocation speaker testified that she received a $75 stipend when she first gave an invocation in 2012, though she did not remember receiving one after that.  [Id. at ¶ 10].  The stipend practice stopped in 2016 or 2017 after City Council investigated the practice.  [Id. at ¶ 9; see Dkt. 110 at

¶¶ 8-10].  TST claims that this practice ceased because of TST's initial demand for inclusion and in contemplation of this litigation.[3]  [Dkt. 112 at ¶ 9; see Dkt. 104 at ¶ 10].

### B.      TST's Requests for Inclusion

On October 6, 2016, Travis LeSaffre ("LeSaffre"), Head of the Boston Chapter of TST, sent an email to former Councilor Mark Ciommo ("Ciommo"), asking him to "appoint[] [LeSaffre] as [Ciommo's] invited clergy member to perform an invocation."  [Dkt. 100-10 at 2; see Dkt. 112 at ¶ 32].  LeSaffre similarly reached out to former Councilor Tito Jackson and former Councilor Wu.  [Dkt. 112 at ¶ 33; see Dkt. 100-11].  In response, former Councilor Wu explained that many Councilors had a "long list" of individuals they would like to invite but are unable to accommodate, and the invitations are "often used to recognize faith leaders who are active in the community and organizations that are representative of [the Councilors'] districts." [Dkt. 100-11 at 2].

LeSaffre sent another email to several City Councilors on August 17, 2017.  [Dkt. 112 at ¶ 36; see Dkt. 100-12].  In that email, LeSaffre asked the City Council to "[a]llow all individuals equal opportunity to perform invocations" or "[r]emove invocations from all future City Council meetings."  [Dkt. 100-12 at 2].  Around this time, some City Councilors received emails from individuals stating that they did not want TST to give an invocation.  [Dkt. 104-1 at 42-45].

---

[3] The deposition testimony TST cites to support this claim is that of O'Donnell.  [See Dkt. 104-1 at 34-38]. O'Donnell acknowledged that the investigation into the stipend "coincides with TST's first request."  [Id. at 35]. When asked, "Was it because of TST's demand?" she responded, "It was looked at and considered best practice to stop the stipend.  [Id.].  When counsel persisted, "But did the process of looking at the process of whether we are giving money to these priests, was that occasioned by TST's demand for invite?" O'Donnell responded, "Yes, the policy was looked at then."  [Id.].  When TST continued to push O'Donnell on the topic, she explained, "I was not involved in that decision whether or not to stop the payment."  [Id. at 36].  And when TST again asked, "Was the purpose of reviewing the determination to pay these priests part of a purpose of avoiding liability thereby avoiding a court order requiring TST to have an invitation?  Is that why you guys did you, your [sic] review?" O'Donnell responded, "The re—the review was done.  And again, I did not conduct this review.  But the review of the policy of paying the people giving the invocation was looked at, and it was determined that it was best practice to stop the stipend."  [Id. at 37-38].

There is no evidence that any City Councilors responded to those emails. [See id.]. One former City Councilor, Annissa Essaibi-George ("Essaibi-George"), commented in response to TST's request[4]:

> It is absurd that this group feels entitled to being invited to give remarks at the beginning of the Council [m]eeting, and frankly its [sic] insulting to all of the amazing religious and secular leaders who are invited. They are invited because of all of the incredible work that they do across the City, work to end youth violence, work to provide shelter and stability to the homeless, or compassion and support for people in recovery. I will not give up the opportunity to highlight one of these amazing leaders who I am privileged to work with for the Satanic Temple. The City Council does important, serious work for the people of Boston and when we invite someone to participate in our meeting it is out of a profound respect, not a sense of obligation.

[Dkt. 100-13 at 2]. Former Councilor Tim McCarthy responded to NBC Boston's inquiry on the issue by stating, "I would not consider anyone that doesn't have a positive impact on my community, my constituents, my family and me personally. Every leader I have invited, they all check the forementioned boxes. This issue is not about the honor bestowed to a faith leader by a Boston City Councilor, this is a publicity stunt." [Dkt. 104-1 at 10].

On October 2, 2018, a representative from TST again requested an opportunity for someone from TST to give the invocation at an upcoming City Council meeting. [Dkt. 112 at ¶ 39]. The next day, O'Donnell informed TST via telephone that the City Council does not accept requests from speakers to deliver invocations and City Councilors decide who will deliver the invocation. [Id. at ¶ 40; see Dkt. 100-14 at 2]. O'Donnell also stated that the City Council does not have a written policy concerning invocations. [Dkt. 112 at ¶ 40; see Dkt. 100-14 at 2]. On October 9, 2018, O'Donnell emailed the TST representative, explaining that each City Councilor may invite "either clergy or a lay person" to give the invocation, and that the City Councilors do not themselves offer the invocation. [Dkt. 112 at ¶¶ 41-42; Dkt. 100-14 at 2].

---

[4] It is unclear to whom the message was circulated or whether this was a draft of a public statement to be made.

TST filed a complaint with the Massachusetts Commission Against Discrimination on October 17, 2018.  [Dkt. 100-14].  City Councilors again received emails from members of the public between March – April 2019 regarding TST's request for inclusion as an invocation speaker, and again it appears no City Councilor responded.  [Dkt. 104-1 at 39-41].

TST provides an affidavit from its co-founder and co-director, Lucien Greaves, which states that TST engaged in "charitable acts and community involvement activities within the Boston community."  [Dkt. 104-1 at 13].  These activities included "Menstruatin' with Satan," a drive to collect tampons and sanitary napkins for Rosie's Place, a safe haven for LGBTQIA+ women, in November through December 2016, November 2019 to March 2020, and July 2021; "Warmer than Hell," a coat and winter clothing drive for Second Chances in January 2017; and tabling at Boston Pride every year from 2016 to 2019.  [Id. at 13-14].  TST does not provide evidence that any of the City Councilors knew of or were also involved in these activities.  There is no evidence in the record of other groups requesting invocation invitations and receiving them.  In fact, at a deposition for this action, former Councilor Essaibi-George stated, "I don't think anyone's ever asked me, with the exception, I think, why I'm here today, to offer remarks, a prayer, or a blessing before the [C]ity [C]ouncil," when asked whether other groups have "solicited an invite."  [Dkt. 100-6 at 121:15-23].

