No. 23-1642

# United States Court of Appeals
## For the First Circuit

---

THE SATANIC TEMPLE, INC.,

Plaintiff - Appellant,

v.

CITY OF BOSTON,

Defendant - Appellee.

---

On Appeal from the United States District Court for the District of Massachusetts
in Civil Action 1:21-cv-10102-AK

---

**BRIEF OF THE DEFENDANT-APPELLEE CITY OF BOSTON**

---

Counsel for Defendant-Appellee,
**CITY OF BOSTON**

Edward F. Whitesell, Jr.
First Circuit Bar No. 1122127
Senior Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
(617) 635-4045
edward.whitesell@boston.gov

Dated: March 18, 2024

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES ............................................................ 2

STATEMENT OF THE CASE ............................................................... 3

  I.    FACTUAL BACKGROUND ....................................................... 3

    A.   The City Council Invocation Invitation Process ........................ 3

    B.   TST Seeks to Obtain an Invocation Invitation .......................... 6

  II.   RELEVANT PROCEDURAL HISTORY ..................................... 8

SUMMARY OF THE ARGUMENT ..................................................... 13

ARGUMENT ...................................................................................... 16

  I.    STANDARD OF REVIEW ........................................................ 16

  II.   THE DISTRICT COURT CORRECTLY DETERMINED THAT THE CITY WAS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE ESTABLISHMENT CLAUSE CLAIM ............................................. 18

    A.   City Council Decisions Regarding Whom to Invite as Invocation Speakers were Motivated by Lawful Reasons, and there was no Evidence that the Decision not to Extend an Invitation to TST was Motivated by Animus or Bias ......................................................................... 19

    B.   No Reasonable Observer Familiar with the Tradition of Legislative Prayer would Conclude that the City Council's Process for Selecting Speakers Constituted Proselytizing or the Advancement of one Faith or Belief at the Expense of Others .............................................. 26

III. THE CITY COUNCIL'S LEGISLATIVE PRAYER SELECTION PROCESS DID NOT PLACE A SUBSTANTIAL BURDEN ON THE RIGHT OF TST TO EXERCISE THEIR RELIGION ................................38

IV. TST WAS NOT ENTITLED TO THE DEPOSITION OF MAYOR WU....42

CONCLUSION ........................................................................................48

CERTIFICATE OF COMPLIANCE ......................................................49

CERTIFICATE OF SERVICE ...............................................................50

# TABLE OF AUTHORITIES

## CASES

*Abington School Dist. v. Schempp*,
  374 U.S. 203 (1963) ....................................................................38

*Am. Legion v. Am. Humanist Ass'n*,
  588 U.S. 29 (2019) .....................................................................26

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...................................................................17

*Ayala-Gerena v. Bristol Myers-Squibb Co.*,
  95 F.3d 86 (1st Cir. 1996) ...........................................................17

*Bogan v. City of Boston*,
  489 F.3d 417 (2007) ...................................................... 45, 46, 47

*Bormuth v. County of Jackson*,
  870 F.3d 494 (6th Cir. 2017) ....................................... 30, 31

*Curtis v. Sch. Comm. of Falmouth*,
  420 Mass. 749 (1995) ............................................... 39, 41

*Gundy v. City of Jacksonville Fla.*,
  50 F.4th 60 (11th Cir. 2022) ....................................................34

*In re Opinion of the Justices to the Senate*,
  430 Mass. 1205 (2000) ..............................................................42

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022) ..................................................... 26, 27

*KinectUs LLC v. Bumble Trading LLC*,
  2021 WL 6066539, at *2 (D. Mass., Dec. 22, 2021) ...........................44

*Krupien v. Ritcey*,
  94 Mass. App. Ct. 131 (2018) ....................................................39

*Larson v. Valente*,
456 U.S. 228 (1982)......................................................................18

*Lee v. Weisman*,
505 U.S. 577 (1992) ............................................................... 29, 37

*Lund v. Rowan Cty.*,
863 F.3d 268 (4th Cir. 2017). ................................ 26, 30, 31, 35, 36

*Mack v. Great Atl. & Pac. Tea Co.*,
871 F.2d 179 (1st Cir. 1989). ............................................. 17, 18, 43

*Magazu v. Dep't of Children and Families*,
473 Mass. 430 (2016) ........................................................... 40, 41

*Marsh v. Chambers*,
463 U.S. 783 (1983)........................ 14, 15, 18, 19, 20, 26, 27, 28, 30, 32, 36, 38

*Mendoza v. Licensing Bd. of Fall River*,
444 Mass. 188 (2005) ...........................................................42

*Mesnick v. Gen. Elec. Co.*,
950 F.2d 816 (1st Cir. 1991)...................................................17

*Monell v. Department of Social Services of the City of New York*,
436 U.S. 658 (1978)................................................................1

*Mulvihill v. Top-Flite Golf Co.*,
335 F.3d 15 (1st Cir. 2003)................................................. 16, 17

*Noviello v. City of Boston*,
398 F.3d 76 (1st Cir. 2005).....................................................16

*Rubin v. City of Lancaster*,
710 F. 3d 1087 (9th Cir. 2013) ............................... 26, 30, 32, 36, 37

*Santa Fe Independent School Dist. v. Doe*,
530 U.S. 290 (2000).............................................................37

iv

*Satanic Temple, Inc. v. City of Scottsdale*,
856 F. App'x 724 (9th Cir. 2021). ....................................................21

*Scott v. Harris*,
550 U.S. 372 (2007)......................................................................17

*Society of Jesus of New Eng. v. Massachusetts*,
441 Mass 662 (2004) ............................................................. 39, 40

*The Satanic Temple, Inc, et al. v. City of Chicago*,
C.A. No. 23-cv-2780 (N.D. Ill. 2023)................................................39

*Town of Greece v. Galloway*,
572 U.S. 565 (2014)........ 14, 18, 19, 20, 26, 27, 29, 30, 32, 33, 34, 35, 36, 37, 38

*United States v. Morgan*,
313 U.S. 409 (1941)......................................................................45

*Vasquez v. Lopez-Rosario*,
134 F.3d 28 (1st Cir. 1998)............................................................16

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)......................................................................25

*Williamson v. Brevard County*,
928 F. 3d 1296 (11th Cir. 2019). ....................................... 21, 24, 30, 37

## STATUTES

28 U.S.C. § 1291 .........................................................................1

28 U.S.C. § 1331 .........................................................................1

28 U.S.C. § 1367 .........................................................................1

42 U.S.C. § 1983 .........................................................................1

**RULES**

Fed. R. Civ. P. 26 ........................................................................... 2, 44, 45

Fed. R. Civ. P. 45 ............................................................................ 2, 44

Fed. R. Civ. P. 56 ................................................................................ 16

# JURISDICTIONAL STATEMENT

The Satanic Temple, Inc. ("TST") appeals the entry of summary judgment in favor of the City of Boston (the "City"), and consequently, the denial of summary judgment in favor of TST, on the two remaining claims brought against the City pursuant to 42 U.S.C. § 1983 ("§ 1983") and the United States Supreme Court's decision in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) ("*Monell*").[1] TST further appeals from the District Court's denials of TST's repeated attempts to take the deposition of Mayor Wu.[2] The District Court had federal question jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims for relief pursuant to 28 U.S.C. § 1367. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1291, as it is an appeal from a decision of the District Court in a case in which it entered final judgment on July 31, 2023 and for which TST filed a timely notice of appeal on August 2, 2023.

---

[1] In the operative pleading, the First Amended Complaint, TST pleaded four counts against the City: Count I (Establishment Clause); Count II (Free Speech and Free Exercise Clauses); Count III (Equal Protection Clause); and Count IV (Massachusetts' Free Exercise Clause). TST Record Appendix ("Appx.") at 20-40; *see also* ECF No. 16. The District Court dismissed Count II for lack of standing and Count III for failure to state a claim. Appx. at 7; *see also* ECF No. 21.

[2] In its notice of appeal, TST listed three additional grounds for appeal: (1) the District Court's denial of TST's motion for discovery sanctions against the City; (2) its denial of TST's motion for recusal; and (3) its denial of a motion for reconsideration of the dismissal of the other two § 1983 claims. In its briefing, however, TST has evidently abandoned these additional grounds for appeal.

*See* TST Brief Addendum 51; Appx. at 914-916; ECF No. 122.

## STATEMENT OF THE ISSUES

1.    Whether the District Court correctly determined that the City was entitled to judgment as a matter of law on the Establishment Clause claim because the undisputed evidence shows that the decisions regarding whom to invite as invocation speakers were motivated by lawful reasons and there was no evidence that the decision not to extend an invitation to TST was motivated by animus or bias.

2.    Whether the District Court correctly determined that the City was entitled to judgment as a matter of law on the Establishment Clause claim because no reasonable observer familiar with the tradition of legislative prayer in the United States would conclude that the City Council's process constituted proselytizing or the advancement of one faith or belief at the expense of others.

