No. 23-1642

# United States Court of Appeals
## For the First Circuit

---

THE SATANIC TEMPLE, INC.,

Plaintiff - Appellant,

v.

CITY OF BOSTON

Defendant - Appellee.

---

On Appeal from the United States District Court for the District of Massachusetts in Civil Action No. 1:21-cv-10102-AK

---

**SUPPLEMENTAL RECORD APPENDIX**

---

Dated: March 18, 2024

Counsel for Defendant-Appellee,
**CITY OF BOSTON**

Edward F. Whitesell, Jr.
First Circuit Bar No. 1122127
Senior Assistant Corporation Counsel
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
(617) 635-4045
edward.whitesell@boston.go

# SUPPLEMENTAL RECORD APPENDIX TABLE OF CONTENTS

**DOCUMENT** **PAGE**

City of Boston's Answer to TST Amended Complaint (ECF 23) …..SUPP.R.A.001

City of Boston's Emergency Motion for Protective Order and Motion to Quash Deposition of City Councilor Michelle Wu (ECF 33)...SUPP.R.A.017

Exhibits to City of Boston's Memorandum in Support of Emergency Motion for Protective Order and Motion to Quash Deposition of City Councilor Michelle Wu (ECF 34):

Exhibit 1: Notice of Deposition of Michelle Wu ……..………SUPP.R.A.020

Exhibit 2: TST First Amended Complaint ………………...…SUPP.R.A.025

City of Boston's Motion to Quash and Request for Sanctions (ECF 57)……………………..………………………………..SUPP.R.A.047

Exhibit 1: Notice of Deposition of Michelle Wu……………..SUPP.R.A.051

Exhibit 2: Email Exchange between Attorney for City of Boston and Attorney for TST regarding Deposition of Michelle Wu and the City's Motion…………………...………...…...…SUPP.R.A.053

Exhibit 3: Email Exchange between Attorney for City of Boston and Attorney for TST regarding Deposition of Michelle Wu and the City's Motion……………………………….………...SUPP.R.A.054

Exhibit 4: Email Exchange between Attorney for City of Boston and Attorney for TST regarding Deposition of Michelle Wu and the City's Motion……………………………..…….SUPP.R.A.055

Exhibit 5: Email Exchange between Attorney for City of Boston and Attorney for TST regarding Deposition of Michelle Wu and the City's Motion………………………………………SUPP.R.A.056

Exhibit 6: Email Exchange between Attorney for City of Boston and Attorney for TST regarding Deposition of Michelle Wu and the City's Motion ……………………………………………..…SUPP.R.A.057

City of Boston's Emergency Renewed Motion to Quash (ECF 62)...SUPP.R.A.058

Exhibit 1: Deposition Subpoena for Mayor Michelle Wu……SUPP.R.A.060

City of Boston's Motion for Summary Judgment (ECF 98)……..…SUPP.R.A.061

Exhibits to City of Boston's Local Rule 56.1 Motion for Summary Judgment (ECF 100):

Exhibit 1: Excerpts of Rule 30(b)(6) Deposition Transcripts of Christine O'Donnell…………………………..……..…SUPP.R.A.064

Exhibit 2: Email exchange Bates-stamped DEF0000228 to DEF0000230……………………………………...…SUPP.R.A.104

Exhibit 3: City of Boston's Answers to TST's First Set of Interrogatories…………………………………....…SUPP.R.A.108

Exhibit 4: City of Boston's Answers to TST's Second Set of Interrogatories………………………………….…SUPP.R.A.113

Exhibit 5: Boston City Council Schedules Bates-stamped DEF0003397 to DEF0003406 and DEF0003439 DEF0003445.....…..SUPP.R.A.118

Exhibit 6: Excerpts of Deposition Transcripts of Annissa Essaibi-George……………..……………………..…SUPP.R.A.136

Exhibit 7: Excerpts of Deposition Transcripts of Anne Marie Rousseau……………………………….………………SUPP.R.A.155

Exhibit 8: Email Correspondence and Letter Bates-stamped DEF0001059 to DEF0001060………..…………….……SUPP.R.A.175

Exhibit 9: Email Correspondence and Charts Bates-stamped DEF0002046 and DEF0002090 to DEF0002092……………..………SUPP.R.A.178

Exhibit 10: Email Correspondence Bates-stamped DEF0000186 to DEF0000187……..…………………..……………SUPP.R.A.183

Exhibit 11: Email Correspondence Bates-stamped DEF0000244 to DEF0000245…………………………………...…SUPP.R.A.186

Exhibit 12: Email Correspondence and Letter Bates-stamped DEF0000221 to DEF0000222…………………………SUPP.R.A.189

Exhibit 13: Email Correspondence Bates-stamped DEF0002890.……………………………..…………SUPP.R.A.192

Exhibit 14: MCAD Complaint dated October 17, 2018 Bates-stamped DEF0000620 ……………………………..…………SUPP.R.A.194

City of Boston's Response Pursuant to Local Rule 56.1 to TST's Statement of Material Facts (ECF 110) ……………………………....…SUPP.R.A.196

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **THE SATANIC TEMPLE, INC.**<br><br>PLAINTIFF,<br><br>**v.**<br><br>**CITY OF BOSTON, MA**<br><br>DEFENDANT. | **CASE NO.** 1:21-CV-10102 |

**DEFENDANT CITY OF BOSTON'S ANSWER TO PLAINTIFF'S AMENDED COMPLAINT**

Pursuant to Rules 8 and 12 of the Massachusetts Rules of Civil Procedure, Defendant City of Boston ("Defendant" or "Defendant City"), by and through its undersigned attorney, hereby answers Plaintiff The Satanic Temple, Inc.'s ("Plaintiff" or "TST") Amended Complaint (the "Complaint"), except as to those counts of the Complaint that were dismissed pursuant to the Court's Order in this action dated July 21, 2021. See ECF No. 17. Any allegation of the Complaint not expressly admitted is deemed denied. Further, Defendant City hereby sets forth its affirmative defenses to the Complaint.

INTRODUCTION[1]

1. The allegations contained in Paragraph 1 of the Complaint set forth conclusions of law, as to which no response is required. To the extent that a response is required, Defendant admits only that, according to the Complaint itself, Petitioners purport to bring this action in the nature of mandamus.
2. Paragraph 2 of the Complaint contains allegations which set forth conclusions of law, as to which no response is required. Defendant denies the remaining allegations.
3. Denied.

[1] For ease of reference, Defendant refers to Plaintiff's headings and titles, but to the extent that those headings and titles could be construed to contain factual allegations, those allegations are denied.

JURISDICTION AND VENUE

4. The allegations contained in Paragraph 4 of the Complaint set forth conclusions of law, as to which no response is required.

5. The allegations contained in Paragraph 5 of the Complaint set forth conclusions of law, as to which no response is required.

6. The allegations contained in Paragraph 6 of the Complaint set forth conclusions of law, as to which no response is required.

PARTIES

7. Defendant admits only that, in 2018, TST sought an opportunity to deliver an invocation. Defendant denies that TST was rejected because it lacked the political clout to obtain a sponsorship. As to the remaining allegations contained in Paragraph 7 of the Complaint, Defendant lacks knowledge or information sufficient to admit or deny them.

8. Defendant admits that the City of Boston is a municipal corporation located in Suffolk County, MA; that Boston serves as the capital of Massachusetts and its most populous city; and that Boston's government includes a legislative branch consisting of 13 councilor seats, all of which are publicly elected positions and one of which serves as chair and Council President. Further answering, Defendant admits that before council meetings, the Council holds an invocation, the speaker of which is selected by councilors on a rotating basis. Defendant denies the remaining allegations contained in Paragraph 8 of the Complaint.

FACTS ALLEGED

Background

9. Admitted.

10. Admitted.

11. Admitted.

12. Denied.

13. Admitted.

14. Defendant admits only that each councilor can select who deliver an invocation at their meeting. Defendant denies the remaining allegations contained in Paragraph 14 of the Complaint.

15. Admitted.

16. Admitted.

17. Admitted.

18. Denied.

19. The allegations contained in Paragraph 19 of the Complaint set forth conclusions of law, as to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in Paragraph 19.

<u>TST's Request</u>

20. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 20 of the Complaint.

21. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 21 of the Complaint.

22. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 22 of the Complaint.

23. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 23 of the Complaint.

24. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 24 of the Complaint.

25. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 25 of the Complaint.

26. The allegations contained in Paragraph 26 of the Complaint refer to, and attempt to restate, an email which is annexed as Exhibit 1 to the Complaint in this matter, which speaks for itself, which speaks for itself. As such, no response is required.

27. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 27 of the Complaint.

28. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 28 of the Complaint.

29. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 29 of the Complaint.

30. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 30 of the Complaint.

31. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 31 of the Complaint.

32. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 32 of the Complaint.

33. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 33 of the Complaint.

34. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 34 of the Complaint.

35. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 34 of the Complaint.

36. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 36 of the Complaint.

37. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 37 of the Complaint. To the extent that Paragraph 37 contains excerpts from true and accurate copies of public records, those documents speak for themselves and, as such, no response is required.

38. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 38 of the Complaint.

39. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 39 of the Complaint.

40. The allegations contained in Paragraph 40 of the Complaint refer to, and attempt to restate, an email which is annexed as Exhibit 2 to the Complaint in this matter, which speaks for itself. As such, no response is required.

41. Denied.

42. To the best of Defendant's knowledge and information, Defendant admits that no other religious group has requested an opportunity to deliver an invocation before the Council. Defendant denies the remaining allegations contained in Paragraph 42 of the Complaint.

43. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 43 of the Complaint.

44. The allegations contained in Paragraph 44 of the Complaint set forth conclusions of law, as to which no response is required. To the extent that a response is required, Defendant admits the allegations contained in Paragraph 44.

45. The allegations contained in Paragraph 45 of the Complaint set forth conclusions of law, as to which no response is required.

46. Admitted.

47. Admitted.

48. Denied.

49. Admitted.

50. Defendant admits only that the invitation to Reverend Popperson was extended by Councilor Matt O'Malley. Defendant denies the remaining allegations contained in Paragraph 50 of the Complaint.

51. Admitted.

52. The allegations contained in Paragraph 52 of the Complaint set forth conclusions of law, as to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in Paragraph 52.

53. Denied.

54. Denied.

55. The allegations contained in Paragraph 55 of the Complaint refer to, and attempt to restate, the lack of probable cause determination issued by the Massachusetts Commission Against Discrimination ("MCAD") in a related administrative proceeding, a document which speaks for itself.

56. The allegations contained in Paragraph 56 of the Complaint refer to, and attempt to restate, the lack of probable cause determination issued by the MCAD in a related administrative proceeding, a document which speaks for itself.

57. The allegations contained in Paragraph 57 of the Complaint set forth conclusions of law, as to which no response is required.

58. Denied.

<u>The Effect of the Practice</u>

59. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 59 of the Complaint.

60. Denied.

61. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 61 of the Complaint.

62. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 62 of the Complaint.

63. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 63 of the Complaint.

64. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 64 of the Complaint.

65. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 65 of the Complaint.

66. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 66 of the Complaint.

67. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 67 of the Complaint.

68. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 68 of the Complaint.

69. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 69 of the Complaint.

70. Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 70 of the Complaint.

71. Denied.

72. Denied.

73. Denied.

## CAUSES OF ACTION

### Count 1

### Violation of the Establishment Clause

74. The allegations contained in Paragraph 74 of the Complaint set forth conclusions of law, as to which no response is required.

75. The allegations contained in Paragraph 75 of the Complaint set forth conclusions of law, as to which no response is required.

76. The allegations contained in Paragraph 76 of the Complaint set forth conclusions of law, as to which no response is required.

77. The allegations contained in Paragraph 77 of the Complaint set forth conclusions of law, as to which no response is required.

78. The allegations contained in Paragraph 78 of the Complaint set forth conclusions of law, as to which no response is required.

79. The allegations contained in Paragraph 79 of the Complaint set forth conclusions of law, as to which no response is required.

80. The allegations contained in Paragraph 80 of the Complaint set forth conclusions of law, as to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in Paragraph 80.

81. The allegations contained in Paragraph 81 of the Complaint set forth conclusions of law, as to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in Paragraph 81.

82. The allegations contained in Paragraph 82 of the Complaint set forth conclusions of law, as to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in Paragraph 82.

83. The allegations contained in Paragraph 83 of the Complaint set forth conclusions of law, as to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in Paragraph 83.

84. The allegations contained in Paragraph 84 of the Complaint set forth conclusions of law, as to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in Paragraph 84.

85. The allegations contained in Paragraph 85 of the Complaint set forth conclusions of law, as to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in Paragraph 85.

86. The allegations contained in Paragraph 86 of the Complaint set forth conclusions of law, as to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in Paragraph 86.

87. The allegations contained in Paragraph 87 of the Complaint set forth conclusions of law, as to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in Paragraph 87.

88. The allegations contained in Paragraph 88 of the Complaint set forth conclusions of law, as to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in Paragraph 88.

89. The allegations contained in Paragraph 89 of the Complaint set forth conclusions of law, as to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in Paragraph 89.

90. The allegations contained in Paragraph 90 of the Complaint set forth conclusions of law, as to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in Paragraph 90.

Count 2

Violations of the Free Speech Clause and the Free Exercise Clause

91. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

92. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

93. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

94. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

95. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

96. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

97. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

98. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

99. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

Count 3

Violation of the Equal Protection Clause

100. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

101. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

102. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

103. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

104. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

105. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

106. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

107. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

108. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

109. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

110. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

111. Because of the Court's Order docketed in this action as Document No. 17, no answer is required to this paragraph of the Complaint.

Count 4

Violation of Massachusetts' Free Exercise Clause

112. The allegations contained in Paragraph 112 of the Complaint set forth conclusions of law, as to which no response is required.

113. The allegations contained in Paragraph 113 of the Complaint set forth conclusions of law, as to which no response is required.

114. The allegations contained in Paragraph 114 of the Complaint set forth conclusions of law, as to which no response is required.

115. The allegations contained in Paragraph 115 of the Complaint set forth conclusions of law, as to which no response is required.

116. The allegations contained in Paragraph 116 of the Complaint set forth conclusions of law, as to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in Paragraph 116.

117. The allegations contained in Paragraph 117 of the Complaint set forth conclusions of law, as to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in Paragraph 117.

In response to the paragraphs which appear immediately following Paragraph 117 of the Complaint and titled as "Prayer for Relief", no response is required. To the extent that a response is required, Defendant denies that Plaintiff is entitled to any relief.

**AFFIRMATIVE DEFENSES**

Defendant asserts the following affirmative and other defenses, without assuming any burdens of production, persuasion, or proof that, pursuant to law, are not legally assigned to Defendant and are Plaintiff's burden to prove.

First Affirmative Defense

Plaintiff's claims for relief are barred, in whole or in part, for failing to state a claim upon which relief may be granted.

Second Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the applicable statute(s) of limitations and/or repose.

Third Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the doctrines of unclean hands, release, waiver, and/or estoppel.

Fourth Affirmative Defense

Plaintiff's claims are moot.

Fifth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because at all times relevant hereto Defendant acted in good faith and, upon reasonable belief, that Defendant's actions were in compliance with relevant authority.

Sixth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because Plaintiff suffered no damages.

**RESERVATION OF RIGHTS**

Defendant expressly reserves the right to assert any additional affirmative or other defenses that may later become warranted as the result of discovery. Further, Defendant reserves the right to amend this Answer to assert any such defenses.

WHEREFORE, Defendant denies that Plaintiff is entitled to any relief, including the relief demanded, and respectfully requests that this Court dismiss with prejudice the Complaint, enter judgment in Defendant's favor, and award Defendant its costs and reasonable attorneys' fees as well as such other relief that this Court deems just and proper.

Respectfully submitted,

DEFENDANT,

CITY OF BOSTON,

By its attorney,
Henry Luthin,
Corporation Counsel

/s/ Nailah A. Freeman____________
Robert Arcangeli (BBO #689034)
Nailah A. Freeman (BBO #695910)
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
Telephone: (617) 635-4064
Facsimile: (617) 635-2012
Robert.arcangeli@boston.gov
nailah.freeman@boston.gov

Dated: August 10, 2021

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on August 10, 2021, this document was served on Plaintiff by electronic mail as follows:

/s/ Nailah A. Freeman
Nailah A. Freeman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **THE SATANIC TEMPLE, INC.**<br>PLAINTIFF,<br>**v.**<br>**CITY OF BOSTON, MA**<br>DEFENDANT. | **CASE NO.** 1:21-CV-10102-AK |

**DEFENDANT CITY OF BOSTON'S EMERGENCY MOTION FOR PROTECTIVE ORDER AND MOTION TO QUASH REGARDING THE DEPOSITION OF CITY COUNCILOR AT LARGE MICHELLE WU**

NOW COMES the Defendant City of Boston, by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. 26(c)(1), hereby moves this Honorable Court to quash the deposition of Michelle Wu and to enter a protective order prohibiting the deposition of Michelle Wu ("Ms. Wu"), which is currently noticed by Plaintiff The Satanic Temple Inc. ("Plaintiff") for Tuesday, November 2, 2021. *See* Notice for Deposition attached as Exhibit 1. In support of this Motion, Defendant incorporates its Memorandum of Law in Support of Defendant's Motion for Protective Order Regarding the Deposition of City Councilor At Large Michelle Wu.

Defendant's Motion and accompanying Memorandum of Law are supported by the Amended Complaint and the attachments annexed to the Memorandum which are incorporated in this Motion as if fully contained herein.

WHEREFORE, Defendant City respectfully requests that this Court:

i. Grant its Motion For Protective Order to Quash the Deposition of Michelle Wu; and

ii. Grant Defendant City its reasonable attorneys' fees and costs and other just and equitable relief as the Court deems appropriate.

Respectfully submitted,

DEFENDANT,

CITY OF BOSTON,

By its attorney,
Henry Luthin,
Corporation Counsel

/s/ Nailah A. Freeman____________
Robert Arcangeli (BBO #689034)
Nailah A. Freeman (BBO #695910)
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
Telephone: (617) 635-4064
Facsimile: (617) 635-2012
Robert.arcangeli@boston.gov
nailah.freeman@boston.gov

Dated: October 27, 2021

**LOCAL RULE 7.1 CERTIFICATION**

Pursuant to L.R. 7.1, I hereby certify that I have conferred in good faith with the Plaintiff on October 27, 2021 in an effort to resolve the dispute without court action and have been unable to resolve the dispute or narrow the issues.

Date: October 27, 2021 s/ Nailah A. Freeman

Case 1:21-cv-11302-AK Document 3 Filed 10/27/21 Page 3 of 3

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 27, 2021, this document was served on Plaintiff by electronic mail as follows:

/s/ Nailah A. Freeman
Nailah A. Freeman

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| THE SATANIC TEMPLE, INC. PLAINTIFF, | CASE NO. 21-CV-10102 |
|---|---|
| *V.* | **NOTICE OF DEPOSITION** |
| CITY OF BOSTON, MA DEFENDANT. | For Michelle Wu<br>On November 2, 2021 at 9:00 am<br>At 64 Bridge St., Salem, MA 01970 |

**To**: Defendant and its counsel of record, Ms. Nailah Freeman and Mr. Robert Arcangeli

**LET IT BE KNOWN** that, pursuant to FCRP 26 and 30, TST will take the deposition of **Ms. Michelle Wu** by oral examination, before a person authorized to administer oaths and take testimony, and recorded by stenographic, audiographic, and videographic means. The deposition will take place in person at the headquarters for The Satanic Temple, **64 Bridge St., Salem, MA 01970** on **November 2, 2021** beginning at **9:00 am** and continuing thereafter until complete.

Propounded on October 22, 2021,
on behalf of The Satanic Temple
By: /s/ Matthew A. Kezhaya

Matthew A. Kezhaya, ABA# 2014161
KEZHAYA LAW PLC
1202 NE McClain Rd
Bentonville, AR 72712
phone: (479) 431-6112
facsimile: (479) 282-2892
email: matt@kezhaya.law

**CERTIFICATE AND NOTICE OF SERVICE**

**NOTICE IS GIVEN** that I, Matthew A. Kezhaya, emailed a copy of this document to Ms. Nailah Freeman at nailah.freeman@boston.gov and Mr. Robert Arcangeli at robert.arcangeli@boston.gov on October 22, 2021. /s/ Matthew A. Kezhaya

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

| | | |
|---|---|---|
| The Satanic Temple, Inc.<br>*Plaintiff*<br>v.<br>City of Boston, MA<br>*Defendant* | )<br>)<br>)<br>)<br>)<br>) | Civil Action No. 21-cv-10102 |

**SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION**

To: Michelle Wu

*(Name of person to whom this subpoena is directed)*

☑ Testimony: YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Bridge St., Salem, MA 01970 | Date and Time: 11/02/2021 9:00 am |
|---|---|

The deposition will be recorded by this method: stenographic, audiographic, videographic

❒ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 10/22/2021

*CLERK OF COURT*

OR

/s/ Matthew A. Kezhaya

*Signature of Clerk or Deputy Clerk* — *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* The Satanic Temple, Inc. (Plaintiff), who issues or requests this subpoena, are:

Matthew A. Kezhaya; 1202 NE McClain Rd., Bentonville, AR 72712; matt@kezhaya.law; 479-431-6112

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 21-cv-10102

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* __________
on *(date)* __________ .

❒ I served the subpoena by delivering a copy to the named individual as follows: __________

__________ on *(date)* __________ ; or

❒ I returned the subpoena unexecuted because: __________
__________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ __________ .

My fees are $ __________ for travel and $ __________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: __________

__________
*Server's signature*

__________
*Printed name and title*

__________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **THE SATANIC TEMPLE, INC.**<br>PLAINTIFF,<br>*v.*<br>**CITY OF BOSTON, MA**<br>DEFENDANT. | **CASE NO. 21-CV-10102**<br><br>**FIRST AMENDED COMPLAINT** |

**COMES NOW** The Satanic Temple, Inc. ("**TST**"), by and through counsel Brendan Durrigan BBO # 668680 and Matthew A. Kezhaya, *pro hac vice*, with a first amended complaint about a discriminatory legislative prayer practice.

## INTRODUCTION

1. This first amended complaint is filed pursuant to FRCP 15(a)(1)(B) ("a party may amend its pleading once as a matter of course within 21 days after service of a motion under Rule 12(b)). The City filed its Rule 12(b)(6) motion on April 5, 2021–which was 21 days ago. This amendment adds a state law claim under the Massachusetts Constitutional analog of the Free Exercise Clause. As further explained under Count 4, below, TST is afforded greater protections under Massachusetts law than the Federal counterpart.

2. This lawsuit attacks the constitutionality of Boston's legislative prayer selection process. The Constitution permits legislative prayers, but the prayer selection process must be nondiscriminatory. Pursuant to an unregulated practice, Boston affords its Councilors the unquestioned freedom to select prayer-givers through legislative fiat. TST does not make the cut and, despite demand, was refused a prayer opportunity. As a result, the City broadcasts two constitutionally impermissible messages: those religions who make the cut are endorsed and are therefore insiders of the politically favored

community; those who don't make the cut are not endorsed and are therefore outsiders from the politically favored community. This legislative prayer process is unconstitutional on its face and is unconstitutional as applied to TST.

3. As important as what this case is, it is equally important what this case is not. This case is not a challenge to legislative prayers, generally; and it is not a challenge to offensive prayers, particularly. We take no issue with the fact that the City permits many congregations to invoke Jesus before Council meetings. We just want an equal opportunity–one guaranteed by the Constitution–to invoke Satan.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this case under 28 USC § 1331 (federal question) because TST complains of alleged constitutional violations under color of state law which are actionable under 42 USC § 1983 (authorizing a cause of action for such claims) and 28 USC § 2201 (authorizing declaratory judgments), both of which are federal laws. See also Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018 (1978) (cities incur legal liability under § 1983 when their policies, practices, etc., are unconstitutional and cause a redressable legal harm). This Court further has supplemental jurisdiction over the state law claim (Count 4) under 28 USC § 1367 (supplemental jurisdiction).

5. This Court has general personal jurisdiction over the City because Boston is in this District. This Court has specific personal jurisdiction over the City because the situs of the injury took place in this District and it is reasonable to exercise jurisdiction here because all of the parties and witnesses are within this District.

6. Venue properly lies with this Court under 28 USC § 1391(b) because the conduct complained of happened in this Court's District.

## PARTIES

7. **The Satanic Temple, Inc.**, plaintiff, (abbreviated to "**TST**") is a famous IRS-recognized atheistic religious corporation with its principal place of business in Salem, Massachusetts. TST's membership exceeds 270,000 and was recently the subject of the acclaimed film, "Hail Satan?" (2019, Magnolia Films). See also Satanic Temple v. City of Scottsdale, No. CV18-00621-PHX-DGC, 2020 WL 587882 (D. Ariz. Feb. 6, 2020) (holding that TST is a bona fide religion). TST's membership can be found in every state, importantly to include the Boston metro area. TST venerates (but does not worship) the biblical adversary as a promethean icon against tyranny. For TST and its membership, the Satan described in Paradise Lost and like works is a revolutionary antihero who stood up against impossible odds to seek justice and egalitarianism for himself and others. TST propagates its Seven Tenets:

(1) One should strive to act with compassion and empathy toward all creatures in accordance with reason.

(2) The struggle for justice is an ongoing and necessary pursuit that should prevail over laws and institutions.

(3) One's body is inviolable, subject to one's own will alone.

(4) The freedoms of others should be respected, including the freedom to offend. To willfully and unjustly encroach upon the freedoms of another is to forgo one's own.

(5) Beliefs should conform to one's best scientific understanding of the world. One should take care never to distort scientific facts to fit one's beliefs.

(6) People are fallible. If one makes a mistake, one should do one's best to rectify it and resolve any harm that might have been caused.

(7) Every tenet is a guiding principle designed to inspire nobility in action and thought. The spirit of compassion, wisdom, and justice should always prevail over the written or spoken word.

https://thesatanictemple.com/pages/about-us (last visited November 11, 2020). Far from the Seven Tenets being the sole "core" of TST's religious beliefs and practices, other core practices of TST includes (among many other things) a demand for an equal opportunity to present its beliefs wherever a government opens the door for some religions to express theirs. In 2018, TST sought a prayer opportunity before the City Council and was rejected because TST lacked the political clout to obtain a Councilor's sponsorship.

8. **The City of Boston**, defendant, is a municipal corporation located in Suffolk County, MA. Boston serves as Massachusetts' capital and is its most populous city. Boston's government includes a unicameral legislative branch (the "**Council**") which consists of thirteen Councilor seats, all of which are publicly elected positions and one of which serves as chair, the Council President. Before Council meetings, the Council hears a legislative prayer which is selected by a rotating Councilor who has plenary authority to extend an invitation to whomever the Councilor desires. In 2018, Boston refused TST a prayer opportunity because TST lacked sponsorship from a Councilor.

## FACTS ALLEGED

### Background

9. Every week, unless otherwise ordered and except on holidays, the Council holds a meeting.

10. There are about 35 meetings per year, but the number fluctuates year-to-year.

11. The meetings are broadcasted to local television and, going back to at least January 2011, were audio/video recorded. Recordings as early as January 2011 can be viewed by following this link: http://meetingrecords.cityofboston.gov/sirepub/meetresults.aspx (last visited December 30, 2020).

12. These meetings start with a legislative invocation with an instruction for the audience to stand in observance of the prayer.

13. At the beginning of each calendar year, the Council promulgates a schedule of the dates of the year's upcoming Council meetings along with the names of the Councilors responsible for securing an invocation speaker.

14. Each Councilor has unfettered authority to select who gets to pray at their meeting.

15. The City has issued no contours or guidelines of each Councilor's right to choose who gives the prayer.

16. This practice has not been reduced to a formal policy. C.f. "Rules of the Boston City Council" (establishing various rules for the Council).

17. Absent a Councilor's invitation, there is no opportunity to offer the legislative prayer. See Council Rule 43 ("No person shall be permitted to speak, testify, or otherwise participate in any council meeting, hearing, or working session unless permitted to do so by the presiding officer or committee chair.")

18. So far as the City is concerned, the question of who gets to pray rests solely in the whim of the inviting Councilor.

19. As further detailed below, the City's policy disregards constitutional restrictions on legislative prayers. E.g. Marsh v. Chambers, 463 U.S. 783, 794–95, 103 S. Ct. 3330, 3338 (1983) (the prayer opportunity cannot be "exploited to proselytize or advance any one, or to disparage any other, faith or belief"); Town of Greece, N.Y. v. Galloway, 572 U.S. 565, 585–86, 134 S. Ct. 1811, 1824 (2014) (the selection policy must be one of of "nondiscrimination"); and Am. Legion v. Am. Humanist Ass'n, 139 S. Ct. 2067, 2089 (2019) (government-sponsored religious practices, including legislative prayers, are constitutional only if they are "an example of respect and tolerance for differing views, an honest

endeavor to achieve inclusivity and nondiscrimination, and a recognition of the important role that religion plays in the lives of many Americans.")

## TST's Request

20. TST is headquartered in Salem, which is a suburb of Boston.

21. TST has 2,449 members in the Boston metropolitan area.

22. At all times relevant, TST has been organized on two scales: the national organization and semi-autonomous local organizations called "chapters."

23. Prior to the events described below, members of TST's Boston Chapter had twice made requests, in 2016 and 2017 respectively, to bless the Council meeting.

24. Each time, the City rebuffed the request because the members lacked sponsorship from a Councilor.

25. In 2018, the matter was escalated to the national organization and attracted the attention of one of TST's co-founders: Malcolm Jarry.

26. On October 2, 2018, Jarry issued an email to the then-Council President, Andrea Campbell. **EXHIBIT 1**. Jarry's email demanded an invite for TST to offer an invocation before the City Council.

27. The next day, Jarry and Christine O'Donnell (then Compliance Director & Staff Counsel for the City) had a phone conversation about the issue.

28. During that conversation, O'Donnell informed Jarry that there is no waiting list to seek an invite. Religious groups either have a Councilor's sponsorship, or they aren't allowed to bless the meeting.

29. Jarry responded that, as a religious minority which is much maligned by a vocal segment of voting Christians, TST's constitutional right to equal participation in the ceremony could not be entrusted to the mechanisms of majoritarian rule.

30. Jarry was speaking from experience. In 2014, TST attempted to publicly show a Black Mass at Harvard University in neighboring Cambridge through Harvard's Extension Cultural Studies.

31. A Black Mass is an act of ritual blasphemy which has religious significance to Satanists.

32. In response, the Archdiocese of Boston organized a public movement to preclude the event.

33. The controversy drew national headlines and more than 2,000 Catholics marched in protest. Joseph P. Laycock, *Oxford University Press*, "Speak of the Devil: How The Satanic Temple is Changing the Way We Talk about Religion" (2020) at p. 28.

