# 23-1642

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

---

The Satanic Temple, Inc.,
*Plaintiff-Appellant*,

vs.

City of Boston,
*Defendant-Appellee*.

---

On appeal from the United States District Court
for the District of Massachusetts

(District Court case no. 21-cv-10102)

The Honorable Angel Kelley, U.S. District Judge, presiding

---

## REPLY BRIEF FOR THE SATANIC TEMPLE

---

Matt Kezhaya                  matt@kezhaya.law
Bar # 1208974                           (479) 431-6112

150 S. Fifth Street, Suite 1850, Minneapolis, MN 55402

# Table of contents

Table of contents .......................................................................... 2

Table of authorities ...................................................................... 3

Argument ...................................................................................... 6

   1: Boston's prayer custom violates the Establishment Clause. .... 6

     1.1: The custom controls prayer, proselytizes, and excludes out-groups. ................................................................................ 6

     1.2: Boston's custom discriminates against dissenting religions. ........................................................................................ 24

     1.3: Boston errantly relies on outdated "reasonable observer" caselaw ........................................................................................ 26

   2: A requirement of palatability burdens unpopular beliefs. .... 27

   3: Wu was subject to a deposition. ........................................ 30

     3.1: Boston stipulated Wu would testify and declared Wu a witness. .......................................................................................... 30

     3.2: Wu was not a "high ranking government official." ....... 31

     3.3: Wu had unique personal knowledge ............................. 31

     3.4: The District Court should have taken an adverse inference. ........................................................................................ 32

Conclusion .................................................................................. 33

# TABLE OF AUTHORITIES

## Cases

*Am. Legion v. Am. Humanist Ass'n*,
    588 U.S. 29 (2019)............................................... 7, 15, 22, 23

*Burns v. Johnson*,
    829 F.3d 1 (1st Cir. 2016).....................................25, 26

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993).................................................. 19, 24, 25

*Davila v. Corporacion De Puerto Rico Para La Difusion Publica*,
    498 F.3d 9 (1st Cir. 2007)...................................................... 33

*Epperson v. State of Ark.*,
    393 U.S. 97 (1968)....................................................9, 15, 20

*Everson v. Bd. of Ed. of Ewing Twp.*,
    330 U.S. 1 (1947)..............................................16, 17, 27, 33

*Gillette v. United States*,
    401 U.S. 437 (1971) ...................................................... 20

*Gundy v. City of Jacksonville Fla.*,
    50 F.4th 60 (11th Cir. 2022) ..................................................... 8

*Hassan v. City of New York*,
    804 F.3d 277 (3d Cir. 2015) ................................................. 18

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022)....................................................22, 26

*Larson v. Valente*,
    456 U.S. 228 (1982)..................................................... passim

*Lemon v. Kurtzman*,
   403 U.S. 602 (1971) .......................................................... 7, 16

*Lund v. Rowan Cnty., N. Carolina*,
   863 F.3d 268 (4th Cir. 2017) ...........................................13, 17

*Lynch v. Donnelly*,
   465 U.S. 668 (1984)..............................................20, 21, 26, 33

*Magazu v. Dep't of Child. & Fams.*,
   473 Mass. 430 (2016)....................................................27, 29

*Marks v. United States*,
   430 U.S. 188 (1977).............................................................. 22

*Marsh v. Chambers*,
   463 U.S. 783 (1983).............................................................. 14

*Mulvihill v. Top-Flite Golf Co.*,
   335 F.3d 15 (1st Cir. 2003)................................................... 12

*Pac. Indem. Co. v. Deming*,
   828 F.3d 19 (1st Cir. 2016)................................................... 12

*Satanic Temple, Inc. v. City of Bos., MA*,
   No. 21-CV-10102-ADB,
   2021 WL 3079868 (D. Mass. July 21, 2021) ........................ 13

*Sch. Dist. of Abington Twp., Pa. v. Schempp*,
   374 U.S. 203 (1963)......................................................15, 18

*Texas v. Johnson*,
   491 U.S. 397 (1989).............................................................. 17

*Town of Greece v. Galloway*,
   572 U.S. 565 (2014)..................................................... passim

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ............................................................ 17

*Walz v. Tax Comm'n of City of New York*,
    397 U.S. 664 (1970) ............................................................. 8

*Williamson v. Brevard County*,
    928 F.3d 1296 (11th Cir. 2019) ............................................ 19

*Zorach v. Clauson*,
    343 U.S. 306 (1952) ............................................................ 17

**Statutes**

IRC § 501 ................................................................................. 16

**Other Authorities**

SERMON, *Merriam-Webster Online Dictionary* ............................ 13

*Town of Greece* oral argument ..................................................... 10

# ARGUMENT

## 1: Boston's prayer custom violates the Establishment Clause.

The opening brief asserts two grounds for reversal. First, Boston's invocation practice is an endorsement of favored religions. Second, a reasonable factfinder could find that Boston intentionally excludes disfavored religions.