C.     **Litigation**

TST filed the suit before this Court on January 20, 2021.  [See Dkt. 1].  While TST asserted violations of the Establishment Clause of the U.S. Constitution ("Count I"), the Free Speech and Free Exercise Clause of the U.S. Constitution ("Count II"), the Equal Protection Clause of the U.S. Constitution ("Count III"), and the Free Exercise Clause of the Massachusetts Constitution ("Count IV"), the Court dismissed Counts II and III.  [See Dkt. 21].  TST then spent

the majority of fact discovery attempting to take the deposition of then-mayoral candidate, and

later Mayor, Wu, including issuing a notice of deposition for November 2, 2021—Election Day.

[See, e.g., Dkt. 40; see also Dkt. 90; Dkt. 96].  The Court ultimately granted the City's motion

for a protective order to quash Wu's deposition and awarded the City attorneys' fees and costs

for TST's counsel's use of abusive discovery tactics when he continued to pursue Wu's

deposition.  [See Dkt. 47; Dkt. 63; Dkt. 78; Dkt. 96].  Each party has filed a motion for summary

judgment, which are opposed.  [Dkt. 98; Dkt. 101; Dkt. 109; Dkt. 111].  The Court held a motion

hearing on the cross-motions for summary judgment on June 28, 2023.

## II.    LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in

order to see whether there is a genuine need for trial."  Mesnick v. Gen. Elec. Co., 950 F.2d 816,

822 (1st Cir. 1991) (citation omitted).  Summary judgment may be granted when the record,

viewed in the light most favorable to the non-moving party, presents no "genuine issue of

material fact," and the moving party is entitled to judgment as a matter of law.  Paul v. Murphy,

948 F.3d 42, 49 (1st Cir. 2020) (citation omitted).  A factual dispute is "genuine" when the

evidence is such that a reasonable factfinder could resolve the issue in favor of the non-moving

party, and a fact is "material" where it might affect the outcome of the suit under the applicable

law.  See Patco Constr. Co., Inc. v. People's United Bank, 684 F.3d 197, 206-07 (1st Cir. 2012);

Morris v. Gov't Dev. Bank, 27 F.3d 746, 748 (1st Cir. 1994).  Courts must evaluate "the record

and [draw] all reasonable inferences therefrom in the light most favorable to the non-moving

part[y]."  Est. of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010) (citation omitted).

"Where, as here, a district court rules simultaneously on cross-motions for summary judgment, it

must view each motion, separately, through this prism."  Id.  A non-moving party may "defeat a

summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Paul, 948 F.3d at 49 (citation omitted). Where the non-moving party bears the ultimate burden of proof, the non-moving party "must present definite, competent evidence to rebut the motion." Mesnick, 950 F.2d at 822.

## III.    DISCUSSION

The Court must determine whether either party is entitled to judgment as a matter of law on two claims. The first is whether the City violated the Establishment Clause when it did not extend an invitation to TST or grant its request to present an invocation at a City Council meeting. While TST does not claim that the City's legislative prayer practice generally runs afoul of the Establishment Clause, the Court still must consider whether the City Council's selection process for invocation speakers renders its legislative prayer practice unconstitutional. The second is whether City Council's invocation selection process burdens TST's religious beliefs in violation of Massachusetts free exercise law.

### A.    The Establishment Clause

The First Amendment, which applies to the states through the Fourteenth Amendment, states that the government "shall make no law respecting an establishment of religion." U.S. Const. amend. I; Cantwell v. Connecticut, 310 U.S. 296, 303 (1940). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." Larson v. Valente, 456 U.S. 228, 244 (1982). The City Council's invocations are a form of legislative prayer, a practice that "is deeply embedded in the history and tradition of this country." Marsh v. Chambers, 463 U.S. 783, 786 (1983). This practice "has coexisted with the principles of disestablishment and religious freedom" from "colonial times through the founding of the Republic and ever since." Id. Legislative prayer "is meant to lend gravity to the occasion

and reflect values long part of the Nation's heritage.  Prayer that is solemn and respectful in tone,

that invites lawmakers to reflect upon shared ideals and common ends before they embark on the

fractious business of governing, serves that legitimate function."  Town of Greece v. Galloway,

572 U.S. 565, 582-83 (2014).  Legislative prayer need not be nonsectarian.  Id. at 580-81

("Marsh nowhere suggested that the constitutionality of legislative prayer turns on the neutrality

of its content. . . .  Nor did the Court imply the rule that prayer violates the Establishment Clause

any time it is given in the name of a figure deified by only one faith or creed.").  To be lawful,

the legislative prayer practice at issue must "fit[] within the tradition long followed in Congress

and the state legislatures."  Id. at 577.

### 1.    Discrimination Against TST

TST does not claim that the City's practice of opening City Council meetings with an

invocation violates the Establishment Clause.  As TST explained at the motion hearing, the

essence of this action is an allegation of discrimination—TST claims that the City discriminated

against it because of its religious views when the City Council refused to invite TST to give the

invocation.  The City counters that there is no evidence that its religious beliefs are the reason

TST did not receive an invitation to give an invocation, and the true question is whether the City

Council's legislative prayer practice endorses or establishes a particular religion over another.