3.    Whether the District Court correctly determined that the City Council's legislative prayer selection process did not place a substantial burden on the right of TST to exercise their religion and thus did not violate the Free Exercise Clause of the Massachusetts Declaration of Rights.

4.    Whether the District Court abused its discretion by barring TST from taking the deposition of Mayor Wu under Rules 26 and 45 and because she is a high-ranking government official where the information sought was readily available from other sources offered by the City.

## STATEMENT OF THE CASE

## I.     FACTUAL BACKGROUND

### A.     The City Council Invocation Invitation Process

Invocations at Boston City Council meetings date back to the 1800s. *See* Supplemental Record Appendix ("Supp. R.A.") at 80.[3] Prior to 1909, the City had an alderman form of governance rather than a City Council, but invocations were still given.  Supp. R.A. at 81-83.  Every week, unless otherwise ordered and except on holidays, the Boston City Council holds a meeting.  Appx. at 23; Supp. R.A. at 2.  Meetings generally occur on Wednesdays, but not every Wednesday.  Supp. R.A. at 78, 84.  There are approximately thirty-five meetings per year.  Appx. at 23; Supp. R.A. at 3.  Time is set aside at the beginning of each meeting for an invited member of the public, often clergy, to say a few words before official Council business begins.  Supp. R.A. at 107.

At the beginning of each calendar year, Council staff prepares a schedule of dates for the meetings, including the name of the Councilor assigned to coordinate an invocation speaker.  Supp. R.A. at 110, 115-116, 119-135.  Council staff attempts to assign the same number of dates to all City Councilors, but due to scheduling and

---

[3] TST failed to consult with counsel for the City with respect to the contents of the Record Appendix, so the City sought and received permission to file a supplemental appendix.  TST also included memoranda of law in support of its positions on summary judgment, which is expressly prohibited by Fed. R. App. P. 30(a)(2).  There is no independent relevance to those memoranda.

availability, that is not always possible. Supp. R.A. at 110. At one point, invocation speakers received a stipend from the City, but the payment of speakers ceased sometime by 2016 or 2017. Supp. R.A. at 97-98, 150. One speaker, Anne Marie Rousseau, testified that she received a $75 stipend in 2012, the first time she gave an invocation, but could not remember receiving one after that. Supp. R.A. at 169.

The selection of an invocation speaker is left within the discretion of the individual Councilors and their respective staffs. Supp. R.A. at 116. There are no guidelines or rules governing whom a Councilor may choose to give an invocation and the practice has not been reduced to writing. Appx. at 24; Supp. R.A. at 3, 54. In the words of staff counsel Attorney O'Donnell:

> the invitations for the invocation are based upon personal relationships the councilors have, [in other words] people that they have relationships with because of their districts. It might be work that the individual does in their district or does for their constituents. That has been the policy.

Supp. R.A. at 73-74. Absent an invitation from a City Councilor, there is no opportunity to offer an invocation prior to the Council's meetings. Appx. at 24; Supp. R.A. at 3. The City Council does not take requests. Supp. R.A. at 73-76. Councilor Essaibi-George was certain that a group referenced during her deposition did not solicit an invite, and that with the exception of TST, no one had asked her if they could "offer remarks, a prayer or a blessing before the City Council." Supp. R.A. at 143. In the words of staff counsel, "It's by invitation. So, the limit would be if you don't get an invitation, you don't give the invocation." Supp. R.A. at 87-

4

88.  The one presenter deposed by TST, Rousseau, testified that she gave an invocation annually from 2012 to 2020 at the invitation of then-Councilor Matt O'Malley.  Supp. R.A. at 158-161, 170.

It is the policy and custom of the Council that invitations for the invocation are based upon personal relationships the Councilors have and the work that the individual invitee does in the district or for their constituents.  Supp. R.A. 73-76, 89-96.  Even TST admits that the selection process is about political expediency and not religious preference.  Appx. at 150.  An example of an invitation is the May 13, 2019 letter from then-Councilor Kim Janey to the Rev. Mary Margaret Earl, acknowledging her congregation's work in the community and asking her to offer the invocation at a meeting scheduled on June 26, 2019.  Supp. R.A. at 176-177. Rousseau, who gave an invocation every year for eight years, volunteered on Councilor O'Malley's campaign and was involved in the community in his district. Supp. R.A. at 161-168, 170-173.  The invocations take a variety of different forms, such as "a blessing," "opening remarks," "a prayer," "a sermon" or "a poem or something like that."  Supp. R.A. at 142.  The content of and invocation is written or determined by the invited speaker.  Supp. R.A. at 174.  The City does not "bless" its Council meetings.  Supp. R.A. at 86.

While the majority of invocations are given by individuals from various Christian denominations, there have "also been a number of representatives from

5

other types of religions," and there have "been some laypeople throughout the years." Supp. R.A. at 102. Numerous Rabbis have been invited to give invocations. Supp. R.A. at 179-182. At the last Council meeting prior to the filing of the summary judgment motion, an Imam gave the invocation at the invitation of Councilor Fernandes Anderson, and indicated that he had been previously invited by Councilor Yancey, who left the Council in 2015. Appx. at 658.[4] Non-religious speakers have been invited to give invocations. Supp. R.A. at 102. Indeed, "there have been instances where an individual from an organization that does work within the community may give the invocation." Supp. R.A. at 102-103. The Council has had "poems and reflections" read by many people for the invocation. Supp. R.A. at 148. The City Clerk, Maureen Feeney, gave a number of invocations reading from a "book of reflections." Supp. R.A. at 148-149. In 2017, an invocation was given by a member of the Boston Debate League, a non-profit organization seeking to integrate argument and debate into public schools. Supp. R.A. at 182.[5]

### B. TST Seeks to Obtain an Invocation Invitation

On October 6, 2016, Travis LeSaffre, Chapter Head of the Boston Chapter of

---

[4] The video from this meeting on April 26, 2023 is available at the City Council YouTube channel: https://www.youtube.com/watch?v=Ti7QMgpUK8Q. The introduction to the invocation by the Imam begins at 4:00.

[5] *See also* the video cited by TST of a City Council meeting from September 2016, https://www.youtube.com/watch?v=T1rDy1ioPnE, involving a speaker involved in several nonprofits and speaking about the merits of the Boston Debate League.

TST, emailed then-Councilor Mark Ciommo asking to be invited to perform an invocation. Supp. R.A. at 184-185. LeSaffre also reached out to then-Councilors Tito Jackson and Michelle Wu seeking an invocation invitation. Supp. R.A. at 187-188. Wu responded that each Councilor only had two or three chances to invite faith leaders for the invocation and that the invitations were used to recognize faith leaders who are active in the community and organizations that are representative of the districts. Supp. R.A. at 187-188. Wu informed LeSaffre that "[t]here is no restriction or criteria based on any Councilor's religious preferences," and that many Councilors "had a long list of folks" they would like to invite but haven't been able to accommodate. Supp. R.A. at 187-188.

On August 17, 2017, LeSaffre emailed Wu and the other Councilors requesting that the Council allow all individuals an opportunity to perform invocations or to cease the invocations, threatening litigation in the absence of the "right choice." Supp. R.A. at 190-191. During TST's attempts to obtain an invitation, Councilors received emails expressing the view that they did not want TST to give an invocation. Supp. R.A. at 85. Councilor Essaibi-George declined to issue an invitation to TST, finding it "absurd" that TST felt entitled to an invitation from her to offer an opening remark without any relationship or interaction, or playing an important role in her work. Supp. R.A. at 144-147, 149-150, 153-154, 193. Former Councilor Tim McCarthy responded to NBC Boston's inquiry about

TST's request to give an invocation by stating:

> I would not consider anyone that doesn't have a positive impact on my community, my constituents, my family and me personally. Every leader I have invited, they all check the aforementioned boxes. This issue is not about the honor bestowed to a faith leader by a Boston City Councilor, this is a publicity stunt.

Appx. at 763.

On October 2, 2018, one of the co-founders of TST, Malcolm Jarry, emailed then-Council President Andrea Campbell requesting that someone from TST be invited to give the invocation at an upcoming Council meeting. Appx. at 42. The next day, Attorney O'Donnell responded that the Council did not accept requests to deliver an invocation, that it did not have a written policy concerning invocations and that Councilors decide who delivers the invocations at meetings. Supp. R.A. 195. On October 9, 2018, Attorney O'Donnell again emailed Jarry to explain the process for selecting individuals to give invocations prior to the start of City Council meetings. Appx. at 44. O'Donnell explained that the Councilors themselves do not offer invocations and that they invite individuals from the community, either clergy or laypeople, to give the invocations. Appx. at 44.