34. This organized movement against TST was partly successful: Harvard rescinded the invitation, but the show went on at the nearby Hong Kong Restaurant and Lounge.

35. Closer to these facts, TST's membership has made requests for equal participation in legislative prayers before the City of Scottsdale, AZ and Kenai Peninsula Borough, AK.

36. In Scottsdale, TST's member was initially accepted, but then 15,207+ emails entitled "No Hail Satan Prayer" crashed city servers. TST's member was ultimately excluded because of the majoritarian outcry and the resulting litigation is now pending before the Ninth Circuit. Oral arguments are in the process of scheduling for some time in March, April, or May of 2021.

37. Similarly, in 2016, the Boston Chapter's prayer request was met with a loud and conspicuously religious objection to TST's equal participation. Choice selections of emails available pursuant to a public records include:

(a) "Evil disguised as benign, doesn't make it ok"

(b) "[T]hose who embrace satanism are those who worship the evil deception of humanity. . . . There can be no sane footing upon which to permit any form of satanic worship or intercession to infest government."

(c) "Please reject Satan and keep us a nation under God."

(d) "If it isn't clear to every City Councilor and Mayor Martin Walsh, that would be a very bad idea and cross far over any bounds of sanity and decency. Moreover, as an act of hate blasphemy, and rejection of God it should be immediately commended as just that."

The public records request and Boston's produced documents are available via Muckrock "Boston City Council Invocation Schedule" August 18, 2017 (https://www.muckrock.com/foi/boston-3/boston-city-council-invocation-schedule-42280/) (Last visited January 18, 2021).

38. In Kenai, TST's member was initially rejected after a public outcry, ostensibly because she was not a member of a "qualifying" religious association. But the Alaska Superior Court found that her exclusion was really, "stemmed from intolerance for the controversial views expressed during two particular invocations." Hunt v. Kenai Peninsula Borough, No. 3AN-16-10652 CI at *18 (Alaska Super. Ct. Oct. 9, 2018). The ban was overturned under Alaska's analogs to the Establishment Clause, the Free Speech Clause, and the Equal Protection Clause. TST's member was subsequently permitted her invocation, the public's religious objections notwithstanding.

39. The City knew of the Harvard Black Mass fiasco and the 2016 objections to the Boston Chapter's request for a prayer and could reasonably anticipate that granting Jarry's request would result in an angry mob protesting the City's decision to comply with the Constitution.

40. So, on October 9, O'Donnell issued notice that TST would not be permitted a prayer opportunity without an invite from a Councilor. **EXHIBIT 2**.

41. TST lacked the political clout to procure a Councilor's invitation.

42. No other religious group has requested an opportunity to bless the Council's meeting, only to be denied. TST is sole group to have ever been excluded.

43. On October 17, TST raised a claim of discrimination in a place of "public accommodation"

to the Massachusetts Commission Against Discrimination ("**MCAD**.")

44. The MCAD is a state agency charged with investigating claims of discrimination in places of "public accommodation." See generally G.L. c. 151B (prohibiting such discrimination).

45. MCAD has no authority to investigate or address claims of constitutional violations.

46. During the MCAD investigation, the City explained that invitees are "either a clergy person or a layperson who is a member of the Boston community and/or has some connection or relevance to the inviting City Councilor's constituents or personal life."

47. The City also claimed that Councilor O'Malley and another Councilor "exclusively invited individuals from withing their respective districts who are known for their outreach work."

48. Both of these claims were demonstrably untrue. The MCAD quickly found that prayer invitations were granted to six religious organizations from outside Boston city limits, just between 2018 and 2019.

49. One of those invitations was to Reverend Lindsay Popperson, of the United Church of Christ's branch in Marblehead, MA.

50. The invitation to Rev. Popperson was extended by none other than Councilor O'Malley, who the City had falsely claimed "exclusively" doled out invitations to his district's residents.

51. In response to the MCAD investigator's further inquiry, the City explained that Councilor O'Malley had a "personal connection" with the Reverend because the Reverend serves as the Chaplain for a nursing center where the Councilor's mother received care.

52. That's religious discrimination. The stated practice was that O'Malley "exclusively invited individuals from within their respective districts who are known for their outreach work." Changing that rule to benefit one ("preferred") religious group, but not affording that same benefit to a different ("undesirable") religious group *is* disparate treatment on the basis of religion.

53. It's also a perfect microcosm of the problem with granting public officials unfettered authority to grant limited governmental benefits: it will inevitably result in a grant of that benefit to someone with a "personal connection" to the official and, necessarily, will deprive someone else of that benefit.

54. The City uniquely excluded TST based on TST's religious viewpoint and the second-order effects of avoiding a public outcry for giving equal access to an "undesirable" religious minority.

55. Ultimately, the MCAD investigator determined that the MCAD could not take up the matter because the prayer opportunity was not a "place of public accommodation" within the meaning of the statute because, although the meetings are open to attendance by the public, the Council determines who can speak at the meeting.

56. The MCAD investigator expressly declined to address the constitutional issues because the Commission lacks authority to address the constitutionality of the prayer ceremony.

57. The MCAD investigator's determination was not a "final ruling" for res judicata purposes and does not preclude TST from raising the same facts to this Court's attention.

58. TST is damaged because the City grants invitations to "preferred" religions, but refuses to invite TST because of its "undesirable" status.

## **The effect of the practice**

59. After TST's exclusion, volunteers of TST dedicated substantial efforts into reviewing 233 invocations between January 3, 2011 and August 8, 2017.

60. The data show that, because Councilors are selecting prayers without any neutrality enforcing safeguards, the prayer opportunity is disproportionately being afforded to those that subscribe to Abrahamic belief traditions. Everyone else is disproportionately underrepresented.

61. According to the Pew Research Center, the Boston metropolitan area boasts a 57% Christian population. Pew Research Center Religious Landscape Study "Adults in the Boston metro area"

(available at https://www.pewforum.org/religious-landscape-study/metro-area/boston-metro-area/).

62. Despite consisting of only 57% of the population, Christians gave 78.5% of the prayers.

63. The Muslim population has 1% of the population, yet 4.7% of the prayers.

64. The Jewish representation was close to right, with 4% of the population and 4.3% of prayers.

65. Christians, Muslims, and Jews are all over-represented because they all share the same Abrahamic tradition roots. They are safe and familiar to the Councilors, and they have the numbers and political clout to demand inclusion.

66. Combined, those who believe in the God of Abraham have only 62% of the population yet command 87.5% of the prayer opportunities.

67. The rest are left in the cold. Nonbelievers of various stripes consist of 33% of the Boston population. Yet, of 233 reviewed instances of prayers between 2011 and 2017, precisely one blessing–less than 0.5%–was secular. That was offered by Sister Margaret Leonard of Project Hope (a laudable international health care organization, but not a religious congregation) on October 22, 2014.

68. Similarly, Hindus consist of 1% of the Boston population, yet were disproportionately underrepresented at one instance of 233 reviewed prayers, less than half their proportionate share.

69. Buddhists, also with 1% of the Boston population, received no representation at all.

70. Wiccans, other Pagans, and Native Americans, all, have adherents in Boston yet they, too, got no invite.

71. To some extent the disproportionate representation could be a function of interest. Maybe the Pagans are happier without the limelight. But the problem with the City's prayer selection system is that the prayer opportunity isn't equally shared among those who are interested–as the Constitution requires–instead, the opportunity is reserved for those who have the political clout to obtain a

Councilor's patronage.

72. TST wants into that club, but lacks the influence to buy admission.

73. Thus, TST needs this Court to enforce the City's compliance with the Constitution.

## CAUSES OF ACTION

### Count 1
Violation of the Establishment Clause

74. The First Amendment, which includes the Establishment Clause, was drafted to protect against political division along religious lines. Lemon v. Kurtzman, 403 U.S. 602, 622, 91 S. Ct. 2105, 2116, 29 L. Ed. 2d 745 (1971).

75. To that end, the Establishment Clause prohibits either governmental preference for, or disparagement of, any particular religion; it also prohibits governmental preference for religious belief over religious disbelief, and vice versa. E.g. U.S. Const. Amend. I ("Congress shall make no law respecting an establishment of religion."); Larson v. Valente, 456 U.S. 228, 245, 102 S. Ct. 1673, 1684 (1982) ("Free exercise thus can be guaranteed only when legislators—and voters—are required to accord to their own religions the very same treatment given to small, new, or unpopular denominations"); Epperson v. State of Ark., 393 U.S. 97, 107, 89 S. Ct. 266, 272, 21 L. Ed. 2d 228 (1968) ("the state has no legitimate interest in protecting any or all religions from views distasteful to them.")

76. In this framework, legislative prayer policies are constitutionally permissible only if the opportunity to pray is afforded without discrimination. Marsh v. Chambers, 463 U.S. 783, 794–95, 103 S. Ct. 3330, 3338 (1983); Town of Greece, N.Y. v. Galloway, 572 U.S. 565, 585–86, 134 S. Ct. 1811, 1824 (2014); Am. Legion v. Am. Humanist Ass'n, 139 S. Ct. 2067, 2089 (2019); accord id. at 2091 (Breyer, J., concurring) and 2094 (Kagan, J., concurring in part), Lund v. Rowan Cty., N. Carolina,

863 F.3d 268 (4th Cir. 2017) and Williamson v. Brevard Cty., 928 F.3d 1296 (11th Cir. 2019); c.f. Bormuth v. Cty. of Jackson, 870 F.3d 494 (6th Cir. 2017).

77. As further discussed in American Legion, governmental sponsorship of a religious practice is constitutional only if it is nondiscriminatory, i.e. it "stands out as an example of respect and tolerance for differing views, an honest endeavor to achieve inclusivity and nondiscrimination, and a recognition of the important role that religion plays in the lives of many Americans. American Legion, 139 S. Ct. 2067 at 2089 (plurality opinion). Justice Kagan signed onto this sentence, but only because of its "sensitivity to and respect for" pluralism, neutrality, and inclusion, all of which "the First Amendment demands." Id., 139 S.Ct. at 2094 (Kagan, J., concurring in part).

78. "Discrimination" is commonly but improperly confused with "religious animus." Intentional discrimination answers "what," it is the mental resolution to conduct or refrain from an act. Intentional religious discrimination, by a government, is what makes an action unconstitutional.

79. "Religious animus" is one possible answer to "why," but that is unnecessary to a favorable decree. See Hassan v. City of New York, 804 F.3d 277, 297–98 (3d Cir. 2015) (equal protection case) ("All you need is that the state actor *meant* to single out a plaintiff because of the *protected characteristic itself*") (emphasis in original).

80. Here, the intentional discrimination is in the City's refusal to extend TST an invitation to join in a government-sponsored religious ceremony while providing that imprimatur to other groups.

81. The City refused to provide TST an invite because of the nature of TST's beliefs: we extol the virtues of Satan, which is decidedly unpopular with the City's sizeable (and politically powerful) Christian constituency.

82. By refusing to invite TST, the City is sending a message that TST and its congregation are outsiders, not full members of the political community. Lynch v. Donnelly, 465 U.S. 668, 688, 104 S.

Ct. 1355, 1367 (1984) (O'Connor, J., concurring) ("Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community. . . . Disapproval sends the opposite message.")

83. Simultaneously, by providing invites only to a select group of clergy, the City is sending a corresponding message that these clergy and their congregations are insiders, favored members of the political community. Id. ("Endorsement sends a message . . . to adherents that they are insiders, favored members of the political community.")

84. The City even admitted as much during MCAD proceedings: Councilor O'Malley issued his invite to Rev. Popperson because of their "personal connection."

85. By reserving it to the whim of publicly-elected Councilors to determine who gives the prayer, the City has upended the point of the Bill of Rights: "to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." W. Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 638, 63 S. Ct. 1178, 1185 (1943).

86. TST's right to equal participation in the prayer ceremony is a fundamental First Amendment right. See Town of Greece. Thus, TST's right to equal participation "may not be submitted to vote" and does not depend on the outcome of an election. Id. at 1185-86.

87. Yet, in Boston, TST's right to equal participation *does* depend on the outcome of an election: TST only gets equal participation if an elected Councilor is sympathetic to TST's desire to participate. This is an inversion of our constitutional norms.

88. The City's prayer selection policy needs to have neutrality-enforcing safeguards and needs a mechanism to provide an equal prayer opportunity to all groups who want to participate. Anything less runs afoul of the Establishment Clause. Because Boston's prayer selection policy does not have

these, it is unconstitutional.

89. The Court should find Boston's legislative prayer scheme unconstitutional as an affront to the Establishment Clause because the City's prayer selection practice lacks neutrality enforcing safeguards, lacks a mechanism to provide an equal prayer opportunity to all groups who want to participate, and was exploited to exclude TST from participation. 42 USC § 1983; 28 USC § 2201; Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018 (1978).

90. The Court should order Boston to provide TST equal access to offer a legislative prayer, should permanently enjoin Boston from refusing TST or any other religion an opportunity to offer a legislative prayer, and should order Boston to create a mechanism for religions to sign up for the prayer opportunity. 42 USC § 1983.

## Count 2

Violations of the Free Speech Clause and the Free Exercise Clause

91. The First Amendment, which also includes the Free Speech and Free Exercise Clauses, was drafted to protect against political division along religious lines. Lemon v. Kurtzman, 403 U.S. 602, 622, 91 S. Ct. 2105, 2116, 29 L. Ed. 2d 745 (1971).

92. To that end, the Free Exercise Clause prohibits governmental restraint on the free exercise of religion. U.S. Const. Amend. I ("Congress shall make no law . . . prohibiting the free exercise [of religion]"); Braunfeld v. Brown, 366 U.S. 599, 607, 81 S. Ct. 1144, 1148 (1961) ("If the purpose or effect of a law is to . . . discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect"); see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 534, 113 S. Ct. 2217, 2227, 124 L. Ed. 2d 472 (1993) ("Facial neutrality is not determinative.")

93. Likewise, the Free Speech Clause prohibits governmental suppression of expression–

particularly to include religious expression. Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 760 (1995) ("government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince.") (emphasis in original)

94. TST's intention to publicly bless the Council's meetings with a Satanic prayer was an expression of religious significance.

95. The City withheld that prayer opportunity because it finds TST to be an "undesirable" religion and wanted to avoid the public outcry which would inevitably ensue from granting TST equal participation rights to Christians.

96. The corollary is that if TST were not controversial, TST would have received an invite like all the other "permissible" minority groups who the overall public finds suitably inoffensive.

97. By refusing to grant TST equal access to the public prayer ceremony, the City issued a governmental restraint on the free exercise of religion.

98. The Court should find Boston's legislative prayer scheme unconstitutional as an affront to the Free Speech and Free Exercise Clauses because the City withheld the prayer opportunity from TST, but grants that opportunity to other religions. 42 USC § 1983; 28 USC § 2201; Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018 (1978).

99. The Court should order Boston to provide TST equal access to offer a legislative prayer, should permanently enjoin Boston from refusing TST or any other religion an opportunity to offer a legislative prayer, and should order Boston to create a mechanism for religions to sign up for the prayer opportunity. 42 USC § 1983.

## Count 3
Violation of the Equal Protection Clause

100. The Equal Protection Clause prohibits governments from treating similarly situated groups differently. U.S. Const. Amend. XIV ("nor shall any State . . . deny to any person within its jurisdiction the equal protection of the laws.")

101. Religious discrimination is barred under the Equal Protection Clause just as well as the Religion Clauses (Counts 1 and 2, above). See In re Subpoena to Witzel, 531 F.3d 113, 118–19 (1st Cir. 2008).

102. The benefit to Equal Protection is that it has what the Religion Clauses lack: consistency in interpretation. E.g. Rowan Cty., N.C. v. Lund, 138 S. Ct. 2564, 201 L. Ed. 2d 1101 (2018) (Thomas and Gorsuch, JJ., dissenting from the denial of certiorari) ("This Court's Establishment Clause jurisprudence is in disarray.")

103. "Disarray" is putting it lightly. It has been more aptly described as "schizophrenic." Paulsen, "Religion, Equality, and the Constitution: An Equal Protection Approach to Establishment Clause Adjudication," 61 Notre Dame L. Rev. 311, 315 (1986) (criticizing the Court's reading of the Establishment Clause as "producing a schizophrenic pattern of decisions")

104. Analyzing this case under the Equal Protection Clause means we get to use a clean and settled tiered judicial scrutiny analysis, not simply stab in the dark with the "Rorsarch tests" offered by the Religion Clauses. Charles Truslow and Craig Jones, "Hunt v. Kenai Peninsula Borough: the Search for Clarity in Legislative Prayer Speaker Selection," 36 Alaska L. Rev. 119, 129 (June, 2019).

105. Strict scrutiny attaches to the City's legislative prayer policy, either because (a) TST is a minority religion which lacks the political clout to overpower a majoritarian political process (i.e. TST is a "suspect class"); or (b) The City's legislative prayer selection practice is a determination of who gets to bless the Council's meeting (i.e. it "impinges upon the exercise of a fundamental right.") Plyler v. Doe, 457 U.S. 202, 216–17, 102 S. Ct. 2382, 2394–95 (1982).

106. Alternatively, intermediate scrutiny should attach because governments cannot determine permissible invokers by considering the contents of the prayers. Marsh, Town of Greece, and American Legion, above. Thus, any regulation of who gets to give the invocation can only be content-neutral. Intermediate scrutiny applies to content-neutral regulations of speech. E.g. Signs for Jesus v. Town of Pembroke, NH, 977 F.3d 93, 101 (1st Cir. 2020).

107. But even if the Court selects rational basis, the City's practice can't survive because "a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." U. S. Dep't of Agric. v. Moreno, 413 U.S. 528, 534, 93 S. Ct. 2821, 2826 (1973).

108. TST is similarly situated to every other "permissible" group which received a right to bless the Council's meeting. The only distinction is that TST extols the virtues of Satan whereas the "permissible" groups predominately extol the virtues of Jesus. This is a distinction without a constitutionally significant difference.

109. By permitting a host of other religious viewpoints to publicly bless the Council meeting, but prohibiting TST equal access to officiate that ceremony, the City disparately treated two similarly situated groups in violation of the Equal Protection Clause.

110. The Court should find Boston's legislative prayer scheme unconstitutional as an affront to the Equal Protection Clause because the City withheld the prayer opportunity from TST, but grants that opportunity to other religions. 42 USC § 1983; 28 USC § 2201; Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018 (1978).

111. The Court should order Boston to provide TST equal access to offer a legislative prayer, should permanently enjoin Boston from refusing TST or any other religion an opportunity to offer a legislative prayer, and should order Boston to create a mechanism for religions to sign up for

the prayer opportunity. 42 USC § 1983.

**Count 4**

Violation of Massachusetts's Free Exercise Clause

112. Similar to the First Amendment, the Massachusetts Constitution protects the free exercise of religion. Mass. Const. Art. 46, § 1 ("No law shall be passed prohibiting the free exercise of religion.")

113. The distinction is in the level of protection. The Massachusetts Constitution affords greater religious freedom than the Federal Constitution. See Att'y Gen. v. Desilets, 418 Mass. 316, 323, 636 N.E.2d 233, 237 (1994). There, the Massachusetts Supreme Court rejected, on state law grounds, the United States Supreme Court's reasoning of Emp. Div., Dep't of Hum. Res. of Oregon v. Smith, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990). In Smith, the Supreme Court held that Congress may prohibit the free exercise of religion provided that a court finds it was done by a generally-applicable, neutral rule which does not impact any other fundamental right. Since then, Congress has rejected the Smith reasoning. See the Religious Freedom Restoration Act (42 USC §§ 2000bb et seq.). Most states–Massachusetts included–have done the same.

114. Under the Massachusetts Constitution, general applicability and neutrality is beside the point. Instead, a plaintiff need only show: "(1) a sincerely held religious belief, which (2) conflicts with, and thus is burdened by, the State requirement." Krupien v. Ritcey, 94 Mass. App. Ct. 131, 136 n. 9, 112 N.E.3d 302, 307 n. 9 (2018). At that point, the law is presumptively unconstitutional and the burden passes to the government to show "both that (3) the requirement pursues an unusually important governmental goal, and that (4) an exemption would substantially hinder the fulfillment of the goal." Id. This is the strict scrutiny test. See id., 94 Mass. App. Ct. at 136, 112 N.E.3d at 307.

115. TST's membership sincerely holds the religious beliefs propagated by The Satanic

Temple.

116. The City's prayer selection policy is determined by a political calculus, which conflicts with and thus burdens TST's religious identity because TST's religious beliefs and identity are both unpopular with the politically powerful majority.

117. Thus, even if the Court finds both that there is no Free Speech issue entailed in the City's prayer selection policy and the prayer selection policy is neutral and generally applicable in fact, the Court should still order Boston to provide TST equal access to offer a legislative prayer, should still permanently enjoin Boston from refusing TST or any other religion an opportunity to offer a legislative prayer, and should still order Boston to create a mechanism for religions to sign up for the prayer opportunity as an affront against the Massachusetts Constitution. MGL ch. 231A, §§ 1 and 5.

## PRAYER FOR RELIEF

**WHEREFORE** TST prays for orders as follows:

1. Find that Boston's legislative prayer scheme is unconstitutional as an affront to the Establishment Clause, the Free Speech and Free Exercise Clauses, the Equal Protection Clause, and the Massachusetts Constitution, art. 46 § 1.

2. Order Boston to afford TST an opportunity to bless the Council's meeting within two weeks following entry of the order.

3. Issue a permanent injunction that Boston shall not exclude TST or any other religious groups from an equal opportunity to bless the Council's meetings.

4. Issue a permanent injunction that Boston shall create a mechanism for interested religious groups to obtain an equal opportunity to bless the Council's meetings.

5. Order Boston to compensate TST for costs and attorney's fees pursuant to FRCP 54, 42 USC § 1988, and MGL ch. 231A § 7.

6. And for all other relief to which TST may be entitled.

Respectfully submitted on April 26, 2021,
on behalf of The Satanic Temple, Inc.

By: /s/ Brendan Durrigan
Brendan Durrigan BBO # 668680
Address: 169 North Franklin St., Suite 7
Holbrook, MA 02343
phone: (781) 726-0763
email: bdurrigan@gmail.com

And: /s/ Matthew A. Kezhaya
Matthew A. Kezhaya, MN # 0402193, *phv* pending
KEZHAYA LAW PLC
100 S. Fifth Street, 19th Floor
Minneapolis, MN 55402
phone: (479) 431-6112
facsimile: (479) 282-2892
email: matt@kezhaya.law

## CERTIFICATE AND NOTICE OF SERVICE

**NOTICE IS GIVEN** that I, Matthew A. Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on April 26, 2021 which sends service to registered users, including all other counsel of record in this cause. /s/ Matthew A. Kezhaya

## EXHIBIT LIST

1. October 2 email from Malcolm Jarry to Council President

2. October 9 email from O'Donnell to Jarry

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**CIVIL ACTION**
**No. 1:21-cv-10102-AK**

**THE SATANIC TEMPLE, INC.,**
**Plaintiff**

**v.**

**CITY OF BOSTON**
**Defendant**

**<u>CITY OF BOSTON'S MOTION TO QUASH AND REQUEST FOR SANCTIONS</u>**

The Satanic Temple originally sought to depose Mayor Michelle Wu on November 2, 2021—mayoral election day in the City of Boston ("City"). Following an emergency motion to quash and motion for protective order filed by the City, this Court ordered the Satanic Temple to file a statement explaining why the deposition of Mayor Wu was scheduled for election day. In response, the Satanic Temple conceded that it was a publicity stunt designed to inconvenience Mayor Wu. <u>See</u> ECF 38 at p. 2. Counsel for the Satanic Temple, Matthew Kezhaya, went on to state that he "felt no remorse" for his actions because, in his view, it was his "sworn duty to do anything short of breaking the law to see to it that my client's goals are recognized." <u>Id.</u> This Court went on to issue a protective order that prohibited the Satanic Temple from taking the deposition of Mayor Wu.[1] <u>See</u> ECF No. 47 at p. 8. In its Order, the Court noted Mr. Kezhaya's

[1] The City's motion for protective order consisted of two parts—first, ensuring that the deposition of Michelle Wu did not take place on election day; and second, prohibiting the Satanic Temple from taking Michelle Wu's deposition altogether. The Court issued an initial order precluding the Satanic Temple from taking Michelle Wu's deposition on election day [ECF

"exceptionally bad faith" and stated its "hope" that he would "dispense with impermissible antics and abusive tactics" as discovery moved forward. See id. at p. 15.

The Court's hope has not come to fruition. In direct contravention of the protective order in this case, the Satanic Temple has noticed Mayor Wu's deposition for September 12, 2022.[2] See Deposition Notice, attached hereto as Exhibit 1. Upon receiving the deposition notice, undersigned counsel e-mailed Mr. Kezhaya, reminded him of the protective order, and stated that the City would not produce Mayor Wu for a deposition in accordance with that order.[3] See email, attached hereto as Exhibit 2. In response, Mr. Kezhaya stated that he would "seek a bench warrant" for Mayor Wu if she does not appear for her deposition as noticed. See e-mail, attached hereto as Exhibit 3. When undersigned counsel responded that the City would need to move forward with a motion to quash in light of the Satanic Temple's position, Mr. Kezhaya sent the following response[4]:

> Speaking as a reasonable third-party observer, it feels an awful lot like public funds are being abused to inure to Wu's private benefit. Something smells fishy. Please tell me, lawyer-to-lawyer, if there is any form of official corruption going on between the City of Boston and U.S.D.J. Kelley, D. Mass…Please also be honest, because when my curiosity is piqued I tend to start demanding evidence.

See e-mail, attached hereto as Exhibit 5. And then approximately 45 minutes later:

---

No. 40] and later issued a second order prohibiting the Satanic Temple from taking Michelle Wu's deposition altogether. See ECF No. 47.

[2] Mr. Kezhaya e-mailed a copy of the deposition notice to undersigned counsel on September 1, 2022. To date, to the best of undersigned counsel's knowledge, Mayor Wu has not been served with a deposition subpoena. Though undersigned counsel informed Mr. Kezhaya that she would accept service of any subpoena issued to Mayor Wu, Mr. Kezhaya has insisted upon serving Mayor Wu personally.

[3] Additionally, undersigned counsel reminded Mr. Kezhaya that the City has agreed to produce a less high-ranking official to answer questions that pertain to Mayor Wu. See Exhibit 2. This proposal has been rejected by the Satanic Temple. See Exhibit 3.

[4] Additionally, when undersigned counsel inquired as to whether the parties should set up a telephone conference to discuss the motion to quash in accordance with Local Rule 7.1, Mr. Kezhaya responded that undersigned counsel had "lost [her] phone privileges". See e-mail, attached hereto as Exhibit 4.

> Time's up, I take your failure to satisfy my curiosity to be an invitation to investigate.

See email, attached hereto as Exhibit 6. The City can only infer that these bizarre and unfounded accusations, coupled with the Satanic Temple's insistence on moving forward with Mayor Wu's deposition despite a protective order that explicitly prohibits them from doing so, are designed to harass, annoy, and cause undue burden to the City and Mayor Wu.

To that end, pursuant to Fed. R. Civ. P. 45(d)(3), the City respectfully moves this Court to quash the deposition of Mayor Wu that is scheduled for September 12, 2022. Additionally, because it has become clear that the Satanic Temple is using this litigation as a mechanism to harass, annoy, and cause undue burden to the City and its employees—rather than to seek the discovery it actually needs regarding its only remaining claim in this case[5]—the City requests that this action be dismissed as a sanction for the Satanic Temple's refusal to abide by a court order. Alternatively, the City seeks attorney's fees and costs for having to file the instant motion.

Respectfully submitted:

**DEFENDANT CITY OF BOSTON**

By its attorneys:

Adam N. Cederbaum
Corporation Counsel

/s/ Nicole M. O'Connor
Nicole M. O'Connor (BBO#675535)
Senior Assistant Corporation Counsel
City of Boston Law Department

[5] Again, the City has offered alternative witnesses to provide the Satanic Temple with the discovery it allegedly seeks from Mayor Wu. The Satanic Temple has rejected these offers. See Exhibits 2 and 3.

City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

**CERTIFICATE OF SERVICE**

I, Nicole M. O'Connor, hereby certify that on September 2, 2022, a copy of this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

*/s/ Nicole M. O'Connor*
Nicole M. O'Connor

**7.1 CERTIFICATION**

I, Nicole M. O'Connor, hereby certify that I attempted to confer with Plaintiff's counsel, Mr. Kezhaya, in a good faith effort to resolve the issues raised in this motion on September 1, 2022. First, I emailed Mr. Kezhaya and stated that Mayor Wu would not be appearing for a deposition in accordance with the protective order in this case. See e-mail, attached hereto as Exhibit 2. In that same e-mail, I explained that the Satanic Temple could obtain the discovery it seeks from Mayor Wu from a less high-ranking government official, which the City would agree to produce on either September 12 or 13. See id. When Mr. Kezhaya insisted on moving forward with the deposition of Mayor Wu, I suggested that we arrange a telephone conference to discuss the City's impending motion to quash. See Exhibit 4. In response, Mr. Kezhaya stated that I had "lost [my] phone privileges". See id. Accordingly, I was unable to confer further regarding the issues raised in this motion.

Dated: September 2, 2022

*/s/ Nicole M. O'Connor*
Nicole M. O'Connor

# 1:21-CV-10102

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**The Satanic Temple**, Inc.
*Plaintiff*

*v.*

City of **Boston**
*Defendant*.

## NOTICE OF DEPOSITION

Matt Kezhaya
Ark. # 2014161
Minn. # 0403196

matt@crown.law
direct: (479) 431-6112
general: (612) 349-2216

333 N. Washington Ave # 300, Minneapolis, MN 55415

**TO**: Boston and its counsel of record.

**LET IT BE KNOWN** that pursuant to FCRP 26 and 30, TST will take the deposition of **Michelle Wu** by oral examination, before a person authorized to administer oaths and take testimony, and recorded by stenographic, audiographic, and videographic means. The deposition will take place in-person at the headquarters for The Satanic Temple, **64 Bridge St., Salem, MA 01970** on **September 12, 2022** beginning at **9:30 am** and continuing thereafter until complete.

Propounded on **August 31, 2022**.