If the Court agrees with the former point, it should reverse and remand for entry of judgment in favor of the Temple. If the Court agrees with the second point, it should reverse and remand for trial proceedings.

### 1.1: The custom controls prayer, proselytizes, and excludes out-groups.

The first point is that the District Court should have granted the Temple's cross-motion because the evidence shows an Establishment Clause violation. Boston's response proudly admits that its councilors unanimously and intentionally exclude the Temple from this prayer opportunity. Response, at 23. But Boston recasts this as a "political decision." *Everything* an elected official does is

"political."[1] The Establishment Clause was drafted, very purposefully, to separate politics from religion. *Lemon v. Kurtzman*, 403 U.S. 602, 622 (1971). "The divisiveness of such conflict is a threat to the normal political process." *Id.*

At issue is who gets to perform an act for Boston which is "by definition religious." *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 61 (2019). Once Boston injected religion into the mix, the situation ceased to be political because "the First Amendment is not a majority rule." *Town of Greece v. Galloway*, 572 U.S. 565, 566 (2014). The Greece custom was permissible only because anyone could give the invocation, "minister or layperson of any persuasion, including an atheist." *Id.*, at 571. So it is not an answer but an admission when Boston retorts the Temple lacks the political clout for equal

---

[1] Depending on context, "politics" means (a) "the art or science of government," (b) as pertains to "guiding or influencing governmental policy," or (c) as pertains to "winning and holding control over a government" POLITICS, *Merriam-Webster Online Dictionary*, available at https://www.merriam-webster.com/dictionary/politics (last visited March 20, 2024); *accord.* (Appx 892) ("Politics is very much a part of every decision I made as a city councilor.")

treatment. Response, at 23-25.

*1.11: Governments may not control or endorse religious practices.*

The opening brief recites the prohibition against government control over endorsement of religious practices. *Town of Greece*, 572 U.S. at 586; *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 674 (1970). By controlling the faith tradition which gives the prayer, a government controls the prayer itself. *Gundy v. City of Jacksonville Fla.*, 50 F.4th 60, 79 (11th Cir. 2022) (control over the speaker "inherently exhibits governmental control over the invocation messages.")

Boston proudly proclaims its complete control over the prayer opportunity in the first sentence of its response: "If you don't get an invitation, you don't give the invocation." Response, at 13. But while Boston acknowledges that it has complete control over the opportunity for Free Speech Clause purposes, it claims to have no control over the content for Establishment Clause purposes. Response, at 34 n. 14. But the content of particular prayers does not

control the outcome: "*Marsh*, indeed, requires an inquiry into the prayer opportunity as a whole." *Town of Greece*, 572 U.S. at 585. Even then, Boston offers no response to the opening brief's original point that controlling the speaker controls the message. Boston's councilors ensure that nobody will invoke any Luciferian impulses by categorically excluding the only faith which does.

First Liberty's *amicus* brief – should the Court choose to consider it – fares no better. In its response, it contends that Boston could rightfully exclude the Temple because of the "tenor" of its prayer. Brief at 13. This runs directly contrary to *Town of Greece*, which explicitly prohibits content-based determinations about who may give the prayer. *Town of Greece*, at 586; *see also Epperson v. State of Ark.*, 393 U.S. 97, 107 (1968) ("the state has no legitimate interest in protecting any or all religions from views distasteful to them"). The principal lesson in *Town of Greece* is that judges should *not* serve as religious censors. *Town of Greece*, at 581-82. Rejecting the notion of a constitutionally required "nonsectarian" scheme of prayers (those inoffensive to all), Justice Scalia quizzed "What about devil

worshippers?"[2] In this, we see that the Constitution does not permit government to draw lines among religions, not even to exclude Satanists. To do so runs afoul of the prohibition against "favoritism among sects." *Larson v. Valente*, 456 U.S. 228, 244-47 (1982).