Establishment Clause jurisprudence is not a paragon of clarity on the issue of legislative

prayer.  Although "historical patterns cannot justify contemporary violations of constitutional

guarantees," Marsh, 463 U.S. at 790, "the Establishment Clause must be interpreted 'by

reference to historical practices and understandings,'" Town of Greece, 572 U.S. at 576 (citation

omitted).  While there are no bright-line rules or tests to apply to legislative prayer cases, the

Supreme Court has made it clear that "the prayer opportunity [cannot be] exploited to proselytize

or advance any one, or to disparage any other, faith or belief."  <u>Marsh</u>, 463 U.S. at 794-95; <u>see</u>

<u>Town of Greece</u>, 572 U.S. at 585 ("Absent a pattern of prayers that over time denigrate,

proselytize, or betray an impermissible government purpose, a challenge based solely on the

content of a prayer will not likely establish a constitutional violation.").  The ultimate question is

whether the legislative prayer practice "compelled its citizens to engage in religious observance,"

which is a "fact-sensitive" inquiry "that considers both the setting in which the prayer arises and

the audience to whom it is directed."  <u>Town of Greece</u>, 572 U.S. at 587.

 There is even less guidance on the proof required for a discrimination claim in the

legislative prayer context of the Establishment Clause.  However, the Supreme Court has

provided some direction on the issue.  In <u>Marsh v. Chambers</u>, the Supreme Court found that a

state legislature's prayer practice did not violate the First Amendment when "[w]eighed against

the historical background."  463 U.S. at 793.  There, a single clergyman of one denomination had

given prayers in the Judeo-Christian tradition for sixteen years and was paid at the public

expense.  <u>Id.</u>  The Supreme Court explained that "[a]bsent proof that the chaplain's

reappointment stemmed from an impermissible motive," his "long tenure does not in itself

conflict with the Establishment Clause."  <u>Id.</u> at 793-94.  The Supreme Court articulated a similar

explanation decades later in <u>Town of Greece v. Galloway</u>:

> [T]he Court disagrees with the view taken by the Court of Appeals that the town of
> Greece contravened the Establishment Clause by inviting a predominantly Christian set
> of ministers to lead the prayer.  The town made reasonable efforts to identify all of the
> congregations located within its borders and represented that it would welcome a prayer
> by any minister or layman who wished to give one.  That nearly all of the congregations
> in town turned out to be Christian does not reflect *an aversion or bias on the part of town
> leaders against minority faiths*.  So long as the town maintains *a policy of
> nondiscrimination*, the Constitution does not require it to search beyond its borders for
> non-Christian prayer givers in an effort to achieve religious balancing.  The quest to
> promote "a 'diversity' of religious views" would require the town "to make wholly
> inappropriate judgments about the number of religions [it] should sponsor and the relative

frequency with which it should sponsor each," a form of government entanglement with religion that is far more troublesome than the current approach.

572 U.S. at 585-86 (emphasis added).

Taken together, these cases suggest that allowing some individuals to give prayers at a legislative session but not others due to "an aversion or bias . . . against minority faiths" or other "impermissible motive" is discrimination in violation of the Establishment Clause.  Id. at 585; Marsh, 463 U.S. at 793.  Other federal courts to consider similar claims have applied this same approach.  See Williamson v. Brevard County, 928 F.3d 1296, 1308 (11th Cir. 2019) (finding that the selection process employed by a board of commissioners reflected "an aversion or bias on the part of the [county] leaders against minority faiths" and had therefore failed to maintain "a policy of nondiscrimination," which indicated that "the prayer opportunity has been exploited to proselytize or advance" a "class of religions to the exclusion of many others" (citations omitted)); The Satanic Temple, Inc. v. City of Scottsdale, No. 18-CV-00621-PHX-DGC, 2020 WL 587822, at *2, 7 (D. Ariz. Feb. 6, 2020) (considering whether the city's denial of the plaintiff's request to give an invocation was "because of 'an aversion or bias . . . against minority faiths'" and therefore in violation of the Establishment Clause (citation omitted)), aff'd The Satanic Temple, Inc. v. City of Scottsdale, 856 Fed. Appx. 724, 726 (9th Cir. 2021) ("After weighing the credibility of the witnesses, the district court properly concluded that TST had failed to prove by a preponderance of the evidence that TST's religious beliefs were a factor, let alone a substantial motivating factor, in [the] decision not to approve TST to give a legislative prayer.").[5]

---

[5] TST itself acknowledges that the "case-dispositive question is whether any of the decisionmakers intentionally discriminated."  [Dkt. 113 at ¶ 3].

TST can prevail on its Establishment Clause claim if the evidence shows that the City's denial of TST's request to give the invocation was based on TST's religious beliefs. The City provides ample evidence that the refusal to invite TST to give an invocation was not because of TST's religious beliefs. All of the evidence submitted suggests that individual City Councilors invited speakers who served their constituents and were active in their communities, and TST did not qualify as such. For example:

- In response to TST's first request for an invocation, former Councilor Wu explained that the invocation invitations are used to recognize leaders "who are active in the community and organizations that are representative of their districts." [Dkt. 100-11 at 2].

- In a deposition, O'Donnell similarly stated that invitations are extended to people the Councilors "have relationships with because of their districts," such as "work that the individual does in their districts or does for their constituents." [Dkt. 100-1 at 53:7-12].

- In 2017, apparently in response to one of TST's requests for an invocation, former Councilor Essaibi-George, like former Councilor Wu, stated that invocation speakers are "invited because of all of the incredible work that they do across the City, work to end youth violence, work to provide shelter and stability to the homeless, or compassion and support for people in recovery." [Dkt. 100-13 at 2].

This evidence shows that the City Council's refusal to extend an invitation to TST was not motivated by an "aversion or bias" toward TST's beliefs. Town of Greece, 572 U.S. at 585. The introductions of the invocation speakers in the videos in the record similarly focus on the work the speakers had done in the community. Moreover, TST's own papers suggest that City

Council invited invocation speakers based on their status as "political insiders," not their religious beliefs. [See Dkt. 102 at 3]. It is possible that City Councilors select invocation speakers based on political affiliations and connections, as TST states. But those political considerations do not equate to discrimination based on religious beliefs.