## II. RELEVANT PROCEDURAL HISTORY

TST filed its initial complaint in this matter on January 24, 2021. ECF No. 2; Appx. at 5. On April 5, 2021, the City filed a motion to dismiss the claims against it. ECF Nos. 13 and 14; Appx. at 7. TST opposed the motion to dismiss and then

amended its Complaint as a matter of right. ECF Nos. 15 and 16; Appx. at 7. The City filed a motion to dismiss the amended complaint on May 10, 2021, and the District Court denied the original motion as moot. ECF Nos. 17, 18 and 19; Appx. at 7. TST opposed the motion to dismiss the amended complaint. ECF No. 20; Appx. at 7. The District Court granted the motion to dismiss as to Count II for lack of standing, and Count III for failure to state a claim, but denied the motion with respect to the Establishment Clause claim. ECF No. 21; Appx. at 7. The District Court acknowledged the "fact-specific nature of the inquiry" and found that TST "plausibly raised a claim that Defendant's prayer selection policy has discriminated against it in violation of the Establishment Clause." ECF No. 21 at p. 12.

On July 6, 2022, TST served a Rule 30(b)(6) deposition notice outlining thirty (30) deposition topics upon which it sought to elicit testimony from the City. Appx. at 660, 852; ECF No. 79-1, at pp. 3-11. The City designated Attorney O'Donnell to testify on topics 1-7, 9, 11, 13-16 and 23-30. Appx. at 852. The topics for which O'Donnell was not designated dealt with the individual Councilors' "subjective bases" (8, 10, 12), "subjective understanding" (17, 18, 20, 21), "subjective opinion" (29) or statements that each had made (30). Appx. at 660, 852; ECF No. 79-1, at pp. 3-11. For Councilors still on the Council in July 2022, the City designated their respective chiefs of staff for these topics, as well as the former chief of staff for then-Mayor Wu. Appx. at 660, 853; ECF No. 79-1, at pp. 375. TST did not attempt to

take depositions of the proffered chiefs of staff or any Councilor other than the two final candidates for mayor – Essaibi-George and Mayor Wu. Appx. at 661, 852; Supp. R.A. at 21-24, 51-52, 60, 137.

In preparation for the Rule 30(b)(6) deposition, O'Donnell spoke with the staffs of the current Councilors about how they decide who receives invites for invocations. Supp. R.A. at 77-80. During the deposition, counsel for TST attempted to pigeon-hole certain questions as a "Wu question" in an effort to convince the Court that a deposition of the Mayor was necessary to prove TST's case. Supp. R.A. at 100-101. Similar efforts were made during the Essaibi-George and Rousseau depositions. Supp. R.A. at 140, 151-152, 172-173.

TST's central focus in the litigation was taking the deposition of Mayor Wu. On October 22, 2021, TST served a notice of deposition and subpoena for candidate and soon-to-be Mayor Wu for November 2, 2021 – ***Election Day***. Supp. R.A. at 21-24. TST admitted, in the District Court's words, its "intent to invite maximum inconvenience, political attention, and media scrutiny of TST's litigation through the deposition notice." TST Brief Addendum at 5; ECF No. 38. The District Court quashed the deposition for Election Day and requested further briefing on whether it should be allowed at all. Appx. at 9; ECF No. 40. The District Court subsequently quashed the deposition entirely, entered a protective order, and awarded attorneys' fees and costs to the City. TST Brief Addendum at 16.

Despite the protective order, on August 31, 2022, TST again noticed the deposition of Mayor Wu for September 12, 2022, and subsequently served a subpoena for a September 20, 2022 deposition. Supp. R.A. at 51-52, 60. The District Court again quashed the subpoena, and articulated the circumstances pursuant to which it would modify the existing protective order. Supp. R.A. at 47-50, 58-59; TST Brief Addendum at 17. TST immediately sought the District Court's recusal (based in part on the Wu deposition orders) and reconsideration of the protective order barring the deposition of Mayor Wu, each of which was denied. Appx 11-12; ECF Nos. 65, 66, 75; TST Brief Addendum at 19. In denying the motion for reconsideration, the District Court emphasized that TST "did not depose the Rule 30(b)(6) representative whom the City designated as the person with knowledge of Mayor Wu's subjective intent." TST Brief Addendum at 19.

Rather than take that deposition to determine whether the designee would be able to provide the information, TST's response was to file a motion for sanctions against the City based on the O'Donnell deposition, seeking as sanctions, *inter alia*, a deposition of Mayor Wu. Appx. at 12; ECF No. 80 at 29. That motion was denied. Appx. at 13; ECF No. 88. In a subsequent Joint Status Report, TST again requested a deposition of Mayor Wu. Appx. at 13; ECF No. 90. That request was denied after a status conference when the District Court ruled that discovery was closed and set a briefing schedule for summary judgment. Appx. at 14-15; ECF Nos. 95 and 96.

Pursuant to the briefing schedule, the City filed its motion for summary judgment on May 1, 2023. Supp. R.A. at 61-63. TST also filed a motion for summary judgment. Appx. at 726-728. The City argued that there was no Establishment Clause violation because the City Council's invocation process falls squarely within the constitutional parameters established by the Supreme Court, as no reasonable observer of the history of legislative prayer would believe that the Council's process was exploited to proselytize or advance or disparage any religion, and there was no evidence of any discriminatory intent on the part of any Councilor. Supp. R.A. 61-62. The City further argued that it was entitled to judgment dismissing the state free exercise claim because the invocation process did not interfere with TST's right to freely exercise its religious beliefs. Supp. R.A. at 62. The District Court heard oral argument on June 28, 2023 and took the matter under advisement. Appx. at 17-18, 930-986.

The District Court granted the City's motion for summary judgment (and denied TST's motion for summary judgment) in an order dated July 31, 2023. TST Brief Addendum at 20-50. With respect to the Establishment Clause claim, the District Court found: (1) that there was no evidence that the decision not to extend an invitation to TST was motivated by animus or bias; and (2) that the City's legislative prayer practice as a whole was not "exploited to proselytize or advance any one, or disparage any other, faith or belief." TST Brief Addendum at 35, 48.

The District Court further held that TST's right to exercise its religion was not hampered by the Council's legislative prayer practice, and thus did not violate the Massachusetts free exercise clause. TST Brief Addendum at 48.

On August 3, 2023, TST filed a notice of appeal of, *inter alia*, the District Court's decisions barring the Wu deposition and its grant of summary judgment in favor of the City. Appx. at 18, 914-916. On January 4, 2024, TST filed its appellant's brief and a noncompliant appendix. *See* First Circuit Document Nos. 00118092923 and 00118092927. The City then requested and received leave to file the supplemental appendix filed herewith. *See* First Circuit Document Nos. 00118098258 and 00118098443.

## SUMMARY OF THE ARGUMENT

"If you don't get an invitation, you don't give the invocation." The City Council's practice of inviting speakers to give an invocation at the start of their meetings is government speech. The people that they invite are usually from their districts or constituencies and the opportunity is seen as a reward for active service in the community. The decision is usually political. It has been described by TST as "whim-based" with invitations issued based on their status as "political insiders." What it is not is based on the particular religion of the speaker. There is no doubt that the majority of the invocation-givers are religious leaders. That is the nature of an invocation, the act of calling on a deity or higher power for a blessing or aid.

There is also no dispute that the majority of the speakers are from Christian religions. But these facts alone do not violate the Establishment Clause.

That requires a showing of discriminatory intent. That evidence does not exist. Contemporaneous responses to TST's requests for an invitation reveal no evidence of any opinion on its religious beliefs. Mayor Wu expressly informed TST that the invitations are "used to recognize faith leaders who are active in the community and organizations that representative of their districts," and that there "is no restriction or criteria based on any Councilor's religious preferences." Supp. R.A. at 187. Councilor Essaibi-George testified that she did not invite TST because she had "no relationship" and "no interaction" with TST. Supp. R.A. 149-150, 153. There was no evidence TST, which maintains its headquarters and temple in Salem, did not receive an invitation because of its religious beliefs.

Nor does the Council's process overall run afoul of the constitutional framework for analyzing legislative prayer under the Establishment Clause that was established by the Supreme Court's decisions in *Marsh v. Chambers*, 463 U.S. 783 (1983) and *Town of Greece v. Galloway*, 572 U.S. 565, 575 (2014). No "reasonable observer" viewing the Council's invocation process in light of the long history of legislative prayer would conclude that the process here has been exploited to proselytize or to advance or disparage any religion. The *Marsh* Court reasoned that "the measure of constitutional adjudication is the ability and willingness to

distinguish between real threat and mere shadow." 463 U.S. at 795. There is no "real threat" that the Boston City Council is using the selection process to advance one faith over others. TST is not concerned that one religion is getting the spotlight at Council meetings; it is only concerned that its religion is not getting the spotlight at all. Its claim is "mere shadow."

The District Court correctly granted summary judgment for the City on the claim that the selection process violates the Massachusetts free exercise clause. As this case involves government speech and not a public forum, this claim should have been dismissed for lack of standing like its federal counterpart. Regardless, the District Court properly determined the process did not place a "substantial burden" on TST's ability to freely exercise its religion. Indeed, TST held SatanCon in Boston during the summary judgment briefing. The invocation is not a government benefit for which constituents are entitled to apply that was denied to TST due to its beliefs. It is government speech for which speakers are selected based on service to the City.