## CERTIFICATE OF SERVICE

I, Matt Kezhaya, emailed a copy of this document to Nicole O'Connor at nicole.oconnor@boston.gov and Robert Arcangeli at robert.arcangeli@boston.gov on August 31, 2022. */s/ Matt Kezhaya*

**From:** Nicole O'Connor <nicole.oconnor@boston.gov>
**Sent:** Thursday, September 1, 2022 11:06 AM
**To:** Matt Kezhaya <matt@crown.law>
**Cc:** robert.arcangeli@boston.gov; Sonia Kezhaya <sonia@crown.law>; Nick Henry <nick@crown.law>; John Hayden <john@crown.law>
**Subject:** Re: Satanic Temple v. Boston - notices of deposition

Matt:

The City will not produce Mayor Wu for a deposition. There is a protective order in place prohibiting her deposition (ECF 47). The Court underscored that the Satanic Temple may seek discovery from other sources in its denial of the Temple's motion for certificate of appealability (ECF 51). To that end, and as stated in my email dated July 29, 2022, the City's 30(b)(6) designee to testify on Mayor Wu's behalf regarding topics 8, 10, 12, 17, 18, 19, 20, and 21 of Plaintiff's Rule 30(b)(6) deposition subpoena is available on September 12 or 13. September 14 no longer works because of a previously-scheduled City Council meeting.

Please let us know how you plan to proceed. If you move forward with Mayor Wu's deposition, we will file a motion to quash. In the meantime, please do not serve Mayor Wu with any court documents. I will accept service on her behalf. Former Councilor Annissa Essaibi-George is not a City employee and I do not have authority to accept a deposition subpoena on her behalf.

Thanks,

Nicole

The information contained in this electronic transmission ("e-mail"), including any attachment (the "Information"), may be confidential or otherwise exempt from disclosure. It is for the addressee only. ***This information may be privileged and confidential attorney work-product or a privileged and confidential attorney-client communication.*** The Information may also be deliberative and pre-decisional in nature. As such, it is for internal use only. The Information may not be disclosed without the prior written consent of the Corporation Counsel of the City of Boston. If you have received this e-mail by mistake, please notify the sender and delete it from your system. Please do not copy or forward it. Thank you for your cooperation.

On Thu, Sep 1, 2022 at 12:10 PM Matt Kezhaya <matt@crown.law> wrote:

> I don't understand the confusion. I sent you a clear letter that informs you that if Wu fails to make her deposition, I will seek a bench warrant and I will move for contempt. Wu's attendance will be secured by the subpoena, not by her stipulation.
>
> Do whatever you want with this information, we will see how the cards turn.

**From:** Matt Kezhaya
**Sent:** Thursday, September 1, 2022 11:34:31 AM
**To:** Nicole O'Connor <nicole.oconnor@boston.gov>
**Cc:** robert.arcangeli@boston.gov <robert.arcangeli@boston.gov>; Sonia Kezhaya <sonia@crown.law>; Nick Henry <nick@crown.law>; John Hayden <john@crown.law>
**Subject:** RE: Satanic Temple v. Boston - notices of deposition

Supplement: you lost your phone privileges when we took materially different understandings from our last conversation. All of ours conversations will take place in writing or in front of a court reporter.

**From:** Nicole O'Connor <nicole.oconnor@boston.gov>
**Sent:** Thursday, September 1, 2022 11:27 AM
**To:** Matt Kezhaya <matt@crown.law>
**Cc:** robert.arcangeli@boston.gov; Sonia Kezhaya <sonia@crown.law>; Nick Henry <nick@crown.law>; John Hayden <john@crown.law>
**Subject:** Re: Satanic Temple v. Boston - notices of deposition

We will proceed with the motion to quash. We will also seek sanctions and attorney's fees for requiring the City to file this motion. Does it make sense to set up a phone conference to discuss, or may the City represent that its 7.1 obligations have been satisfied?

Nicole

**Nicole M. O'Connor**
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov



Nicole O'Connor <nicole.oconnor@boston.gov>

## RE: Satanic Temple v. Boston - notices of deposition
1 message

**Matt Kezhaya** <matt@crown.law>                                   Thu, Sep 1, 2022 at 12:33 PM
To: Nicole O'Connor <nicole.oconnor@boston.gov>
Cc: "robert.arcangeli@boston.gov" <robert.arcangeli@boston.gov>, Sonia Kezhaya <sonia@crown.law>, Nick Henry
<nick@crown.law>, John Hayden <john@crown.law>

The motion is not yet ripe because I have not yet prepared or served the subpoena on the non-party witness. Also, I question the City's standing to intervene on behalf of Wu (who is being deposed in her personal capacity, not as "Mayor.")

Speaking as a reasonable third-party observer, it feels an awful lot like public funds are being abused to inure to Wu's private benefit. Something smells fishy. Please tell me, lawyer-to-lawyer, if there is any form of official corruption going on between the City of Boston and U.S.D.J. Kelley, D. Mass.

Please also be honest, because when my curiosity is piqued I tend to start demanding evidence.



**Nicole O'Connor <nicole.oconnor@boston.gov>**

## Re: Satanic Temple v. Boston - notices of deposition

1 message

**Matt Kezhaya** <matt@crown.law> Thu, Sep 1, 2022 at 1:11 PM
To: Nicole O'Connor <nicole.oconnor@boston.gov>
Cc: "robert.arcangeli@boston.gov" <robert.arcangeli@boston.gov>, Sonia Kezhaya <sonia@crown.law>, Nick Henry <nick@crown.law>, John Hayden <john@crown.law>

Time's up, I take your failure to satisfy my curiosity to be an invitation to investigate.

Sent via the Samsung Galaxy S22+ 5G, an AT&T 5G smartphone
Get Outlook for Android

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**CIVIL ACTION**
**No. 1:21-cv-10102-AK**

**THE SATANIC TEMPLE, INC.,**
**Plaintiff**

**v.**

**CITY OF BOSTON**
**Defendant**

**CITY OF BOSTON'S EMERGENCY RENEWED MOTION TO QUASH**

The City of Boston filed a Motion to Quash and Request for Sanctions [ECF No. 57] on September 2, 2022 upon receiving a notice of deposition for Mayor Michelle Wu, scheduling her deposition for September 20, 2022. Yesterday, Mayor Wu was served with a deposition subpoena, scheduling her deposition for September 20, 2022. See Exhibit 1.

Undersigned counsel has informed the Satanic Temple repeatedly that Mayor Wu will not be appearing for the deposition because it is the City's position that there is a protective order that precludes her from being deposed in this case. The Satanic Temple has indicated that it will seek a bench warrant for Mayor Wu if she does not appear on Tuesday, September 20, 2022. In light of this, the City files the instant motion on an emergency basis to quash Mayor Wu's deposition that is scheduled for next Tuesday.

In further support of this Motion, the City respectfully refers the Court to its previously-filed Motion to Quash and Request for Sanctions [ECF No 57].

Respectfully submitted:

**DEFENDANT CITY OF BOSTON**

By its attorneys:

Adam N. Cederbaum
Corporation Counsel

*/s/ Nicole M. O'Connor*
Nicole M. O'Connor (BBO#675535)
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039
Nicole.OConnor@boston.gov

**CERTIFICATE OF SERVICE**

I, Nicole M. O'Connor, hereby certify that on September 15, 2022, a copy of this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

*/s/ Nicole M. O'Connor*
Nicole M. O'Connor

**7.1 CERTIFICATION**

I, Nicole M. O'Connor, hereby certify that I attempted to confer with Plaintiff's counsel, Mr. Kezhaya, in a good faith effort to resolve the issues raised in this motion on September 1, 2022. First, I emailed Mr. Kezhaya and stated that Mayor Wu would not be appearing for a deposition in accordance with the protective order in this case. In that same e-mail, I explained that the Satanic Temple could obtain the discovery it seeks from Mayor Wu from a less high-ranking government official, which the City would agree to produce on either September 12 or 13. When Mr. Kezhaya insisted on moving forward with the deposition of Mayor Wu, I suggested that we arrange a telephone conference to discuss the City's impending motion to quash. In response, Mr. Kezhaya stated that I had "lost [my] phone privileges". Accordingly, I was unable to confer further regarding the issues raised in this motion.

Dated: September 15, 2022

*/s/ Nicole M. O'Connor*
Nicole M. O'Connor

(Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

RECEIVED
CITY CLERKS OFFICE
2022 SEP 14 P 1:46
BOSTON, MA

The Satanic Temple, Inc.
*Plaintiff*
v.
City of Boston, MA
*Defendant*

Civil Action No. 1:21-cv-10102

CC492527

**SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION**

FORWARDED BY THE CITY CLERK TO THE
SEP 14 2022
LAW DEPARTMENT

To: Michelle Wu

*(Name of person to whom this subpoena is directed)*

☑ Testimony: YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: 64 Bridge St., Salem, MA 01970 | Date and Time: 09/20/2022 9:30 am |
|---|---|

The deposition will be recorded by this method: stenographic, audiographic, videographic

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 09/11/2022

*CLERK OF COURT*

OR

*Signature of Clerk or Deputy Clerk*

/s/ Matthew A. Kezhaya
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* The Satanic Temple, Inc. (Plaintiff), who issues or requests this subpoena, are:

Matthew A. Kezhaya; 1202 NE McClain Rd., Bentonville, AR 72712; matt@crown.law; 479-431-6112

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

A True Copy Attest 9-14-22

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| THE SATANIC TEMPLE, INC.,<br>Plaintiff,<br>v.<br>CITY OF BOSTON,<br>Defendant. | **Civil Action No. 1:21-cv-10102-AK** |

**THE CITY OF BOSTON'S MOTION FOR SUMMARY JUDGMENT**

The City of Boston (the "City") moves, pursuant to Fed. R. Civ. P. 56, for summary judgment in its favor dismissing on the two remaining counts – Counts I and IV - of the First Amended Complaint of plaintiff The Satanic Temple, Inc. ("TST"). In Count I, TST alleges violations of the U.S. Constitution's Establishment Clause. In Count IV, TST alleges violations of the Massachusetts Constitution's Free Exercise Clause. TST failed to present any evidence that would raise a genuine issue of material fact on the issue of whether the Boston City Council's invocation invitation process is constitutionally sound under either of these two provisions. The claims fail as a matter of law. The grounds for this motion, which are incorporated by reference herein in their entirety, are set forth in the accompanying memorandum of law and Local Rule 56.1 Statement of Material Undisputed Facts. Briefly stated, however, TST's remaining claims fail for the following reasons:

***First***, the City Council's invocation invitation process falls squarely within the constitutional parameters established by the Supreme Court in *Marsh v. Chambers*, 463 U.S. 783 (1983) and *Town of Greece v. Galloway*, 572 U.S. 565, 575 (2014). No reasonable observer

viewing the Council's invocation process in light of the long history of legislative prayer both at the Council and nationally would conclude that the legislative prayer here has been exploited to proselytize or to advance or disparage any religion. There is no evidence of any discriminatory intent on the part of any City Councilor. The legislative prayer here does not violate the Establishment Clause.

***Second***, like the analogous federal free exercise claim that was dismissed for lack of standing, the state free exercise claim fails as a matter of law. There are no cases indicating that Massachusetts courts would depart from federal free exercise jurisprudence and allow for a free exercise claim based on government speech in a nonpublic forum. The invocation process simply did not interfere with TST's right to freely exercise its beliefs.

**WHEREFORE**, the City respectfully requests that this Honorable Court grant its motion, enter judgment in its favor dismissing the two remaining counts of Plaintiffs' Amended Complaint – Counts I and IV – and grant such other and further relief as it deems just and proper.

**REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 7.1(d), the City hereby requests that this motion be set down for a hearing at such time as the Court determines.

Dated: May 1, 2023

Respectfully submitted,
**CITY OF BOSTON**,

By its attorney:

ADAM CEDERBAUM
Corporation Counsel

/s/ Edward F. Whitesell, Jr.
Edward F. Whitesell, Jr. (BBO#644331)
Senior Assistant Corporation Counsel
Elizabeth L. Bostwick (BBO #644498)
Senior Assistant Corporation Counsel
City of Boston Law Department
Room 615, City Hall
Boston, MA 02201
(617) 635-4045 (EFW)
(617) 635-4031 (ELB)
edward.whitesell@boston.gov
elizabeth.bostwick@boston.gov

**Certificate of Compliance with Local Rule 7.1(a)(2)**

I, Edward F. Whitesell, Jr., hereby certify that, in accordance with Local Rule 7.1(a)(2), counsel for the parties met and conferred in person at the City of Boston Law Department on April 28, 2023 at 2:00 p.m. and attempted in good faith to resolve or narrow the issues raised by this motion but were unable to do so.

/s/ Edward F. Whitesell, Jr.
Edward F. Whitesell, Jr.

**Certificate of Service**

I, Edward F. Whitesell, Jr., hereby certify that on May 1, 2023, a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non-registered participants.

/s/ Edward F. Whitesell, Jr.
Edward F. Whitesell, Jr.

# EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CASE NO. 21-cv-10102

- - - - - - - - - - - - - - - - - - -

THE SATANIC TEMPLE, INC.,

Plaintiff,

v.

CITY OF BOSTON, MA,

Defendant.

- - - - - - - - - - - - - - - - - - -

AUDIOVISUAL DEPOSITION of CHRISTINE O'DONNELL, a witness called by counsel for the Plaintiff, taken pursuant to the Federal Rules of Civil Procedure before Kristen L. Kelly, Registered Professional Reporter, MA CSR No. 115893 and Notary Public in and for the Commonwealth of Massachusetts, at The Satanic Temple, 64 Bridge Street, Salem, Massachusetts, on Thursday, August 25, 2022, commencing at 9:32 a.m.

A P P E A R A N C E S:

CROWN LAW

By: Matthew A. Kezhaya, Esquire

Sonia A. Kezhaya, Esquire

300 N. Washington Avenue, #300

Minneapolis, Minnesota 55401

479.431.6112

matt@crown.law

sonia@crown.law

For the Plaintiff

CITY OF BOSTON LAW DEPARTMENT

By: Nicole O'Connor, Esquire

Robert S. Arcangeli, Esquire

City Hall, Room 615

Boston, Massachusetts 02201

617.635.2902

nicole.oconnor@boston.gov

robert.arcangeli@boston.gov

For the Defendant

ALSO PRESENT:

Shawn Budd, Videographer

Lucien Greaves, Ada King, and Mobius

P R O C E E D I N G S

THE VIDEOGRAPHER: We are on the record. The time is 9:32.

MR. KEZHAYA: Okay. Ada, if you could get us started please.

MS. KING: Very good. Welcome, everyone. My name is Ada King. I'm an ordained Minister of Satan. And I will be lowering the lights, lighting some candles and reading our invocation.

Let us stand now unavowed and unfettered by arcane doctrines borne of fearful minds in darkened times.

Let us embrace the Luciferian impulse to eat of the tree of knowledge and dissipate our blissful and comforting delusions of old.

Let us demand that individuals be judged for their concrete actions not their fealty to arbitrary social norms and elusory categorizations.

Let us reason our solutions with agnosticism in all things, holding fast only to that which is demonstrably true.

Let us stand firm against any and all arbitrary authority that threatens the personal

sovereignty of one or of all.

That which will not bend must break and that which can be destroyed by the truth should never be spared its demise.

It is done. Hail Satan.

MR. KEZHAYA: Hail Satan. Great.

DIRECT EXAMINATION

BY MR. KEZHAYA:

Q So pleased that you all are gathered here today. I want to be very, very clear. The purpose of today's meeting is to get to the truth, that's it. We are not a threat to you. I want you to know that. It's very important to me that you are aware of that. Do you understand that, Christine?

A I do.

Q Thank you.

MR. KEZHAYA: I presumed -- sorry. I shouldn't have been so presumptuous. We should start with who we are. So I'm Matt Kezhaya. I represent The Satanic Temple against the City of Boston on charges that City of Boston is not inviting TST to the legislative prayer event that opens public meetings.

You just heard the invocation that we

City of Boston and I might have a dispute. All I request is that to the extent there be contention, Rob be intervening to fix the contention.

MS. O'CONNOR: I hope it's a nonissue, but I think, I think this will be an issue that we don't need to worry about.

MR. KEZHAYA: Okay. Can we table that then in the event of contention?

MS. O'CONNOR: I mean these are very bizarre sort of stipulations or suggestions for a typical deposition. I'm happy to -- we'll work with you amicably to resolve any issues, and I think this is nonissue that we don't need to worry about. And if we should get into some sort of dispute, I think we can cross that bridge when we get to it.

MR. KEZHAYA: Understood. Once again, no contention. Just looking for the truth. And to the extent we have any tabled issues, those obviously have to go to the judge.

Any objections as to anything that I, I have proposed here?

MS. O'CONNOR: No.

MR. KEZHAYA: Anyone at all? Okay.

All right. So that being the case, we

have some important public documents that I just want to make reference to. I see no reason to show anyone them. There was the Complaint. There was the answer. There was a motion to dismiss. There was the order granting the motion to dismiss as to part, importantly on the issue of government speech, and then Shurtleff came out which importantly said that government speech cannot be used to exclude certain religions.

Any objections as to the court taking note in, in the court -- in the course of understanding the rest of this deposition of its own public docket?

MS. O'CONNOR: I don't really understand what you're asking on the record but ...

MR. KEZHAYA: And to be clear, I'm not saying this for the court's benefit. I'm saying this for the congregants' benefit.

MS. O'CONNOR: Okay. I don't --

MR. KEZHAYA: The congregants are, are gonna be needing to know that they need to take a look at the Complaint, the answer, the motion to dismiss, the order granting motion to dismiss importantly as to government speech and Shurtleff which overturned government speech. That's the only thing that the congregants need to take note of. I'm telling them

this by using those words.

MS. O'CONNOR: Okay.

MR. KEZHAYA: But, you know, again, obviously the court's going to take note of its own docket. We'll -- we'll figure out docket numbers if, if the needs end up being.

So, that all being the case, I propose that we proceed with the deposition. Any objections?

MS. O'CONNOR: No.

Q Please identify yourself for the benefit of the public.

A Christine O'Donnell. I'm the Compliance Director and staff counsel for the Boston City Council.

THE REPORTER: Do you want -- I'm sorry to interrupt. Do you want her sworn in first or ...

Q Oh. Christine, are you gonna lie?

A I'm not but ...

MS. O'CONNOR: I think we should swear her in just for consistency of the testimony.

MR. KEZHAYA: I like ceremony. Let's swear her in.

CHRISTINE O'DONNELL

Q Tell us more about the Federal Rules of Civil Procedure.

MS. O'CONNOR: Objection.

MR. KEZHAYA: What -- what's the nature of your objection?

MS. O'CONNOR: As they pertain to what?

MR. KEZHAYA: She's the one who said it. I'm asking her to expound.

MS. O'CONNOR: On her understanding of what the Federal Rules of Civil Procedure are?

MR. KEZHAYA: Correct.

MS. O'CONNOR: Okay.

A Just my understanding is I'm here because of that rule. I am not a litigator for the Boston City Council so that -- it's my understanding that I'm here pursuant to that rule.

Q Let me back up with a little bit of exposition. The lawyers in the room speak a certain language that the congregants do not speak. I'm trying to take out the legalese. So 30(b)(6) means something to all four of us and also Sonia. I doesn't mean anything to them. So when you say 30(b)(6), I know what you mean. They don't know what you mean.

What is a 30(b)(6) deposition?

Q Okay. Or at least not to your knowledge?
A Not to my knowledge.
Q Okay. Let's see here.
Okay. So going back to the topic at hand, the Council President came to you with a request as to the Council's legal obligations as to a nondescript matter; is that correct?
A Yes.
Q What was the matter?
A The matter was at the time I believe she received an email from TST to request being put on to give the invocation, requesting an invitation to give the invocation.
Q Okay. And so her --
A And I believe the email to her, in my review I believe it was around the Lund case, citing because of recent case law the Satanic Temple would like to be put on the next available meeting to give the invocation.
I was asked to look into the -- that case and whether or not the City Council was required to oblige. The City Council does not take requests. It -- the invitations for the invocation are based upon personal relationships the councilors have. It's by invitation

only.

Q Don't take requests.

Why don't -- why doesn't the City Councilors take requests? What's the reason why not?

A Because the invocation is each councilor has a turn for a particular meeting to invite someone to give the invocation, and it's based upon personal relationships that that councilor has. It's based upon people that they have relationships with because of their districts. It might be work that the individual does in their districts or does for their constituents. That has been the policy.

Q That's been the policy or has that been the custom?

A Policy and custom. I would say both.

Q And I, I -- I do a lot of First Amendment. I'll just tell you. In my understanding those two mean slightly different things. Policies are written down, codified, and there are like procedures involved; whereas, customs are just like this is kinda how we do things. So was this -- is this more of a custom or is this more of a policy?

A In my capa -- in my work, what I do, I do not really consider a policy being written down.

Q Okay.
A I use the terms interchangeably. With your definition, I would define it more as a custom.
Q Okay.
A The City Council does not have a written policy --
Q Okay.
A -- about it's -- but it's understood that it's by invitation.
Q Okay. I understand that it's understood that it's by invitation. I'm asking why not.
MS. O'CONNOR: Objection. But you can answer if you understand.
A You're -- can I ask a clarification?
Q Yeah. Yeah.
A You're asking me why not -- why it's not written down?
Q Well, yeah, let's start there. Why isn't it written down?
A I am not sure.
Q Okay. I was actually going a different, a different route which is why is there not some kind of a mechanism for people to request an invite?
A Because the mechanism is that the councilor

is the individual that controls who they invite.

Q Okay. It sounds like it's just whatever the councilor wants to do then.

A Correct.

Q Okay. Why?

A That's been the custom.

Q That's just how things go, in other words?

A Yes.

Q Okay. All right. So you issued an opinion, the details of which I don't much care about, essentially, no, suffice it to say, you don't have to order them in because the way we've always done things is that you can if you want to. If you don't want to, you don't have to. Is that a fair recitation of the way things go?

A Yes.

Q Okay.

A And if I could just clarify.

Q Yeah.

A It wasn't a formal legal memo. I was asked to assist the councilor in drafting a letter. I believe she provided an email response back to TST.

Q I, I think that ... let's see here.

A If I recall.

example?

A With City decision makers?

Q Yeah. I mean the people at the City who make the decisions I assume are called the Council; is that correct?

A I know them because I work for them.

Q Yeah. Outside of that, though, do you have any relationship of any sort?

A No.

Q Okay. Investigation, okay.

What investigation or preparation have you done so far? Up to, up to walking into that door, what preparation, what did that entail?

A So I've met with my counsel, Rob and Nicole, numerous times to talk about this. I spoke with Councilors' staff, the employees that work for the City Councilors. I've researched City Council minutes, City Council agendas. I looked through the documents that were produced for discovery.

Q Okay.

A I spoke with other relevant parties that were -- that have experience with the subject matter in the, the deposition to find out, you know, City policies.

Q Okay. Let's take these in turn.
So you said you talked with members of the Coun -- well, you said Council. I may have misheard. Did you speak with members of the people who vote on things for the City or did you speak with your attorney's counsel, because those are -- you know, they sound the same.
A I spoke with Rob and Nicole.
Q Okay. Did you talk to any of the people who actually send the invitations or request the invitations?
A Oh, okay. I'm sorry. I -- when you -- when I said counsel, I meant my counsel, Rob and Nicole.
Q Okay.
A The City Councilors, --
Q Mm-hmm.
A -- I spoke with their staff about how the councilors decide.
Q Councilors, okay.
A And I also have -- only because in my capacity I attend the City Council meetings.
Q Oh, okay.
A They generally happen on Wednesdays.
Q Okay.

Q Okay. Okay. When -- just still narrowing down on this other parties. Are there any other other parties that are in this other parties category?

A No, I think that covers it.

Q Okay. So then we've got that one done.

You talked to staff. Who, who did you -- who all staff did you talk to?

A So there's 13 City Councilors. So I asked the employees -- do you want specific names or ...

Q Yeah. Yeah, let's talk names. What have we got?

A I spoke to Amanda Curley. She works for Councilor Baker. I asked her how does the councilor generally decide, and she said it's people that he has a personal relationship with or that he knows from the district that are -- that do work within the district.

Q Okay.

A I've spoken to -- I can't even recall. Most -- I've spoken to pretty much someone in every single council office to ask.

Q But that's the gist?

A Yes.

Q Is that ...

A Yes. For all of them it's those common

factors exist.

Q How far back does this custom go?

A So I did research as I indicated.

Q Oh.

A I did research the City documents and City Council minutes. I am not sure of the exact time that the invocation originated, but going back to the 1800s, the City Council has had someone give an invocation. When I went back to look at the documents from the 1800s, the -- a clergy person gave the invocation generally at the inauguration. With the way the minutes were done back then, it's hard to tell if every single meeting after that there was an invocation.

Q Mm-hmm.

A But from the 1800s, clergy and invocations were part of the City Council meetings.

Q It's basically always been part of the thing?

A Yes.

Q Did anyone address why it's part of the thing, in any of the records that you've seen?

A Not that I have seen.

Q Do you have an opinion as to why it is?

MS. O'CONNOR: Objection. You can answer that.

some kind of primary historical rec -- I'm using jargon terms again. You looked through papers from like the 1800s; is that correct?

A Yes, the minutes.

Q Okay. Where did you find those?

A The City of Boston has books of all the past minutes going back to the 1800s. In the 1800s it was an alderman form of government so it's a little bit different. But the City Council has books that are available to the public. It's also at the City of Boston archives. And more recently, all of the City Council meetings are online.

Q Yes. Yes. I think they're on YouTube nowadays, right?

A Yes. And I believe they have been online since 2011.

Q Okay. Now, you said it used to be an alderman government, and things are different now. What's the distinction between aldermen and whatever it is now?

And do you -- actually, let me back up. Before, before you answer that question, let's start with you said it was aldermen before, and now it's something different. What is it called now, so we have

a short designation for that?

A City Council.

Q Okay. So alderman vs. city council.

A They, they both were the local government for the City of Boston.

Q Yeah. Yeah.

A And -- right. The City Council has 13 members.

Q Yeah, I'm starting off because I want to, I want to understand the distinction between al -- you saw fit to mention. It's clearly something of interest. What is the difference between alderman and City Council form of government?

A I'm not sure what the difference is except for the -- they're both local form of governments. I didn't look into what the difference was.

Q I see.

A I just know that right now it's the City Council. 1909 was the Chapter 486 of the Acts of 1909.

Q Wait. Wait. Wait. Slow down. Slow down. So Chapter 84.

A Chapter 486.

Q Sorry. 486?

A Yes.

Q 486.
A Of the Acts of 1909.
Q Of 1909.
A That was when the City of Boston became a council form of government.
Q Was that like a charter by the state government or like a --
A It was a charter within the City of Boston.
Q Okay. So it sounds like a statute was passed in Massachusetts proper. Boston encoded its organizational purposes into some kind of a written document. Is that right so far?
A Boston -- Boston -- it, it started with Boston then the state approved it.
Q Okay.
A That's how it works.
Q So internal inside of Boston sometime before 1909 there was some kind of internal movement to say, hey, things are different. We should encode, encode how things are -- should be going moving forward?
A I'm assuming that that's how --
Q Well, yeah.
A -- it happened.
Q Well, yeah. That's, that's the best that we

can surmise based off the fact that it's here.

A But, but that -- the cite that I gave you, that is what established the City Council form of government.

Q Okay. Let's see. So I think that answers all of my history-related questions.

Did you have any other staff who were noteworthy in the course of your investigation?

A No.

Q Okay. What about employees?

A No.

Q Okay. I have a note looked through. I think that had something to do with discovery. Did you find anything of interest in the course of looking through discovery, in your opinion?

A No.

Q Okay. I have -- okay. This is just generally about meetings. Payment records I think I'm good on that.

Okay. You addressed meetings. You said, if I remember correctly, they happen on Wednesdays. How long do these meetings usually last?

A So it depends on what's on the agenda. And it's not every single Wednesday, but it's most

that.

A No, it's ...

Q Public body is actually the organization. The public is the not body. So members of the public will communicate to the public body their desires pursuant to designated person?

A Yes.

Q Okay. And some of those opinions were we don't want TST to give a prayer?

A I reviewed some emails where the public sent to their councilors. I can't recall which ones in particular, but I did see emails where members of the public expressed that view to their councilor.

Q Okay. Do you have any specific instances in mind?

A I, I can't recall. I just -- I remember seeing some emails.

MR. KEZHAYA: You know, we've been going on for a decent amount of time now. I'm parched. Does anyone else want a break? Because I also have to like get some emails together and do some exhibit stuff.

MS. O'CONNOR: Sure, we can take a break.

THE VIDEOGRAPHER: Okay. The time is

objected to. Is there something that I'm misunderstanding about your objection?

MS. O'CONNOR: Ask your question again. Let me hear it.

BY MR. KEZHAYA:

Q City of Boston, do you bless your meetings?

MS. O'CONNOR: That's a fair question.

Q Yes or no.

A No.

Q You do not. Okay.

MR. KEZHAYA: Let us continue. Back at 7:00.

MS. KING: 7:00?

MR. KEZHAYA: Seven minutes even. Ah, 6:50, 7:00 minutes. That's fine. Whatever, 7:00. I'm sure she's saying nothing of importance. That's good. 6:49, that's good too.

(Video playing.)

MR. KEZHAYA: Pause here.

Q In the past 45 seconds I've heard her call the councilors your servants, servants. She's called this a blessing, and she has requested that God literally endow his servants with knowledge. Have you heard all those things or do we need to watch the last

it disrespectfully.

MR. KEZHAYA: Then I need a break.

MS. O'CONNOR: Okay. That makes sense.

THE VIDEOGRAPHER: Okay. The time is 12:21. We're off the record.

(Break was taken.)

THE VIDEOGRAPHER: Okay. We are back on the record. The time is 12:31.

MR. KEZHAYA: Okay. Off the record I apologized for my errant ways. Once again, looking you both eyes, I apologize sincerely. Sincerely, okay?

MS. O'CONNOR: Thank you.

MR. KEZHAYA: You're welcome.

BY MR. KEZHAYA:

Q The subject of dispute is basically I'm coloring outside the lines of my 30(b)(6) notice. So that being the case, specifically with regard to "the bases for limiting who may participate" which is more particularly included with the term "a background on the City's invocation ceremony", my question to you is whether there are bases for limiting who may participate, yes or no?

A It's by invitation. So the limit would be if you don't get an invitation, you don't give the

invocation.

Q So the answer is yes, and the basis is singular which is you were not invited?

A Yes.

Q Okay. All right. And as I recall, earlier you said you investigated why -- how and why a particular speaker is selected in the course of preparing for this deposition; is that correct?

A I didn't investigate how or why -- oh, well, if you're asking -- I asked staffers of city councilors how a councilor determines who they invite. Is that what you're asking?

Q That is what I'm trying to ask.

A Yes.