It cannot be overstated that Boston's councilors, accountable only to their whim, consciously decide which faith tradition gets rewarded with public recognition and an unabashed endorsement. (Appx. 962, 972, 984). For Councilor McCarthy, that whim turned on whether he "personally" felt a "positive impact" from the organization. (Appx. 763). Councilor Essaibi-George testified that her whim was a *quid pro quo* reward for those who play an "important role" in her career. (Appx. 888) (Essaibi-George Depo. at 151:5-9). These whim-based invitations, explicitly outside the reach of the Temple, are completely inconsistent with binding precedent, in which "the town has never refused a request to offer an invocation." *Town of Greece*, 572 U.S. at 594 (Alito, J., concurring).

---

[2]  *Town of Greece* oral argument, at 31:36 (available at https://www.oyez.org/cases/2013/12-696)

Nor does Boston have a meritorious response to the point that the custom entails pre-prayer review, as proven with Rabbi Kreiman providing a script to Boston just two hours before giving her prayer.[3] Boston contends there is no proof that this prayer was given at a meeting. Response, at 33. Yet the judgment upon review cites the very meeting at issue. Ad. 45 n. 9 (the one in which Council President asks the guests to "please rise" for the prayer and 'remain standing' for the Pledge of Allegiance.") As a fallback, Boston claims there is no way to tell whether this email was sent before or after the meeting. Response at 33. Yet both the email and the video recording of the meeting bear timestamps. (Appx. 804) (September 26, 2018 at 10:09 am); the video shows at the top-right: September 26, 2018 from 12:10:19 pm – 12:12:22 pm. Failing that, Boston denies that there is any evidence any City Councilor or their staff read it. Response, at 34. The email was sent to Jessica Rodriguez, Essaibi-George's chief of staff. (Appx. 873) (Jessica Rodriguez was

---

[3]    Compare    (Appx.    804)    with https://www.youtube.com/watch?v=NTXFgOjpbTE at 2:30-4:36.

Essaibi-George's chief of staff); (Appx. 804) (To: jessica.rodri-guez@boston.gov); Ad. 45 n. 9 (Essaibi-George issued the invite).

Not only is Boston wrong on the facts, these arguments are un-founded appeals to ignorance. Both to sustain its own motion for summary judgment and to rebut the Temple's, Boston needed an affidavit from Essaibi-George's chief of staff explaining why she re-ceived this email and what she did with it. Otherwise, nothing com-bats the inference that it was sent for purposes of review. *Pac. Indem. Co. v. Deming*, 828 F.3d 19, 22 (1st Cir. 2016) (all reasonable infer-ences are to be drawn in favor of the non-moving party); *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (nonmovant must "produc[e] specific facts sufficient to deflect the swing of the sum-mary judgment scythe.") Here again we see that the below judgment turned upon a selective review of the record.

The undisputed facts show that this custom entails government control over *who* gives the prayer, *when* the prayer is given, and *what* will be said. So thoroughly does Boston control this prayer oppor-tunity that it is done in Boston's own voice. *Satanic Temple, Inc. v.*

*City of Bos., MA*, No. 21-CV-10102-ADB, 2021 WL 3079868, at \*3–4  (D. Mass. July 21, 2021) (the prayer is government speech). About 35 times per year, Boston's councilors are "elbow-deep in the activities banned by the Establishment Clause—selecting and pre-scribing sectarian prayers." *Lund v. Rowan Cnty., N. Carolina*, 863 F.3d 268, 281 (4th Cir. 2017). The Temple was entitled to judgment as a matter of law on this point.

### 1.12: The prayer opportunity is exploited to proselytize.

Not only does Boston hold complete control over the prayer, the opportunity is exploited to proselytize. Boston argues that a "ser-mon" is not "proselytizing." Response, at 36. But *Town of Greece* teaches against customs with "lengthy disquisition on religious dogma." 572 U.S. at 589-90. That is the definition of a "sermon." SERMON, *Merriam-Webster Online Dictionary* ("a religious discourse delivered in public usually by a member of the clergy as a part of a

worship service").[4] Sermons delivered in the government's voice impermissibly advance the religious faith performing the sermon. *Marsh v. Chambers*, 463 U.S. 783, 794–95 (1983).