TST provides no evidence that the decision not to extend an invitation to TST was motivated by animus or bias. The City provides evidence that it was, in fact, motivated by other, lawful reasons. This evidence ranges from the City Councilors' contemporaneous responses to TST's requests for an invitation to evidence revealed years later through fact discovery, such as depositions. The evidence, viewed as a whole, does not suggest that these reasons were pretextual.[6] There is no evidence that other groups asked to give an invocation and an invitation was then extended to them.[7] [See Dkt. 100-6 at 121:19-23]. While TST provides some evidence that it had been involved in the greater Boston community, which is the primary factor City Councilors consider when selecting invocation speakers, through "Menstruatin' with Satan,"

---

[6] While TST acknowledges that the "case-dispositive question is whether any of the decisionmakers intentionally discriminated," it maintains that "discoverable information" regarding such intent has been withheld from TST because it was not allowed to take now-Mayor Wu's deposition. [Dkt. 113 at ¶¶ 3-4]. The Court has already discussed, on multiple occasions and at length, TST's attempt to take Mayor Wu's deposition. [See, e.g., Dkt. 96]. TST ignores the fact that the City Council is comprised of many members, and it chose to depose only former Councilor Essaibi-George and one 30(b)(6) designee, even though the City identified several other 30(b)(6) deponents, and the identities of other City Council members are publicly known. If relevant evidence is absent from the summary judgment record, it is the result of TST's own actions.

[7] TST cites to an email exchange between City Councilors and representatives of the Jewish Community Relations Council of Greater Boston ("JCRCGB") to support its assertion that other groups have requested and received invitations to give the invocation. [Dkt. 102 at 12; see Dkt. 104-1 at 24-25]. The emails themselves do not support that conclusion. In that email exchange, the JCRCGB representatives write that they are excited to "showcase GBJCL (our literacy program) at the September 26th City Council meeting." [Dkt. 104-1 at 25]. They inquire, "Would the invited clergy member have to be from the City of Boston or could we open it up to a Rabbi that is involved in our programming? What does this actually look like during the meeting?" [Id. at 25]. These questions are not a request for an invitation. In context, it is clear that the invitation to give the invocation had already been extended to JCRCGB, and the organization's representatives wanted to know whether they could select a rabbi from the organization that is generally involved in their programming. [Id.]. There is no response to these questions included in the email exchange. [See id. at 24-25]. Moreover, even if the rabbi the organization chose to give the invocation was not from Boston—and the record is not clear on that matter—the organization is clearly Boston-based.

"Warmer than Hell," and Boston Pride tabling, there is no evidence that the City Councilors knew of those activities, nor that those activities took place within the Councilors' districts. Indeed, the evidence clearly conflicts with that conclusion—former Councilor Essaibi-George explained that she was unaware of TST's activities and community contributions when they sought inclusion in the invocation calendar and, indeed, the most she had read about TST was in the pamphlet given to her on the day of her deposition for this litigation. [Dkt. 100-6 at 150:18-21].

The emails sent from the public to the City Councilors fall short of supporting TST's discrimination claim. Emails from the public expressing disagreement with TST's beliefs—particularly where, as here, there is no evidence that any City Councilor responded to those emails—do not support an inference that City Councilors did not invite TST to give an invocation because they shared the same opinion as the senders. City Councilors are public officials who interact with constituents regularly and whose email addresses are publicly available. See https://www.boston.gov/departments/city-council#city-council-members. If they could be held liable for every belief a constituent expressed, there would be no end to their liability. That is a step too far that the Court is not willing to take.

TST's reliance on the City Council's decision to end the stipend given to invocation speakers is misplaced. Even if the Court assumes that City Council reviewed its stipend policy as a result of receiving TST's request for inclusion, the decision to terminate that practice does not suggest discriminatory intent. While TST cites to Village of Arlington Heights v. Metro. Hous. Dev. Corp., for the proposition that a change in the City Council's process is evidence of discrimination, Arlington Heights stands only for the proposition that "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a

role." 429 U.S. 252, 267 (1977). There was no such departure and "improper" purpose here. City Council did not give a stipend to one speaker and not to another; rather, it ended a practice for everyone after it determined that the "best practice" was to stop the stipend. [See Dkt. 104-1 at 37-38]. Nor did City Council terminate the invocation practice entirely to keep one group from participating; it simply eliminated a singular element of the practice—an element that says nothing about how and why a speaker is selected. Despite TST's claims otherwise, it is unclear how the termination of the stipend demonstrates "aversion or bias" based on religious beliefs. Town of Greece, 572 U.S. at 585. The decision to end the stipend affected all invocation speakers equally.

The Court would be remiss not to acknowledge the differences between Town of Greece and this case. In Town of Greece, the town made "reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one." 572 U.S. at 585. Such practices would support a finding that there has been no Establishment Clause violation. The City Council here does neither of these things. Instead, invocation speakers are invited at the discretion of the individual City Councilors, which heightens Establishment Clause concerns. The evidence on record, however, suggests that the City Councilors' discretion was not exercised in such a way that individuals or groups were excluded from giving an invocation because of their religious beliefs. The City Council did not allow some requests while denying others, and the City Councilors' primary motivation in inviting an invocation speaker, based on the evidence before the Court, has always been the individual or organization's involvement in the community. While the Court understands TST's desire to enjoy what it describes as the "benefit" of sharing its message in this forum, the record is simply devoid of any evidence that would support the conclusion that

the failure to extend an invocation invitation to TST stemmed from an "impermissible motive."

Marsh, 463 U.S. at 793.