Finally, the District Court's repeated denials of TST's attempts to depose Mayor Wu were not an abuse of discretion. As District Court noted, the initial attempt to take her deposition on Election Day was a publicity stunt. The District Court cited several grounds for prohibiting the deposition under the express language of Rules 26 and 45. It also barred the deposition because Mayor Wu is a high-ranking official that had no first-hand knowledge related to the case that could

not be discovered from other sources, such as her chief of staff designated by the City for that purpose, whom TST made no effort to depose. For these reasons, the District Court found that the City is entitled to summary judgment dismissing the remaining claims. The First Circuit should affirm.

## ARGUMENT

## I.    STANDARD OF REVIEW

"An order granting summary judgment engenders de novo review." *Noviello v. City of Boston*, 398 F.3d 76, 84 (1st Cir. 2005). "When all is said and done, summary judgment will lie only if the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Mulvihill v. Top-Flite Golf Co.,* 335 F.3d 15, 19 (1st Cir. 2003) (quoting Fed. R. Civ. P. 56(c)). The "nonmovant bears 'the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe.'" *Noviello*, 398 F.3d at 84 (quoting *Mulvihill,* 335 F.3d at 19). The facts offered to defeat summary judgment, "typically set forth in affidavits, depositions, and the like, must have evidentiary value; as a rule, 'evidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment.'" *Id.* (quoting *Vasquez v. Lopez–Rosario,* 134 F.3d 28 (1st Cir. 1998)).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). "Moreover, the factual conflicts relied upon by the nonmovant must be both genuine and material." *Mulvihill*, 335 F.3d at 19. "For this purpose, 'genuine' means that the evidence is such that a reasonable factfinder could resolve the point in favor of the nonmoving party, and 'material' means that the fact is one that might affect the outcome of the suit under the applicable law." *Id*. (internal citations omitted).

"This same paradigm governs [the First Circuit's] de novo review of a district court's summary judgment rulings" with "one important distinction." *Id*. at 19-20. "The court of appeals 'is not restricted to the district court's reasoning but can affirm a summary judgment on any independently sufficient ground' made manifest in the record." *Id*. (quoting *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991)); *see also Elder v. Holloway*, 510 U.S. 510, 516 (1994).

With respect to the decision to quash the deposition of Mayor Wu, the standard is abuse of discretion. *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 91 (1st Cir. 1996). "Circumstances warranting appellate intervention in garden-variety pretrial discovery are infrequent." *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 186 (1st Cir. 1989). The First Circuit "will intervene in such matters only upon a clear showing of manifest injustice, that is, where the lower court's discovery

order was plainly wrong and resulted in substantial prejudice to the aggrieved party." *Id.* "Sticking the appellate nose too readily into the district court's scope-of-discovery tent is, we think, a recipe for disaster." *Id.*

## II. THE DISTRICT COURT CORRECTLY DETERMINED THAT THE CITY WAS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE ESTABLISHMENT CLAUSE CLAIM

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). In the context of legislative prayer, the framework for Establishment Clause jurisprudence is centered on two Supreme Court cases, *Town of Greece*, 572 U.S. at 565 and *Marsh*, 463 U.S. at 783. In its order on the motion to dismiss, the District Court found that the alleged facts, if true, established a discriminatory motive and thus the Council's policy would fall outside of the scope of the holding in *Marsh*. During discovery, however, TST failed to uncover any evidence of a discriminatory motive. In fact, TST did little discovery into that issue at all. TST took *one* deposition of a City Councilor (who it honed in on because she was a final mayoral candidate) and spent the rest of discovery focused on its attempts to depose the other Councilor who was a final mayoral candidate and ultimately won, Mayor Wu.

In its order on the motions for summary judgment, the District Court determined that TST did not claim that the City Council's general practice of

opening meetings with an invocation violated the Establishment Clause, but rather that the City discriminated against TST when it did not extend it an invitation. TST Brief Addendum at p. 30-31. TST's goal is not to stop the Council's legislative prayer, but rather to participate in it. TST Brief Addendum at p. 954.[6] The District Court nonetheless analyzed the constitutionality of the Council's overall process for selecting invocation speakers under the Establishment Clause and the *Marsh/Town of Greece* framework. After an analysis of whether the specific decision not to invite TST was discriminatory and an analysis of whether the process as a whole violates the Establishment Clause, the District Court correctly concluded that the City's invocation selection process passes constitutional muster.

## A. City Council Decisions Regarding Whom to Invite as Invocation Speakers were Motivated by Lawful Reasons, and there was no Evidence that the Decision not to Extend an Invitation to TST was Motivated by Animus or Bias

The District Court concluded based on TST's representations at the hearing that the "essence of this action is an allegation of discrimination – TST claims that the City discriminated against it because of its religious views when the City Council refused to invite TST to give the invocation." TST Brief Addendum at p. 31. The District Court conceded that there is very little "guidance on the proof required for

---

[6] When asked by the District Court whether TST wanted the practice to cease, TST's counsel replied, "No. We want in. We do not want to cease the prayer practice." Appx. at 954.

a discrimination claim in the legislative prayer context of the Establishment Clause." TST Brief Addendum at p. 32. However, the District Court looked to *Marsh* and *Town of Greece* to ascertain what guidance does exist.

In *Marsh*, the Supreme Court found that although a single clergyman of one denomination had given prayers in the Judeo-Christian tradition for sixteen years and was paid at the public expense, "[a]bsent proof that the chaplain's reappointment stemmed from an impermissible motive," his "long tenure does not in itself conflict with the Establishment Clause." 463 U.S. at 793-94. Likewise, in *Town of Greece*, the Supreme Court noted that the fact that "nearly all of the congregations in town turned out to be Christian does not reflect an aversion or bias on the part of town leaders against minority faiths." 572 U.S. at 585-86. "So long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing." *Id.* As the District Court concluded, "[t]aken together, these cases suggest that allowing some individuals to give prayers at a legislative session but not others due to 'an aversion or bias … against minority faiths' or other 'impermissible motive' is discrimination in violation of the Establishment Clause." TST Brief Addendum at p. 32-33; *see also Town of Greece*, 572 U.S. at 585; *Marsh*, 463 U.S. at 793. This is not the first time that TST has challenged a city invocation process as discriminatory under the Establishment Clause. *See*, *e.g.*, *Satanic Temple*,

*Inc. v. City of Scottsdale*, 856 F. App'x 724 (9th Cir. 2021). In *City of Scottsdale*, the Ninth Circuit held that the district court "properly concluded that TST had failed to prove by a preponderance of the evidence that TST's religious beliefs were a factor, let alone a substantial motivating factor, in [the] decision not to approve TST to give a legislative prayer." *Id*. at 726. In other words, there must be evidence that the legislators failed to maintain "a policy of nondiscrimination" that indicated that "the prayer opportunity has been exploited to proselytize or advance" a "class of religions to the exclusions of many others." *Williamson v. Brevard County*, 928 F. 3d 1296, 1308 (11th Cir. 2019). There is no such policy here.

It is within this framework that the District Court concluded that the Council's decision not to extend TST an invocation invitation was not discriminatory. In the words of the District Court, "[a]ll of the evidence submitted suggests that individual City Councilors invited speakers who served their constituents and were active in their communities, and TST did not qualify as such." TST Brief Addendum at p. 34. In response to TST's first request for an invocation, Councilor Wu explained that the invocation invitations are used to recognize leaders "who are active in the community and organizations that are representative of their districts." Supp. R.A. at 187. Council Attorney O'Donnell testified that invitations are extended to people the Councilors "have relationships with because of their districts" such as "work that the individual does in their districts or for their constituents." Supp. R.A. at 74.

Councilor Essaibi-George stated that invocation speakers are "invited because of all the incredible work that they do across the City, work to end youth violence, work to provide shelter and stability to the homeless, or compassion and support for people in recovery." Supp. R.A. at 193. It is for this reason that Councilor Essaibi-George felt TST's request was absurd and "insulting to all of the amazing religious and secular leaders who are invited" – "when we invite someone to participate in our meeting it is out of a profound respect, not a sense of obligation." Supp. R.A. at 193. By contrast, TST maintains its physical temple and headquarters in Salem, Massachusetts, and not Boston, where the Council's constituents reside.