MR. KEZHAYA: Nicole, may I rephrase it as I see fit or am I bound --

MS. O'CONNOR: Sure.

MR. KEZHAYA: -- to the language?

Q Basically what I'm trying to get at here is pursuant to your earlier conversation here, you -- like you got here. Before you got here, --

A Yes.

Q -- you did an investigation. That investigation included talking to people.

A Yes.

Q Did you talk to the people for your investigation why a particular matter or why a particular speaker is selected or any permutation in your mind thereof?

A I asked how a councilor determines who they're going to invite for the invocation.

Q Okay. Pause there. And why. Did you ask why, yes or no?

A I did not because that answer was part of the answer that the staff person gave me.

Q So the -- I tasked you with giving me how and why a particular speaker is selected. You went out. You found how. You did not investigate why; is that correct?

A The --

MS. O'CONNOR: Objection. You can answer.

A The response from the staff persons that I asked said, oh, it's someone that the councilor has a personal relationship with or does work within our district or has done work with our constituents.

Q Okay. And --

A So that would be the why. That would be why

a councilor extends an invitation to somebody.
Q Yes. Yes. Thank you.
That sounded like a quote. Were you given a quote or is this just you referencing your prior statement?
A It's not a quote. It's me summarizing the question that I asked the staffers.
Q Okay. So you had some kind of a dialogue with staffers?
A Yes.
Q Minimally you asked a question. Did you get one statement or more than one statement in return?
A I, I asked more than one staffer so, yes, more than one statement.
Q Did you ask each staffer -- let's do it like this. How did you ask each staffer this question?
A I asked what does -- how, how does the councilor determine who to invite for the invocation.
Q In what form --
A The same question.
Q Yeah. Yeah.
What form was this inquiry made? Was it spoken, written or something else?
A Spoken.

Q Okay. So you met with them in person or did you talk to them on the phone or was there some other means of communication?
A It was in person.
Q Okay. When was this meeting?
A It wasn't a meeting. It was just a conversation. Probably about two weeks ago.
Q Okay. So give or take two weeks ago. How many -- well, was this -- did you guys all meet in one place? Because you mentioned you talked to multiple staff, plural staff people.
A Talked to a couple of people.
Q Okay. Who were the two people that you talked to?
A Amanda Curley.
Q C -- how do I spell Curley?
A C-u-r-l-e-y.
Q E-y. Thank you.
A You're welcome.
Q And just for sake of good notes, a-n-d-a.
Okay. So you talked to Amanda. Who else did you ...
A Sophia Wang.
Q Sophia Wang.

Okay. Who is Amanda Curley in the organization?

A Amanda Curley is the Chief of Staff for Councilor Baker.

Q Chief Staff Baker. K-e-r?

A Yes.

Q Okay. Sophia Wang is?

A She is the policy director for councilor Flynn.

Q C director for F-l-y-n-n.

And it's the City's position that the councilors may -- basically the councilors have -- you know, whatever they do, that's pretty much up to them. That's pretty much the custom; is that correct?

A Yes.

Q In terms of extending invites, each -- each person does whatever they feel like is essentially ...

A Yes.

Q You talked to two, by my count, councilors for a time period, an agreed time period discoverable scope of 2011 until minimally the date of the complaint, although that's a subject of dispute as well. How, how many councilors have been, you know, employed by the City during that timeframe?

A So there has been a lot of turnover.

Q Yeah.

A The City Council has -- their election is every two years. It's a two-year term. So since I started in 2011, there -- actually, all of the councilors are gone since I first started in 2011. It's all new councilors right now.

Q Okay.

A So part of the reason why I reached out to those two councilors' offices, Councilor Baker started in 2012/2013.

Q Okay.

A And although Councilor Flynn is a newer councilor, I believe his first term was 20 ... 2018. I think. But he is the Council president. So that is my reasoning for speaking to those two offices.

Q So he's the council president?

A Councilor Flynn is the council president, yes, the current council president.

Q Okay. So Flynn is currently the -- currently the Council president, correct?

A Yes.

Q When did he first became council president?

A This, this year.

Q Oh, wow, okay.
A Yes.
Q Council pres, all right.
You gave me beginning dates for both Baker and Flynn. Are they still --
A Yeah, approximately.
Q Well, yeah, obviously.
A Yeah.
Q Yeah, everything's approximate. I'm not playing semantics games here. Give or take 2012, that's what this squiggly line means for my purposes.
A Mm-hmm.
Q Are they still councilors, though?
A Yes.
Q Okay. Present. And present.
Okay. So you talked to Flynn to determine how Flynn does things, but you did not talk to anyone else, it seems, or other than Baker?
A No.
Q Okay. All right. Turning once again back to here. Mm-hmm. Mm-hmm. Mm-hmm.
All right. Why didn't you talk to anyone other than Flynn's people?
A Well, I talked to Councilor Baker's --

Q Oh, yes.

A -- people because, again, he's been there the longest now and Councilor Flynn because he's the council president.

Q Oh, so you --

A And I -- as I said previously, I have attended the meetings so I can see from the introduction and I know that the policy is based on invitation and that's why I'm here to discuss that policy. So I spoke to those two offices just to get an idea how their councilors pick the individual that gives the invocation.

Q You specify how, but I also charged you with specifying why.

A And again, I feel that I answered that. It's individuals that the councilors have a relationship with, and the Council -- it's by invitation.

Q Well, sorry, I was --

A I, I -- I feel that the councilors are the only ones that can speak to why they're asking somebody. I can infer based on the invites that it's people that they know because of a personal relationship or work they do within the City.

Q Yes, but that's an inference, and as their

employer who has charged them to do certain tasks for your business purposes, that, I posit, is a material aspect of the agency seeing as how you, 30(b)(6) witness, are unable or unwilling to testify to that effect. Would you agree then that I need to talk to the individual councilors, each?

A Yes.

Q Okay. In order -- to be more -- to make a better record, I heard yes. I interpreted that to mean yes for the particular purpose of why are they not inviting TST, why are they inviting these other people. For example, I would need to talk to Wu about this particular person and why Wu in particular would not invite TST, correct?

A Wu didn't invite TST. There -- there was never an invite.

Q I understand. The why question is addressed to Wu, though, correct?

A Yes.

Q Okay. Who would I talk to in Wu's office or on Wu's behalf in order to get her deposition set up because we only have like two months left in discovery?

MS. O'CONNOR: Objection. I mean I'm happy to coordinate --

MR. KEZHAYA: Okay.

MS. O'CONNOR: -- that information. I don't think Christine will know it. You can ask her.

MR. KEZHAYA: You don't need to call an objection. You can just ...

MS. O'CONNOR: Okay.

MR. KEZHAYA: Okay. All right. I, I bring that up because words like "objection" have a tendency to, to get me riled up. I'm trying to, trying to keep it down.

MS. O'CONNOR: That's just pretty standard.

MR. KEZHAYA: Okay.

BY MR. KEZHAYA:

Q All right. And I also see on my handy list here, paragraph 4, City's recordkeeping policies surrounding payment to guest speakers at the invocation policy which presupposes that this person who is presently blessing the proceedings, although that's subject to dispute, Wu invited this priest and this priest is paid by the City for speaking at this event; is that correct?

A The people that give the invocation are no longer paid.

did not conduct this review. But the review of the policy of paying the people giving the invocation was looked at, and it was determined that it was best practice to stop the stipend.

Q Okay. And, City of Boston, was it -- is it your testimony, as we sit here today, that since approximately 2016 - let's bookend it at 2018 - people have not been getting paid since at least going back to 2018-ish?

A Correct. And I'm, I'm pretty -- I'm pretty sure it was 2017. I'm pretty sure you can settle on, on that.

Q Okay.

A That it was 2017 when the payment stopped.

Q Okay. Who made that decision?

A At the time it was Council President Wu.

Q Oh, so Councilor Wu, here who invited this particular person, I should probably ask her why she decided to turn off this money thing?

A Yes.

Q Okay.

MR. KEZHAYA: Let us proceed.

(Video playing.)

MR. KEZHAYA: Amen. All right. Pause

through discovery.

To recap, Christine, you looked at the discovery, correct?

A Yes.

Q Okay. And more particularly, I apologize, discovery is a legal jargon term. Could you please explain to the, the congregants what it means to have discovery?

MS. O'CONNOR: Objection. You can answer.

A My understanding is that it's requests for information and documents pur -- before litigation or during litigation. Again, I'm not a litigator so I'm not familiar with the proper terms.

Q That's okay. If I, if I dispute any part of what you have to say to me, I ask further examining questions until we get to the place where I feel like we're either at an impasse or I understand what you're saying.

A Okay.

Q So if I could rephrase it in my own words, is it fair to say that discovery is a means by which you prepare for trial that the rules allow you to have?

A Yes.

That's the full statement; otherwise, it's a speaking objection which is objectionable and grounds for discovery sanctions.

MS. O'CONNOR: Oh, okay. Christine, answer that question if you can.

Q Please do. Yes or no: Are you in a position to disprove that in Aramaic words 2000 years ago Lord's servants was meaningfully different from Lord's slaves?

A No.

Q Okay.

MR. KEZHAYA: That's a Wu question. 17 is just a Wu question. I'm kinda just skimming through to get us through the end of this. Bases or source of each. Ah, that's a Wu question. Wu question. Wu question. Wu question. Mm-hmm.

Q I take note, number 22, once again specifically identifies any statement -- inclusive of any statements that were written that any councilor has made or either has prepared or has had prepared for them but did not make about Satanism, TST, its membership or its activities.

I take note that you are not prepared to talk about that Mayor Wu's former political opponent email in which she found TST and its viewpoint absurd; is

that correct?

A Yes.

Q Okay.

MR. KEZHAYA: Just once again making very abundantly clear that the witness was unprepared to speak to item number 22.

Q Number 23 --

MS. O'CONNOR: She's prepared to speak about 22.

MR. KEZHAYA: Oh, she is. Fantastic.

Q So what was going on in Mayor Wu's former political opponent's head when she described it as absurd that TST would think it entitled to an invite?

MS. O'CONNOR: So paragraph 22 doesn't ask for the subjective intent of the councilor. It just asks for a statement that any councilor has made and so she has fully answered those questions today about that statement that was put up on the screen.

MR. KEZHAYA: These are matters for examination. I get to ask the who-what-when-where-why.

MS. O'CONNOR: We fundamentally disagree about that.

MR. KEZHAYA: I see. Well, you understand that my next thing is to move for discovery

Having sat through 11 years worth of meetings, how many of these invocations are Christian?

A I don't have an exact number. There -- the majority Christian but within Christianity there's different sects of religion.

Q Sure.

A There's also been a number of representatives from other types of religion. There's been some laypeople throughout the years.

Q So --

A So I cannot give -- I do not have an exact number or percentage.

Q Okay. So the City will even extend invitations to nonministers of proper religious entities, just any random person of the public who wants to give a prayer?

MS. O'CONNOR: Objection.

Q Correct?

MS. O'CONNOR: You can answer.

A Again, it's by invitation from the City Councilor.

Q Mm-hmm.

A And there have been instances where an individual from an organization that does work within

the community may give the invocation.

MR. KEZHAYA: Okay. Number 27, skip. Skip. Skip. Okay. That's the end of those topics.

Q I posit -- I keep using words like posit and proffer. These are formal legal -- formal logic, I should say, not legal. Law is based on formal discourse which is formal logic, so I kind of use the terms interchangeably. I apologize. Again, I'm bad with words.

A proffer is to make a statement that you posit is true. Something can be either true or false. Opinions cannot be proved true or false. Not because opinions are not true or false, but because the First Amendment says that the government may not punish true or false opinions. That's where we get defamation law from.

So back in the day in common law, defamation was strict liability. You said something bad about someone, well, you better be prepared -- you better be ready to prove it's true. All of that changed in the mid 1960s or so with a bunch of free speech stuff.

I say all of that to say that irrespective as to the impasse on whether, in fact, the City of Boston finds TST's religious viewpoint to be absurd, we see

Case 1:21-cv-10182-AK Document 108-2 Filed 05/01/23 Page 1 of 4

# EXHIBIT 2



**Michelle Wu <michelle.wu@boston.gov>**

## Boston Metro request for comment -- Satanic Temple letter

6 messages

**Kristin Toussaint** <kristin.toussaint@metro.us> Mon, Aug 21, 2017 at 10:34 AM
To: Michelle Wu <Michelle.Wu@boston.gov>

Hi Michelle,
This is Kristin Toussaint from the Boston Metro, how are you?
I'm reaching out to follow up on a post I saw from the Satanic Temple Boston Chapter shared on their Facebook at the end of last week.
The post said that a Chapter Head of the Satanic Temple here reached out to you and the Boston City Council about allowing a member to present an invocation.
Are you able to comment on that request, as well as explaining what the invocations are in your meetings and the rules around that?
Please let me know. I can be reached here or at 215-717-2696.
Thank you,
Kristin

---

Kristin Toussaint
News Reporter
P: (215) 717-2696 | | F:

metro.us<http://www.metro.us>
234 Congress St, Boston, MA 02210

[Facebook]<https://www.facebook.com/MetroBoston> [Twitter] <https://twitter.com/MetroBOS> [Linkedin] <https://www.linkedin.com/company/metro-us> [Instagram] <https://instagram.com/metroboston/> [MetroMedia]<http://media.metro.us>

**Michelle Wu** <michelle.wu@boston.gov> Mon, Aug 21, 2017 at 12:55 PM
To: Andrea Patton <andrea.patton@boston.gov>

Interview request

SW
--
Michelle Wu
Boston City Councilor At-Large
One City Hall Square, 5th floor
Boston, MA 02201

Office: 617.635.3115
Fax: 617.635.4203
michelle.wu@boston.gov
[Quoted text hidden]

**Andrea Patton** <andrea.patton@boston.gov> Mon, Aug 21, 2017 at 2:15 PM
To: kristin.toussaint@metro.us
Cc: Michelle Wu <michelle.wu@boston.gov>

Hi Kristin,

My name is Andrea and I am Councilor Wu's Director of Communications. Thanks so much for reaching out to our office! We will get back to you as soon as we can regarding this story. Do you have a deadline for the piece?

Thanks,
Andrea

---------- Forwarded message ----------
From: **Kristin Toussaint** <kristin.toussaint@metro.us>
Date: Mon, Aug 21, 2017 at 10:34 AM
Subject: Boston Metro request for comment -- Satanic Temple letter
To: Michelle Wu <Michelle.Wu@boston.gov>

Hi Michelle,
This is Kristin Toussaint from the Boston Metro, how are you?
I'm reaching out to follow up on a post I saw from the Satanic Temple Boston Chapter shared on their Facebook at the end of last week.
The post said that a Chapter Head of the Satanic Temple here reached out to you and the Boston City Council about allowing a member to present an invocation.
Are you able to comment on that request, as well as explaining what the invocations are in your meetings and the rules around that?
Please let me know. I can be reached here or at 215-717-2696.
Thank you,
Kristin

---

Kristin Toussaint
News Reporter
P: (215) 717-2696 | | F:

metro.us<http://www.metro.us>
234 Congress St, Boston, MA 02210

[Facebook]<https://www.facebook.com/MetroBoston> [Twitter] <https://twitter.com/MetroBOS> [Linkedin] <https://www.linkedin.com/company/metro-us> [Instagram] <https://instagram.com/metroboston/> [MetroMedia]<http://media.metro.us>

--
**Andrea Sarah Patton**
Director of Communications and Engagement

Office of Michelle Wu
Boston City Council President
One City Hall Square, 5th Floor
Boston, MA 02201
P: 617-635-3115

---

**Kristin Toussaint** <kristin.toussaint@metro.us> Mon, Aug 21, 2017 at 2:17 PM
To: Andrea Patton <andrea.patton@boston.gov>
Cc: Michelle Wu <michelle.wu@boston.gov>

Hi Andrea,
Thanks so much. Yes, I'd love a response as soon as possible of course but the latest I can get this to my editor is 5 p.m., so they can plan the print pages.
Please let me know.
Thanks,
Kristin
[Quoted text hidden]

---

**Andrea Patton** <andrea.patton@boston.gov> Mon, Aug 21, 2017 at 4:40 PM

To: Kristin Toussaint <kristin.toussaint@metro.us>
Cc: Michelle Wu <michelle.wu@boston.gov>

Hi Kristin,

Regarding your questions about what the invocations are and how clergy members are chosen:

There is time at the beginning of each Council meeting for an invited member of the clergy to say a few words before Council business begins. At the beginning of the legislative year meetings are assigned to Councilors. Councilors decide which clergy they wish to invite to speak. There are no rules for this selection. Traditionally, Councilors have invited members from their district (or in the case of at-large councilors, members from anywhere in the City of Boston) who are active in their neighborhood and engaged community members in addition to being members of the clergy.

Please let me know if you have any further questions.

Best,
Andrea

[Quoted text hidden]

---

**Kristin Toussaint** <kristin.toussaint@metro.us>                    Mon, Aug 21, 2017 at 4:41 PM
To: Andrea Patton <andrea.patton@boston.gov>
Cc: Michelle Wu <michelle.wu@boston.gov>

Thank you Andrea,
Is there a comment directly on the Satanic Temples request that they be allowed to give an invocation? Has Michelle or any other council member responded to their letter?

Best
Kristin
[Quoted text hidden]

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**THE SATANIC TEMPLE, INC.**

PLAINTIFF,

**v.**

**CITY OF BOSTON, MA**

DEFENDANT.

**CASE NO.** 1:21-CV-10102-AK

**DEFENDANT CITY OF BOSTON'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33 and Local Rule 33.1, Defendant City of Boston ("Defendant" or the "City") hereby responds to Plaintiff The Satanic Temple, Inc.'s ("Plaintiff" or "TST") First Set of Interrogatories as follows:

**Introduction**

Defendant will respond to the Interrogatories as required by the applicable rules, including Fed. R. Civ. P. 26 and 33. The Responses provided below are based upon the information now available to Defendant after having made reasonable and diligent efforts to ascertain information responsive to the Interrogatories. Defendant may, in the future, identify or discover additional information responsive to the Interrogatories or relative to its Responses to them. Defendant reserves the right to revise, correct, add to, supplement, modify, or clarify the Responses set forth below or the information contained therein at any time – although Defendant does not hereby undertake to do so except to the extent required by the Federal Rules of Civil Procedure.

Defendant reserves the right to object to the competence, relevance, materiality, and admissibility of the information disclosed pursuant to its responses to Plaintiff's Interrogatories. By responding to any Interrogatory, Defendant does not concede, agree, or admit that any

**INTERROGATORY NO. 3**

What is the City's process for distributing limited invitation rights among the Councilors? For example: in 2018, Councilor Ciommo had the right to determine the invocator for January 1; what was the process that determined Ciommo goes first? Similarly, in the same year, Councilors Zakim and Edwards only had two rights to invite, and Campbell only had one, but everyone else got three; what was the process that resulted in this distribution of invites?

**RESPONSE TO INTERROGATORY NO. 3**

Defendant objects to Interrogatory No. 3 as it is vague and ambiguous in the use of the phrase "limited invitation rights." Defendant further objects to Interrogatory No. 3 because it contains discrete subparts, or compound, conjunctive, or disjunctive questions attempting to combine multiple interrogatories into a singular request.

Subject to and without waiving its objections, Defendant states that at the beginning of each calendar year, Council Staff assigns for the Council President meeting dates for each City Councilor which the designated City Councilor is responsible for coordinating the invocation, which includes inviting a guest to deliver it. The Council staff endeavors to assign each councilor the same number of dates to invite speakers, however, due to anticipated scheduling conflicts or limited availability, councilors may be assigned themselves fewer or more dates. Defendant further refers Plaintiff to the documents Bates stamped DEF0003407-DEF0003438.

**INTERROGATORY NO. 4**

Identify, in chronological order, each Council invocation for the period beginning January 2011 and ending on the discovery cutoff. For each invocation, provide the following:
   a)  date of the invocation,
   b)  the full name of the invocator,
   c)  the name of the invocator's organization at the time of the invocation (if applicable),
   d)  the address for the invocator's organization at the time of the invocation (or, if not from an organization, the invocator's residential mailing address at the time of the invocation),
   e)  the faith tradition of the invocator's organization (or, if different, the faith tradition invoked by the invocator),
   f)  the invocator's sponsoring Councilor; and
   g)  Why that invocator received sponsorship.

CITY OF BOSTON,

*Signed as to responses,*

The information contained in these Responses to Interrogatories has been assembled by authorized employees and agents of the City of Boston, and I am informed and believe that the facts stated in the Responses to Interrogatories are true and accurate to the best of my knowledge and belief.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 8 DAY OF NOVEMBER, 2021.

Christine O'Donnell

Respectfully submitted,

DEFENDANT,

CITY OF BOSTON,

By its attorney,
Henry C. Luthin,
Corporation Counsel

/s/ Nailah A. Freeman
Nicole O'Connor (BBO #675535)
Nailah A. Freeman (BBO #695910)
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
Telephone: (617) 635-4064
Facsimile: (617) 635-2012
Nicole.oconnor@boston.gov
nailah.freeman@boston.gov

Dated: November 8, 2021

Dated: November 8, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 8, 2021, this document was served on Plaintiff by electronic mail as follows:

/s/ Nailah A. Freeman
Nailah A. Freeman

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **THE SATANIC TEMPLE, INC.**<br>PLAINTIFF,<br>**v.**<br>**CITY OF BOSTON, MA**<br>DEFENDANT. | **CASE NO.** 1:21-CV-10102-AK |

**DEFENDANT CITY OF BOSTON'S RESPONSES TO PLAINTIFF'S SECOND SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33 and Local Rule 33.1, Defendant City of Boston ("Defendant" or the "City") hereby responds to Plaintiff The Satanic Temple, Inc.'s ("Plaintiff" or "TST") Second Set of Interrogatories as follows:

**Introduction**

Defendant will respond to the Interrogatories as required by the applicable rules, including Fed. R. Civ. P. 26 and 33. The Responses provided below are based upon the information now available to Defendant after having made reasonable and diligent efforts to ascertain information responsive to the Interrogatories. Defendant may, in the future, identify or discover additional information responsive to the Interrogatories or relative to its Responses to them. Defendant reserves the right to revise, correct, add to, supplement, modify, or clarify the Responses set forth below or the information contained therein at any time – although Defendant does not hereby undertake to do so except to the extent required by the Federal Rules of Civil Procedure.

Defendant reserves the right to object to the competence, relevance, materiality, and admissibility of the information disclosed pursuant to its responses to Plaintiff's Interrogatories. By responding to any Interrogatory, Defendant does not concede, agree, or admit that any

answer as required by the Federal Rules of Civil Procedure and any applicable Case

Management deadlines established by the Court.

Subject to and without waiving its objections, at this time, Defendant is no longer

pursuing this affirmative defense. In the event that circumstances regarding this defense change,

Defendant reserves the right to seasonably supplement this answer.

**INTERROGATORY NO. 9**
State the factual basis for Defendant's fifth affirmative defense (that "Plaintiff's claims are
barred, in whole or in part, because at all times relevant hereto Defendant acted in good faith
and, upon reasonable belief, that Defendant's actions were in compliance with relevant
authority.").

**RESPONSE TO INTERROGATORY NO. 9**

Defendant objects to Interrogatory No. 9 not reasonably calculated to lead to the

discovery of admissible evidence. Defendant further objects to Interrogatory No. 8 to the extent

they seek information protected by the attorney-client privilege or the work product doctrine.

Finally, Defendant objects to Interrogatory No. 9 on the basis that discovery and Defendant's

investigation into the facts surrounding the case remain ongoing. Defendant will supplement this

answer as required by the Federal Rules of Civil Procedure and any applicable Case

Management deadlines established by the Court.

**INTERROGATORY NO. 10**

State the City's policy for selecting invocators for each City Council meeting as it has been
amended from time to time. Particularly, provide: (a) state the policy in its current form; (b) state
the date of each iteration of the policy, going back to its inception; and (c) state the policy as it
was amended on the date identified in (b).

**RESPONSE TO INTERROGATORY NO. 10**

Defendant objects to Interrogatory No. 10 to the extent that it attempts to extend the

scope of discovery beyond a reasonable timeframe. Specifically, Defendant objects to providing

information beyond the date of Plaintiff's complaint because that information is not relevant, is

not reasonably calculated to lead to the discovery of admissible evidence, and is not proportional to the needs of this case.

Subject to and without waiving its objections and limited to the time period of January 2011 to the date of the Complaint in this current action, Defendant states that at the beginning of each calendar year, the Central Staff Director assigns for the Council President meeting dates for each City Councilor which the designated City Councilor is responsible for coordinating the invocation, which includes inviting a guest to deliver it. The Central Staff Director prepares a schedule of the dates of the council meetings along with the names of the City Councilors responsible for securing an invocation speaker. The selection of the invocation speaker is left within the discretion of the individual City Councilors and their respective staff.

**INTERROGATORY NO. 11**

State the City's basis for determining how much money to pay, compensate or donate to an invocator or an invocator's organization for giving an invocation. (See DEF0002081-2088, which requires clergy who give the invocation to fill out paperwork and provide a completed W-9 form).

**RESPONSE TO INTERROGATORY NO. 11**

Defendant objects to Interrogatory No. 11 on the basis that it is not reasonably calculated to lead to the discovery of admissible evidence. With the understanding that Plaintiff is seeking information regarding the Council's regular weekly meetings, Defendant states as follows:

Subject to and without waiving its objections and limited to the time period of January 2011 to the date of the Complaint in this current action, the stipend amount paid to invocation speakers in the past was set by vote of City Council during their budgeting process. All invocation speakers receive the amount decided upon during that budgeting process.

**INTERROGATORY NO. 12**

State the name and title of everyone involved in preparing, drafting and sending all responses to Travis LaSaffre and to Malcom Jarry regarding The Satanic Temple's request to give the invocation at a City council meeting.

Respectfully submitted,

DEFENDANT,

CITY OF BOSTON,

By its attorney,
Adam N. Cederbaum,
Corporation Counsel

/s/ Nailah A. Freeman
Nicole O'Connor (BBO #675535)
Nailah A. Freeman (BBO #695910)
City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
Telephone: (617) 635-4064
Facsimile: (617) 635-2012
Nicole.oconnor@boston.gov
nailah.freeman@boston.gov

Dated: March 14, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 14, 2022, this document was served on Plaintiff by electronic mail as follows:

/s/ Nailah A. Freeman
Nailah A. Freeman

# EXHIBIT 5



# BOSTON CITY COUNCIL

www.cityofboston.gov/citycouncil
city.council@boston.gov

One City Hall Square ◊ 5th Floor ◊ Boston, MA 02201 ◊ Phone: (617) 635-3040 ◊ Fax: (617) 635-4203

## 2017 CITY COUNCIL MEETING & CLERGY SCHEDULE

**JANUARY**

| | |
|---|---|
| January 4 | NO MEETING (New Year's Day) |
| January 11 | Meeting (ZAKIM) 1st Mtg |
| January 18 | NO MEETING (MLK Day) |
| January 25 | Meeting (ZAKIM) |

**FEBRUARY**

| | |
|---|---|
| February 1 | Meeting (ZAKIM) |
| February 8 | Meeting (BAKER) |
| February 15 | Meeting (BAKER) |
| February 22 | NO MEETING (Presidents Day) |

**MARCH**

| | |
|---|---|
| March 1 | Meeting (MCCARTHY) |
| March 8 | Meeting (MCCARTHY) |
| March 15 | Meeting (MCCARTHY) |
| March 22 | Meeting (FLAHERTY) |
| March 29 | Meeting (FLAHERTY) |

**APRIL**

| | |
|---|---|
| April 5 | Meeting (FLAHERTY) |
| April 12 | Meeting (O'MALLEY) |
| April 19 | NO MEETING (Patriots Day) |
| April 26 | Meeting (O'MALLEY) |

**MAY**

| | |
|---|---|
| May 3 | Meeting (O'MALLEY) |
| May 10 | Meeting (LAMATTINA) |
| May 17 | Meeting (LAMATTINA) |
| May 24 | Meeting (LAMATTINA) |
| May 31 | NO MEETING (Memorial Day) |

**JUNE**

| | |
|---|---|
| June 7 | Meeting (LINEHAN) |
| June 14 | Meeting (Oper.,1st Cap. Vote) (LINEHAN) |
| June 21 | Meeting (LINEHAN) |
| June 28 | Meeting (End FY16) (CAMPBELL) |

**JULY**

| | |
|---|---|
| July 5 | NO MEETING (Independence Day) |
| ***July 12** | **Meeting (CAMPBELL)** |
| July 19 | NO MEETING (Summer Break) |
| July 26 | NO MEETING (Summer Break) |

**AUGUST**

| | |
|---|---|
| ***August 2** | **Meeting (CAMPBELL)** |
| August 9 | NO MEETING (Summer Break) |
| August 16 | NO MEETING (Summer Break) |
| ***August 23** | **Meeting (ESSAIBI GEORGE)** |
| August 30 | NO MEETING (Summer Break) |

**SEPTEMBER**

| | |
|---|---|
| September 6 | NO MEETING (Labor Day) |
| ***September 13** | **Meeting (ESSAIBI GEORGE)** |
| September 20 | Meeting (ESSAIBI GEORGE) |
| September 27 | Meeting (PRESSLEY) |

**OCTOBER**

| | |
|---|---|
| October 4 | Meeting (PRESSLEY) |
| October 11 | NO MEETING (Columbus Day) |
| October 18 | Meeting (PRESSLEY) |
| October 25 | Meeting (CIOMMO) |

**NOVEMBER**

| | |
|---|---|
| November 1 | Meeting (CIOMMO) |
| November 8 | NO MEETING (Veterans Day) |
| November 15 | Meeting (CIOMMO) |
| November 22 | NO MEETING (Thanksgiving) |
| November 29 | Meeting (JACKSON) |

**DECEMBER**

| | |
|---|---|
| December 6 | Meeting (JACKSON) |
| December 13 | Meeting (JACKSON) |
| December 20 | NO MEETING (Christmas) |
| December 27 | NO MEETING (New Year's) |

All Council Meetings are held at twelve o'clock noon in the Christopher A. Iannella Chamber on the fifth floor of Boston City Hall, unless otherwise noted. All meetings are open to the public and are also available on Comcast 8/ RCN 82/Verizon 1964 and on webcast at www.boston.gov/city-council-tv

NOTE: This schedule is subject to change at the call of the Council President.

NOTE: * Meetings to be held at Historic Faneuil Hall located at 1Faneuil Hall Square, Boston, MA 02109 at twelve o'clock noon.