Boston's response is deafeningly silent on the fact that "town board members directed the public to participate in the prayers." *Town of Greece*, 572 U.S. at 588 (plurality op.); (Ad. 45 n. 9) (noting that the Council President directs the audience to stand for the prayer). The District Court departed from binding caselaw by further requiring this unlawful directive be "consistent." *See Town of Greece*, at 588 ("The analysis would be different if town board members directed the public to participate in the prayers" not if they *consistently* directed to do so). Here again we see the District Court departing from binding caselaw to justify rejecting the Temple's claim.

Boston also accepts the point that this invitation is an endorsement of preferred ministers. (Appx. 885); Response at 36. But Boston notes that the offended public could just leave. Response at 36.

---

[4] Available at https://www.merriam-webster.com/dictionary/sermon (last visited March 21, 2024).

The offended public can also leave when the Temple gives its invocation, the response only prompts one to wonder why including the Temple causes such offense. (Appx. 762-763, 792-798); *but see Epperson*, 393 U.S. at 107 ("the state has no legitimate interest in protecting any or all religions from views distasteful to them"). The truth of the matter is that this prayer practice is a government endorsement of particular religions. The value of this endorsement lies in its selectivity. Boston's politicians are not neutrally recognizing the value that religion plays in many Americans' lives (*Am. Legion*, 588 U.S. at 63), they are drawing lines among religions in outright defiance of the first clause of the First Amendment. *Larson*, 456 U.S. at 246 ("when we are presented with a state law granting a denominational preference, our precedents demand that we treat the law as suspect"); *see also Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 305 (1963) (Goldberg, J., concurring) ("The fullest realization of true religious liberty requires that government *neither engage in* nor compel *religious practices*") (emphasis added).

Boston's response only leans into the fact that this sermon

opportunity is a "reward," contending without citation that there is nothing untoward if a councilor "might find it politically expedient to curry favor with a religious group and its constituent members by inviting it to say a prayer prior to a meeting." Response, at 23. Everything is untoward about it. The religious organization is not supposed to influence "any political campaign on behalf of … any candidate for public office." IRC § 501(c)(3). The Establishment Clause forbids the councilors from "openly or secretly, participat[ing] in the affairs of any religious organizations or groups and vice versa." *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 15–16 (1947). Again, the purpose of the Establishment Clause is to sever the historical tie between Church and State. *Lemon*, 403 U.S. at 622. It is an affront to our societal compact that Boston's highest elected officials loudly and proudly blur the lines between religion and politics. Response, at 23-24 (proudly acknowledging they are politicizing religion); *Larson*, 456 U.S. at 252-53 (through § 1983, the Establishment Clause prohibits practices that "engender a risk of politicizing religion.")

As best explained by the Fourth Circuit*:* "[W]hen a seat of

government begins to resemble a house of worship, the values of religious observance are put at risk, and the danger of religious division rises accordingly." *Lund*, 863 F.3d at 280. This religious division is reflected in the record. (Appx. 762-763, 792-798). It is irresistible for a politician to downplay a minority religion's demand for equal inclusion as a "publicity stunt." (Appx. 763). That is why we entrusted the protection of fundamental rights to judges and not the voting populace. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The First Amendment protects the ideas we hate because the only historical alternative is the tyranny of a majority. *Texas v. Johnson*, 491 U.S. 397, 414 (1989). The irresistible rhetoric of politicizing religion immediately takes society down a dark path. *Zorach v. Clauson*, 343 U.S. 306, 319 (1952) (Black, J., dissenting) ("zealous sectarians entrusted with governmental power … would sometimes torture, maim and kill those they branded 'heretics,' 'atheists' or 'agnostics.'"); *see also Everson*, 330 U.S. at 67-68 (quoting James Madison, *Memorial and Remonstrance against Religious Assessments*, ¶ 7).

First Liberty's *amicus* brief contends that endorsement is no longer the inquiry. Brief at 9. First Liberty asks the Court to ignore history: The Constitution was framed and adopted "to avoid all appearance even of … a State endorsement of any particular creed or religious sect." *Schempp*, 374 U.S. at 257 n. 23 (Brennan, J., concurring) (quoting *Miscellaneous Writings of Joseph P. Bradley* (1901), 357—359). Government endorsement of particular religions, here literally conferred by invitation only, has always been against the law.