### 2.    City Council's Legislative Prayer Practice as a Whole

In their briefs, the parties discuss a number of cases that have considered the constitutionality of various legislative prayer practices.  See Town of Greece, 572 U.S. at 565; Marsh, 463 U.S. at 783; Lund v. Rowan County, 863 F.3d 268 (4th Cir. 2017); Bormuth v. County of Jackson, 870 F.3d 494 (6th Cir. 2017); Rubin v. City of Lancaster, 710 F.3d 1087, 1097 (9th Cir. 2013).  The case before this Court is unlike those cases.  In those cases, the plaintiffs brought broad challenges against the government's legislative prayer policies and practices.  They argued that the government's actions, through its legislative prayer, had the effect of placing an "official seal of approval" on Christianity.  Rubin, 710 F.3d at 1097; see also, e.g., Lund, 863 F.3d at 274 (plaintiffs arguing that "the Board, by delivering exclusively Christian prayers, affiliated the county with Christianity, advanced Christianity, and coerced the plaintiffs into participating in religious exercises").  TST makes no such claim here.  TST instead asserts that it was discriminated against when it asked for and was denied an opportunity to give the invocation at a City Council meeting.  [Dkt. 102 at 2-3].  As explained, it was not.  And even if the Court assumes that TST does claim, like the plaintiffs in the cases that have come before this, that City Council's legislative prayer practice as a whole violates the Establishment Clause, TST's Establishment Clause action fails.

Because there is no definitive test to apply to legislative prayer challenges, it is necessary to understand how previous courts have evaluated this issue.  In Marsh, the Supreme Court evaluated a "challenge to the practice of opening sessions with prayers by a State-employed clergyman."  463 U.S. at 786.  It found that the state's practice did not run afoul of the

Establishment Clause after examining the "features" of the legislature's practice: a clergyman of only one denomination had been selected for sixteen years; the chaplain was "paid at public expense"; and the prayers offered followed "the Judeo-Christian tradition."  Id. at 793.  In Town of Greece, the Supreme Court considered whether the town "impose[d] an impermissible establishment of religion by opening its monthly board meetings with a prayer."  572 U.S. at 569-70.  There, the Court noted that the town "made reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one," though it stopped short of *requiring* such efforts in legislative prayer cases.  Id. at 585.  The Supreme Court also determined that the offering of the invocation did not compel "citizens to engage in a religious observance," because the "principal audience for these invocations is not, indeed, the public but lawmakers themselves," and the government had not "directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity."  Id. at 587-88.  The town board "at no point solicited . . . gestures by the public," such as standing, bowing their heads, or making the sign of the cross.  Id. at 588.  Moreover, the town "neither reviewed the prayers in advance of the meetings nor provided guidance as to their tone or content," and the "prayers often sounded both civic and religious themes."  Id. at 571.  Under Town of Greece, the question is whether "the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion," which would suggest the prayer "fall[s] short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort."  Id. at 583.

Appellate courts have used Marsh and Town of Greece to evaluate similar legislative prayer claims under the Establishment Clause.  In Rubin v. City of Lancaster, the plaintiff

challenged a city council's practice of opening its meetings with invocations, which were frequently in the Christian tradition. 710 F.3d at 1090, 1095. The city compiled a database of religious congregations with an established presence in the city and invited those groups to open a city-council meeting with an invocation. Id. at 1089. The question at the heart of the case was "whether the City itself has taken steps to affiliate itself with Christianity" through its legislative prayer practices. Id. at 1097. Given the "litany of neutrality-enforcing safeguards," the Ninth Circuit held that it had not. Id. The court described these safeguards: "No person attending a city-council meeting, including a city employee or official, is required to participate in any prayer. No volunteer is paid to pray. Neither the council nor the clerk may engage in any prior inquiry, review of, or involvement in, the content of any prayer to be offered. Moreover, the clerk has never removed a congregation's name from the list of invitees or refused to include one." Id. (internal quotation marks omitted).

The Fourth Circuit confronted a similar question in Lund v. Rowan County. Four factors convinced the court that the county's legislative prayer practice violated the Establishment Clause. See 863 F.3d at 271-272. First, the government actors themselves, elected members of the county's board of commissioners, gave the prayers. Id. at 277. These "elected officials [therefore] took up a ministerial function." Id. at 290. Moreover, the content of the prayers was "entirely at the discretion of the commissioner." Id. at 273. Second, the prayers were used to proselytize. The prayers were "invariably and unmistakably Christian in content," with several prayers "confess[ing] sin and ask[ing] for forgiveness on the community's behalf," and others "impl[ying] that Christianity was superior to other faiths" and "implor[ing] attendees to accept Christianity." Id. Third, the public audience was instructed to participate. For example, after calling the meeting to order, the chairperson would ask everyone in attendance, including

constituents, to stand up, and a commissioner would then ask the community to "join him in worship." Id. at 272.  Fourth, the "intimate setting of a municipal board meeting present[ed] a heightened potential for coercion."  Id. at 287.  The Fourth Circuit emphasized the need to look at the "totality of the circumstances"—the "crucial interaction between the elements"—when evaluating legislative prayer practices under the Establishment Clause.  Id. at 289.  In Bormuth v. County of Jackson, the Sixth Circuit evaluated a similar challenge to legislator-led prayer, considering largely the same factors but reaching the opposite conclusion on the record before it. 870 F.3d at 512.