The District Court correctly determined that TST provided no evidence that the decision not to extend it an invitation was motivated by animus or bias. The City, on the other hand, presented ample evidence that the decision not to invite TST was motivated by other lawful reasons.[7] The one decisionmaker deposed by TST, Councilor Essaibi-George, was clear in her reasons for not extending an invite to TST – she did not know anything about the entity and "did not have a relationship

---

[7] TST continues to complain that it was unable to obtain necessary information because it was foiled in its indivertible quest to take the deposition of Mayor Wu. As the District Court discussed, however, TST had multiple other avenues to obtain the information and refused to take them. TST only attempted to depose the two final mayoral candidates and none of the other listed Councilors or their chiefs of staff. In the words of the District Court, "[i]f relevant evidence is absent from the summary judgment record, it is the result of TST's own actions." TST Brief Addendum at p. 35, n. 6.

with TST." Appx. at 571, 585-86. TST concedes that invocation speakers were chosen based on their status as "political insiders" rather than their political beliefs. However, those "political considerations do not equate to discrimination based on religious beliefs." TST Brief Addendum at p. 35. However much the lines may be blurred from time to time, here politics did not equal religion for the purposes of the Establishment Clause. TST argued that the invitations were "whim-based," but there was no evidence that the whims of the Councilors were motivated by an endorsement of a particular religion. That a Councilor might find it politically expedient to curry favor with a religious group and its constituent members by inviting it to say a prayer prior to a meeting does not violate the Establishment Clause. In the words of Councilor Essaibi-George during her deposition:

> Q:    Did politics play any role in your decision to invite people to give this ceremonial prayer?
>
> A:    I'm a politician. Politics is very much a part of every decision I make as a city councilor.
>
> Q:    Is that a "yes"?
>
> A:    Politics plays a role in every decision I make as a city councilor.
>
> Q:    Including who to invite. Correct?
>
> A:    Of course. It is based on relationships and what is happening in our city.

Appx. at 587. It is self-evident that religious congregations of all types contain large groups of potential voters. It was the votes, and not the religion, that was the driving

force behind the decision-making here.

The facts of the present case are in stark contrast to those in *Williamson*. 928 F.3d at 1299. There, the Eleventh Circuit determined that a plaintiff was able to present evidence – ***the testimony of the inviting lawmakers themselves*** – that made it "abundantly clear that most if not all of the Commissioners exercise their discretion in a way that discriminates among religions based on their beliefs, favoring some but not all monotheistic and familiar religious sects over those faiths that fall outside the 'mainstream.'" *Id*. The Eleventh Circuit elaborated:

> Moreover, some religions are scrutinized by the Commissioners more closely, and others are even categorically excluded from consideration. Secular humanists are far from the only group viewed with disfavor. Thus, for example, some of the Commissioners and former Commissioners have testified unambiguously that they would not allow deists, Wiccans, Rastafarians, or, for that matter, polytheists to deliver prayers, and that they would have to think long and hard before inviting a Hindu, a Sikh, or a follower of a Native American religion. Nothing could be clearer from this record than that more than a few of the Commissioners rejected speakers based squarely on the nature of the religious beliefs they held.

*Id*. Following *Town of Greece*, the Court held that it was not the predominance of Christian speakers that ran afoul of the Establishment Clause, but rather the unabashed admissions reflecting "an aversion or bias on the part of [county] leaders against minority faiths." *Id*. at 1315. TST cannot present any similar evidence here.

TST points to two facts in support of its argument that the Council discriminated against TST: (1) unsolicited emails from constituents urging

Councilors to deny TST an invitation; and (2) the timing of the elimination of the small stipend previously paid to invocation speakers. Each is a red herring. There was no evidence in the record that any of the City Councilors agreed with or acted on the positions of the small number of constituents that emailed about TST's attempt to get an invitation for an invocation. The District Court rightly refused to hold the Council liable for the opinions of constituents in unsolicited email correspondence. TST Brief Addendum at p. 36.

Similarly, that the Council eliminated a small stipend for speakers roughly around the time that TST sought to give an invocation has no impact on the outcome. The mere decision to terminate the stipend does not indicate discriminatory intent under *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). TST Brief Addendum at p. 36. *Arlington Heights* stands only for the proposition that "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." *Id.* The decision to end the stipend affected all speakers equally. There is no evidence that it had anything to do with excluding speakers, let alone TST.[8] There was no evidence in the summary judgment record that the City chose not to extend an invitation for an invocation to TST because of its religious beliefs. The judgment should be affirmed.

---

[8] The *Arlington Heights* Court found no discriminatory intent in the failure to follow procedure. 429 U.S. at 267.

**B. No Reasonable Observer Familiar with the Tradition of Legislative Prayer would Conclude that the City Council's Process for Selecting Speakers Constituted Proselytizing or the Advancement of one Faith or Belief at the Expense of Others**

Although TST disclaimed challenging the process as a whole, the District Court conducted the analysis of the Council's selection process and deemed it to be constitutional under the Establishment clause.  Under *Marsh*, *Town of Greece* and their progeny, plaintiffs brought broad challenges against legislative prayer practices and policies, arguing that legislative prayer had the effect of placing an "official seal of approval" on Christianity in particular.  *Rubin v. City of Lancaster*, 710 F. 3d 1087, 1097 (9th Cir. 2013); *see also Lund v. Rowan Cty.,* 863 F.3d 268, 274 (4th Cir. 2017).  This Court should affirm the District Court's finding that the City Council's legislative prayer practice does not violate the Establishment Clause.

There is a "presumption of constitutionality for longstanding monuments, symbols, and practices." *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 51 (2019). "In place of *Lemon* and the endorsement test, this Court has instructed that the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) (quoting *Town of Greece*, 572 U.S. at 576)). *"Marsh* stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted." *Town of Greece*, 572 U.S. at 577.  In analyzing legislative prayer, "[t]he line that courts and governments must

draw between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers." *Kennedy*, 597 U.S. at 535-536.[9]

"The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." *Marsh*, 463 U.S. at 786. "From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom." *Id*. "Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress." *Id*.[10] "[T]he delegates did not consider opening prayers as a proselytizing activity or as symbolically placing the government's official seal of approval on one

---

[9] In a twist of fate, the *Town of Greece* Court cited the City Council of Boston as historical precedent for the practice of opening meetings of local legislative bodies under this Establishment Clause standard. 572 U.S. at 576 (citing Reports of Proceedings of the City Council of Boston for the Year Commencing Jan. 1, 1909, and Ending Feb. 5, 1910, pp. 1–2 (1910) (Rev. Arthur Little)).

[10] The *Marsh* Court noted that the chaplaincy was challenged in the 1850s, when after consideration by the Senate Judiciary Committee, the Senate decided that the practice did not violate the Establishment Clause. 463 U.S. at 786, n. 10. The Senate "reasoned that since prayer was said by the very Congress that adopted the Bill of Rights, the Founding Fathers could not have intended the First Amendment to forbid legislative prayer or viewed prayer as a step toward an established church." *Id*.

religious view." *Id*. at 792 (internal quotation omitted). The Supreme Court has accepted "the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from a practice of prayer similar to that now challenged." Id. at 791. The same is true of the City's invocation practice.

The City Council's tradition of legislative prayer dates back to the 1800s, a similar period to the Nebraska Legislature's "practice of over a century" in *Marsh*. *Id*. at 790. Although "[s]tanding alone, historical patterns cannot justify contemporary violations or constitutional guarantees," like *Marsh*, "there is far more here than simply historical patterns." *Id*. In *Marsh*, the Supreme Court rejected three factual arguments that the legislative prayer policy violated the Establishment Clause: (1) that a clergyman of only one denomination had been selected for 16 years[11]; (2) that the chaplain was paid at the public expense; and (3) that the prayers were exclusively in the Judeo-Christian tradition. 463 U.S. at 792-793. Weighed against the historical background of legislative prayer, the *Marsh* Court held that none of these factors invalidated the Nebraska legislative prayer practice under the Establishment Clause. *Id*. at 793.

*Town of Greece* instructs courts to consider a prayer practice from the perspective of the "reasonable observer," who is presumed to be "acquainted with

---

[11] TST no longer argues that repeat speakers weigh in favor of a finding that the selection policy violates the Establishment Clause. That position is contrary to the holding in *Marsh*, where the same individual gave the prayer for sixteen years.

[the] tradition" of legislative prayer. 572 U.S. at 587. There, the Supreme Court found that the offering of a prayer to open its monthly board meetings did not "compel citizens to engage in a religious observance" because "[t]he principal audience for these invocations is not, indeed, the public but lawmakers themselves, who may find that a moment of prayer or quiet reflection sets the mind to a higher purpose and thereby eases the task of governing." *Id*. at 587. The town maintained an informal process for selecting invocation speakers – a town employee called congregations until she found a minister available for the meetings and kept a list of those willing to return in the future. *Id*. at 571. The town "neither reviewed the prayers in advance of the meetings nor provided guidance as to their tone or content,"[12] and the "prayers often sounded both civic and religious themes." *Id*. at 571. "Although board members themselves stood, bowed their head, or made the sign of the cross during prayer, they at no point solicited similar gestures by the public." *Id*. at 588. The Supreme Court rejected the notion that instructions to the audience from the prayer-giver to rise, bow their heads or join in prayer would be unconstitutional, holding that guest ministers "presumably are accustomed to directing their congregations in this way and might have done so thinking the action

---

[12] The *Town of Greece* Court distinguished the decision in *Lee v. Weisman*, 505 U.S. 577 (1992), finding that case to involve a graduation where school authorities maintained strict control over the conduct of the students and the substance of the ceremony and the religious invocation was thus deemed to be coercive. 572 U.S. at 590. Those factors are not present here.

was inclusive, not coercive." *Id.* at 588-89. "The analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity." *Id.*

In reaching its decision, the District Court also conducted an in-depth analysis of cases in other Circuits that have examined legislative prayer under the Establishment Clause and the *Marsh*/*Town of Greece* framework. In addition to the Eleventh Circuit's decision in *Williamson*, which is discussed in detail in Section II.A, *supra*, the issue has been addressed by the Fourth Circuit in *Lund*, 863 F.3d at 271-272, the Ninth Circuit in *Rubin*, 710 F. 3d at 1097, and the Sixth Circuit in *Bormuth v. County of Jackson*, 870 F.3d 494, 512 (6th Cir. 2017). Carefully considering the body of existing caselaw, the District Court gleaned "five general factors to consider when evaluating broad challenges to a legislative prayer practice: (1) the identity of the speaker; (2) whether the speaker is paid to give a prayer; (3) the government's review of the speaker's chosen prayer content; (4) whether the nature of the prayer proselytizes or denigrates other religions; and (5) the selection process. Applying these five factors to the Council's process, the District Court correctly determined that it did not violate the Establishment Clause.