Rev: 6/5/17



# BOSTON CITY COUNCIL

www.cityofboston.gov/citycouncil
city.council@boston.gov

**One City Hall Square ◊ 5th Floor ◊ Boston, MA 02201 ◊ Phone: (617) 635-3040 ◊ Fax: (617) 635-4203**

## 2017 CITY COUNCIL MEETING & CLERGY SCHEDULE

**JANUARY**

| | |
|---|---|
| January 4 | NO MEETING (New Year's Day) |
| January 11 | Meeting (ZAKIM) 1st Mtg |
| January 18 | NO MEETING (MLK Day) |
| January 25 | Meeting (ZAKIM) |

**FEBRUARY**

| | |
|---|---|
| February 1 | Meeting (ZAKIM) |
| February 8 | Meeting (BAKER) |
| February 15 | Meeting (BAKER) |
| February 24 | NO MEETING (Presidents Day) |

**MARCH**

| | |
|---|---|
| March 1 | Meeting (MCCARTHY) |
| March 8 | Meeting (MCCARTHY) |
| March 15 | Meeting (MCCARTHY) |
| March 22 | Meeting (FLAHERTY) |
| March 29 | Meeting (FLAHERTY) |

**APRIL**

| | |
|---|---|
| April 5 | Meeting (FLAHERTY) |
| April 12 | Meeting (O'MALLEY) |
| April 19 | NO MEETING (Patriots Day) |
| April 26 | Meeting (O'MALLEY) |

**MAY**

| | |
|---|---|
| May 3 | Meeting (O'MALLEY) |
| May 10 | Meeting (LAMATTINA) |
| May 17 | Meeting (LAMATTINA) |
| May 24 | Meeting (LAMATTINA) |
| May 31 | NO MEETING (Memorial Day) |

**JUNE**

| | |
|---|---|
| June 7 | Meeting (LINEHAN) |
| June 14 | Meeting (Oper.,1st Cap. Vote) (LINEHAN) |
| June 21 | Meeting (LINEHAN) |
| June 28 | Meeting (End FY16) (CAMPBELL) |

**JULY**

| | |
|---|---|
| July 5 | NO MEETING (Independence Day) |
| July 12 | Meeting (CAMPBELL) |
| July 19 | NO MEETING (Summer Break) |
| July 26 | NO MEETING (Summer Break) |

**AUGUST**

| | |
|---|---|
| August 2 | Meeting (CAMPBELL) |
| August 9 | NO MEETING (Summer Break) |
| August 16 | NO MEETING (Summer Break) |
| August 23 | Meeting (ESSAIBI GEORGE) |
| August 30 | NO MEETING (Summer Break) |

**SEPTEMBER**

| | |
|---|---|
| September 6 | NO MEETING (Labor Day) |
| September 13 | Meeting (ESSAIBI GEORGE) |
| September 20 | Meeting (ESSAIBI GEORGE) |
| September 27 | Meeting (PRESSLEY) |

**OCTOBER**

| | |
|---|---|
| October 4 | Meeting (PRESSLEY) |
| October 11 | NO MEETING (Columbus Day) |
| October 18 | Meeting (PRESSLEY) |
| October 25 | Meeting (CIOMMO) |

**NOVEMBER**

| | |
|---|---|
| November 1 | Meeting (CIOMMO) |
| November 8 | NO MEETING (Veterans Day) |
| November 15 | Meeting (CIOMMO) |
| November 22 | NO MEETING (Thanksgiving) |
| November 29 | Meeting (JACKSON) |

**DECEMBER**

| | |
|---|---|
| December 6 | Meeting (JACKSON) |
| December 13 | Meeting (JACKSON) |
| December 20 | NO MEETING (Christmas) |
| December 27 | NO MEETING (New Year's) |

All Council Meetings are held at twelve o'clock noon in the Christopher A. Iannella Chamber on the fifth floor of Boston City Hall, unless otherwise noted. All meetings are open to the public and are also available on Comcast Channel 8/ RCN 82 and on webcast at www.cityofboston.gov/citycouncil/live.asp

NOTE: This schedule is subject to change at the call of the Council President.



# BOSTON CITY COUNCIL

www.cityofboston.gov/citycouncil
city.council@boston.gov

**One City Hall Square ◊ 5th Floor ◊ Boston, MA 02201 ◊ Phone: (617) 635-3040 ◊ Fax: (617) 635-4203**

## 2018 CITY COUNCIL MEETING & CLERGY SCHEDULE

**JANUARY**

| | |
|---|---|
| Monday, January 1 | Meeting (CIOMMO) |
| January 10 | NO MEETING |
| January 17 | NO MEETING (MLK Day) |
| January 24 | Meeting (CAMPBELL) |
| January 31 | Meeting (WU) |

**FEBRUARY**

| | |
|---|---|
| February 7 | Meeting (WU) |
| February 14 | Meeting (WU) |
| February 21 | NO MEETING (Presidents Day) |
| February 28 | Meeting (O'MALLEY) |

**MARCH**

| | |
|---|---|
| March 7 | Meeting (MCCARTHY) |
| March 14 | Meeting (O'MALLEY) |
| March 21 | Meeting (O'MALLEY) |
| March 28 | Meeting (MCCARTHY) |

**APRIL**

| | |
|---|---|
| April 4 | Meeting (MCCARTHY) |
| April 11 | Meeting (FLAHERTY) |
| April 18 | NO MEETING (Patriots Day) |
| April 25 | Meeting (FLAHERTY) |

**MAY**

| | |
|---|---|
| May 2 | Meeting (FLAHERTY) |
| May 9 | Meeting (PRESSLEY) |
| May 16 | Meeting (PRESSLEY) |
| May 23 | Meeting (PRESSLEY) |
| May 30 | NO MEETING (Memorial Day) |

**JUNE**

| | |
|---|---|
| June 6 | Meeting (JANEY) |
| June 13 | Meeting (JANEY) |
| June 20 | Meeting (JANEY) |
| June 27 | Meeting (End FY19) (ZAKIM) |

**JULY**

| | |
|---|---|
| July 4 | NO MEETING (Independence Day) |
| July 11 | Meeting (ZAKIM) |
| July 18 | NO MEETING (Summer Break) |
| July 25 | NO MEETING (Summer Break) |

**AUGUST**

| | |
|---|---|
| August 1 | Meeting (BAKER) |
| August 8 | NO MEETING (Summer Break) |
| August 15 | NO MEETING (Summer Break) |
| August 22 | Meeting (BAKER) |
| August 29 | NO MEETING (Summer Break) |

**SEPTEMBER**

| | |
|---|---|
| September 5 | NO MEETING (Labor Day) |
| September 12 | Meeting (BAKER) |
| September 19 | Meeting (ESSAIBI GEORGE) |
| September 26 | Meeting (ESSAIBI GEORGE) |

**OCTOBER**

| | |
|---|---|
| October 3 | Meeting (ESSAIBI GEORGE) |
| October 10 | NO MEETING (Columbus Day) |
| October 17 | Meeting (FLYNN) |
| October 24 | Meeting (FLYNN) |
| October 31 | Meeting (FLYNN) |

**NOVEMBER**

| | |
|---|---|
| November 7 | Meeting (CIOMMO) |
| November 14 | NO MEETING (Veteran's Day) |
| November 21 | NO MEETING (Thanksgiving) |
| November 28 | Meeting (CIOMMO) |

**DECEMBER**

| | |
|---|---|
| December 5 | Meeting (EDWARDS) |
| December 12 | Meeting (EDWARDS) |
| December 19 | NO MEETING |
| December 26 | NO MEETING (Christmas Day) |

All Council Meetings are held at twelve o'clock noon in the Christopher A. Iannella Chamber on the fifth floor of Boston City Hall, unless otherwise noted. All meetings are open to the public and are also available on Comcast Channel 8/ RCN 82 and on webcast at www.cityofboston.gov/citycouncil/live.asp

NOTE: This schedule is subject to change at the call of the Council President.

# BOSTON CITY COUNCIL

www.cityofboston.gov/citycouncil
city.council@boston.gov

One City Hall Square ◊ 5th Floor ◊ Boston, MA 02201 ◊ Phone: (617) 635-3040 ◊ Fax: (617) 635-4203

## 2018 CITY COUNCIL MEETING & CLERGY SCHEDULE

**JANUARY**

| | |
|---|---|
| Monday, January 1 | Meeting (CIOMMO) |
| January 10 | NO MEETING |
| January 17 | NO MEETING (MLK Day) |
| January 24 | Meeting (CAMPBELL) |
| January 31 | Meeting (WU) |

**FEBRUARY**

| | |
|---|---|
| February 7 | Meeting (WU) |
| February 14 | Meeting (WU) |
| February 21 | NO MEETING (Presidents Day) |
| February 28 | Meeting (O'MALLEY) |

**MARCH**

| | |
|---|---|
| March 7 | Meeting (O'MALLEY) |
| March 14 | Meeting (O'MALLEY) |
| March 21 | Meeting (MCCARTHY) |
| March 28 | Meeting (MCCARTHY) |

**APRIL**

| | |
|---|---|
| April 4 | Meeting (MCCARTHY) |
| April 11 | Meeting (FLAHERTY) |
| April 18 | NO MEETING (Patriots Day) |
| April 25 | Meeting (FLAHERTY) |

**MAY**

| | |
|---|---|
| May 2 | Meeting (FLAHERTY) |
| May 9 | Meeting (PRESSLEY) |
| May 16 | Meeting (PRESSLEY) |
| May 23 | Meeting (PRESSLEY) |
| May 30 | NO MEETING (Memorial Day) |

**JUNE**

| | |
|---|---|
| June 6 | Meeting (JANEY) |
| June 13 | Meeting (JANEY) |
| June 20 | Meeting (JANEY) |
| June 27 | Meeting (End FY19) (ZAKIM) |

**JULY**

| | |
|---|---|
| July 4 | NO MEETING (Independence Day) |
| July 11 | Meeting (ZAKIM) |
| July 18 | NO MEETING (Summer Break) |
| July 25 | NO MEETING (Summer Break) |

**AUGUST**

| | |
|---|---|
| August 1 | Meeting (BAKER) |
| August 8 | NO MEETING (Summer Break) |
| August 15 | NO MEETING (Summer Break) |
| August 22 | Meeting (BAKER) |
| August 29 | NO MEETING (Summer Break) |

**SEPTEMBER**

| | |
|---|---|
| September 5 | NO MEETING (Labor Day) |
| September 12 | Meeting (BAKER) |
| September 19 | Meeting (ESSAIBI GEORGE) |
| September 26 | Meeting (ESSAIBI GEORGE) |

**OCTOBER**

| | |
|---|---|
| October 3 | Meeting (ESSAIBI GEORGE) |
| October 10 | NO MEETING (Columbus Day) |
| October 17 | Meeting (FLYNN) |
| October 24 | Meeting (FLYNN) |
| October 31 | Meeting (FLYNN) |

**NOVEMBER**

| | |
|---|---|
| November 7 | Meeting (CIOMMO) |
| November 14 | NO MEETING (Veteran's Day) |
| November 21 | NO MEETING (Thanksgiving) |
| November 28 | Meeting (CIOMMO) |

**DECEMBER**

| | |
|---|---|
| December 5 | Meeting (EDWARDS) |
| December 12 | Meeting (EDWARDS) |
| December 19 | NO MEETING |
| December 26 | NO MEETING (Christmas Day) |

All Council Meetings are held at twelve o'clock noon in the Christopher A. Iannella Chamber on the fifth floor of Boston City Hall, unless otherwise noted. All meetings are open to the public and are also available on Comcast Channel 8/ RCN 82 and on webcast at www.cityofboston.gov/citycouncil/live.asp

NOTE: This schedule is subject to change at the call of the Council President.



# BOSTON CITY COUNCIL

www.boston.gov/citycouncil
city.council@boston.gov

**One City Hall Square ◊ 5th Floor ◊ Boston, MA 02201 ◊ Phone: (617) 635-3040 ◊ Fax: (617) 635-4203**

## 2019 CITY COUNCIL MEETING & CLERGY SCHEDULE

**JANUARY**

| | |
|---|---|
| January 2 | NO MEETING (New Year's) |
| January 9 | Meeting (FLYNN) |
| January 16 | Meeting (FLYNN) |
| January 23 | NO MEETING (MLK Day) |
| January 30 | Meeting (FLYNN) |

**FEBRUARY**

| | |
|---|---|
| February 6 | Meeting (ESSAIBI GEORGE) |
| February 13 | Meeting (ESSAIBI GEORGE) |
| February 20 | NO MEETING (Presidents Day) |
| February 27 | Meeting (ESSAIBI GEORGE) |

**MARCH**

| | |
|---|---|
| March 6 | Meeting (BAKER) |
| March 13 | Meeting (BAKER) |
| March 20 | Meeting (BAKER) |
| March 27 | Meeting (EDWARDS) |

**APRIL**

| | |
|---|---|
| April 3 | Meeting (EDWARDS) |
| April 10 | Meeting (EDWARDS) |
| April 17 | NO MEETING (Patriots Day) |
| April 24 | Meeting (CIOMMO) |

**MAY**

| | |
|---|---|
| May 1 | Meeting (CIOMMO) |
| May 8 | Meeting (CIOMMO) |
| May 15 | Meeting (O'MALLEY) |
| May 22 | Meeting (O'MALLEY) |
| May 29 | NO MEETING (Memorial Day) |

**JUNE**

| | |
|---|---|
| June 5 | Meeting (O'MALLEY) |
| June 12 | Meeting (JANEY) |
| June 19 | Meeting (JANEY) |
| June 26 | Meeting (End FY20) (JANEY) |

**JULY**

| | |
|---|---|
| July 3 | NO MEETING (Independence Day) |
| July 10 | Meeting (ZAKIM) |
| July 17 | NO MEETING (Summer Break) |
| July 24 | NO MEETING (Summer Break) |
| July 31 | Meeting (ZAKIM) |

**AUGUST**

| | |
|---|---|
| August 7 | NO MEETING (Summer Break) |
| August 14 | NO MEETING (Summer Break) |
| August 21 | Meeting (ZAKIM) |
| August 28 | NO MEETING (Summer Break) |

**SEPTEMBER**

| | |
|---|---|
| September 4 | NO MEETING (Labor Day) |
| September 11 | Meeting (WU) |
| September 18 | Meeting (WU) |
| September 25 | Meeting (WU) |

**OCTOBER**

| | |
|---|---|
| October 2 | Meeting (MCCARTHY) |
| October 9 | Meeting (MCCARTHY) |
| October 16 | NO MEETING (Indigenous Peoples Day) |
| October 23 | Meeting (MCCARTHY) |
| October 30 | Meeting (FLAHERTY) |

**NOVEMBER**

| | |
|---|---|
| November 6 | Meeting (FLAHERTY) |
| November 13 | NO MEETING (Veteran's Day) |
| November 20 | Meeting (FLAHERTY) |
| November 27 | NO MEETING (Thanksgiving) |

**DECEMBER**

| | |
|---|---|
| December 4 | Meeting (GARRISON) |
| December 11 | Meeting (GARRISON) |
| December 18 | NO MEETING |
| December 25 | NO MEETING (Christmas Day) |

All Council Meetings are held at twelve o'clock noon in the Christopher A. Iannella Chamber on the fifth floor of Boston City Hall, unless otherwise noted. All meetings are open to the public and are also available on Comcast Channel 8/ RCN 82/ Verizon 1964 and on webcast at www.boston.gov/city-council-tv

NOTE: This schedule is subject to change at the call of the Council President.



# BOSTON CITY COUNCIL

www.cityofboston.gov/citycouncil
city.council@boston.gov

One City Hall Square ◊ 5th Floor ◊ Boston, MA 02201 ◊ Phone: (617) 635-3040 ◊ Fax: (617) 635-4203

## 2019 CITY COUNCIL MEETING & CLERGY SCHEDULE

**JANUARY**

| | |
|---|---|
| January 2 | NO MEETING (New Year's) |
| January 9 | Meeting (FLYNN) |
| January 16 | Meeting (FLYNN) |
| January 23 | NO MEETING (MLK Day) |
| January 30 | Meeting (FLYNN) |

**FEBRUARY**

| | |
|---|---|
| February 6 | Meeting (ESSAIBI GEORGE) |
| February 13 | Meeting (ESSAIBI GEORGE) |
| February 20 | NO MEETING (Presidents Day) |
| February 27 | Meeting (ESSAIBI GEORGE) |

**MARCH**

| | |
|---|---|
| March 6 | Meeting (BAKER) |
| March 13 | Meeting (BAKER) |
| March 20 | Meeting (BAKER) |
| March 27 | Meeting (EDWARDS) |

**APRIL**

| | |
|---|---|
| April 3 | Meeting (EDWARDS) |
| April 10 | Meeting (EDWARDS) |
| April 17 | NO MEETING (Patriots Day) |
| April 24 | Meeting (CIOMMO) |

**MAY**

| | |
|---|---|
| May 1 | Meeting (CIOMMO) |
| May 8 | Meeting (CIOMMO) |
| May 15 | Meeting (O'MALLEY) |
| May 22 | Meeting (O'MALLEY) |
| May 29 | NO MEETING (Memorial Day) |

**JUNE**

| | |
|---|---|
| June 5 | Meeting (O'MALLEY) |
| June 12 | Meeting (JANEY) |
| June 19 | Meeting (JANEY) |
| June 26 | Meeting (End FY20) (JANEY) |

**JULY**

| | |
|---|---|
| July 3 | NO MEETING (Independence Day) |
| July 10 | Meeting (ZAKIM) |
| July 17 | NO MEETING (Summer Break) |
| July 24 | NO MEETING (Summer Break) |
| July 31 | Meeting (ZAKIM) |

**AUGUST**

| | |
|---|---|
| August 7 | NO MEETING (Summer Break) |
| August 14 | NO MEETING (Summer Break) |
| August 21 | Meeting (ZAKIM) |
| August 28 | NO MEETING (Summer Break) |

**SEPTEMBER**

| | |
|---|---|
| September 4 | NO MEETING (Labor Day) |
| September 11 | Meeting (WU) |
| September 18 | Meeting (WU) |
| September 25 | Meeting (WU) |

**OCTOBER**

| | |
|---|---|
| October 2 | Meeting (MCCARTHY) |
| October 9 | Meeting (MCCARTHY) |
| October 16 | NO MEETING (Indigenous Peoples Day) |
| October 23 | Meeting (MCCARTHY) |
| October 30 | Meeting (FLAHERTY) |

**NOVEMBER**

| | |
|---|---|
| November 6 | Meeting (FLAHERTY) |
| November 13 | NO MEETING (Veteran's Day) |
| November 20 | Meeting (FLAHERTY) |
| November 27 | NO MEETING (Thanksgiving) |

**DECEMBER**

| | |
|---|---|
| December 4 | Meeting (TBD) |
| December 11 | Meeting (TBD) |
| December 18 | NO MEETING |
| December 25 | NO MEETING (Christmas Day) |

All Council Meetings are held at twelve o'clock noon in the Christopher A. Iannella Chamber on the fifth floor of Boston City Hall, unless otherwise noted. All meetings are open to the public and are also available on Comcast Channel 8/ RCN 82 and on webcast at www.cityofboston.gov/citycouncil/live.asp

NOTE: This schedule is subject to change at the call of the Council President.



# BOSTON CITY COUNCIL

www.boston.gov/citycouncil
city.council@boston.gov

**One City Hall Square ◊ 5th Floor ◊ Boston, MA 02201 ◊ Phone: (617) 635-3040 ◊ Fax: (617) 635-4203**

## 2020 CITY COUNCIL MEETING & CLERGY SCHEDULE

**JANUARY**

| | |
|---|---|
| January 6 | FIRST MEETING (BREADON) |
| January 15 | Meeting (FLYNN) |
| January 22 | NO MEETING (MLK Day) |
| January 29 | Meeting (FLYNN) |

**FEBRUARY**

| | |
|---|---|
| February 5 | Meeting (FLYNN) |
| February 12 | Meeting (ESSAIBI-GEORGE) |
| February 19 | NO MEETING (Presidents' Day) |
| February 26 | Meeting (ESSAIBI-GEORGE) |

**MARCH**

| | |
|---|---|
| March 4 | Meeting (ESSAIBI-GEORGE) |
| March 11 | Meeting (BAKER) |
| March 18 | Meeting (BAKER) |
| March 25 | Meeting (BAKER) |

**APRIL**

| | |
|---|---|
| April 1 | Meeting (EDWARDS) |
| April 8 | Meeting (EDWARDS) |
| April 15 | Meeting (EDWARDS) |
| April 22 | NO MEETING (Patriots' Day) |
| April 29 | Meeting (MEJIA) |

**MAY**

| | |
|---|---|
| May 6 | Meeting (MEJIA) |
| May 13 | Meeting (MEJIA) |
| May 20 | Meeting (O'MALLEY) |
| May 27 | NO MEETING (Memorial Day) |

**JUNE**

| | |
|---|---|
| June 3 | Meeting (O'MALLEY) |
| June 10 | Meeting (O'MALLEY) |
| June 17 | Meeting (BOK) |
| June 24 | Meeting (End FY21) (BOK) |

**JULY**

| | |
|---|---|
| July 1 | NO MEETING (Independence Day) |
| July 8 | Meeting (BOK) |
| July 15 | NO MEETING (Summer Break) |
| July 22 | NO MEETING (Summer Break) |
| July 29 | Meeting (BREADON) |

**AUGUST**

| | |
|---|---|
| August 5 | NO MEETING (Summer Break) |
| August 12 | NO MEETING (Summer Break) |
| August 19 | Meeting (BREADON) |
| August 26 | NO MEETING (Summer Break) |

**SEPTEMBER**

| | |
|---|---|
| September 2 | NO MEETING (Summer Break) |
| September 9 | NO MEETING (Labor Day) |
| September 16 | Meeting (WU) |
| September 23 | Meeting (WU) |
| September 30 | Meeting (WU) |

**OCTOBER**

| | |
|---|---|
| October 7 | Meeting (ARROYO) |
| October 14 | NO MEETING (Columbus Day) (Indigenous People's Day) |
| October 21 | Meeting (ARROYO) |
| October 28 | Meeting (CAMPBELL) |

**NOVEMBER**

| | |
|---|---|
| November 4 | Meeting (CAMPBELL) |
| November 11 | NO MEETING (Veterans Day) |
| November 18 | Meeting (CAMPBELL) |
| November 25 | NO MEETING (Thanksgiving) |

**DECEMBER**

| | |
|---|---|
| December 2 | Meeting (FLAHERTY) |
| December 9 | Meeting (FLAHERTY) |
| December 16 | Meeting (FLAHERTY) |
| December 23 | NO MEETING (Christmas Day) |
| December 30 | NO MEETING (New Year's) |

All Council Meetings are held at twelve o'clock noon in the Christopher A. Iannella Chamber on the fifth floor of Boston City Hall, unless otherwise noted. All meetings are open to the public and are also available on Comcast Channel 8/ RCN 82/ Verizon 1964 and on webcast at www.boston.gov/city-council-tv

NOTE: This schedule is subject to change at the call of the Council President.



# BOSTON CITY COUNCIL

www.boston.gov/citycouncil
city.council@boston.gov

One City Hall Square ◊ 5th Floor ◊ Boston, MA 02201 ◊ Phone: (617) 635-3040 ◊ Fax: (617) 635-4203

## 2021 CITY COUNCIL MEETING & CLERGY SCHEDULE

**JANUARY**

| | |
|---|---|
| January 13 | Meeting (JANEY) |
| January 20 | NO MEETING (MLK Day) |
| January 27 | Meeting (FLYNN) |

**FEBRUARY**

| | |
|---|---|
| February 3 | Meeting (FLYNN) |
| February 10 | Meeting (FLYNN) |
| February 17 | NO MEETING (Presidents' Day) |
| February 24 | Meeting (ESSAIBI-GEORGE) |

**MARCH**

| | |
|---|---|
| March 3 | Meeting (ESSAIBI-GEORGE) |
| March 10 | Meeting ((ESSAIBI-GEORGE) |
| March 17 | Meeting (BAKER) |
| March 24 | Meeting (BAKER) |
| March 31 | Meeting (BAKER) |

**APRIL**

| | |
|---|---|
| April 7 | Meeting (MEJIA) |
| April 14 | Meeting (MEJIA) |
| April 21 | NO MEETING (Patriots' Day) |
| April 28 | Meeting (O'MALLEY) |

**MAY**

| | |
|---|---|
| May 5 | Meeting (O'MALLEY) |
| May 12 | Meeting (O'MALLEY) |
| May 19 | Meeting (BREADON) |
| May 26 | Meeting (BREADON) |

**JUNE**

| | |
|---|---|
| June 2 | NO MEETING (Memorial Day) |
| June 9 | Meeting (ARROYO) |
| June 16 | Meeting (ARROYO) |
| June 23 | Meeting (BOK) |
| June 30 | Meeting (End FY21) (BOK) |

**JULY**

| | |
|---|---|
| July 7 | NO MEETING (Independence Day) |
| July 14 | NO MEETING (Summer Break) |
| July 21 | Meeting (JANEY) |
| July 28 | NO MEETING (Summer Break) |

**AUGUST**

| | |
|---|---|
| August 4 | NO MEETING (Summer Break) |
| August 11 | NO MEETING (Summer Break) |
| August 18 | Meeting (WU) |
| August 25 | NO MEETING (Summer Break) |

**SEPTEMBER**

| | |
|---|---|
| September 1 | NO MEETING (Summer Break) |
| September 8 | NO MEETING (Labor Day) |
| September 15 | Meeting (WU) |
| September 22 | Meeting (WU) |
| September 29 | Meeting (EDWARDS) |

**OCTOBER**

| | |
|---|---|
| October 6 | Meeting (EDWARDS) |
| October 13 | NO MEETING (Columbus Day) (Indigenous People's Day) |
| October 20 | Meeting (EDWARDS) |
| October 27 | Meeting (CAMPBELL) |

**NOVEMBER**

| | |
|---|---|
| November 3 | Meeting (CAMPBELL) |
| November 10 | NO MEETING (Veterans Day) |
| November 17 | Meeting (CAMPBELL) |
| November 24 | NO MEETING (Thanksgiving) |

**DECEMBER**

| | |
|---|---|
| December 1 | Meeting (FLAHERTY) |
| December 8 | Meeting (FLAHERTY) |
| December 15 | Meeting (FLAHERTY) (End legislative year) |

All Council Meetings are held at twelve o'clock noon in the Christopher A. Iannella Chamber on the fifth floor of Boston City Hall, unless otherwise noted. All meetings are open to the public and are also available on Xfinity Channel 8/ RCN 82/ Fios 964 and on webcast at www.boston.gov/city-council-tv

**Note: Due to Covid-19, meetings are currently being held remotely via Zoom.** This schedule is subject to change at the call of the Council President.

Revised 12/11/20



# BOSTON CITY COUNCIL

www.boston.gov/citycouncil
city.council@boston.gov

**One City Hall Square ◊ 5th Floor ◊ Boston, MA 02201 ◊ Phone: (617) 635-3040 ◊ Fax: (617) 635-4203**

## 2020 CITY COUNCIL MEETING & CLERGY SCHEDULE

**JANUARY**

| | |
|---|---|
| January 6 | FIRST MEETING (BREADON) |
| January 15 | Meeting (FLYNN) |
| January 22 | NO MEETING (MLK Day) |
| January 29 | Meeting (FLYNN) |

**FEBRUARY**

| | |
|---|---|
| February 5 | Meeting (FLYNN) |
| February 12 | Meeting (ESSAIBI-GEORGE) |
| February 19 | NO MEETING (Presidents' Day) |
| February 26 | Meeting (ESSAIBI-GEORGE) |

**MARCH**

| | |
|---|---|
| March 4 | Meeting (ESSAIBI-GEORGE) |
| March 11 | Meeting (BAKER) |
| March 18 | Meeting (BAKER) |
| March 25 | Meeting (~~BAKER~~) |

**APRIL**

| | |
|---|---|
| April 1 | Meeting (~~EDWARDS~~) |
| April 8 | Meeting (~~EDWARDS~~) |
| April 15 | Meeting (~~EDWARDS~~) |
| April 22 | NO MEETING (Patriots' Day) |
| April 29 | Meeting (~~MEJIA~~) |

**MAY**

| | |
|---|---|
| May 6 | Meeting (~~MEJIA~~) |
| May 13 | Meeting (~~MEJIA~~) |
| May 20 | Meeting (O'MALLEY) |
| May 27 | NO MEETING (Memorial Day) |

**JUNE**

| | |
|---|---|
| June 3 | Meeting (O'MALLEY) |
| June 10 | Meeting (EDWARDS) |
| June 17 | Meeting (EDWARDS) |
| June 24 | Meeting (End FY21) (BOK) |

**JULY**

| | |
|---|---|
| July 1 | NO MEETING (Independence Day) |
| July 8 | Meeting (BOK) |
| July 15 | NO MEETING (Summer Break) |
| July 22 | NO MEETING (Summer Break) |
| July 29 | Meeting (BREADON) |

**AUGUST**

| | |
|---|---|
| August 5 | NO MEETING (Summer Break) |
| August 12 | NO MEETING (Summer Break) |
| August 19 | Meeting (MEJIA) |
| August 26 | NO MEETING (Summer Break) |

**SEPTEMBER**

| | |
|---|---|
| September 2 | NO MEETING (Summer Break) |
| September 9 | NO MEETING (Labor Day) |
| September 16 | Meeting (MEJIA) |
| September 23 | Meeting (WU) |
| September 30 | Meeting (WU) |

**OCTOBER**

| | |
|---|---|
| October 7 | Meeting (ARROYO) |
| October 14 | NO MEETING (Columbus Day) (Indigenous People's Day) |
| October 21 | Meeting (ARROYO) |
| October 28 | Meeting (CAMPBELL) |

**NOVEMBER**

| | |
|---|---|
| November 4 | Meeting (CAMPBELL) |
| November 11 | NO MEETING (Veterans Day) |
| November 18 | Meeting (CAMPBELL) |
| November 25 | NO MEETING (Thanksgiving) |

**DECEMBER**

| | |
|---|---|
| December 2 | Meeting (FLAHERTY) |
| December 9 | Meeting (FLAHERTY) |
| December 16 | Meeting (FLAHERTY) |
| December 23 | NO MEETING (Christmas Day) |
| December 30 | NO MEETING (New Year's) |

All Council Meetings are held at twelve o'clock noon in the Christopher A. Iannella Chamber on the fifth floor of Boston City Hall, unless otherwise noted. All meetings are open to the public and are also available on Comcast Channel 8/ RCN 82/ Verizon 1964 and on webcast at www.boston.gov/city-council-tv

NOTE: This schedule is subject to change at the call of the Council President.