*1.13: Intentional discrimination does not require proof of motive.*

The opening brief posits that intentional discrimination does not require proof of motive. *Hassan v. City of New York*, 804 F.3d 277, 297-298 (3d Cir. 2015). Undeniably, the Temple is treated differently from the insider religions: insider religions are granted repeat invitations whereas the Temple is not granted even one. The question is whether this differential treatment is accidental or on purpose. *Id.* It is on purpose, as Boston's response freely admits.

Response at 23. Although Boston contends that this record does not show a categorical exclusion of particular faiths, response at 24, the record says otherwise. (Appx. 762-763) (Councilors Essaibi-George and McCarthy publicly declared they would never invite the Temple); (Appx. 890) (Essaibi-George also testified that she would never invite the Temple); *accord. Williamson v. Brevard County*, 928 F.3d 1296, 1314 (11th Cir. 2019) ("Most troubling and plainly unconstitutional were the statements by numerous Commissioners that certain religions or types of religions would be flatly banned from giving an invocation.")

Sensing the trouble this puts Boston in, First Liberty resists the assertion that the Establishment Clause's prohibition on discrimination is somehow different from the Equal Protection Clause's prohibition on the same. Brief, at 22. But First Liberty has no response to the plain language of binding caselaw: "[n]eutrality in its application requires an equal protection mode of analysis." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) (discussing the Establishment Clause). Failing that, First Liberty

contends that the Temple is different because it declines to engage in this game of politics. Brief, at 13-14. But that is a distinction without a difference, religious gerrymanders must be predicated on a "neutral, secular basis for the lines government has drawn." *Gillette v. United States*, 401 U.S. 437, 452 (1971). No secular purpose has ever been advanced, Boston's councilors nakedly "aid" their preferred prayers with an endorsement and nakedly prohibit those they deem "antagonistic." *Epperson*, 393 U.S. at 106-07; (Appx. 762-763).

Neither Boston nor First Liberty nor the District Court can muster a response to this simple, dispositive point. Instead, all parrot an unsupported assertion that the Establishment Clause requires proof of bias or animus. Response, at 22, 38. Not so, the Clause "affirmatively mandates accommodation, *not merely tolerance*, of all religions, and forbids hostility toward any." *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) (emphasis added). The opening sentence of *Larson* describes itself as a case of religious discrimination. 456 U.S. at 230. The issue there was whether it was discriminatory to impose

registration and reporting requirements "upon only those religious organizations that solicit more than fifty per cent of their funds from nonmembers." *Id.* Those requirements were unconstitutional as discriminatory, notwithstanding that the words "animus" and "bias" do not once appear in the opinion, because they discriminate "*among* religions." *Id.*, at 252. (emphasis in original). Differential treatment among religions as a class is prohibited by the bars against States passing "laws which aid one religion" or that "prefer one religion over another." *Id.* , at 246 (quoting *Everson*, 330 U.S. at 15). Just as here, there was evidence that the policymakers sought to include and exclude certain religions. *Id.* , at 254-55. Because the law there had the "capacity … to burden or favor selected religious denominations," it created an unconstitutional "religious gerrymander." *Id.* , at 255. Here again we see that the law cares about purposeful differential treatment, not animus or bias.

The notion that this union's framework "affirmatively mandates accommodation" is not some forgotten proposition in a dusty case reporter. *Lynch*, 465 U.S. at 674. Our history and heritage still today

require that legislative prayers "stand out as an example of respect and tolerance for differing views" and be "an honest endeavor to achieve inclusivity and nondiscrimination." *Am. Legion*, 588 U.S. at 63; *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 538 (2022) ("learning how to tolerate speech or prayer of all kinds is 'part of learning how to live in a pluralistic society,' a trait of character essential to 'a tolerant citizenry.'") No part of any binding case requires proof of bias or animus, the inquiry ended when Boston's councilors purposely refused to extend an invite so as to preclude a prayer they did not want to hear. (Appx. 762-763).