From these cases, the Court gleans five general factors to consider when evaluating broad challenges to a legislative prayer practice: (1) the identity of the speaker; (2) whether the speaker is paid to give a prayer; (3) the government's review of the speaker's chosen prayer content; (4) whether the nature of the prayer proselytizes or denigrates other religions; and (5) the selection process.[8]

As to the first factor, the City Council's invocation speaker is a guest, often a member of the clergy, not the City Councilors themselves.  Contrary to TST's assertions, the fact that these speakers are selected by individual City Councilors does not require the Court to conclude that the "[C]ouncil members might as well be the sole providers of invocations."  [Dkt. 102 at 16]. This argument ignores the fundamental differences in lawmaker-led prayer and prayer led by guest speakers.  See Lund, 863 F.3d at 278 (explaining that "lawmaker-led prayer . . . both identifies the government with religion more strongly than ordinary invocations and heightens the constitutional risks posed by requests to participate and by sectarian prayers").  When

---

[8] The particular setting, e.g., that of a municipal board meeting versus a state legislature, has not been considered by the majority of courts, and this Court does not find it necessary to evaluate that factor now.  Even if it did, the Court notes that the invocation here occurs right after roll call, before the City Council's official business begins, which lessens any concerns of possible coercion.  See Lund, 863 F.3d at 287.

government actors "themselves, not guest ministers, [lead] the community in prayer" and "compose[] each invocation 'according to their personal faiths,'" there is "much greater and more intimate government involvement." Id. Such is not the case here.

While the majority of City Council's invocation speakers have been undoubtedly of a Christian denomination, speakers of other denominations and laypeople have also been asked to give the invocation. [See Dkt. 112 at ¶¶ 24-31]. The inclusion of rabbis, an imam, and laypersons allows for a "'diversity' of religious views." Town of Greece, 572 U.S. at 585-86. While there could be even more diversity of speakers, the fact that the majority of speakers have been of a Christian denomination is not a sufficient basis to determine that City Council's invocation practice violates the Establishment Clause. See Marsh, 463 U.S. at 793 ("We, no more than Members of the Congresses of this century, can perceive any suggestion that choosing a clergyman of one denomination advances the beliefs of a particular church."); Town of Greece, 572 U.S. at 570-71, 584-85; Brevard, 928 F.3d at 1310 ("We have found no Establishment Clause problems presented when local governments mostly invited Christian volunteer invocation-givers, so long as this was reasonably reflective of the community's demographics and did not advance a single faith."). Furthermore, the Court must view this fact in combination with the other facts before it.

As to the second factor, it is undisputed that the invocation speakers received a stipend for their participation until 2016 or 2017 when the practice ceased. [See Dkt. 112 at ¶¶ 9-10]. The evidence suggests that the stipend was nominal, and speakers received no other financial benefits. [See id. at ¶ 10; see also Dkt. 100-7 at 16:2-4]. Given the nominal financial amount at issue, and the fact that the practice has not existed for at least five years, the Court is not persuaded that this feature of City Council's historical legislative practice violates the

Establishment Clause, particularly when viewing the facts as a whole.  See Marsh, 463 U.S. at

794 ("Nor is the compensation of the chaplain from public funds a reason to invalidate the

Nebraska Legislature's chaplaincy . . . .").

     Regarding the third consideration, there is no evidence that the City Councilors review or

are otherwise involved in the speaker's prayer selection.  See Town of Greece, 572 U.S. at 571

("Greece neither reviewed the prayers in advance of the meetings nor provided guidance as to

their tone or content . . . .   The town instead left the guest clergy free to compose their own

devotions.").  The evidence instead shows that the speakers determine and write their own

invocations.  [See Dkt. 100-7 at 29:16-18 ("I usually write my invocations depending on what is

going on or what time or year something is happening.")].

     As to the fourth factor, whether the nature of the prayers given at City Council meetings

evinces "a pattern of prayers that over time denigrate, proselytize, or betray an impermissible

government purpose," the evidence on record suggests that it does not.  Town of Greece, 572

U.S. at 585.  There are few examples of City Council invocations in the record before this Court,

especially when considering that the City Council meets every week.  Of the three examples, all

of the speakers direct their prayer largely toward the City Council itself.  One speaker explicitly

notes, "I pray for each member of the Boston City Council," asking the Lord to give them

understanding, wisdom, and knowledge as they proceed with their duties.  August 2021 Video at

7:17-9:49.  Another speaker reads from the Koran and then implores the City Councilors to get

to know one another outside of the walls of City Hall, as they represent the people, and the more

they can come together, the more the people benefit.  April 2023 Video at 8:35-9:34.  In the third

video, the speaker thanks the Lord for the service of the City Councilors and asks the Lord to

remind them that "nothing is too hard" and to guide them to be the "best politicians, the best

governing body that this nation has ever seen." September 2016 Video at 5:57-9:57. To be sure, each of the speakers incorporates religious references, sometimes beginning with, "Let us pray," and reading from holy books, "but they also invoked universal themes, as by . . . calling for a 'spirit of cooperation' among town leaders." Town of Greece, 572 U.S. at 584. In other words, the invocations included "both civic and religious themes" and largely serve "to elevate the purpose of the occasion and to unite lawmakers in their common effort." Id. at 571, 582-83. Indeed, it appears that the "principal audience for these invocations is not . . . the public but lawmakers themselves, who may find that a moment of prayer or quiet reflection sets the mind to a higher purpose and thereby eases the task of governing." Id. at 587. Such prayers "do not fall outside the tradition [the Supreme] Court has recognized" as allowed by the Establishment Clause. Id. at 584. None of the prayers, at least those in the record before the Court, "denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion," even with their references to a deity or prayer. Id. at 582-83.