### 1. *The Identity of the Speaker*

With respect to the first factor, the District Court emphasized that the City

Council's invocation speaker is a guest and not the Councilors themselves. In finding a constitutional violation in *Lund*, the Fourth Circuit distinguished *Marsh* and *Town of Greece* because the prayers in those cases were led by guest ministers, whereas in *Lund*, the prayers were given by the board members themselves based on their personal faiths. 863 F. 3d at 277-280. [13] "[T]he identity of the prayer-giver is relevant to the constitutional inquiry." *Id*. at 280. As the Fourth Circuit noted, the distinction between guest-led prayer and legislator-led prayer is crucial in the eyes of the reasonable observer. *Id*. at 287. As the Fourth Circuit held:

> The conspicuous absence of [prior] case law on lawmaker-led prayer is likely no accident. As elaborated below, this type of prayer both identifies the government with religion more strongly than ordinary invocations and heightens the constitutional risks posed by requests to participate and by sectarian prayers.

*Id*. at 278. In *Lund*, the legislative prayer violated the Establishment Clause because the legislators "led the community in prayer," "composed each invocation according to their personal faiths," thus creating a prayer practice featuring "much greater and more intimate government involvement." *Id*.

---

[13] *Lund* and *Bormuth* are legislator-led prayer cases, where there is an evident conflict between the Fourth and Sixth Circuits that remains unresolved. Compare *Lund,* 863 F.3d at 268 (Constitutional violation) with *Bormuth*, 870 F. 3d 494 (no Constitutional violation). As counsel stated during oral argument, the City's position is not that the First Circuit should follow one or the other of these decisions, but rather that its own invocation scheme is constitutional in part because the religious message is not coming from the Councilors themselves. This distinguishes it from these two decisions, where the question is much closer to constitutional limits because the religious message was coming from the legislators.

On appeal, TST has abandoned the argument that the fact that a majority of the Council invocations were given by Abrahamic speakers supported a finding that the City's selection practice was unconstitutional. This argument was expressly rejected in *Marsh*, where the prayers were exclusively Judeo-Christian. 463 U.S. at 794-795. "So long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing." *Town of Greece*, 572 U.S. at 585-586. Analyzing the first factor, the District Court also noted that speakers of non-Christian denomination and laypeople had been asked to give an invocation and that the "inclusion of rabbis, an imam, and laypersons allows for a 'diversity of religious views.'" TST Brief Addendum at 42 (quoting *Town of Greece*, 572 U.S. at 585-586).

## 2. *Whether the Speaker is Paid*

The second factor identified by the District Court – whether the speaker is paid to give the invocation – finds its source in the "neutrality-enforcing" mechanisms of the Ninth Circuit's decision in *Rubin*. 710 F.3d at 1097. The City argues that the payment of an invocation speaker should not be a heavily weighted factor given that in *Marsh*, the chaplain was a paid position and the legislative prayer was held to be constitutional under the Establishment Clause. 463 U.S. at 794. Regardless, the evidence here is that the stipend paid was nominal and that paying a stipend to speakers has not been part of the City's practice since at least 2016-2017.

### 3. The Council's Review of the Speaker's Chosen Prayer Content

The third factor comes from *Town of Greece*, where the Supreme Court noted that the town "neither reviewed the prayers in advance of the meetings nor provided guidance as to their tone or content." 572 U.S. at 571. "The town instead left the guest clergy free to compose their own devotions." *Id*. Here the evidence was that the speakers determine the content and write their own invocations. Like the legislators in *Town of Greece*, City Councilors exercised no control over the invocations other than to select the speaker, nor did they provide guidance as to their tone or contents. *Id*. at 571. Rousseau, the one presenter deposed, testified: "I usually write my invocations depending on what is going on or what time or year something is happening." Supp. App. at 174.

TST asserts that on two occasions prayers were subject to sufficient preliminary review, relying on two emails that evidently contain the text of prayers given at a Council meeting. These emails were sent or forwarded to individuals with boston.gov email addresses, including on one occasion, the addresses of several members of the Council. Appx. at 800 and 804. TST is grasping at straws. The record contained no evidence that either of these prayers was read to the Council at a meeting. Even assuming that they were, there is no way to tell from the emails whether the prayers were sent in advance of the meeting at which they were given or whether they were sent as a courtesy copy after the meeting. There is no evidence

that any City Councilor or their staff read them in advance of the meeting.  And there

is *zero* evidence that there was any review, input, approval or participation in the

prayer's contents by a Councilor or any of the other City employee recipients.[14]

### 4. *Whether the Nature of the Prayer Proselytizes or Denigrates Other Religions*

The fourth factor – whether the nature of the prayer proselytizes or denigrates

other religions – goes to the heart of the Establishment Clause analysis.  The

Supreme Court in *Town of Greece* recognized that there were some constraints on

---

[14] TST's reliance on *Gundy v. City of Jacksonville Fla.* is misplaced.  50 F.4th 60, 79 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 790 (2023).  TST cites *Gundy* for the proposition that merely selecting the speaker is sufficient control over the invocation under this third prong.  *See* TST Brief at 29.  However, the holding of *Gundy* is inapposite.  *Gundy* involved a pastor invited to give an invocation who brought a free speech and free exercise action under § 1983 after the city council president turned off the microphone during his invocation that became political in nature, posted a critical social media message about the pastor, and proposed new guidance on future invocations.  *Id*. at 65.  The Eleventh Circuit held that the city council's selection of the speaker was sufficient control over the invocation *to determine that this was government speech* and not a public forum, something that is no longer disputed here.  *See id*.  The Court affirmed summary judgment for the city on the free speech and free exercise claims – there was no Establishment Clause claim and thus no analysis of the level of review and control contemplated by *Town of Greece*. *See id*. at 80-81.  Indeed, there is no reference to review or control in the three-factor Establishment Clause test referenced – but not applied – by the Eleventh Circuit. *See id*. at 81.  As the Court's held, "the selection process for choosing invocation speakers gives the City Council inherent control over invocations and their messages from the outset, which is why maintaining a selection process and a 'prayer opportunity as a whole' that are consistent with the confines of the Establishment Clause is so important."  *See id*. (citing *Town of Greece*, 572 U.S. at 585-586). In other words, sufficient control to constitute government speech and bring the claim within the Establishment Clause does not mean sufficient control to violate the Establishment Clause under *Town of Greece*.  *See id*. at 80.

34

content: "If the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion, many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort." 572 U.S. at 583. *Lund* is a clear example of the type of behavior by legislators that violates the Establishment Clause. *Lund* involved legislator-led prayer, no religion other than Christianity was represented, the prayers represented that Christianity was superior to other faiths, and board members on occasion would appear "to implore attendees to accept Christianity." 863 F.3d at 273, 280. The prayer scheme in *Lund* represents the type of proselytizing that deviated from the history and tradition of legislative prayer and which the Establishment Clause was meant to bar. There is no evidence that occurred in any of the invocations here. Indeed, as the District Court discussed, a review of the three videos of invocations in the record reveals that the prayer is largely directed at the Council itself, and not the public, bringing the prayers within the acceptable boundaries of *Town of Greece*. TST Brief Addendum 43-44 (citing *Town of Greece*, 572 U.S. at 571, 582-84, 587).