Revised 5/7/20



# BOSTON CITY COUNCIL

www.boston.gov/citycouncil
city.council@boston.gov

**One City Hall Square ◊ 5th Floor ◊ Boston, MA 02201 ◊ Phone: (617) 635-3040 ◊ Fax: (617) 635-4203**

## 2020 CITY COUNCIL MEETING & CLERGY SCHEDULE

**JANUARY**

| | |
|---|---|
| January 6 | FIRST MEETING (BREADON) |
| January 15 | Meeting (FLYNN) |
| January 22 | NO MEETING (MLK Day) |
| January 29 | Meeting (FLYNN) |

**FEBRUARY**

| | |
|---|---|
| February 5 | Meeting (FLYNN) |
| February 12 | Meeting (ESSAIBI-GEORGE) |
| February 19 | NO MEETING (Presidents' Day) |
| February 26 | Meeting (ESSAIBI-GEORGE) |

**MARCH**

| | |
|---|---|
| March 4 | Meeting (ESSAIBI-GEORGE) |
| March 11 | Meeting (BAKER) |
| March 18 | Meeting (BAKER) |
| March 25 | Meeting (~~BAKER~~) |

**APRIL**

| | |
|---|---|
| April 1 | Meeting (~~EDWARDS~~) |
| April 8 | Meeting (~~EDWARDS~~) |
| April 15 | Meeting (~~EDWARDS~~) |
| April 22 | NO MEETING (Patriots' Day) |
| April 29 | Meeting (~~MEJIA~~) |

**MAY**

| | |
|---|---|
| May 6 | Meeting (~~MEJIA~~) |
| May 13 | Meeting (~~MEJIA~~) |
| May 20 | Meeting (O'MALLEY) |
| May 27 | NO MEETING (Memorial Day) |

**JUNE**

| | |
|---|---|
| June 3 | Meeting (O'MALLEY) |
| June 10 | Meeting (EDWARDS) |
| June 17 | Meeting (EDWARDS) |
| June 24 | Meeting (End FY21) (BOK) |

**JULY**

| | |
|---|---|
| July 1 | NO MEETING (Independence Day) |
| July 8 | Meeting (BOK) |
| July 15 | NO MEETING (Summer Break) |
| July 22 | NO MEETING (Summer Break) |
| July 29 | Meeting (BREADON) |

**AUGUST**

| | |
|---|---|
| August 5 | NO MEETING (Summer Break) |
| August 12 | NO MEETING (Summer Break) |
| August 19 | Meeting (MEJIA) |
| August 26 | NO MEETING (Summer Break) |

**SEPTEMBER**

| | |
|---|---|
| September 2 | NO MEETING (Summer Break) |
| September 9 | NO MEETING (Labor Day) |
| September 16 | Meeting (MEJIA) |
| September 23 | Meeting (WU) |
| September 30 | Meeting (WU) |

**OCTOBER**

| | |
|---|---|
| October 7 | Meeting (ARROYO) |
| October 14 | NO MEETING (Columbus Day) (Indigenous People's Day) |
| October 21 | Meeting (ARROYO) |
| October 28 | Meeting (CAMPBELL) |

**NOVEMBER**

| | |
|---|---|
| November 4 | Meeting (CAMPBELL) |
| November 11 | NO MEETING (Veterans Day) |
| November 18 | Meeting (CAMPBELL) |
| November 25 | NO MEETING (Thanksgiving) |

**DECEMBER**

| | |
|---|---|
| December 2 | Meeting (FLAHERTY) |
| December 9 | Meeting (FLAHERTY) |
| December 16 | Meeting (FLAHERTY) |
| December 23 | NO MEETING (Christmas Day) |
| December 30 | NO MEETING (New Year's) |

All Council Meetings are held at twelve o'clock noon in the Christopher A. Iannella Chamber on the fifth floor of Boston City Hall, unless otherwise noted. All meetings are open to the public and are also available on Comcast Channel 8/ RCN 82/ Verizon 1964 and on webcast at www.boston.gov/city-council-tv

NOTE: This schedule is subject to change at the call of the Council President.

Revised 5/7/20



# BOSTON CITY COUNCIL

www.cityofboston.gov/citycouncil
city.council@cityofboston.gov

**One City Hall Square ◊ 5th Floor ◊ Boston, MA 02201 ◊ Phone: (617) 635-3040 ◊ Fax: (617) 635-4203**

## 2011 CITY COUNCIL MEETING & CLERGY SCHEDULE

**JANUARY**

Monday, January 3 — 1st Mtg (FEENEY)
January 12 — Meeting (FEENEY)
January 19 — NO MEETING (MLK Day)
January 26 — Meeting (FEENEY)

**FEBRUARY**

February 2 — Meeting (ROSS )
February 9 — Meeting (ROSS)
February 16 — NO MEETING (President's Day)
February 23 — Meeting (ROSS)

**MARCH**

March 2 — Meeting (MURPHY)
March 9 — Meeting(MURPHY)
March 16 — NO MEETING (Evac. Day)
March 23 — Meeting (MURPHY)
March 30 — Meeting (CONSALVO)

**APRIL**

April 6 — Meeting (CONSALVO)
April 13 — Meeting (FY11 Budget) (O'MALLEY)
April 20 — NO MEETING (Patriots Day)
April 27 — Meeting (O'MALLEY)

**MAY**

May 4 — Meeting (O'MALLEY)
May 11 — Meeting (ARROYO)
May 18 — Meeting (ARROYO)
May 25 — NO MEETING (Memorial Day)

**JUNE**

June 1 — Meeting (Cap.Vote) (LAMATTINA)
June 8 — Meeting (Oper. Vote) (LAMATTINA)
June 15 — NO MEETING (Bunker Hill Day)
June 22 — Meeting (CONNOLLY)
June 29 — Meeting (End of FY11) (CONNOLLY)

**JULY**

July 6 — NO MEETING (Independence Day)
July 13 — Meeting (CONNOLLY)
July 20 — NO MEETING (Summer Break)
July 27 — NO MEETING (Summer Break)

**AUGUST**

August 3 — Meeting (LINEHAN)
August 10 — NO MEETING (Summer Break)
August 17 — NO MEETING (Summer Break)
August 24 — Meeting (LINEHAN)
August 31 — NO MEETING (Summer Break)

**SEPTEMBER**

September 7 — NO MEETING (Labor Day)
September 14 — Meeting (LINEHAN)
September 21 — Meeting (YANCEY)
September 28 — Meeting (YANCEY)

**OCTOBER**

October 5 — Meeting (PRESSLEY)
October 12 — NO MEETING (Columbus Day)
October 19 — Meeting (PRESSLEY)
October 26 — Meeting (PRESSLEY)

**NOVEMBER**

November 2 — Meeting (CIOMMO)
November 9 — NO MEETING (Veterans Day)
November 16 — Meeting (CIOMMO)
November 23 — NO MEETING (Thanksgiving)
November 30 — Meeting (CIOMMO)

**DECEMBER**

December 7 — Meeting (DISTRICT 7)
December 14 — Meeting (End of 2011) (DISTRICT 7)
December 21 — NO MEETING (Christmas/Hanukkah)
December 28 — NO MEETING (New Years)

**JANUARY 2012**

Monday, January 2, 2012 — Inauguration & First Meeting

All Council Meetings are held at twelve o'clock noon in the Christopher A. Iannella Chamber on the fifth floor of Boston City Hall, unless otherwise noted. All meetings are open to the public and are also available on Comcast Channel 51 and on webcast at www.cityofboston.gov/citycouncil/live.asp

NOTE: This schedule is subject to change at the call of the Council President.



# BOSTON CITY COUNCIL

www.cityofboston.gov/citycouncil
city.council@cityofboston.gov

One City Hall Square ◊ 5th Floor ◊ Boston, MA 02201 ◊ Phone: (617) 635-3040 ◊ Fax: (617) 635-4203

## 2011 CITY COUNCIL MEETING & CLERGY SCHEDULE (8/17/2011)

**JANUARY**

| | |
|---|---|
| Monday, January 3 | 1st Mtg (FEENEY) |
| January 12 | Meeting (FEENEY) |
| January 19 | NO MEETING (MLK Day) |
| January 26 | Meeting (FEENEY) |

**FEBRUARY**

| | |
|---|---|
| February 2 | Meeting (ROSS ) |
| February 9 | Meeting (ROSS) |
| February 16 | Meeting (ROSS) |
| February 23 | NO MEETING (President's Day) |

**MARCH**

| | |
|---|---|
| March 2 | Meeting (MURPHY) |
| March 9 | Meeting(MURPHY) |
| March 16 | NO MEETING (Evac. Day) |
| March 23 | Meeting (MURPHY) |
| March 30 | Meeting (CONSALVO) |

**APRIL**

| | |
|---|---|
| April 6 | Meeting (CONSALVO) |
| April 13 | Meeting (FY11 Budget) (O'MALLEY) |
| April 20 | NO MEETING (Patriots Day) |
| April 27 | Meeting (O'MALLEY) |

**MAY**

| | |
|---|---|
| May 4 | Meeting (O'MALLEY) |
| May 11 | Meeting (ARROYO) |
| May 18 | Meeting (ARROYO) |
| May 25 | NO MEETING (Memorial Day) |

**JUNE**

| | |
|---|---|
| June 1 | Meeting (Cap.Vote) (LAMATTINA) |
| June 8 | Meeting (Oper. Vote) (LAMATTINA) |
| June 15 | NO MEETING (Bunker Hill Day) |
| June 22 | Meeting (CONNOLLY) |
| June 29 | Meeting (End of FY11) (CONNOLLY) |

**JULY**

| | |
|---|---|
| July 6 | NO MEETING (Independence Day) |
| July 13 | Meeting (CONNOLLY) |
| July 20 | NO MEETING (Summer Break) |
| July 27 | NO MEETING (Summer Break) |

**AUGUST**

| | |
|---|---|
| August 3 | Meeting (LINEHAN) |
| August 10 | NO MEETING (Summer Break) |
| August 17 | NO MEETING (Summer Break) |
| August 24 | Meeting (LINEHAN) |
| August 31 | NO MEETING (Summer Break) |

**SEPTEMBER**

| | |
|---|---|
| September 7 | NO MEETING (Labor Day) |
| September 14 | Meeting (LINEHAN) |
| September 21 | Meeting (YANCEY) |
| September 28 | Meeting (YANCEY) |

**OCTOBER**

| | |
|---|---|
| October 5 | Meeting (PRESSLEY) |
| October 12 | NO MEETING (Columbus Day) |
| October 19 | Meeting (PRESSLEY) |
| October 26 | Meeting (PRESSLEY) |

**NOVEMBER**

| | |
|---|---|
| November 2 | Meeting (CIOMMO) |
| November 9 | Meeting (CIOMMO) |
| November 16 | NO MEETING (Veterans Day) |
| November 23 | NO MEETING (Thanksgiving) |
| November 30 | Meeting (CIOMMO) |

**DECEMBER**

| | |
|---|---|
| December 7 | Meeting (DISTRICT 7) |
| December 14 | Meeting (End of 2011) (DISTRICT 7) |
| December 21 | NO MEETING (Christmas/Hanukkah) |
| December 28 | NO MEETING (New Years) |

**JANUARY 2012**

Monday, January 2, 2012 Inauguration & First Meeting

All Council Meetings are held at twelve o'clock noon in the Christopher A. Iannella Chamber on the fifth floor of Boston City Hall, unless otherwise noted. All meetings are open to the public and are also available on Comcast Channel 51 and on webcast at www.cityofboston.gov/citycouncil/live.asp

NOTE: This schedule is subject to change at the call of the Council President.



# BOSTON CITY COUNCIL

www.cityofboston.gov/citycouncil
city.council@cityofboston.gov

**One City Hall Square ◊ 5th Floor ◊ Boston, MA 02201 ◊ Phone: (617) 635-3040 ◊ Fax: (617) 635-4203**

## 2012 CITY COUNCIL MEETING & CLERGY SCHEDULE

**JANUARY**

| | |
|---|---|
| Monday, January 2 | 1st Mtg (YANCEY) |
| January 11 | Meeting (YANCEY) |
| January 18 | NO MEETING (MLK Day) |
| January 25 | Meeting (YANCEY) |

**FEBRUARY**

| | |
|---|---|
| February 1 | Meeting (ROSS) |
| February 8 | Meeting (ROSS) |
| February 15 | Meeting (ROSS) |
| February 22 | NO MEETING (President's Day) |
| February 29 | Meeting (MURPHY) |

**MARCH**

| | |
|---|---|
| March 7 | Meeting (MURPHY) |
| March 14 | NO MEETING |
| March 21 | Meeting(MURPHY) |
| March 28 | Meeting (CONSALVO) |

**APRIL**

| | |
|---|---|
| April 4 | Meeting (CONSALVO) |
| April 11 | Meeting (FY13 Budget) (CONSALVO) |
| April 18 | NO MEETING (Patriots Day) |
| April 25 | Meeting (ARROYO) |

**MAY**

| | |
|---|---|
| May 2 | Meeting (ARROYO) |
| May 9 | Meeting (ARROYO) |
| May 16 | Meeting (LAMATTINA) |
| May 23 | Meeting (LAMATTINA) |
| May 30 | NO MEETING (Memorial Day) |

**JUNE**

| | |
|---|---|
| June 6 | Meeting (Cap.Vote) (LAMATTINA) |
| June 13 | Meeting (Oper. Vote) (CONNOLLY) |
| June 20 | NO MEETING |
| June 27 | Meeting (End FY12)(CONNOLLY) |

**JULY**

| | |
|---|---|
| July 4 | NO MEETING (Independence Day) |
| July 11 | Meeting (CONNOLLY) |
| July 18 | NO MEETING (Summer Break) |
| July 25 | NO MEETING (Summer Break) |

**AUGUST**

| | |
|---|---|
| August 1 | Meeting (LINEHAN) |
| August 8 | NO MEETING (Summer Break) |
| August 15 | NO MEETING (Summer Break) |
| August 22 | Meeting (LINEHAN) |
| August 29 | NO MEETING (Summer Break) |

**SEPTEMBER**

| | |
|---|---|
| September 5 | NO MEETING (Labor Day) |
| September 12 | Meeting (BAKER) |
| September 19 | Meeting (BAKER) |
| September 26 | NO MEETING (Yom Kippur) |

**OCTOBER**

| | |
|---|---|
| October 3 | Meeting (PRESSLEY) |
| October 10 | NO MEETING (Columbus Day) |
| October 17 | Meeting (PRESSLEY) |
| October 24 | Meeting (O'MALLEY) |
| October 31 | Meeting (O'MALLEY) |

**NOVEMBER**

| | |
|---|---|
| November 7 | Meeting (CIOMMO) |
| November 14 | NO MEETING(Veterans Day) |
| November 21 | NO MEETING (Thanksgiving) |
| November 28 | Meeting (CIOMMO) |

**DECEMBER**

| | |
|---|---|
| December 5 | Meeting (JACKSON) |
| December 12 | Meeting (JACKSON) |
| December 19 | Meeting (End of 2012) (JACKSON) |
| December 26 | NO MEETING (Christmas) |

**JANUARY 2013**

Monday, January 7, 2013 First Meeting 10AM

All Council Meetings are held at twelve o'clock noon in the Christopher A. Iannella Chamber on the fifth floor of Boston City Hall, unless otherwise noted. All meetings are open to the public and are also available on Comcast Channel 12/ RCN 82 and on webcast at www.cityofboston.gov/citycouncil/live.asp

NOTE: This schedule is subject to change at the call of the Council President.

# 2013 CITY COUNCIL MEETINGS & CLERGY SCHEDULE

**January**

| | |
|---|---|
| Monday Jan 7th | 1st Meeting [YANCEY] |
| January 16 | Meeting [Yancey] |
| January 23 | No Meeting [MLK Day] |
| January 30 | Meeting [Yancey] |

**FEBRUARY**

| | |
|---|---|
| February 6 | Meeting [Ross] |
| February 13 | Meeting [Ross] |
| February 20 | NO Meeting [President's Day] |
| February 27 | Meeting [Consalvo] |

**MARCH**

| | |
|---|---|
| March 6 | Meeting [Consalvo] |
| March 13 | Meeting [Consalvo] |
| March 20 | NO Meeting [St. Pat's Day] |
| March 27 | Meeting [Arroyo] |

**APRIL**

| | |
|---|---|
| April 3 | Meeting [Arroyo] |
| April 10 | Meeting [LaMattina] |
| April 17 | NO Meeting |
| April 24 | Meeting [LaMattina] |

**MAY**

| | |
|---|---|
| May 1 | Meeting [LaMattina] |
| May 8 | Meeting {Connolly] |
| May 15 | Meeting [Connolly] |
| May 22 | Meeting [Linehan] |
| May 29 | NO Meeting |

**JUNE**

| | |
|---|---|
| June 5 | Meeting [Linehan] |
| June 12 | Meeting [Linehan] |
| June 19 | NO Meeting |
| June 26 | Meeting [Baker] |

**JULY**

| | |
|---|---|
| July 3 | NO Meeting [4th of July] |
| July 10 | Meeting [Baker] |
| July 17 | NO Meeting |
| July 24 | NO Meeting |
| July 31 | Meeting [Baker] |

**AUGUST**

| | |
|---|---|
| August 7 | NO Meeting |
| August 14 | NO Meeting |
| August 21 | Meeting [ Murphy] |
| August 28 | NO Meeting |

**SEPTEMBER**

| | |
|---|---|
| September 4 | NO Meeting |
| September 11 | Meeting [Murphy] |
| September 18 | Meeting [Murphy] |
| September 25 | Meeting [Pressley] |

**OCTOBER**

| | |
|---|---|
| October 2 | Meeting [Pressley] |
| October 9 | Meeting [O'Malley] |
| October 16 | NO Meeting[Columbus Day] |
| October 23 | Meeting [O'Malley] |
| October 30 | Meeting [Ciommo] |

**November**

| | |
|---|---|
| November 6 | Meeting [Ciommo] |
| November 13 | NO Meeting |
| November 20 | Meeting [Ciommo] |
| November 27 | NO Meeting [Thanksgiving] |

**December**

| | |
|---|---|
| December 4 | Meeting [Jackson] |
| December 11 | Meeting {Jackson] |
| December 18 | Meeting [Jackson] |
| December 25 | NO Meeting |

**January**

| | |
|---|---|
| January 1,2014 | No Meeting |
| Monday January 6, 2014 | 1st Meeting |



# BOSTON CITY COUNCIL

www.cityofboston.gov/citycouncil
city.council@boston.gov

One City Hall Square ◊ 5th Floor ◊ Boston, MA 02201 ◊ Phone: (617) 635-3040 ◊ Fax: (617) 635-4203

## 2014 CITY COUNCIL MEETING & CLERGY SCHEDULE

**JANUARY**

| | |
|---|---|
| Monday, January 6 | 1st Mtg (YANCEY) |
| January 15 | Meeting (YANCEY) |
| January 22 | NO MEETING (MLK Day) |
| January 29 | Meeting (YANCEY) |

**FEBRUARY**

| | |
|---|---|
| February 5 | Meeting (ZAKIM) |
| February 12 | Meeting (ZAKIM) |
| February 19 | NO MEETING (President's Day) |
| February 26 | Meeting (McCARTHY) |

**MARCH**

| | |
|---|---|
| March 5 | Meeting (McCARTHY) |
| March 12 | Meeting (McCARTHY) |
| March 19 | NO MEETING |
| March 26 | Meeting (FLAHERTY) |

**APRIL**

| | |
|---|---|
| April 2 | Meeting (FLAHERTY) |
| April 9 | Meeting (LAMATTINA) |
| April 16 | Meeting (LAMATTINA) |
| April 23 | NO MEETING (Patriots Day) |
| April 30 | Meeting (LAMATTINA) |

**MAY**

| | |
|---|---|
| May 7 | Meeting (WU) |
| May 14 | Meeting (WU) |
| May 21 | Meeting (WU) |
| May 28 | NO MEETING (Memorial Day) |

**JUNE**

| | |
|---|---|
| June 4 | Meeting (1st Cap. Vote) (LINEHAN) |
| June 11 | Meeting (1st Oper. Vote) (LINEHAN) |
| June 18 | Meeting (LINEHAN) |
| June 25 | Meeting (End FY14) (BAKER) |

**JULY**

| | |
|---|---|
| July 2 | NO MEETING (Independence Day) |
| July 9 | Meeting (BAKER) |
| July 16 | NO MEETING (Summer Break) |
| July 23 | NO MEETING (Summer Break) |
| July 30 | Meeting (BAKER) |

**AUGUST**

| | |
|---|---|
| August 6 | NO MEETING (Summer Break) |
| August 13 | NO MEETING (Summer Break) |
| August 20 | Meeting (MURPHY) |
| August 27 | NO MEETING (Summer Break) |

**SEPTEMBER**

| | |
|---|---|
| September 3 | NO MEETING (Labor Day) |
| September 10 | Meeting (MURPHY) |
| September 17 | Meeting (MURPHY) |
| September 24 | Meeting (PRESSLEY) |

**OCTOBER**

| | |
|---|---|
| October 1 | Meeting (PRESSLEY) |
| October 8 | Meeting (O'MALLEY) |
| October 15 | NO MEETING (Columbus Day) |
| October 22 | Meeting (O'MALLEY) |
| October 29 | Meeting (CIOMMO) |

**NOVEMBER**

| | |
|---|---|
| November 5 | Meeting (CIOMMO) |
| November 12 | NO MEETING (Veterans Day) |
| November 19 | Meeting (CIOMMO) |
| November 26 | NO MEETING (Thanksgiving) |

**DECEMBER**

| | |
|---|---|
| December 3 | Meeting (JACKSON) |
| December 10 | Meeting (JACKSON) |
| December 17 | Meeting (JACKSON) |
| December 24 | NO MEETING (Christmas) |
| December 31 | NO MEETING (New Years) |

**JANUARY 2015**

Monday, January 5, 2015 1st Meeting 10AM/Noon

All Council Meetings are held at twelve o'clock noon in the Christopher A. Iannella Chamber on the fifth floor of Boston City Hall, unless otherwise noted. All meetings are open to the public and are also available on Comcast Channel 8/ RCN 82 and on webcast at www.cityofboston.gov/citycouncil/live.asp

NOTE: This schedule is subject to change at the call of the Council President.



# BOSTON CITY COUNCIL

www.cityofboston.gov/citycouncil
city.council@boston.gov

One City Hall Square ◊ 5th Floor ◊ Boston, MA 02201 ◊ Phone: (617) 635-3040 ◊ Fax: (617) 635-4203

## 2015 CITY COUNCIL MEETING & CLERGY SCHEDULE

**JANUARY**

| | |
|---|---|
| **Wednesday, January 7** | 1st Mtg (YANCEY) |
| January 14 | Meeting (YANCEY) |
| January 21 | NO MEETING (MLK Day) |
| January 28 | Meeting (YANCEY) |

**FEBRUARY**

| | |
|---|---|
| February 4 | Meeting (ZAKIM) |
| February 11 | Meeting (ZAKIM) |
| February 18 | NO MEETING (President's Day) |
| February 25 | Meeting (ZAKIM)) |

**MARCH**

| | |
|---|---|
| March 4 | Meeting (McCARTHY) |
| March 11 | Meeting (McCARTHY) |
| March 18 | NO MEETING |
| March 25 | Meeting (McCARTHY) |

**APRIL**

| | |
|---|---|
| April 1 | Meeting (FLAHERTY) |
| April 8 | Meeting (FLAHERTY) |
| April 15 | Meeting (FLAHERTY) |
| April 22 | NO MEETING (Patriots Day) |
| April 29 | Meeting (LAMATTINA) |

**MAY**

| | |
|---|---|
| May 6 | Meeting (LAMATTINA) |
| May 13 | Meeting (WU) |
| May 20 | Meeting (WU) |
| May 27 | NO MEETING (Memorial Day) |

**JUNE**

| | |
|---|---|
| June 3 | Meeting (1st Cap. Vote) (WU) |
| June 10 | Meeting (1st Oper. Vote) (LINEHAN) |
| June 17 | Meeting (LINEHAN) |
| June 24 | Meeting (End FY15) (BAKER) |

**JULY**

| | |
|---|---|
| July 1 | NO MEETING (Summer Break) |
| July 8 | NO MEETING (Summer Break) |
| July 15 | Meeting (BAKER) |
| July 22 | Meeting (BAKER) |
| July 29 | NO MEETING (Summer Break) |

**AUGUST**

| | |
|---|---|
| August 5 | NO MEETING (Summer Break) |
| August 12 | Meeting (MURPHY) |
| August 19 | NO MEETING (Summer Break) |
| August 26 | NO MEETING (Summer Break) |

**SEPTEMBER**

| | |
|---|---|
| September 2 | Meeting (MURPHY) |
| September 9 | NO MEETING (Labor Day) |
| September 16 | Meeting (PRESSLEY) |
| September 23 | Meeting (PRESSLEY) |
| September 30 | Meeting (PRESSLEY) |

**OCTOBER**

| | |
|---|---|
| October 7 | Meeting (O'MALLEY) |
| October 14 | NO MEETING (Columbus Day) |
| October 21 | Meeting (O'MALLEY) |
| October 28 | Meeting (O'MALLEY) |

**NOVEMBER**

| | |
|---|---|
| November 4 | Meeting (CIOMMO) |
| November 11 | NO MEETING (Veterans Day) |
| November 18 | Meeting (CIOMMO) |
| November 25 | NO MEETING (Thanksgiving) |

**DECEMBER**

| | |
|---|---|
| December 2 | Meeting (JACKSON) |
| December 9 | Meeting (JACKSON) |
| December 16 | Meeting (JACKSON) |
| December 23 | NO MEETING (Christmas) |
| December 30 | NO MEETING (New Years) |

**JANUARY 2016**

Monday, January 4, 2016 1st Meeting 10AM/Noon

All Council Meetings are held at twelve o'clock noon in the Christopher A. Iannella Chamber on the fifth floor of Boston City Hall, unless otherwise noted. All meetings are open to the public and are also available on Comcast Channel 8/ RCN 82 and on webcast at www.cityofboston.gov/citycouncil/live.asp

NOTE: This schedule is subject to change at the call of the Council President.



# BOSTON CITY COUNCIL

www.cityofboston.gov/citycouncil
city.council@cityofboston.gov

One City Hall Square ◊ 5th Floor ◊ Boston, MA 02201 ◊ Phone: (617) 635-3040 ◊ Fax: (617) 635-4203

## 2013 CITY COUNCIL MEETING & CLERGY SCHEDULE (Rev. 1/3/2013)

**JANUARY**

| | |
|---|---|
| Monday, January 7 | 1st Mtg (YANCEY) |
| January 16 | Meeting (YANCEY) |
| January 23 | NO MEETING (MLK Day) |
| January 30 | Meeting (YANCEY) |

**FEBRUARY**

| | |
|---|---|
| February 6 | Meeting (ROSS) |
| February 13 | Meeting (ROSS) |
| February 20 | NO MEETING (President's Day) |
| February 27 | Meeting (CONSALVO) |

**MARCH**

| | |
|---|---|
| March 6 | Meeting (CONSALVO) |
| March 13 | Meeting (CONSALVO) |
| March 20 | NO MEETING |
| March 27 | Meeting (ARROYO) |

**APRIL**

| | |
|---|---|
| April 3 | Meeting (ARROYO) |
| April 10 | Meeting (LAMATTINA) |
| April 17 | NO MEETING (Patriots Day) |
| April 24 | Meeting (LAMATTINA) |

**MAY**

| | |
|---|---|
| May 1 | Meeting (LAMATTINA) |
| May 8 | Meeting (CONNOLLY) |
| May 15 | Meeting (CONNOLLY) |
| May 22 | Meeting (LINEHAN) |
| May 29 | NO MEETING (Memorial Day) |

**JUNE**

| | |
|---|---|
| June 5 | Meeting (Cap. Vote) (LINEHAN) |
| June 12 | Meeting (Oper. Vote) (LINEHAN) |
| June 19 | NO MEETING |
| June 26 | Meeting (End FY12) (BAKER) |

**JULY**

| | |
|---|---|
| July 3 | NO MEETING (Independence Day) |
| July 10 | Meeting (BAKER) |
| July 17 | NO MEETING (Summer Break) |
| July 24 | NO MEETING (Summer Break) |
| July 31 | Meeting (BAKER) |

**AUGUST**

| | |
|---|---|
| August 7 | NO MEETING (Summer Break) |
| August 14 | NO MEETING (Summer Break) |
| August 21 | Meeting (MURPHY) |
| August 28 | NO MEETING (Summer Break) |

**SEPTEMBER**

| | |
|---|---|
| September 4 | NO MEETING (Labor Day) |
| September 11 | Meeting (MURPHY) |
| September 18 | Meeting (MURPHY) |
| September 25 | Meeting (PRESSLEY) |

**OCTOBER**

| | |
|---|---|
| October 2 | Meeting (PRESSLEY) |
| October 9 | Meeting (O'MALLEY) |
| October 16 | NO MEETING (Columbus Day) |
| October 23 | Meeting (O'MALLEY) |
| October 30 | Meeting (CIOMMO) |

**NOVEMBER**

| | |
|---|---|
| November 6 | Meeting (CIOMMO) |
| November 13 | NO MEETING (Veterans Day) |
| November 20 | Meeting (CIOMMO) |
| November 27 | NO MEETING (Thanksgiving) |

**DECEMBER**

| | |
|---|---|
| December 4 | Meeting (JACKSON) |
| December 11 | Meeting (JACKSON) |
| December 18 | Meeting (JACKSON) |
| December 25 | NO MEETING (Christmas) |

**JANUARY 2013**

Monday, January 6, 2014 First Meeting 10AM

All Council Meetings are held at twelve o'clock noon in the Christopher A. Iannella Chamber on the fifth floor of Boston City Hall, unless otherwise noted. All meetings are open to the public and are also available on Comcast Channel 8/ RCN 82 and on webcast at www.cityofboston.gov/citycouncil/live.asp

NOTE: This schedule is subject to change at the call of the Council President.

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

________________________________

THE SATANIC TEMPLE, INC.,

Plaintiff,

v. Civil Action No.

CITY OF BOSTON, MA, 1:21-cv-10102

Defendant.

________________________________

VIDEOCONFERENCE DEPOSITION OF

ANNISSA ESSAIBI-GEORGE

DATE: Monday, September 19, 2022

TIME: 10:01 a.m.