Nor, as Boston continues to claim, is there a presumption of constitutionality in its legislative prayer practice. Response at 26 (citing Part II-A of *American Legion*); *but see Am. Legion*, 577 U.S. at 35 ("Justice ALITO announced … *an opinion* with respect to Part[] II-A … in which THE CHIEF JUSTICE, Justice BREYER, and Justice KAVANAUGH join") (emphasis added). Four justices do not precedent make. *Marks v. United States*, 430 U.S. 188, 193 (1977). There is no presumption of constitutionality, the question is whether the prayer

opportunity is "in compliance with ageless principles." *Am. Legion*, 588 U.S. at 86-87 (Gorsuch, J., concurring); *see also id.*, at 73 (Kagan, J., concurring in part) ("Although I too 'look[] to history for guidance, I prefer at least for now to do so case-by-case") (internal citation omitted, alteration in original). These history-entrenched, ageless principles direct the focus on whether the prayer practice reflects a "respect and tolerance for differing views." *Id.* , at 73 (Kagan, J., the fifth vote, concurring in part). This case presents the opposite: a religious gerrymander in which councilors are free to endorse only those religious traditions which have had a "positive impact" on that particular councilor. (Appx. 763).

Thus, it was error for the District Court to add a requirement that the Temple prove animus or bias. The law has always affirmatively mandated accommodation of the outsider. The genius of our constitutional scheme protects every individual's right of conscience by forcing parity between the most regarded and the most reviled. *Larson*, 456 U.S. at 245. The fact is that Boston's prayer practice intentionally excludes small, new, and unpopular religions. (Appx. 762-

– 23 –

763); see also (Ad. 47 n. 10) (the Hindus are also excluded). There being no effort at accommodation, the Court should reverse and remand for judgment in favor of the Temple.

### 1.2: Boston's custom discriminates against dissenting religions.

The second point is that there is at least a genuine issue of material fact about intentional exclusion, and a trial was warranted. Boston's responded by ignoring evidence cited in the opening brief.

### 1.21: Two councilors publicly stated they will never invite the Temple.

As addressed in the opening brief, two councilors publicly stated that they will never invite the Temple. (Appx. 762-763). Boston's response offers neither explanation nor justification as to how these public statements do not plainly show the intentional exclusion of a particular religion. These public declarations are direct evidence of purposeful differential treatment among religions.

Likewise, it was error for the District Court's to purposely ignore the significant hostility exhibited by residents. (Ad. 36). This evidence merits consideration. *Lukumi Babalu Aye*, 508 U.S. at 541.

And plaintiffs are allowed to prove discrimination by circumstantial evidence alone. *Burns v. Johnson*, 829 F.3d 1, 9 (1st Cir. 2016). Boston offers no response. By concession, the Court should find error and reverse for failure to consider this direct and circumstantial evidence of discrimination.

*1.22: Wu changed the pray-for-pay policy to prevent equal access.*

As addressed in the opening brief, the summary judgment standard required a finding that Michelle Wu changed the pray-for-pay policy to prevent the Temple from gaining equal access to the ceremony. See (Appx. 787-791). The City responds that the payment was nominal and they stopped it at any rate. Response, at 32. But this misses the point: this evidence in the light most favorable to the Temple shows that a government official took considered measures to avoid the Temple's equal inclusion. That is not an accident, it shows a purposeful action to exclude the Temple. *Lukumi Babalu Aye,* 508 U.S. 534 ("the Establishment Clause[] extends beyond facial discrimination"). Circumstantial evidence this may be, it still

required denying Boston's motion. *Burns*, 829 F.3d at 9.

*1.23: Boston itself does not want equal access for the Temple.*

The opening brief also pointed to Boston's in-court admission that it does not want to include the Temple in the prayer ceremony. (Appx. 927). The response offers no rebuttal.

*1.3: Boston errantly relies on outdated "reasonable observer" caselaw.*

Boston's response fairly points out that, in lieu of following established precedent, the District Court fashioned its own Establishment Clause test. Response at 26-38. The noble effort to create a "grand unified theory" of the Establishment Clause has been tried and failed. *Kennedy*, 597 U.S. at , 534-36. And despite Boston's repetitious reliance on a hypothetical "reasonable observer," that fiction has been dispelled too. *Id.*, at 533. This case is controlled by the standard of review and ageless principles, not some newfangled multi-factor balancing test. *See Lynch*, 465 U.S. at 679 ("The purpose of the Establishment Clause was to state an objective, not to write a statute … [so] we have repeatedly emphasized our unwillingness to

be confined to any single test or criterion in this sensitive area.") As discussed above, there was at least a genuine issue of material fact whether Boston's custom is inconsistent with those principles.