Moreover, the prayers do not demonstrate an intent to force "citizens to engage in a religious observance." Id. at 587. In one video, the City Councilor asks people to rise for the invocation and the Pledge of Allegiance. At no point in the other two videos do City Councilors ask the public to rise for the invocation, nor do any of the videos indicate any requests from City Councilors to bow heads, make the sign of the cross, or participate in any similar gestures. The singular instance on record of a City Councilor asking everyone to rise—not just for the invocation, but also for the Pledge of Allegiance—does not suggest a "pattern of prayers" that violates the Establishment Clause by "direct[ing] the public to participate in the prayers, singl[ing] out dissidents for opprobrium, or indicat[ing] that their decisions might be influenced

by a person's acquiescence in the prayer opportunity."[9]  Id. at 588; see also Bormuth, 870 F.3d at 517 ("[W]e do not agree that soliciting adult members of the public to assist in solemnizing the meetings by rising and remaining quiet in a reverent position is coercive.  These 'commonplace' and 'reflexive' requests—whether from ministers or elected individuals following their own faith's normative cues—do not alone mandate participation, especially as most are preceded with a polite 'please.'" (citations omitted)).  A City Councilor requesting the audience to stand for the invocation and the Pledge of Allegiance is a far cry from asking the audience to "join . . . in worship."  See Lund, 863 F.3d at 272.

That leaves us with the fifth factor, the process used to identify and invite invocation speakers.  While the Court has already evaluated City Council's invocation speaker selection process as it relates to TST's particular claim of discrimination, it has not examined City Council's process generally.  TST's claim could be construed not as an individual allegation of discrimination, but rather as alleging that the City's legislative prayer practice generally violates the Establishment Clause because the selection process is discriminatory.

---

[9] In rebuttal to the City's argument that the audience was not directed to stand for the invocation in the August 2021 Video, TST provides a link to another video for the first time in its reply in support of its motion for summary judgment, stating that it "conflated" one invocation invitee with another.  [See Dkt. 114 at 2].  The video is not included in TST's statement of facts or in its response to the City's statement of facts.  "[A]rguments raised for the first time in a reply memorandum will not be considered," and TST's claim that it "conflated" one invitee with another does not convince the Court that the video is properly before the Court.  Facey v. Dickhaut, 91 F. Supp. 3d 12, 22 (D. Mass. 2014).  Even if the Court does consider the video, it does not change the Court's review.  In that video, which is from a September 2018 City Council meeting, the former City Council President asks "the guests [to] please rise as Councilor Essaibi-George comes up to introduce our clergy for the day . . . and remain standing as Councilor Essaibi-George leads us in the Pledge of Allegiance."  https://www.youtube.com/watch?v=NTXFgOjpbTE at 1:33-1:46.  As in the other video, the public is asked to stand not just for the invocation but also for the Pledge of Allegiance.  And two examples in which the public is asked to stand does not, any more than the one example properly before the Court, convince the Court that there is a "pattern" of forced public participation.  See Town of Greece, 572 U.S. at 589; Bormuth, 870 F.3d at 571.  Moreover, when asked whether it was "normal" to ask everyone to stand for the invocation and Pledge of Allegiance, former Councilor Essaibi-George responded, "I don't know whether I characterize it as normal.  Every [C]ouncil [P]resident or whoever's leading the body, sometimes phrases it in different ways.  Sometimes there are [C]ouncilors and—and whoever's in the chamber is not necessarily asked, stands on their own, if they're able.  So I actually don't know whether I'd say that's normal."  [Dkt. 113 at 24].  While she acknowledges that there may be "an expectation that people generally stand during the prayer," that is a far cry from a consistent request from a City Councilor to the public to stand only for the invocation.  [Id.].

The City Council's process—or lack thereof—for selecting invocation speakers is the most troublesome to the Court of all factors to consider regarding legislative prayer practices. There is no dispute that the selection of the invocation speaker is left to each individual City Councilor's discretion, and there are no formal written policies governing this procedure. This leaves ample room for abuse, which concerns the Court. However, the lack of a formal, written policy does not by itself create a constitutional problem (though the existence of one could provide neutrality-enforcing guidelines that would help avoid constitutional issues in the future), nor does the fact that the selection of speakers is left to the discretion of the individual Councilors. Brevard, 928 F.3d at 1314. The ultimate question is whether the City "maintains a policy of nondiscrimination" in the way it chooses invocation speakers. Town of Greece, 572 U.S. at 585. In other words, the "issue lies in how the [Councilors] exercised their discretion in practice." Brevard, 928 F.3d at 1314-15.

The evidence the City provides shows that it does maintain a policy of nondiscrimination, and TST fails to provide evidence that the City Councilors "exercised [their] plenary discretion in plainly unconstitutional ways." Brevard, 928 F.3d at 1312. Speakers from a variety of Christian denominations, rabbis, and leaders of other faiths, including an imam, in addition to laypeople, have been asked to give the invocation at City Council meetings. All evidence before the Court indicates that City Councilors choose invocation speakers not because of the religion they are affiliated with, but because of their involvement in the communities the Councilors represent. TST's own briefing repeatedly suggests—without evidence—that invocation invitations are reserved for "political allies," not certain religious groups. [See, e.g., Dkt. 102 at 8]. Of course, this is not a case where City Council "at no point excluded or denied an opportunity to a would-be prayer giver," nor has City Council made "reasonable efforts to

identify all of the congregations located within its borders," as in <u>Town of Greece</u>.  572 U.S. at

571, 585.  City Councilors did, in fact, deny one request—TST's—to give an invocation, and

speaker selection is left to each City Councilor's individual discretion.  But, as the Court has

already explained, here, the rejection of one group (there are no other rejections on record)[10] who

had been previously unknown to the City Councilors does not constitute a violation of the

Establishment Clause.  Moreover, the evidence before the Court suggests that the City

Councilors' discretion generally has been exercised within the limits of the Establishment

Clause, as nothing in the record suggests that the selection or exclusion of speakers is based on

religious beliefs rather than community involvement.

 This case is unlike <u>Williamson v. Brevard County</u>, which found that a county board's

selection process rendered its legislative prayer practice unconstitutional.  928 F.3d at 1314-15.