TST focuses on a quote from the deposition of Councilor Essaibi-George in which she conceded, at the prompting of counsel, that some of the invocations "probably could be described as sermons." TST then swaps "sermon" for "proselytize" in an effort to convince the Court that the Council adopted the sermon

as its own and attempted to force it on the public. Such sleight of hand does not create an Establishment Clause violation. By definition, sermons are moral or religious discourse; proselytizing requires attempts to induce someone to **convert** to one's faith. The prayers in the record do not demonstrate an intent to force "citizens to engage in a religious observance." *Town of Greece*, 572 U.S. at 587. There is no evidence that Councilors endorsed or participated in the content of those sermons – indeed, to get involved and co-author invocations to prevent sermonizing would run afoul of the "neutrality-enforcing" safeguards of *Rubin*. 710 F.3d at 1100. As the District Court noted, a "City Councilor requesting the audience to stand for the invocation and the Pledge of Allegiance is a far cry from asking the audience to 'join … in worship.'" TST Brief Addendum 45 (citing *Lund*, 863 F. 3d at 272).

Furthermore, as was the case in *Marsh*, "the individual claiming injury by the practice is an adult, presumably not readily susceptible to 'religious indoctrination' or peer pressure." 463 U.S. at 792 (internal citations omitted); *Town of Greece*, 572 U.S. at 590 (choice to exit during prayer they found distasteful or remain and acquiesce does not "represent an unconstitutional imposition to mature adults"). The Councilors select these invocation speakers for their own private reflection, not as an imposition on the public as a whole. Even accepting the notion that the Boston City Council might have the intent to promote one religion over others, the public is free to leave. This is not akin to the cases involving high school students where the

schools control the content of the message and the students are compelled or feel compelled to attend. *See*, *e.g.*, *Lee*, 505 U.S. at 577 (religious invocation at high school graduation coercive); *Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290, 309-310 (2000) ("overtly Christian" prayer before high school football games promoted attendance at Baptist events, encouraged membership in religious clubs, distributed Bibles and chastised students with minority beliefs").

### 5. *The Selection Process*

The fifth factor, the selection process, was the one most troubling to the District Court, but it held that the "lack of a formal, written policy does not by itself create a constitutional problem (though the existence of one could provide neutrality-enforcing guidelines [like those in *Rubin*] that would help avoid constitutional issues in the future)." TST Brief Addendum 46. The fact that the selection of speakers is left to the complete discretion of the individual Councilors does not create a constitutional problem. *See Williamson*, 928 F. 3d at 1314.[15] What matters is whether the City "maintains a policy of nondiscrimination" in the way that it chooses invocation speakers. *Town of Greece*, 572 U.S. at 585. Where, as here, the Council selects its invocation speakers not based on their religion but on their

---

[15] *Williamson* is discussed in detail in the foregoing section regarding specific discrimination against TST. The District Court contrasted it to the present case in its analysis of the fifth factor. There, legislators admitted in depositions that they were specifically excluding certain religions or types of religions outside of the mainstream. *Williamson*, 928 F.3d at 1311-1314.

level of community involvement, this factor is met.  As the District Court noted, "there must be something to suggest that the selection process reflects 'an aversion or bias on the part of town leaders against minority faiths.'"  TST Brief Addendum at 48 (quoting *Town of Greece*, 572 U.S. at 585).  There is none.

"[T]he measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow."  *Marsh*, 463 U.S. at 795 (citing *Abington School Dist. v. Schempp,* 374 U.S. 203, 237 (1963)).  Here, a reasonable observer familiar with the history of legislative prayer would determine that there is no real threat that the Council's policy for choosing invocation speakers will lead to the promotion of a particular religion.  This is nothing more than the mere shadow of disdain for the Council's process.  The judgment should be affirmed.

## III.  THE CITY COUNCIL'S LEGISLATIVE PRAYER SELECTION PROCESS DID NOT PLACE A SUBSTANTIAL BURDEN ON THE RIGHT OF TST TO EXERCISE THEIR RELIGION

The District Court also correctly found that the City's legislative prayer selection process did not burden TST's free exercise of religion under Massachusetts law.  "Massachusetts cases addressing the issue of religious freedom under both the State and the Federal Constitutions have generally also inquired, as a preliminary matter, whether the State action creates a substantial burden on a claimant's free exercise of religion."  *Curtis v. Sch. Comm. of Falmouth*, 420 Mass. 749, 761, n. 11

(1995).[16]  The City Council invocation process does not.  Indeed, during the course of the summary judgment briefing, TST freely exercised its religious beliefs – ***in Boston*** – when it held its three-day SatanCon convention in the Back Bay.  The attempt to get an invocation invitation, and the subsequent lawsuit, has been a precursor to the announcement of TST's convention locations.[17]

The question is whether the state action complained of "substantially burdens [the] free exercise of religion, and, if it does, whether the [government] has shown that it has an interest sufficiently compelling to justify that burden."  *Society of Jesus of New Eng. v. Massachusetts*, 441 Mass 662, 669-70 (2004) (first alteration in original).  "The party claiming an unconstitutional burden on the free exercise of religion must show (1) a sincerely held religious belief, which (2) conflicts with, and thus is burdened by, the state requirement. Once the claimant has made that showing,

---

[16] The Appeals Court's decision in *Krupien v. Ritcey* is inapposite.  94 Mass. App. Ct. 131, 136, n. 9 (2018).  There, the question was whether an employer was entitled to qualified immunity after barring access to an employees' place of employment, which included **her church**, for thirty-seven days, including Christmas.  *See id*. at 132.  The City Council chamber is not the Satanic Temple.

[17] The timing of this lawsuit is another publicity stunt by TST.  TST first challenged the legislative prayer of Scottsdale, AZ, and SatanCon 2022 followed. https://thesatanictemple.com/pages/tst-satancon. TST then challenged the legislative prayer of the City Council of Boston, and SatanCon 2023 followed. https://thesatanictemple.com/pages/satancon-about-us.  TST recently sued the City of Chicago, *see The Satanic Temple, Inc, et al. v. City of Chicago*, C.A. No. 23-cv-2780 (N.D. Ill. 2023), but has delayed the next announced SatanCon until 2025. https://www.instagram.com/thesatanictemple/p/C1floBdRCx9/.

the burden shifts to the state" to demonstrate "both that the (3) requirement pursues an unusually important governmental goal, and that (4) an exemption would substantially hinder the fulfillment of the goal." *Id*. (citation and quotation omitted).

The District Court correctly determined that TST's claim failed on the second prong. There is no evidence that the Council's legislative prayer selection process placed any burden on the right of TST to exercise their religion. TST takes issue with the District Court's failure to address *Magazu v. Dep't of Children and Families*, 473 Mass. 430, 444-46 (2016). In the first instance, *Magazu* applies the same four-part balancing test that the District Court applied, and cites *Society of Jesus*, 441 Mass at 676, throughout. *Id*. at 443-44. Furthermore, in *Magazu* the SJC held the second prong of the test to be satisfied where: (1) there was a regulation that ***explicitly*** forbid corporal punishment of a foster child; (2) a DCF policy and practice of not placing a foster child in a home where parents administer physical discipline; and (3) DCF did not challenge the contention that corporal punishment was part of the plaintiffs' deeply held beliefs. *See id*. The Court found a substantial burden existed because the DCF's prohibition was "***inherently*** incompatible with the Magazus' religious beliefs" forcing a choice:

> On the one hand, they can adhere to the teachings of their religion and use corporal punishment as a form of discipline in their home, thereby forfeiting the opportunity to become foster parents. On the other hand, they can abandon this particular religious tenet in the hope of being approved as foster parents

40

*Id*. at 444-45 (emphasis added).[18] This is a true Hobson's choice – either give up a religious tenet in order to foster a child or don't foster a child at all. As the facts of *Magazu* illustrate, the required "'substantial burden' is one that is coercive or compulsory in nature." *Curtis*, 420 Mass. at 761. (citations omitted). "'[I]ncidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, [do not] require government to bring forward a compelling justification for its otherwise lawful actions.'" *Magazu*, 473 Mass. at 444 (quoting *Curtis*, 420 Mass at 762).

This case presents no such choice. The District Court properly rejected TST's "manufactured burden" of a choice between continuing to "venerate Satan," on the one hand, or electing to "abandon the defining aspect of [its] creed in the hopes that this will make [it] sufficiently palatable to the political ruling class," on the other. TST Brief Addendum at 49. The speaker selection process is not "inherently incompatible" with TST's religion. The City has neither "condition[ed] receipt of an important benefit on conduct proscribed by a religious faith," nor has it "denie[d] such a benefit because of conduct mandated by a religious belief," and there is no indication that the City Council's legislative prayer practice has made it "more difficult to practice certain religions." *Curtis*, 420 Mass at 762-63. There was no

---

[18] The *Magazu* Court found a compelling government interest.

41

promise that TST would be considered if they did not "venerate Satan," and the invocation is not an important benefit to which TST – or anyone – is entitled. Though TST places great weight on the use of "reward" and "honor," the invocation is not a government benefit for which constituents are entitled to apply, it is government speech for which constituents are selected.[19]  The Court's entry of summary judgment in favor of the City on Count IV should be affirmed.