LOCATION: The Satanic Temple

64 Bridge Street

Salem, MA 01970

REPORTED BY: Robert Lombardi, Notary Public

JOB NO.: 5488484

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF THE SATANIC TEMPLE, INC.:

MATTHEW A. KEZHAYA, ESQUIRE (by videoconference)
Crown Law
333 North Washington Avenue, Suite 300
Minneapolis, MN 55401
matt@crown.law

SONIA KEZHAYA, ESQUIRE (by videoconference)
Crown Law
333 North Washington Avenue, Suite 300
Minneapolis, MN 55401
sonia@crown.law

ON BEHALF OF DEFENDANT CITY OF BOSTON, MA, AND WITNESS ANNISSA ESSAIBI-GEORGE:

NICOLE O'CONNOR, ESQUIRE
City of Boston Law Department
1 City Hall Square, Room 615
Boston, MA 02201
nicole.oconnor@boston.gov

A P P E A R A N C E S (Cont'd.)

ON BEHALF OF DEFENDANT CITY OF BOSTON, MA, AND WITNESS ANNISSA ESSAIBI-GEORGE:

ROBERT S. ARCANGELI, ESQUIRE
City of Boston Law Department
1 City Hall Square, Room 615
Boston, MA 02201
robert.arcangeli@boston.gov

ALSO PRESENT:

Sean Budd, Videographer
Lucien Greaves
Ada King
Mobius

that it is in oversimplification, whether we go down to the middle Mesoamerican Aztec traditions or, you know, following thereafter into the South American traditions, any of those varietals of Native American traditions, pre- or during or post-political life, did you have any exposure to any of that?

A Not that I recall.

Q Okay. And then back up north through, you know, Canadian and leading into the Inuits, any of those pre-, post-, or during?

A Not that I recall; no.

Q Can you speak to Michelle Wu's exposure to the various religions of the world, whether pre-political life, during political life, or now in her mayoral life?

A I cannot.

Q Would you agree with me that I need to talk to Michelle Wu about that?

A That's not my decision to make.

Q I understand that but since you --

A I can't answer or speak for her or her experiences.

Q Correct. That's all I need.

MR. KEZHAYA: This is a good stopping point to take lunch. Also, this laptop is about to

die. We can go off record now if it pleases the group.

THE WITNESS: I don't need to come off record. I don't -- I'd prefer to work through lunch if possible.

MR. KEZHAYA: Oh, this is approximately half of the deposition. So I imagine you're going to want to take lunch. This is a good halfway point.

THE WITNESS: How --

MR. KEZHAYA: Once we get started into the next thing, we're going to have a solid -- what time is it now, it's 12:48; we've been here about four hours. This is an all-day affair. I don't know if you were apprised of this.

MS. O'CONNOR: What's the briefest amount of time we can take for lunch?

MR. KEZHAYA: That's a question for the group. I don't know.

MS. O'CONNOR: I think 20 minutes would probably be fine on our end.

MR. KEZHAYA: Well then let me confer with my group and then we will reconvene.

THE VIDEOGRAPHER: Okay. The time is 12:49. We are off the record.

(Off the record.)

THE VIDEOGRAPHER: Okay. We are back on the record. The time is 1:41.

BY MR. KEZHAYA:

Q Ms. Essaibi-George, all of that background was essentially to establish your relative familiarity with essentially all of the world religions, both pre-political life and during your political life. That's necessary background before we can get to the next phase of the questioning which is as pertains to this litigation.

As I understand it, the City of Boston has a council and you were on that council. Is that correct?

A I was on that council; yes.

Q Okay. And in the course and scope of your employment for the City of Boston as a councilor, you invited various people to give a blessing over city council meetings. Is that also correct?

A Yes. Blessing, invocation, opening remarks; yes.

Q All three of those words are interchangeable in your parlance. Is that correct?

A Well, sometimes the remarks would be more of a blessing as opposed to remarks. Sometimes it was more of a prayer as opposed to a poem or something

time in our public schools; I think I named a couple of schools in which they work in. So I'm sure I came to know of them either during one of my visits to a classroom in our school -- school district or one of -- maybe a classroom teacher perhaps referenced some of their work in our schools. I don't -- I don't recall exactly but I imagine that's how it could have happened.

Q Okay. More --

A -- schools I mentioned specifically in my remarks here were the Ohrenberger, which is in West Roxbury part of the city and the Winship which is in the Brighton part of our city.

Q Sorry. I'm trying to figure out how to -- oh, that's the -- okay. More particularly, do you recall whether they solicited the invite?

A They did not.

Q They definitely did not?

A I'm -- I'm certain that they didn't and I don't think anyone's ever asked me, with the exception, I think, why I'm here today, to offer remarks, a prayer, or a blessing before the city council.

Q Okay. In the course of giving these remarks, did you prepare those or did they prepare

Q And it's subject, statement on Satanic Temple. Also correct?

A That's what I'm reading.

Q And the date and time of this e-mail is October 19, 2017, at 3:17 p.m. Is that also correct?

A That's what it says.

Q Okay. Please read the body of this e-mail in full.

A It --

THE WITNESS: Mobius, could you make it just a hair bigger for me? Can you just zoom in just a little bit? I'll do my best. That's great. Thank you.

It is absurd that this group feels entitled to being invited to give remarks at the beginning of the council meeting. And frankly, it's insulting to all of the amazing religious and secular leaders who are invited. They are invited because of all the incredible work that they do across the city; work to end youth violence, work to provide shelter and stability to the homeless, or compassion and support for those in recovery. I will not give up the opportunity to highlight one of those amazing leaders who I am privileged to work with for The Satanic Temple. The city council does important, serious work

for the people of Boston and when we invite someone to participate in our meeting, it -- it is out of profound -- a profound respect, not a sense of obligation.

BY MR. KEZHAYA:

Q Did you confer with any attorneys about the state of constitutional while at the time you sent this e-mail as pertains --

A I --

Q -- rights?

A I -- I don't think so.

Q Have you since conferred with any attorneys about the state of constitutional law with respect to TST's equal right to participate in this legislative prayer ceremony?

A I have not.

MS. O'CONNOR: Objection.

BY MR. KEZHAYA:

Q Let's drill down a little bit further. As of 2017, did you perform any form of investigation to determine what, if any, involvement TST has with the community of Boston at all?

A I have not -- I have not.

Q So you indicate, for example, that the people who you do invite do incredible work, for

example, to end youth violence, provide shelter and stability to the homeless, or compassion and support for people in recovery. These are qualities of people who you do invite. Correct?
A Those are qualities of people and organizations; yes.
Q Well, TST is an organization also. Correct?
A Yes.
Q TST as an organization is comprised of people. Correct?
A Yes. I think so.
Q Yes. I'll tell you the answer's yes.
You, at the time of writing this e-mail, had no basis to believe that TST as an organization does not provide what I would describe as charitable contributions to the Boston community. Is that also correct?
A I had no reason to believe that you did or did not. I didn't look it up and the most information I've ever read about TST is in the pamphlet that's before me today.
Q So before this reading of this pamphlet today, you had essentially no idea who the membership of TST or -- comprised of, what they do in the Boston community. All you knew is that you had never heard

of them. Is that correct?

A That is correct.

Q Is that why you felt it was absurd that this group felt entitled to an equal --

A I think any -- anyone that feels entitled to offer an opening remark without having a relationship or playing an important role in my -- my work, yes, I think that that -- I didn't appreciate that sense of entitlement. Now, I can't speak for other councilors. But for me, when I selected an individual or organization or set of work to highlight before the city council, I did it based on my experiences and the work that I was doing in the City of Boston.

Q Earlier you testified that your understanding of an event being religious or community oriented turned on there being a religious ceremony. Do you recall that?

A When we were in the questions around when an event or community meeting took place in a building that had a religious affiliation.

Q So if there's a religious ceremony in a building that does not happen to have religious affiliation, that religious ceremony is not religious to you?

A It is -- it -- because I participated in,

for example, a blessing offered by a rabbi, it does not make me Jewish.

Q When you, as the city government, direct that the public stand for that particular prayer and you bow your head and everyone is directed to bow their head, that does not involve participation in the ceremony that you have invited the officiant to officiate?

A I have -- I have never felt mandated to stand and -- and bow my head. I do that out of respect for my guest and for the prayer and blessing that they're offering for the council. I would also bow my head in a moment of reflection when we have had, and I have had, offered a simple poem read before the council.

Q Who read this poem that you're referencing?

A Oh, we've had poems and reflections read by many people including our city -- our former city clerk who would often do that if -- I once had, I don't recall who it was, but a guest assigned to come in and offer this blessing and that -- something happened with the schedule, I don't recall exactly what, but we would have our clerk step in and she had a handy book of reflections that she would read from.

Q Was that clerk -- is it Maureen Feeney?

A Yes.

Q I saw a number of her invocations, for lack of a better word. Was that pretty much typical whenever she's giving that blessings, something fell through?

A No, sometimes she was actually invited to offer them by the individual; by the councilor.

Q Okay. So as I understand it, your grounds for not inviting TST -- well, actually, let me just back up. Please recite your grounds for not inviting TST during your tenure.

A I had no relationship with TST. Had no interaction with TST. And as the city councilor, I have very few opportunities to invite someone to offer either opening remarks or a blessing or a prayer prior -- before the start of a council meeting and utilized those opportunities for, you know, very specific folks and organizations that I wanted to do that with.

Q Did any of them ever drop out on you?

A I -- like I just mentioned, I had one that something happened last minute, so we had Maureen, the Clerk Feeney, step in and offer a reflection.

Q And yet you knew that TST wanted to get in, why did you not invite this group that announced a desire to come in?

A I didn't have a desire to invite you.
Q Why not?
A I can't tell you why I did or why I didn't; I just didn't.
Q I know that you didn't --
A That, we have had -- huh?
Q The purpose of the deposition is to understand why not.
A There -- there is no reason why not. I don't have a relationship with TST. I did not have a relationship with TST. I, therefore, had no desire to invite you as an organization for the city council.
Q The people who you did invite up until about 2016 or so were paid. Is that correct?
A I did not take office until 2016. I do believe I recall a small stipend at some point being discussed. But I don't know when that ended over, you know, what -- I don't know what year that was.
Q As I recall prior testimony, it was during your tenure. If I remember correctly, it was 2017 or 2018.
A Perhaps. I don't know.
Q You were not involved in that determination to end the stipend?
A Not that I recall.

that.

Q I understand, but the question posed is as to the investigation about this custom.

A I'm sorry; is there a question there?

Q The question posed is whether you know anything about the investigation into this matter?

A I -- isn't that why I'm here?

Q Not exactly. No, you're here because I need to understand why TST was not afforded an invite; at least from you. Because each councilor had different ways of going about things. Correct?

A That's my understanding.

Q So you can only really speak to you and your office as to why you did or did not invite certain people. Correct?

A That is true. Yes.

Q Now, Mayor Wu had her own means of inviting or not inviting people. Correct?

A I would say that's correct.

Q Did you and then councilor, now Mayor Wu, have any discussions as to her practices of inviting or not inviting people?

A No.

Q So I really need to talk to Wu to determine why she did or did not invite any particular groups.

Is that correct?

A Yes.

MR. KEZHAYA: Let's take a brief break.

THE VIDEOGRAPHER: The time is 3:01. We're off the record.

(Off the record.)

THE VIDEOGRAPHER: And we're back on the record. The time is 3:08.

MR. KEZHAYA: Okay. Mobius, if you could please take us to this -- and still in folder number 3, the Boston Herald article dated February 14, 2019.

MR. MOBIUS: Okay.

THE WITNESS: 2019?

MR. KEZHAYA: Well, that's the date of -- or that's the -- yes. That's correct; yes. 2019.

THE WITNESS: Oh. No, I'm looking at the print. It says 2022, but --

MR. KEZHAYA: Oh, yes. That's just when we printed it off. If you take a look, you'll see a Lucien Greaves photo and then underneath, it should say, published February 14, 2019, at 8:04 p.m., updated the next day.

THE WITNESS: I see it.

MR. KEZHAYA: Mobius, directing our

relationship with you. I didn't have one as a -- in my capacity as a city councilor. I don't have one today in my capacity as a private citizen.

Q I understand that. Earlier you said that if you were a counselor, you still would not invite TST.

A I -- I would still today not have a working relationship with TST.

Q So it doesn't really much matter whether you have an invitation; what really matters is that you don't have a relationship with TST. Correct?

A I'd say both of those things are true.

Q Okay. Well, let's rewind back to 2017. You were aware of TST. Yes?

A I was made aware -- yes, through your request and demand to offer invocation at the city council.

Q Okay. So having been made aware of them and having had the power, you still did not invite TST despite knowing TST wanted in. Correct?

A That is correct. I also did not and still do not have a working relationship or any overlapping my work as a member of the city council with TST.

Q And that is the only reason why you did not invite TST. Correct?

A I'd say so. I would say there was never a

decision made to invite or not invite. You were not on my radar. We did not have any work or overlapping work and my -- quite frankly, my dance card was very much full every year thinking about who I would invite to the few opportunities I had to invite someone to -- to kick off and start our council meetings.

Q Then, why did you invite the clerk?

A Because I had a last-minute cancellation.

Q You had a last-minute cancellation, you knew that TST wanted in --

A No. I -- I will tell you that I wasn't thinking about TST. TST has not ever been front of mind for me.

Q I see. Have you ever invited any atheistic religious speakers?

A To open and give the opening blessing or reflection, I don't believe so.

Q To the best of your --

A -- I'd have to look at -- I'd have to look at my -- I don't believe so. To the best of my recollection, I do not believe so. I have used my opportunity as a city councilor to invite lots of individuals and lots of organizations that have zero connection to religious organizations to the council to be recognized for the work that they're doing in

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
1:21-CV-10102

Vol. I
Pgs 1-33
Ex. 1

-----------------------------------
The Satanic Temple, Inc. )
Plaintiff, )
V. )
City of Boston, )
Defendant. )
------------------------------------

REMOTE DEPOSITION OF
ANNE MARIE ROUSSEAU
November 16, 2022
11:14 a.m.

Reported By: Lori J. Atkinson
Job No: MW 5572382

A P P E A R A N C E S: (Remote)

FOR THE PLAINTIFF:

Matthew A. Kezhaya Esq.
Crown Law
333 N. Washington Ave
Suite 300
Minneapolis MN 55401
Matt@crown.law
479.431.6112

FOR THE DEFENDANT:

Edward F. Whitesell, Jr., Esq.
Robert Arcangeli, Esq.
City of Boston Law Department
One City Hall Plaza
Room 615
Boston, MA 02201
Edward.whitesell@boston.gov
617.635.4045

Also Present: Lucien Greaves

P R O C E E D I N G S

ANNE MARIE ROUSSEAU,

having been satisfactorily identified and first duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. KEZHAYA:

Q. Good morning, Ms. Rousseau. How do you prefer I address you?

A. Ms. Rousseau is fine.

Q. We have found your information in some of the discovery that the City has provided us in this case. You have given the invocation a good seven times as of February of 2018 that we can tell. Is that accurate?

A. I believe I started doing invocations annually in 2012.

Q. But the question posed is whether as of February of 2018 you had, in fact, had given seven of them?

A. Just doing the math here. That's correct.

Q. Are you familiar with the nature of this case?

A. I am not.

Q. Okay. By way of brief exposition, we are suing the City of Boston -- first of all, do you know who we are?

A. I don't know any more than the name that I received on the notice of deposition.

Q. Okay. The Satanic Temple is a nontheistic religious organization that is suing the City of Boston for an order to allow TST to give the same invocation that you have. That's our goal out of this litigation.

Your information came out in the course of discovery, essentially we issued document demands upon the City. The City provides this document, your name came up. That's how we came across your name.

Do you know anyone who has given more than -- more than, as of February 2018, seven invocations?

A. I'm not privy to that information.

Q. Okay. Have you talked to anyone about this case before today?

A. I consulted a friend who is also a lawyer.

Q. What is the name of that friend?

A. Ed Burley.

Q. Is Ed associated with the City at all?

A. No, he is not. He's not representing me.

Q. That's no problem.

You had mentioned that you started giving these invocations in 2012; is that correct?

A. That's correct.

Q. What prompted you to start giving the invocations?

A. I was invited by my district city counselor, Counselor Matt O'Malley.

Q. Have you exclusively been invited by Matt O'Malley?

A. Yes.

Q. How many of these invocations have you given?

A. So I believe I gave one annually from 2012 to 2020.

Q. You mentioned annually, I saw in some of the materials that I have been given by my client that three of them were in October. The dates that I have been given is October 31st of 2012, October 23rd of 2013, and October 8th of 2014. Is that consistent with your recollection?

A. Yes, it is.

Q. Were they always in October?

A. I don't believe so. I don't have -- my Outlook doesn't go back that far, but I don't think they were always in October.

Q. I see you looking down. Are you looking at some kind of notes or something to that effect?

A. I'm just looking at the -- I just pulled out the

last time I did an invocation and what I wrote, so I had it. The last time I did it was on 2020 over Zoom.

Q. Do you know when in 2020 by chance?

A. I don't. I don't have a date on this.

Q. You mentioned that in 2012, you had been invited by Matt O'Malley, how did that invitation arise?

A. I don't remember if he asked me in person or via email, but he asked me if I would like to give the invocation at a City Council meeting, and I said yes.

Q. Did you ask any additional information of him? What it would entail? Anything to that effect?

A. No. I have seen City Council meetings before so I was used to the practice of an invocation occurring at the start of the Wednesday meetings.

Q. What had prompted you to go to the meetings before?

A. I'm very involved in my community. I live in Jamaica Plain, which is a neighborhood of Boston. I'm co-chair of the Ward 11 Democratic Committee. I am one of the founders of JP progressives, which is a local community-based organization that is concerned about issues and electing progressive candidates.

In 2012, I was also an on-call minister at Hope Central Church in Jamaica Plain. I had been a chaplain

at another organization. I also have been working at Metro Housing Boston now for currently over 25 years. I knew the councilor personally, had interacted with him many times.

Q. Let's start with JP Progressives, what is -- you mentioned that it is a political organization of some sort. Is that true?

A. It is a little neighborhood organization with, you know, voluntary runs that we have forums on issues and candidates.

Q. Is it fair to call it kind of like a Town Hall sort of meetings?

A. Yes, most of our -- yes. Yes.

Q. And I gather it is progressive in nature. Does JP stand for anything any particular?

A. Jamaica Plain.

Q. Then you also mentioned that you are on Board 11, I think you said?

A. Yes. Boston's Ward 11 Democratic Committee.

Q. Ward 11. I apologize.

You say "committee," this is some kind of a government organization, I assume, is that correct?

A. It is part of the -- it is part of the Mass. Dems, Massachusetts Democratic party.

There are ward committees or Town committees that are democratic. There are also republican ward committees or town committees.

Q. Then you also mentioned that you in 2012 were an on-call minister at Hope Central Church; is that correct?

A. That's correct.

Q. Tell me what Hope Central Church is?

A. Hope Central Church is a church located in Jamaica Plain. It is -- I am ordained in the United Church of Christ. That is the denomination. It also -- it is a bidenominational church. But my representation was as the United Church of Christ minister.

Q. You mentioned it is bidenominational. I presume that means there is another denomination?

A. Yes. And the Disciples of Christ is the other denomination. It is a yoke church, I guess you would call it.

Q. Okay. And you mentioned that you were an on-call minister, how does that work?

A. Non-stipend. When the minister was on vacation, I could fill in if there was a pastoral emergency.

I served on a couple of committees. I'm no longer active in that church, but I served on a couple

of small committees?

Q. So how did you come to be an on-call minister for that church?

A. I had actually gone to seminary with the pastor of that church and she asked me if I could help fill in for her. I was worshiping there at the time, so I said yes.

Q. Is your vocation in the clergy?

A. I am bivocational. I was -- I have been an outreach -- a in -- a nonstipend outreach minister at the congregational church in Needham. I was -- for over 13 years, I was a chaplain at what was Germaine Lawrence, which was a residential school and program for young girls that was located in Arlington.

And I have done that work since -- I attended the Episcopal Divinity School and graduated in 1993 and then was ordained in the United Church of Christ.

Q. You mentioned that you are bivocational, and I believe that this has something to do with this Metro Housing Boston; is that correct?

A. Yes. I'm the chief financial officer.

Q. Tell me about Metro Housing Boston, what is this?

A. It is a regional nonprofit housing organization that receives funding from the state, City of Boston and

other entities that -- to perform, you know, rental assistance, emergency assistance. We have many programs large and small. What would probably be most familiar would be to you what is commonly referred to as a Section Eight program. So we administer that for Boston in 29 areas, cities, and towns for the Commonwealth of Massachusetts.

Q. So this isn't Boston specific. It extends outside of Boston as well?

A. Right. It's metropolitan Boston area.

Q. Okay. That makes sense.

So you mentioned earlier you started giving these invocations in 2012. You had previously been familiar with Matt O'Malley, is that a correct recitation of your testimony?

A. I had actually volunteered on his campaign when he was running for City Council.

Q. When did he run for City Council?

A. I would have to look that up. I think it was 2009. I'm not sure on that.

Q. I was trying to understand if that's how you came to meet him. Is that how you came to meet him?

A. I came to meet him at various places in Jamaica Plain at people's houses. At Doyle's, which was a local

institution. You know, I was -- as I said I was very involved in the community. I would run across him often.

Q. You are familiar with other city politicians as well?

A. I have volunteered on many campaigns. Yes, you know, I have met many of them. I have volunteered on senator campaigns, mayoral campaigns. Campaigns for Congress. Presidential campaigns. I'm what you would call an uber volunteer on campaigns, so I meet a lot of people.

Q. What kind of volunteering are you doing for -- let me backup. In your volunteering efforts, do you usually perform a specific role or is it more broad-based?

A. It is more broad-based. Sometimes I have just been a canvasser knocking doors or a phone bank or making phone calls. Sometimes I help to organize the canvasses and the phone banks or, you know, the get-out-the-vote effort.

Q. The get-out-the-vote effort being, I assume, some kind of media outreach to get people to vote?

A. No, no. Actually, you know, helping volunteers get out and knock the doors and getting people to the

poles and making phone calls and making sure there are people at the poles, checking numbers and making sure volunteers are fed and all that kind of stuff that happens on the days leading up and including Election Day.

Q. So you are probably busy in the past couple of weeks, I would assume, is that a fair assumption?

A. Yes. I often take vacation on Monday and Tuesday before an election.

Q. All right. You came to meet O'Malley, O'Malley, as I recall, sometime before 2009. Is that correct?

A. I believe so. I believe that's when I met him.

Q. Dates are usually not important unless it's -- I will tell you if the date is important. Otherwise, it is vague, general timelines.

So about pre-2009, give or take, you meet Matt O'Malley, you volunteer on his campaign. Was the election in 2009 or was that when you started volunteering?

A. I would really have to look that up. I mean that is public record of when he ran. You know -- you know, I knocked a few doors for him. I did a few shifts. This is the first time.

Actually the first time I met him -- I remember

meeting him, he was standing outside of Dunkin' Donuts in Jamaica Plain, getting signatures; as every candidate has to do to get on the ballot. I had a long conversation with him and I signed his nomination papers and I liked him and I thought he was the best candidate for the job at that time.

Q. Is he still a councilor?

A. No, he is not.

Q. All right. When did he stop being a councilor in terms of the year?

A. By 2021. So he -- the last City Council -- city councilors are elected every two years. He did not seek re-election. The last time his election was up was 2021. He ceased being a councilor, I think, the beginning of January, if not December 31, 2020. Whenever the term rolled over.

Q. Do you know who your current councilor is?

A. Yes, that would be Kendra Lara, who is currently the District 6 City Council.

Q. Are you familiar with your current councilor, Lauren, was it?

A. Lara, L-A-R-A.

Q. Lara.

A. What was the question?

shortly from 2018.

Okay, so 2012, you started giving the invocation. You get a $75 stipend. Did you get any other benefits?

A. No.

Q. These are broadcasted in some way; is that correct?

A. Yes, the City Council live broadcasts their meetings. There is an open meeting law, as you probably are aware of in Boston.

Q. In terms of, I don't know, media exposure, general building of goodwill, did you notice any benefits along those lines?

A. No, I don't think too many people actually watched the City Council proceedings. No, I don't ever recall me being mentioned in any media for giving an invocation at City Council.

Q. In terms of your -- well, you say you are bivocational. Do you consider one of the vocations primary?

A. Yes. I don't say primary. I mean if I didn't -- my faith has led me to do the work that I do in housing. I don't separate them either. My paid job is a CFO.

Q. The other one is something more than a hobby, something less than a job. Is that fair to say?

A. I don't see the difference. A chaplain is a -- a chaplain usually designates someone who is not a pastor in a congregation or a church.

Q. So the word chaplain then doesn't necessarily refer to someone's denomination, so much as the organization for which they serve? Is that fair to say?

A. No. I would say it's a role. Such as a CFO is a role. A chaplain is a role. A pastor is a role. It's not attached to a particular denomination.

Q. Yeah. Yeah. That's what my understanding of the word as well.

Going back to the invocation in 2012, you were asked -- you were prompted by it. Do you remember why you were prompted in 2012 to give the invocation?

A. I was invited. And if you go back and you listen to any of the invocations, Matt -- Councilor O'Malley would introduce me as being an active member in the community and I believe that's why I was invited.

Q. So 2012, then you mentioned every year thereafter, I see October 31st, 10-23 of the next year, 10-8 of the next year. Actually, we had one dated 5-4-11 in our records. Does that ring any bells for you as well? That could also be an error.

A. It could be. Like I said, I don't remember the

A. I don't -- I can't answer that question. I can only speak for myself.

Q. You are familiar with Boston politics, are you not?

A. I'm familiar with Boston politics, but I guess I don't understand your question.

Q. The question is as to whether you would be surprised to learn that Boston has a practice of excluding a particular faith group from giving the same invocation as you have?

MR. WHITESELL: Objection.

Q. Ms. Rousseau?

A. Would I be surprised that Boston excluded a particular faith? Is that what the question is?

Q. Yeah, from giving the -- having the same opportunity to give this invocation as you have been given?

A. I guess I don't see it as Boston excluding anyone. I see this as individual City Councilors having the opportunity to invite people that they know. So I -- and that are involved in the City. I guess I'm uncomfortable answering that question because I don't think I -- I don't think I can and I don't think it is a fair question about the practice.

Q. To give a little bit more exposition as to how we got here today. My client had demanded, at least three times, to give the same invocation. We have case law that says that they are entitled to give this invocation on equal footing as any other religious group or clergy member or what have you.

They have been consistently informed that they will not be given an invocation opportunity because of their identity?

A. My understanding is that clergy are invited by the City Councilors, so I don't know that -- I couldn't demand that I give an invocation.

So, as I said, I don't feel like I can answer your question. It is not the way it works.

Q. So it is your understanding that this is something that they can pick and choose among faith groups if they feel like it. Is that your understanding?

A. If -- they can choose people that they know and they know are active in the community that's my understanding.

Q. Sure. But the question posed is whether -- if they felt like it, they could exclude someone because of their religious identification.

MR. WHITESELL: Objection.

Q. Correct?

A. I don't see this as excluding -- this is just my personal opinion. I don't think it is a question of excluding anyone. I think it's a question of inviting people, so I don't feel like I can answer your question.

Q. Let me rephrase it. If they did not feel like inviting someone because of their particular faith group, they could do that, in your opinion?

A. I don't see how my opinion matters. But, you know, I guess you would have to ask the City Councilor.

Q. One of the people that we have been told no by explicitly was now Mayor Wu.

Do you know of anything of Wu's predilection to inviting any particular faith groups?

MR. WHITESELL: Objection.

A. I don't. I don't know. I don't know how she makes her decisions.

Q. In order for me to get that information, I would have to ask Wu, wouldn't I?

A. Yes.

MR. KEZHAYA: No further questions. Pass the witness.

MR. WHITESELL: I don't have any questions.

MR. KEZHAYA: Ms. Rousseau, thank you so much for your time. Do you have any -- well, if you have any questions for me, feel free to reach out. Do you have City of Boston counsel's contact information?

THE WITNESS: It was included in the emails that you sent.

MR. KEZHAYA: If you have any questions, feel free to reach out to me. I'm sure the same goes for them as well. Thank you very much for your time. I appreciate you.

THE WITNESS: Thank you.

MR. KEZHAYA: Actually, one last question.

BY MR. KEZHAYA:

Q. The February 28th, 2018 is that pretty common for how our invocations go?

A. Yeah. I usually write my invocations depending on what is going on or what time or year something is happening.

MR. KEZHAYA: All right. Thank you for your time.

THE WITNESS: Thank you.

THE COURT REPORTER: Mr. Whitesell, do you need a copy?

MR. WHITESELL: Yes.

# EXHIBIT 8

**From:** Noah Coolidge <noah.coolidge@boston.gov>
**Sent:** Monday, May 13, 2019 2:49 PM EDT
**To:** Mary Margaret Earl <mmearl@uuum.org>
**CC:** Kim Janey <kim.janey@boston.gov>
**Subject:** Invitation to Address City Council Meeting
**Attachment(s):** "Rev Earl Invite 5-13-19.pdf"

Dear Rev. Earl,

On behalf of Councilor Janey, I am writing to invite you to present the invocation at the City Council meeting on **Wednesday, June 26, 2019 at 12 noon.**

Please see the attached letter for details. If you could let me know by this Friday, May 17th, if you are able to attend, that would be great. We can also provide parking for you here at City Hall, please let me know if you would like to take advantage of this.

Sincerely,
Noah Coolidge

PS: I am working on your Browne Fund support letter and hope to send it to you tomorrow.

Noah Coolidge
Policy and Communications Director
Office of City Councilor Kim Janey
noah.coolidge@boston.gov
Office Line: (617) 635-3510
Direct Line: (617) 635-1899
Pronouns: He/Him/His

Please be aware that this is a City of Boston email account and that correspondence may be subject to disclosure under the Massachusetts Public Record Law.



KIM JANEY
BOSTON CITY COUNCILOR
DISTRICT 7

Rev. Mary Margaret Earl
The Unitarian Universalist Urban Ministry
10 Putnam St.
Roxbury, MA 02119

May 13, 2019

Dear Rev. Earl,

I would be deeply honored and very grateful if you would offer the invocation before the meeting of the Boston City Council on **Wednesday, June 26, 2019 at 12 noon.** Opening our meetings with prayer provides the Council with a moment of meditation and reflection as we address the important work before us as a body. I hope you can bless us with your presence and prayers.

The Unitarian Universalist Urban Ministry, under your leadership, is deeply active in the Roxbury community, providing and hosting wide array of services and events. Your work to restore the First Church of Roxbury, and continued efforts to reinvigorate the building, are evidence of this commitment to social justice and service.

If you are able to offer the prayer, or if you are unavailable on the proposed date, please call my office at 617-635-3510 or send an email to kim.janey@boston.gov at your earliest convenience.