## 2: A requirement of palatability burdens unpopular beliefs.

Next, the opening brief assigned error to dismissal of the claim arising under the Massachusetts free exercise clause. The coercion at play lies in Boston's ranking system of preferred *vs.* disfavored religions, with the Temple being relegated to the latter. *See Everson*, 330 U.S. at 69 (quoting Madison's *Remonstrance Against Religious Assessments* ¶ 9) ("It degrades from the equal rank of Citizens all those whose opinions in Religion do not bend to those of the Legislative authority.")

Boston's response creates a false equivalence between free exercise claims and free speech claims. Response at 42 n. 19. The primary authority on this point does not even involve speech, it was the opportunity to foster children. *Magazu v. Dep't of Child. & Fams.*, 473 Mass. 430 (2016). This claim does not turn on speech, it turns

whether a belief is burdened by a City requirement. *Id.*, at 443. The City requirement here is to not be a Satanist. (Appx. 762-763, 890). Satanists don't get the "honor" of receiving Boston's "endorsement." (Appx. 808, 885). Obviously that is "inherently incompatible" with a group of Satanists. *Id.* True, Boston did not have to dole out this prayer opportunity. Response at 42. But once they started doing so, the Massachusetts constitution so strongly prohibits Boston from excluding the Temple that even *bona fide* neutrality is not a defense. *Id.*

The Temple is a new religion struggling to acquire recognition on equal footing as established religions. Boston's insipid response repeatedly downplays the Temple's efforts as a "publicity stunt." As if religions are lesser-than for trying to even the playing field by asserting their right to equal treatment. For a world-class city like Boston to withhold this intangible governmental benefit from the Temple, solely because the Temple's beliefs lack sufficient popularity, is antithetical to the principles of religious freedom this country was founded upon. One's right to function in a society without their

religious opinions being an impediment is not a government benefit which cities may disseminate, as Boston's response wrongly contends at 41-42. Rather, it is a natural right which cannot be taken away. *Everson*, 330 U.S. at 66 (quoting Madison's *Remonstrance Against Religious Assessments*, at ¶ 4)

Boston's regular monthly meetings starve the Temple of much-needed public recognition as equals and instead lavish praise on already-established Abrahamic religions to the contemplated exclusion of everyone else. The District Court understood the Temple's desire to equally enjoy this benefit. (Ad. 37). But it reversibly erred when it failed to find that because this benefit is conferred only to popular religions, it is "inherently incompatible" with the Temple's status as a religious dissenter. *Magazu*, 473 Mass. at 444. The District Court should have held Boston to its strict scrutiny burden of explaining why these invitations may lawfully turn on palatability. Because Boston offered no such justification, the Court should reverse and remand for entry of judgment in favor of the Temple.

### 3: Wu was subject to a deposition.

The last assertion of error lies in precluding a deposition of Michelle Wu, the central decisionmaker in this case of intentional discrimination.

*3.1: Boston stipulated Wu would testify and declared Wu a witness.*

The first ground to reverse is that Boston stipulated Wu would testify and even declared Wu as a defense witness.

*3.11: Boston stipulated all Councilors, including Wu, would testify.*

The opening brief points out Boston's stipulation that the number of available depositions should be increased because Wu, as well as all the other inviting lawmakers, each "has discoverable knowledge for their reasons not to invite a representative from Plaintiff." (Appx. 45-46). Boston's response ignores this point.

*3.12: Wu was a declared witness for the defense.*

Next, the opening brief points out that Wu was a declared witness for a defense. (Appx. 869). Boston responds that the Temple should have deposed the other 45 witnesses. Response, at 45.

Earlier, Boston acknowledged the importance of considering "***the testimony of the inviting lawmakers themselves***." Response at 24 (quoting *Williamson*, 928 F. 3d at 1299) (overemphasis in original). Wu's subjective intent is not examined by questioning her chief of staff, the chief can only offer hearsay or speculation. Boston offers no response to this point, either.

### 3.2: Wu was not a "high ranking government official."

Next, the opening brief attacked the circular opinion below that Wu was a "high ranking government official." Boston's brief hand-waves this point, offering no rebuttal to the points that the District Court assumed its own conclusion, had no facts upon which it could perform an analysis, and that Wu was a legislator at the relevant time.