In <u>Brevard</u>, the evidence suggested that the commissioners used their plenary discretion "to

discriminate on the basis of religious beliefs, favoring some monotheistic religions over others

and disfavoring and excluding—at least—religions that are polytheistic, pantheistic, or otherwise

outside of the 'mainstream.'"  <u>Id.</u> at 1311.  This evidence included statements from the

commissioners themselves which indicated that they considered "the specific religious beliefs of

a prospective invocation-giver" and that "certain religions or types of religions would be flatly

banned from giving an invocation."  <u>Id.</u> at 1313-14.  The court found that these comments

reflected "an aversion or bias on the part of [county] leaders against minority faiths," and a "fair

---

[10] TST provides an email dated December 12, 2020, from Rajan Zed, "a Hindu leader," in which he asks to read an invocation at a City Council meeting.  [Dkt. 104-1 at 46].  The recipients of the email are a number of City Councilors.  There is no indication that any of the Councilors responded.  Even if the Court assumes Zed's request was not granted, this second denial fails to support a claim that the selection process is discriminatory.  There is nothing in the record regarding Zed's congregation—merely that he is "a Hindu leader"— his involvement in the community, or the City Councilors' reasons for not extending an invitation to lead an invocation to Zed.  If anything, this email suggests that the City Council did, in fact, follow a non-discriminatory policy of not allowing requests to give the invocation.

examination of the lengthy summary judgment record" showed that the "[c]ommissioners consciously held and acted upon views about which religions and types of religious beliefs were the right kind for invocations and which were not." Id. at 1315.  No such evidence exists here. This is not to say that there must be a "smoking gun" indicating clear religious bias to find that the City Council's selection process fails to adhere to a policy of nondiscrimination, but there must be *something* to suggest that the selection process reflects "an aversion or bias on the part of town leaders against minority faiths." Town of Greece, 572 U.S. at 585.  On the summary judgment record before this Court, the selection process here does not reflect such prejudice. This is particularly true when the Court views the selection process in light of the other factors discussed.  When the Court considers the City Council's legislative prayer practice as a whole, it cannot say that "the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief," Marsh, 463 at 794-95, such that it "promote[s] a preferred system of belief or code of moral behavior" in violation of the Establishment Clause, Town of Greece, 572 U.S. at 581.  Judgment must be awarded in favor of the City on TST's Establishment Clause claim.

### B.    Massachusetts Free Exercise Claim

The City also seeks summary judgment on TST's claim that the City Council's legislative prayer practice burdens TST's free exercise of religion under Massachusetts law.  See Mass. Gen. Laws. Const. amend. art. 46, § 1.  The question is whether the state action complained of "substantially burdens [the] free exercise of religion, and, if it does, whether the [government] has shown that it has an interest sufficiently compelling to justify that burden." Society of Jesus of New Eng. v. Massachusetts, 808 N.E.2d 272, 279 (Mass. 2004) (first modification in original). "The party claiming an unconstitutional burden on the free exercise of religion must show (1) a

sincerely held religious belief, which (2) conflicts with, and thus is burdened by, the state requirement.  Once the claimant has made that showing, the burden shifts to the state" to demonstrate "both that the (3) requirement pursues an unusually important governmental goal, and that (4) an exemption would substantially hinder the fulfillment of the goal."  Id. (citation and internal quotation marks omitted).

TST's claim fails on the second prong of this analysis.  See Curtis v. Sch. Comm. of Falmouth, 652 N.E.2d 580, 587 (Mass. 1995) ("The preliminary inquiry in a free exercise analysis is whether the challenged governmental action creates a burden on the exercise of a plaintiff's religion.").  TST argues that City Council's legislative prayer practice is unlawfully burdensome because "it amounts to a forced choice" that requires TST to "continue to venerate Satan and thereby forfeit [its] opportunity to access a prayer opportunity," or it can "abandon the defining aspect of [its] creed in the hopes that this will make [it] sufficiently palatable to the political ruling class."  [Dkt. 111 at 10].  This manufactured burden cannot sustain TST's free exercise challenge.  A "'substantial burden' is one that is coercive or compulsory in nature." Curtis, 652 N.E.2d at 587 (citations omitted).  The City Council's legislative prayer practice is neither.  The City has neither "condition[ed] receipt of an important benefit on conduct proscribed by a religious faith," nor has it "denie[d] such a benefit because of conduct mandated by a religious belief," and there is no indication that the City Council's legislative prayer practice has made it "more difficult to practice certain religions."  Id. at 588.  Because TST's "right to maintain [its] religion has not been hampered" by the City Council's legislative prayer practice, judgment must be awarded in favor of the City.  Fedele v. Sch. Comm. of Westwood, 587 N.E.2d 757, 761 (Mass. 1992).

IV.    **CONCLUSION**

For the foregoing reasons, the City's motion for summary judgment [Dkt. 98] is

**GRANTED**, and TST's motion for summary judgment [Dkt. 101] is **DENIED**.

**SO ORDERED.**

Dated: July 31, 2023                                    /s/ Angel Kelley
                                                        Hon. Angel Kelley
                                                        United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|                          |     |                                 |
|--------------------------|-----|---------------------------------|
|                          | )   |                                 |
| The Satanic Temple, Inc.,| )   |                                 |
|                          | )   |                                 |
| Plaintiff,               | )   |                                 |
|                          | )   |                                 |
|                          | )   | Civil Action No. 21-CV-10102-AK |
| v.                       | )   |                                 |
|                          | )   |                                 |
| City of Boston,          | )   |                                 |
|                          | )   |                                 |
| Defendant.               | )   |                                 |
|                          | )   |                                 |

## <u>JUDGMENT</u>

**A. KELLEY, D.J.**

In accordance with the Court's Memorandum and Order dated July 31, 2023 (Dkt. No. 119), granting the City's motion for summary judgment and denying TST's motion for summary judgment, it is hereby ORDERED:

Judgment entered for City of Boston.

Dated: July 31, 2023                          /s/ Miguel A. Lara
                                              Deputy Clerk