## IV.    TST WAS NOT ENTITLED TO THE DEPOSITION OF MAYOR WU

TST appeals from two orders related to its attempts to take the deposition of Mayor Wu.  First, TST appeals the District Court's Memorandum and Order on the City's Emergency Motion for Protective Order and Motion to Quash the Deposition of Mayor Wu dated April 6, 2022.  *See* ECF No. 47; TST Brief at Addendum 2-16. TST ignores the fact that the District Court first had to grant the motion on an emergency basis to prevent the deposition from occurring ***on Election Day***, where

---

[19] The Massachusetts free exercise claim also fails for the reason that its federal counterpart was dismissed – the prayer is government speech and not a public forum, and thus there was no standing.  The Massachusetts Declaration of Rights is generally coextensive with the federal constitution when it comes to the rights guaranteed by the First Amendment.  *See In re Opinion of the Justices to the Senate*, 430 Mass. 1205, 1209 (2000) (analysis of free speech and buffer zones same under federal and state constitutions).  It is true that where the two depart, the Massachusetts version provides more extensive freedom of expression protections than its federal counterpart.  *See*, *e.g.*, *Mendoza v. Licensing Bd. of Fall River*, 444 Mass. 188, 201 (2005) (state free speech rights broader on issue of strip clubs). However, there are no cases indicating that Massachusetts courts would allow for a free exercise claim under these circumstances.

then-Councilor Wu was one of the two candidates and the presumptive front-runner. *See* ECF No. 40. While TST references the District Court's "invitation" to file a motion for reconsideration, it glosses over the fact that the "invitation" came in an order granting a second Motion to Quash a subpoena of Mayor Wu served in the face of the District Court's protective order. *See* ECF No. 63; TST Brief at Addendum 17. Second, TST appeals from the District Court's denial of that motion for reconsideration. *See* ECF No. 63; TST Brief at Addendum 19.

"Management of discovery is a largely empirical exercise, requiring judges to balance the inquirer's right to know against the responder's right to be free from unwarranted intrusions, and then to factor in systemic concerns." *Mack*, 871 F.2d 179, 187 (1st Cir. 1989). All that litigants "have a right to expect" is that a District Court make a reasonable reconciliation of the centrifugal and centripedal forces at work in the discovery process." *Id*. There is no question that the District Court did that here. The District Court's first decision on this issue was in a well-reasoned fifteen-page memorandum and order outlining the reasons why TST was not entitled to a deposition of Mayor Wu under the Rules of Civil Procedure. TST Addendum 2-16. The order on the motion for reconsideration was brief, in large part because TST failed to show a material change in circumstances, but it still noted that Mayor Wu is a high-ranking government official who should not be called as a witness absent "extraordinary circumstances" – "only where it is shown that other persons

cannot provide the information." TST Addendum 19 (quoting *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007).

Pursuant to Fed. R. Civ. P. 26(b)(2)(C), the District Court "must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Pursuant to Fed. R. Civ. P. 26(c)(1)(A), the District Court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including … forbidding the disclosure or discovery." Pursuant to Fed. R. Civ. P. 45(d)(3)(A) on a timely motion the District Court "must quash or modify a subpoena that … subjects a person to undue burden." "When analyzing motions to quash, courts weigh the need of the party seeking discovery against any undue hardships created by permitting it." *KinectUs LLC v. Bumble Trading LLC*, 2021 WL 6066539, at *2 (D. Mass., Dec. 22, 2021) (internal quotation omitted).

The District Court did not abuse its discretion when it prohibited the deposition of Mayor Wu under these provisions of the Rules. First, the information was unreasonably cumulative and duplicative and could be obtained from a more

convenient and less burdensome source – Mayor Wu's former chief of staff when she was a Councilor. *See* Fed. R. Civ. P. 26(b)(2)(C)(i). Second, TST had ample opportunity to obtain the information sought from Mayor Wu, whether from her former chief of staff designated by the City on the Rule 30(b)(6) topics related to her subjective intent, or one of the 45 other people identified in the City's initial disclosures. TST admitted in a letter to the Court that it targeted Mayor Wu for deposition on Election Day because she was a candidate and it wanted to pit the City's position in the litigation against her interest in getting elected. *See* ECF No. 38. As the District Court noted, where the "subpoena at issue burdens the City's highest-ranking official and was largely issued as a publicity stunt, it is not difficult to find undue burden in favor of a protective order." TST Brief Addendum 9.

Even if the District Court's reliance on the Rules of Procedure to bar the deposition of Mayor Wu was an abuse of discretion, the First Circuit's decision in *Bogan v. City of Boston* should end the inquiry. 489 F.3d 417, 423 (2007) (barring deposition of Mayor Menino). In *United States v. Morgan,* the Supreme Court indicated that the practice of calling high ranking government officials as witnesses should be discouraged. 313 U.S. 409, 422 (1941). Relying on *Morgan*, several Circuits have held that high-ranking officials "should not, absent extraordinary circumstances, be called to testify or deposed regarding their reasons for taking official action." *Bogan*, 489 F.3d at 423 (citations omitted). "This rule is based on

the notion that high ranking government officials have greater duties and time constraints than other witnesses and that, without appropriate limitations, such officials will spend an inordinate amount of time tending to pending litigation." *Id*. There is an exception to the rule that does not apply here for the reasons stated above. "Depositions of high-ranking officials may be permitted where the official has first-hand knowledge related to the claim being litigated" ***and*** "it is shown that other persons cannot provide the necessary information." *Id*.

The First Circuit held that the "argument founders because they did not pursue other sources to obtain relevant information before turning to the Mayor." *Id*. at 424. Moreover, the Bogans "failed to pursue discovery from other City employees who could have shed light on the Mayor's involvement." The Court determined:

> It is certainly likely that at least one of these employees was involved and could have clarified the Mayor's role. It was therefore incumbent on the Bogans to seek information from these individuals before turning to the Mayor.[20]

*Id*. Here, TST flatly refused to depose the employees that the City represented could provide the information TST sought. As the First Circuit held in *Bogan*, there is no

---

[20] TST gives weight to the District Court's supposed reliance on hearsay – Mayor Wu's email to TST regarding the process. Supp. R.A. at 188. It is unlikely that this fact alone tipped the summary judgment scale in favor of the City. Moreover, it is evident that staff could have testified as to the content – indeed, in the email itself she states "as my staff mentioned," indicating that someone from her staff had already spoken to TST. Instead, TST argues that the District Court had to draw an adverse inference based on the missing witness rule. There is no evidence that Mayor Wu is missing, she was just not subject to a deposition.

abuse of discretion in issuing a protective order for Mayor Wu "because [TST] had not exhausted other available avenues of discovery." *Id*.

The circumstances of this case are nearly identical to *Bogan*. TST didn't want the information, it wanted the deposition of the Mayor. There is no other explanation for why the only two City Councilors for which TST sought depositions were the two final mayoral candidates. There is no explanation for why TST refused to take the deposition of Mayor Wu's former chief of staff while she was on the Council. As the District Court noted, the subpoena of Mayor Wu was nothing more than a "publicity stunt" and "[i]f relevant evidence is absent from the summary judgment record, it is the result of TST's own actions." TST Brief Addendum at p. 35, n. 6. The District Court did not abuse its discretion in quashing the deposition. The judgment should be affirmed.

# CONCLUSION

For the reasons set forth herein, TST failed to raise a genuine issue of material fact sufficient to allow a jury to conclude that the City violated TST's rights under the Establishment Clause or the Massachusetts free exercise clause. TST further failed to demonstrate that the District Court's refusals to allow the deposition of Mayor Wu was an abuse of discretion. As a result, TST's remaining claims fail as a matter of law. The City respectfully requests that this Court affirm the judgment of the District Court dismissing all claims against the City and grant such other and further relief as it deems just and proper.

Dated: March 18, 2024

Respectfully submitted,

**CITY OF BOSTON,**
By its attorney,

ADAM N. CEDERBAUM
Corporation Counsel


*/s/ Edward F. Whitesell, Jr.*
Edward F. Whitesell, Jr.
First Circuit Bar #1122127
Senior Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA  02201
(617) 635-4045
edward.whitesell@boston.gov

## CERTIFICATE OF COMPLIANCE

I, Edward F. Whitesell, Jr., certify pursuant to Fed. R. App. P. 32(g) that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because the document, exclusive of the cover page, table of contents, table of authorities, signature block, certificate of compliance and certificate of service (as allowed by Fed. R. App. P. 32(f)) contains 12,636 words, as verified by the word count function of Microsoft Word, the word-processing system used to prepare this brief.  I further certify that this document complies with the typeface requirements of Fed. R. App, P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word using 14-point Times New Roman font, a proportionally-spaced typeface.

Dated: March 18, 2024

*/s/ Edward F. Whitesell, Jr.*
Edward F. Whitesell, Jr.

## CERTIFICATE OF SERVICE

I, Edward F. Whitesell, Jr., certify that on March 18, 2024, a true and accurate copy of the foregoing document was electronically filed with the United States Court of Appeals for the First Circuit by using the CM/ECF system and that all counsel of record will be served by the CM/ECF system.

*/s/ Edward F. Whitesell, Jr.*
Edward F. Whitesell, Jr.