With gratitude,

Kim Janey
Boston City Council
District 7

BOSTON CITY HALL, ONE CITY HALL SQUARE, BOSTON, MASSACHUSETTS, 02201
617-635-3510 FAX: 617-635-4203 KIM.JANEY@BOSTON.GOV

# EXHIBIT 9

**From:** Nad ne Jean <nad ne.jean@boston.gov>
**Sent:** Monday, September 11, 2017 4:35 PM EDT
**To:** A ana O sen <a ana.o sen@boston.gov>
**Subject:** Fwd: For Wednesday

---------- Forwarded message ----------
From: **Melissa Carp** <mcarp@t srae .org>
Date: Mon, Sep 11, 2017 at 1:36 PM
Subject: For Wednesday
To: nad ne. ean@boston.gov

Hi Nadine,

I hope you are well. I am just realizing I never sent you Rabbi Soffer's proper bio, is it too late? If not, here it is below:

Rabbi Matthew V. Soffer has served as a rabbi at Temple Israel of Boston since his ordination from the New York Campus of the Hebrew Union College - Jewish Institute of Religion in 2010. At Temple Israel, Rabbi Soffer leads social justice initiatives and works closely with the Families with Young Children Program. He is an active member on the boards of the Jewish Alliance for Social Action, the Massachusetts Board of Rabbis, and the Pluralism Project at Harvard.

He was also wondering if there is something in particular that this meeting is dealing with, and he would love to cater his invocation to that issue or message.

Lastly, any update on parking?

Thanks so much for your help and I look forward to hearing from you.

Best,

Melissa
--

**Melissa Carp**, Executive Assistant to Rabbis Soffer and Gubitz and Riverway Project Coordinator
Temple Israel
477 Longwood Avenue
Boston, MA 02215
617 487 4407

mcarp@tisrael.org

 Please consider the environment before printing this e-mail

***CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message.***

--
**Nadine Jean**
Leg slat ve A de
Off ce of Boston C ty Counc lor Ann ssa Essa b George
1 C ty Hall Plaza 5th Floor
Boston MA 02201

Phone 617 635 4376
D rect L ne 617 635 3753
Fax 617 635 4203

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Invocation FY16 | | | | | | |
| 2 | | | | | | | |
| 3 | Name | Title | Church | Address | Vendor ID | Date of invocation | Councilor |
| 4 | | | | | | | |
| 5 | Cornel Miller | | Waymark Seventh Day Advestist Churc | | [redacted] | 7/15/2015 | Baker |
| 6 | Daniel Rogers | Reverend | Christ the King Church | | | 7/22/2015 | Baker |
| 7 | Ron Coyne | | Saint Piux Church | | | 8/12/2015 | Murphy |
| 8 | Kim Odom | Pastor | True Vine Church | | | 9/16/2015 | Pressley |
| 9 | Conley Hughes, Jr | Reverend | Concord Baptist Church | [redacted] | [redacted] | 9/23/2015 | Pressley |
| 10 | Omar Jarvis | Pastor | Berea Seventh Day Adventist Church | | | 9/30/2015 | Pressley |
| 11 | Linda Wood-Boyle | Reverend | United Methodist Church | [redacted] | [redacted] | 10/7/2015 | O'Malley |
| 12 | Annie Rouseau | Reverend | Hope Central | [redacted] | | 10/21/2015 | O'Malley |
| 13 | William Helmick | Monsigneur | St Theresa of Avila Parish | | | 10/28/2015 | O'Malley |
| 14 | Patricia Andrews | | Sisters of St. Joseph Boston | [redacted] | [redacted] | 11/4/2015 | Ciommo |
| 15 | Jack Fagan | Father | Jesuits of Maine | | | 11/18/2015 | Ciommo |
| 16 | Mary Margaret Earl | Reverend | Uniterian Universalist Urban Ministry | | | 12/2/2015 | Jackson |
| 17 | Willie Brodrick | Reverend | Twelth Baptist Church | | | 12/9/2015 | Jackson |
| 18 | Steven Lopes | Major | Salvation Army | | | 12/16/2015 | Jackson |
| 19 | Sam Acevedo | Pastor | Leon de Judas Church | | | 1/4/2016 | |
| 20 | Mimiard Culpepper | Reverend | Pleasant Hill Baptist Church | | | 1/13/2016 | |
| 21 | Daniel Klein | Rabbi | Boston Synagogue | | | 1/27/2016 | |
| 22 | Charles Stith | Reverend | | | | 2/3/2016 | |
| 23 | Lynda Banzi Sponholtz | Clerk | Friends of Beacon Hill Meeting | | | 2/10/2016 | |
| 24 | Joe white | Father | | | | 2/24/2016 | |
| 25 | Michael Drea | Father | St. Brendan's - St. Ann Collaborative | | | 3/2/2016 | |
| 26 | Maureen Feeney | City Clerk | | [redacted] | [redacted] | 3/9/2016 | |
| 27 | Bill Shaw | Reverend | Presbyterian Church | | | 3/16/2016 | |
| 28 | Gustav Miracle | Reverend | St. Gregory / St. Angela / St. Matthew | | | 3/23/2016 | |
| 29 | Patrick Universal | Father | St. James Mission Society | | | 3/30/2016 | |
| 30 | Laura Ahart | Reverend | United Baptist Church | [redacted] | [redacted] | 4/6/2016 | |
| 31 | Francis Kelly | Monsigneur | Sacred Heart | | | 4/13/2016 | |
| 32 | Vinnie Leo | Deacon | St. John the Evangelist | | | 4/27/2016 | |
| 33 | Barbara Penzner | Rabbi | Temple Hillel B'Nai Torah | | | 5/4/2016 | |
| 34 | Laura Everett | Reverend | MA Council of Churches | | | 5/11/2016 | |
| 35 | Jhon Carroll | Reverend | St. John Chrysoston | | | 5/18/2016 | |
| 36 | John Nazzaro | Father | Salesian Boys & Girls Club of East Boston | | | 5/25/2016 | |
| 37 | william Dickerson II | Reverend | Greater Love Tabernacle | [redacted] | | 6/8/2016 | |
| 38 | Steven Chin | | Boston Evangelical Church | | | 6/22/2016 | |

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 39 | Tom Conway | Father | Arch Street St. Anthony Shrine | | | 6/29/2016 | |

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Invocation FY17 | | | | | | |
| 2 | | | | | | | |
| 3 | Name | Title | Church | Address | Vendor ID | Date of invocation | Councilor |
| 4 | | | | | | | |
| 5 | Denton Lotz | Reverend | Tremont Temple Batist Church | | | 7/13/2016 | Linehan |
| 6 | Darryl Elow | Reverend | Morning Baptist Church | | | 8/3/2016 | Campbell |
| 7 | Virginia Ward | Pastor | Abudant Life Church | [redacted] | [redacted] | 8/24/2016 | Campbell |
| 8 | Toba Spitzer / Dorshei Tzedek | Rabbi | | | | 9/14/2016 | E-George |
| 9 | Katherine O'Leary | Sister | Sister of Charity | | | 9/21/2016 | E-George |
| 10 | Alicia Adamson | | Boston Debate League | [redacted] | [redacted] | 9/28/2016 | Pressley |
| 11 | Davie Hernandez | Pastor | Defenders Boston Church | [redacted] | [redacted] | 10/5/2016 | Pressley |
| 12 | | | | | | | |
| 13 | Naftoly Bier | Rabbi | | [redacted] | [redacted] | 10/26/2016 | Ciommo |

# EXHIBIT 10



Christine O'Donnell <christine.odonnell@boston.gov>

## Fwd: Invocation Request
1 message

**Mark Ciommo** <mark.ciommo@boston.gov>                                      Fri, Sep 29, 2017 at 12:27 PM
To: Christine O'Donnell <christine.odonnell@boston.gov>

---------- Forwarded message ----------
From: <travis@thesatanictempleboston.com>
Date: Thu, Oct 6, 2016 at 3:18 PM
Subject: Invocation Request
To: Mark.Ciommo@boston.gov

Good afternoon Councilor Ciommo,

My name is Travis LeSaffre and I am the Chapter Head of The Satanic Temple –
Boston. We're a group of politically aware, non-theistic Satanists active within your
community. The mission of The Satanic Temple is to encourage benevolence and
empathy among all people, reject tyrannical authority, advocate practical common
sense and justice, and be directed by the human conscience to undertake noble
pursuits guided by the individual will.

It has come to my attention that you have some upcoming slots for clergy to perform
an invocation during Boston City Council meetings. Over the past year, the invited
clergy performing these actions have been overwhelmingly Christian. As a member of
a religious minority, I plead with you to consider appointing myself as your invited
clergy member to perform an invocation.

The religious oppression felt by those outside the Christian community in Boston is a
blight on an otherwise liberal state. Consider what your actions could do to increase
the diversity of the city council's current invocation schedule and the light it can shine
on religious plurality within the great Commonwealth of Massachusetts.

Regards,

**Travis LeSaffre | Chapter Head**
**The Satanic Temple - Boston Chapter**
*P: 781-854-1265 | E: travis@thesatanictemple.com*


--
Mark Ciommo
Boston City Council, District 9
Boston City Hall
*One City Hall Plaza, 5th Floor*
Boston, MA 02201
Phone: (617) 635-3113
Fax:    (617) 635-4203
Email: Mark.Ciommo@cityofboston.gov



TST-Letter-Ciommo.pdf
221K

# EXHIBIT 11



Michelle Wu <michelle.wu@boston.gov>

# Invocation Request

9 messages

**travis@thesatanictempleboston.com** <travis@thesatanictempleboston.com> Tue, Oct 11, 2016 at 3:52 PM
To: MICHELLE.WU@boston.gov

Good afternoon Councilor Wu,

My name is Travis LeSaffre and I am the Chapter Head of The Satanic Temple –Boston. We're a group of politically aware, non-theistic Satanists active within your community. The mission of The Satanic Temple is to encourage benevolence and empathy among all people, reject tyrannical authority, advocate practical common sense and justice, and be directed by the human conscience to undertake noble pursuits guided by the individual will.

I spoke to a representative of your office named David, and I was informed that the Boston City Council's invocation slots are invitation based. Over the past year, the invited clergy performing these actions have been overwhelmingly Christian. As a member of a religious minority, I plead with you to consider allowing me to perform an invocation. I was told by David that I would need to personally request a spot from a councilor. I've reached out to Mark Ciommo last week, but I haven't received a reply just yet. I have also sent an email to Tito Jackson in an attempt to be heard by someone who still has slots open for invocations during this calendar year.

While requiring some variety of sponsorship is understandable, it would be shocking if I am to be turned away due to my faith while other religions are allowed to hold prayers in a government building. In fact, I would say that it would be a breach of the first amendment.

The religious oppression felt by those outside the Christian community in Boston is a blight on an otherwise liberal state. Consider what your actions could do to increase the diversity of the city council's current invocation schedule and the light it can shine on religious plurality within the great Commonwealth of Massachusetts.

Regards,

**Travis LeSaffre** | Chapter Head
**The Satanic Temple - Boston Chapter**
*P: 781-854-1265* | *E: travis@thesatanictemple.com*

**Invocation-Request-to-Councilor-Wu.pdf**
237K

**Michelle Wu** <michelle.wu@boston.gov> Wed, Oct 12, 2016 at 2:51 PM
To: travis@thesatanictempleboston.com

Travis,

Thank you very much for taking the time to reach out. As my staff mentioned, each Councilor has the chance to invite 2-3 faith leaders per year to deliver the opening invocation at one of our Council meetings. The invitations are often used to recognize faith leaders who are active in the community and organizations that are representative of their districts. There is no restriction or criteria based on any Councilors' religious preferences. Many of us have a long list of folks we'd like to invite but haven't been able to accommodate. Everyone is welcome to attend the weekly City Council session, to testify at any City Council hearing, and to get involved in our policy work.

Michelle

--

DEF0000244

Michelle Wu
Boston City Councilor At-Large
One City Hall Square, 5th floor
Boston, MA 02201

Office: 617.635.3115
Fax: 617.635.4203
michelle.wu@boston.gov
[Quoted text hidden]

---

**travis@thesatanictempleboston.com** <travis@thesatanictempleboston.com> Wed, Oct 12, 2016 at 4:24 PM
To: Michelle Wu <michelle.wu@boston.gov>

Good afternoon Michelle,

The system you're describing is the hand-picking of councilor-approved clergy members to perform a prayer that commences a government meeting. This sets up the precedent that prayer can be regulated and approved for consumption before public hearings. Whether you're accepting of this notion or not, you are discriminating by not allowing all faith's to participate.

We've reviewed the list of those who have been invited to perform invocations over the last year. Out of the 28 invocations given to the Boston City Council in 2016, 22 were made by Christian clergy, 4 were made by Rabbi's, and 2 presenters were not affiliated directly with a religious organization.

I would like to see the safeguards you have in place to ensure that a plurality of voices are heard from your community. Additionally, you say there is no discrimination, but can you be absolutely certain that your fellow councilors would approve of other faith's participating? Can you read what is in their hearts, or are you hiding behind a system which is built to prevent the separation of Church and State.

How would this look if only Christians were chosen? What about only white pastors? Would you then see the inherent flaw in your system then?

I will be sending out formal requests to the 9 council members which I have not contacted as of yet within the next few days. I'm certain that I will receive no reply from them either, as it seems that Councilor Jackson and Ciommo were both too busy to respond to my inquiries.

I'm certain we'll be speaking more often in the coming months, and I look forward to requesting to testify in future meetings regarding your policy.

Best,

**Travis LeSaffre | Chapter Head**
**The Satanic Temple - Boston Chapter**
*P: 781-854-1265 | E: travis@thesatanictemple.com*

[Quoted text hidden]

---

**Michelle Wu** <michelle.wu@boston.gov> Wed, Oct 12, 2016 at 8:05 PM
To: Dan Atkinson <dan.atkinson@bostonherald.com>

[Quoted text hidden]
--
[Quoted text hidden]

**Invocation-Request-to-Councilor-Wu.pdf**
237K

---

**Michelle Wu** <michelle.wu@boston.gov> Wed, Oct 12, 2016 at 10:18 PM
To: Dan Atkinson <dan.atkinson@bostonherald.com>

---------- Forwarded message ----------
From: **Michelle Wu** <michelle.wu@boston.gov>

Case 1:21-cv-10102-AK Document 100-12 Filed 05/01/23 Page 1 of 3

# EXHIBIT 12

---------- Forwarded message ----------
From: <travis@thesatanictempleboston.com>
Date: Thu, Aug 17, 2017 at 9:44 AM
Subject: The Satanic Temple - Boston Chapter Invocation Request
To: Michelle Wu <michelle.wu@boston.gov>
Cc: Timothy.McCarthy@boston.gov, Michael.F.Flaherty@boston.gov, A.E.George@boston.gov, Ayanna.Pressley@boston.gov, Salvatore.LaMattina@boston.gov, Bill.Linehan@boston.gov, Frank.Baker@boston.gov, Andrea.Campbell@boston.gov, matthew.omalley@boston.gov, tito.jackson@boston.gov, Josh.Zakim@boston.gov, Mark.Ciommo@boston.gov

Greetings Councilor Wu and members of the Boston City Council,

My name is Travis LeSaffre and I am the Chapter Head of The Satanic Temple – Boston. Last October, I requested that the Boston City Council allow one of our members to present an invocation. You informed us that this was a restriction free process, but it requires an invitation from a sitting city council member. You noted that "Many of us have a long list of folks we'd like to invite but haven't been able to accommodate." I understand that you believe that the process the Boston City uses is restriction free, but I, as well as the 4th Circuit Court of Appeals, disagree. According to their recent ruling in Lund v. Rowan County, they found that a system such as yours violates constitutional law.

The Boston City Council has created an environment very similar to Rowan County, as it has instated what is essentially a default Christian prayer during government meetings. Now is the time to get Boston on the right side of history. Stop our great city from continuing to violate the principles behind the First Amendment to the United States Constitution.

The options of the Boston City Council seem rather clear:

- Allow all individuals equal opportunity to perform invocations.
- Remove invocations from all future City Council meetings.

Your decision may open the City of Boston to litigation for the hindrance of our Constitutionally protected rights.

May your logic guide you to make the right choice, and bring true religious plurality to the great Commonwealth of Massachusetts.

Regards,
**Travis LeSaffre | Chapter Head**
**The Satanic Temple - Boston Chapter**
P: (857) 293-1295 | E: travis@thesatanictemple.com

--
Director of Communications - Office of Boston City Councilor Michael Flaherty
1 City Hall Plaza, Suite 550, Boston, MA 02201
Office: 617-635-4205
-
*Mad Hatter: "Have I gone mad?"*
Alice: "I'm afraid so. You're entirely bonkers. But I'll tell you a secret. All the best people are."

**The Satanic Temple - Boston Letter to the City Council.pdf**

Greetings Councilor Wu and members of the Boston City Council,

My name is Travis LeSaffre and I am the Chapter Head of The Satanic Temple – Boston. Last October, I requested that the Boston City Council allow one of our members to present an invocation. You informed us that this was a restriction free process, but it requires an invitation from a sitting city council member. You noted that "Many of us have a long list of folks we'd like to invite but haven't been able to accommodate." I understand that you believe that the process the Boston City uses is restriction free, but I, as well as the 4th Circuit Court of Appeals, disagree. According to their recent ruling in Lund v. Rowan County, they found that a system such as yours violates constitutional law.

The Boston City Council has created an environment very similar to Rowan County, as it has instated what is essentially a default Christian prayer during government meetings. Now is the time to get Boston on the right side of history. Stop our great city from continuing to violate the principles behind the First Amendment to the United States Constitution.

The options of the Boston City Council seem rather clear:

- Allow all individuals equal opportunity to perform invocations.
- Remove invocations from all future City Council meetings.

Your decision may open the City of Boston to litigation for the hindrance of our Constitutionally protected rights.

May your logic guide you to make the right choice, and bring true religious plurality to the great Commonwealth of Massachusetts.

Regards,
Travis LeSaffre | Chapter Head
The Satanic Temple - Boston Chapter
P: (857) 293-1295 | E: travis@thesatanictemple.com

# EXHIBIT 13

**From:** Alana Olsen <alana.olsen@boston.gov>
**Sent:** Thursday, October 19, 2017 3:17 PM EDT
**To:** Annissa Essaibi-George <annissa.essaibi-george@boston.gov>
**Subject:** Statement on Satanic Temple

"It is absurd that this group feels entitled to being invited to give remarks at the beginning of the Council Meeting, and frankly its insulting to all of the amazing religious and secular leaders who are invited. They are invited because of all of the incredible work that they do across the City, work to end youth violence, work to provide shelter and stability to the homeless, or compassion and support for people in recovery. I will not give up the opportunity to highlight one of these amazing leaders who I am privileged to work with for the Satantic Temple. The City Council does important, serious work for the people of Boston and when we invite someone to participate in our meeting it is out of a profound respect, not a sense of obligation."

--

**Alana Olsen**
Chief of Staff
Office of Boston City Councilor Annissa Essaibi-George
1 City Hall Plaza 5th Floor
Boston, MA 02201

phone 617.635.4376
direct line 617.635.3716
fax 617.635.4203

**Please remember this is a City of Boston email account and the content is a matter of public record.**

# EXHIBIT 14

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**One Ashburton Place, Boston, MA 02108**
**Phone: (617) 994-6000 Fax: (617) 994-6024**

---

MCAD DOCKET NUMBER: 18BPA02946
FILING DATE: 10/17/18

EEOC/HUD CHARGE NUMBER:
VIOLATION DATE: 10/02/18

---

Name of Aggrieved Person or Organization:
Malcom Jarry
64 Bridge Street
Salem, MA 01970

---

Named is the employer, labor organization, employment agency, or state/local government agency who discriminated against me:
City of Boston/Boston City Council
Attn: President Andrea Campbell
1 City Hall Square
Boston, MA 02201
Primary Phone: (617)635-3040 ext. ____

---

Cause of Discrimination based on:
Creed (Satanism)

---

**The particulars are:**

I, Malcom Jarry, the Complainant believe that I was discriminated against by City of Boston/Boston City Council, on the basis of Creed. This is in violation of M.G.L. c. 272 Section 98.

1. I am the co-founder of the religious organization, the Satanic Temple (Satanism). I believe that City of Boston/Boston City Council has discriminated against my organization based upon the religious practice of Satanism.
2. On October 2, 2018, I made an email request to the Boston City Council President Andrea Campbell that a member of our organization be able to speak at an invocation prior to one of its monthly council meetings.
3. On October 3, 2018, I spoke with the Boston City Council Compliance Director and Staff Counsel Christine O'Donnell via telephone who informed me that its council does not accept requests from speakers to deliver an invocation, does not have a written policy concerning invocations, and the council members decide who will deliver the invocations at its meetings.
4. On October 4, 2018, I emailed Campbell concerning the council's violation of Establishment Clause along with various other laws by not allowing a member of our organization to deliver an invocation at one of its monthly meetings.
5. On October 5, 2018, I emailed Campbell and requested a response from her to my October 4, 2018 email concerning the possible legal violations.
6. On October 9, 2018, I received an email response from O'Donnell indicating that each city councilor has an opportunity to invite either clergy or a lay person to give an invocation prior to its council meetings, the councilors themselves do not offer the invocation, and her disagreement with my interpretation of their possible legal violations by not allowing my religious organization deliver an invocation.
7. Based upon my belief, Boston City Council has allowed other religious individuals/organizations i.e. Christian or Jewish and other religious creeds to deliver invocation prior to its monthly meetings.
8. I believe that the City of Boston/ Boston City Council has engaged in discrimination against my organization based upon our religious creed and practices.

---

I hereby verify, under the pains and penalties of perjury, that I have read this complaint and the allegations contained herein are true to the best of my knowledge.

(Signature of Complainant)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

THE SATANIC TEMPLE, INC.,

Plaintiff,

v.

CITY OF BOSTON,

Defendant.

**Civil Action No. 1:21-cv-10102-AK**

**THE CITY OF BOSTON'S RESPONSES TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

The City of Boston (the "City") responds, pursuant to Local Rule 56.1 and this Court's Standing Order, to the Statement of Material Facts in Support of Motion for Summary Judgment of the Satanic Temple, Inc. ("TST") [ECF Doc. No. 104]. The City sets forth this response to TST's statement of facts solely for the purposes of the pending summary judgment motions and makes no admission with respect to the facts contained therein.

1. The City of Boston has a legislative prayer custom. The City meetings follow a standard agenda: roll call, the inviting counselor gives an endorsing introduction of the prayer-giver, directs the audience to stand for the prayer and to remain standing for the pledge of allegiance, the prayer is directed at the audience, the councilor leads the audience in the pledge of allegiance, and then the ordinary business begins. *See* August 18, 2021 prayer (conventional filing); also available at https://www.youtube.com/watch?v=qb5iu6B1TxA.

**RESPONSE:** **Undisputed. The video speaks for itself. Further responding, the City does not dispute the facts stated in this paragraph, other than the clause "the prayer is directed at the audience." However, this is not a genuine issue. It is unsupported by the**

**video. At 6:10 of the video, Rev. Arlene Hall specifically addresses then-Councilor Wu, the acting Council President "and to all the members of the Boston City Council, the Lord Bless you …." At 7:10 of the video, Rev. Hall states that she is praying "for each member of the Boston City Council …" to understand the City's differing neighborhoods, unique culture and the problems that the Council faces and needs to work through in taking the best course and making the best decisions. The contention that the prayer is directed at the audience is in fact contrary to the undisputed evidence, which is that the invocations occur before official Council business begins. *See* the City's L.R. 56.1 Concise Statement of Material Facts as to Which There is no Genuine Issue to be Tried (the "City's Rule 56.1 Statement") at ¶5 and Exhibit 2.**

2. Government officials have exclusive control over the content of the prayers. Particularly, they extend invites only to their friends and political allies. Depo. Essaibi-George at 151:3-13. Churches invite politicians to church events during election season. Depo. Essaibi-George at 41:18-42:5.

**<u>RESPONSE:</u> Undisputed. The City does not dispute the bulk of this paragraph. The City disputes the mischaracterization of the testimony of Councilor Essaibi-George that the Councilors "extend invites only to their friends and political allies" but that is not a fact material to the outcome of the motions for summary judgment, and in fact, if true, would weigh in favor of summary judgment for the City. Councilor Essaibi-George testified that she selected people with whom she had a relationship or played an important role in her work, and expressly stated she did not speak for any other Councilor. TST Appx. 006. *See also* the City's Rule 56.1 Statement at ¶38, and Exhibit 6 at pp. 148-151, 153-154, 168-169; Exhibit 13.**

3. The prayers have sometimes been used to proselytize. Appx 4 (Depo. Essaibi-George) at 108:6-7.

**RESPONSE:  Disputed.  However, this is not a genuine issue.  The City does not dispute the actual testimony of Councilor Essaibi-George cited by TST.   What the City disputes the mischaracterization of that testimony.  Councilor Essaibi-George stated that some of the invocations "probably could be described" as sermons, although the term was suggested by counsel examining the witness, rather than the witness.  TST Appx 004 at 108:6-7.  That testimony is undisputed by the City.**

4. Boston officials direct the audience to participate in the prayers. *See* August 18, 2021 prayer (conventional filing); also available at https://www.youtube.com/watch?v=qb5iu6B1TxA.

**RESPONSE:  Disputed.  However, this is not a genuine issue.  It is directly contradicted by the video.**

5. The prayers take place at a local government meeting. *See* August 18, 2021 prayer (conventional filing); also available at https://www.youtube.com/watch?v=qb5iu6B1TxA.

**RESPONSE:  Undisputed.  It is undisputed that the prayers take place immediately prior to the start of official Council business.  *See* the City's Rule 56.1 Statement at ¶5.**

6. In 2016, TST demanded equal access to the prayer opportunity. Appx 22.

**RESPONSE:  Undisputed.  The undisputed facts are that the invocation opportunties were by invite only – TST concedes that fact, and indeed pleaded it.  *See* the City's Rule 56.1 Statement at ¶¶13, 14, 16 and Exhibit 1 at pp. 52-55, 152-153; ECF Doc. No. 16 at ¶17 and ECF Doc. No. 23 at ¶17 (TST Amended Complaint and City Answer).**

7. In response to TST's demands, several individuals issued emails stating a religious objection to TST's equal inclusion. Appx 39-51.

**RESPONSE: Undisputed. These individuals were members of the public, not the City Councilors themselves. TST Appx 039-051.**

8. As a result of TST's demand, then-Councilor Michelle Wu investigated the prayer practice. Appx 35-38 (Depo. Boston) at 162:23-166:20.

**RESPONSE: Undisputed. The City states that it is not clear from the testimony cited that the investigation was as a result of TST's 2016 demand or done by Councilor Wu, but these disputes are immaterial to the outcome of the motions for summary judgment.**

9. Then-Councilor Michelle Wu found that it was "best practice" to stop paying prayer-givers. Appx 35-38 (Depo. Boston) at 162:23-166:20.

**RESPONSE: Undisputed.**

10. In contemplation of this very lawsuit, then-Councilor Michelle Wu directed that the prayer-givers should stop being paid. Appx 35-38 (Depo. Boston) at 162:23-166:20.

**RESPONSE: Undisputed. The City does not dispute that Council President Wu made the decision that it was best practice to stop the stipend in 2017. Nothing in the cited testimony supports the statement that it was in contemplation of this lawsuit other than the contention of counsel questioning the witness. TST Appx. 037-038.**

11. Subsequently, then-Councilor Michelle Wu first described the custom in writing: it is by invitation only, subject only to the whim of each councilor. Appx. 22.

**RESPONSE: Undisputed. The City disputes the use of the word "whim," but this is not a genuine dispute. Then-Councilor Wu stated that the "invitations are often used to recognize faith leaders who are active in the community and organizations that are representative of their districts," and that there "is no restriction or criteria based on any**

**Councilors' religious preferences." TST Appx. 022. The City does not dispute this description of the policy for inviting invocation speakers.**

12. Prayer-givers would sometimes cancel last-minute, sending the City staff into a scramble to find an appropriate prayer-giver. Appx. 25-33. None invited TST.

**RESPONSE:** **Undisputed. The substitute invocation givers were not always prayer givers, and it was often the City Clerk that would read from a book of reflections.** ***See*** **the City's Rule 56.1 Statement at ¶¶29, 30.**

13. TST reiterated its demands in 2018, but never received an invite. Appx. 16-21.

**RESPONSE:** **Undisputed.**

14. In response to TST's demands, two councilors issued written statements that they would never invite TST. Appx. 9 (Councilor Essaibi-George); 10 (Councilor McCarthy)

**RESPONSE:** **Disputed. However, this is not a genuine issue. Neither statement states that the two former Councilors "would never invite TST." Former Councilor Essaibi-George stated that she would not give up opportunities to highlight individuals for the incredible work that they do for the City in order to invite TST. TST Appx. 009. Former Councilor McCarthy stated: "I would not consider anyone that doesn't have a positive impact on my community, my constituents, my family and me personally," and referred to TST's efforts as "a publicity stunt." TST Appx. 010. The City does not dispute the actual statements.**

15. Other prayer-givers have been invited to give repeat performances. Two repeat performance prayer-givers are of record, each are political insiders: Dr. Hall (at least twice) and Anne Rousseau (seven times). https://youtu.be/qb5iu6B1TxA?t=375; Appx. 52; see also Appx. 57-61.

**RESPONSE:** **Undisputed.**

Dated: May 22, 2023

Respectfully submitted,
**CITY OF BOSTON**,

By its attorney:

ADAM CEDERBAUM
Corporation Counsel

/s/ Edward F. Whitesell, Jr.
Edward F. Whitesell, Jr. (BBO#644331)
Senior Assistant Corporation Counsel
Elizabeth L. Bostwick (BBO #644498)
Senior Assistant Corporation Counsel
City of Boston Law Department
Room 615, City Hall
Boston, MA 02201
(617) 635-4045 (EFW)
(617) 635-4031 (ELB)
edward.whitesell@boston.gov
elizabeth.bostwick@boston.gov

**Certificate of Service**

I, Edward F. Whitesell, Jr., hereby certify that on May 22, 2023, a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non-registered participants.

/s/ Edward F. Whitesell, Jr.
Edward F. Whitesell, Jr.

# CERTIFICATE OF SERVICE

I, Edward F. Whitesell, Jr., certify that on March 18, 2024, a true and accurate copy of the foregoing document was electronically filed with the United States Court of Appeals for the First Circuit by using the CM/ECF system and that all counsel of record will be served by the CM/ECF system.

*/s/ Edward F. Whitesell, Jr.*
Edward F. Whitesell, Jr.