### 3.3: Wu had unique personal knowledge.

The opening brief also addressed Wu's unique personal knowledge in this case. This being an intentional discrimination case, the subjective intent of the decisionmakers – Wu included –

each forms the dispositive factual question of the case. Boston parries in its response that Wu did not have any unique personal knowledge. Yet the Temple asserted that Wu's intent behind changing the pray-for-pay policy was done on purpose to prevent the Temple from procuring a decree for an equal right of access. The District Court rejected this argument because *why* Wu changed the policy was not sufficiently laid out in the deposition testimony. Ad. 26 n. 3. Yet the Temple filed a Rule 56(d) affidavit, addressing the need of the Wu deposition. (Appx. 864-866). Here again we see a summary judgment opinion which chides the Temple for not having sufficient evidence while barring the Temple from that very evidence.

### 3.4: The District Court should have taken an adverse inference.

Last, the opening brief pointed out that Wu's importance to this case cannot be seriously denied because even the District Court relied on hearsay from Wu to support its opinion. (Ad. 34). Boston defends the District Court's reliance on hearsay as merely superfluous to the judgment. Response, at 46. But Boston has no response

to the point that "[i]t is black-letter law that hearsay evidence *cannot* be considered on summary judgment." *Davila v. Corporacion De Puerto Rico Para La Difusion Publica*, 498 F.3d 9, 17 (1st Cir. 2007) (emphasis added). The point demonstrates once again that the District Court's view of the record was not constrained by the applicable standards, rather it was in furtherance of a results-based ruling.

## CONCLUSION

Persecution begins with discrimination. That is why the Establishment Clause affirmatively mandates accommodation of all sects when the government opens the door to any. *Lynch*, 465 U.S. at 674. To hold otherwise is to defy the original intent of our great nation as "an asylum to the persecuted and oppressed of every Nation *and Religion*." *Everson*, 330 U.S. at 68 (quoting Madison's *Remonstrance Against Religious Assessments*, ¶ 9) (emphasis added).

It is no answer for Boston to retort at p. 15 that these sermons, delivered in the government's voice, are a "mere shadow" of a threat because "it is proper to take alarm at the *first* experiment on

our liberties." *Id.*, at 67 (quoting *id.*, at ¶ 3) (emphasis added). Eighteen centuries of collective experience shows that blurred lines and flirting between the political class and their preferred ministers inevitably ends in "pride and indolence in the Clergy; ignorance and servility in the laity; [and] in both, superstition, bigotry[,] and persecution." *Id.* (quoting *id.*, at ¶ 7). Boston has not figured out some clever new path toward politicizing religion, as its response so arrogantly contends; rather it has only taken the "first step … in the career of intolerance." *Id.*, at 69 (quoting id., at ¶ 9). Along this path, as we saw in the old world and we continue to see *ad nauseum* throughout the headlines of today, are "Torrents of blood … [spilled] by vain attempts of the secular arm to extinguish Religious discord[] by proscribing all difference in Religious opinions." *Id.* (quoting *id.*, at ¶ 11).

We resolved to be different. U.S. Const. Amend I. We resolved to close off this path by prohibiting any form of line-drawing among religions. Boston treads upon these forbidden grounds and essentially asks the Court for its blessing because the Temple is just too

unpopular for equal rights. Response, at 22-23. But the victims of persecution are always in the political minority, the response simply restates the problem of tyranny by the majority which our constitution was designed to prevent.

**WHEREFORE** the Court must reverse because the only historical alternative is yet another tired lesson of a merger between Church and State.

Respectfully submitted on March 26, 2024,

By: */s/ Matt Kezhaya*

Matt Kezhaya (# 1208974)
KEZHAYA LAW PLC
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone:  (479) 431-6112
email:  matt@kezhaya.law

## CERTIFICATE OF SERVICE

NOTICE IS GIVEN that I, Matt Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on March 26, 2024, which sends service to registered users, including all other counsel of record in this cause. Paper copies to follow based on the Clerk's instructions. *s/ Matt Kezhaya*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of FRAP 32 (a reply may not exceed 6,500 words) because, excluding the parts of the document exempted by FRAP 32(f), this document contains **5,166** words.

This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because this document has been prepared in a proportionally spaced typeface using MS Office 365 in 14pt "Calisto MT" font. Headers are in 15pt "Calisto MT" font.

The electronic version of the brief has been scanned for viruses and is virus-free. *s/ Matt Kezhaya*