# United States Court of Appeals
## For the First Circuit

No. 23-1642

THE SATANIC TEMPLE, INC.,

Plaintiff, Appellant,

v.

CITY OF BOSTON,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Angel Kelley, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Kayatta, Circuit Judges.

Matt Kezhaya, with whom Kezhaya Law PLC was on brief, for
appellant.
Edward F. Whitesell, Jr., Senior Assistant Corporation
Counsel, City of Boston Law Department, with whom Adam N.
Cederbaum, Corporation Counsel, was on brief, for appellee.
Lea E. Patterson, Joel S. Nolette, Stephen J. Obermeier,
Krystal B. Swendsboe, Kahlil H. Epps, and Wiley Rein LLP, on brief
for First Liberty Institute, amicus curiae.

August 6, 2024

LYNCH, **Circuit Judge**.  The Satanic Temple, Inc. ("TST"), an atheistic organization which venerates Satan, appeals from the district court's grant of a motion for summary judgment to the City of Boston and denial of TST's cross-motion for summary judgment.  Satanic Temple, Inc. v. City of Bos., 684 F. Supp. 3d 21, 25 (D. Mass. 2023).  TST sued, alleging that Boston's failure to invite TST to give an invocation before its City Council meeting violates the Establishment Clause of the First Amendment of the U.S. Constitution and the Free Exercise Clause of the Massachusetts Constitution.  On appeal, TST argues that that the district court abused its discretion by issuing and not revoking a protective order preventing the deposition of Michelle Wu, once-City Councilor, now Mayor, of Boston.

We hold that TST has not shown that Boston's legislative prayer practice, either on its face or as applied, violates the Establishment Clause or the Massachusetts Free Exercise Clause. Further, the district court did not abuse its discretion by issuing a protective order preventing TST from deposing Mayor Wu.  We affirm entry of judgment for Boston.

**I.**

**A.**

The following facts are undisputed by the parties unless otherwise indicated.  Boston's City Council, the city's legislative branch of government, consists of thirteen publicly

elected Councilors, one of whom serves as chair/Council President. The City Council holds a meeting every week, unless otherwise ordered, and excluding holidays. Approximately thirty-five meetings are held each year. Since the 1800s, before official Council business begins, the City Council traditionally has started its meetings with an invocation delivered by a private person, often a religious leader, who is invited by a Councilor.[1] These invocations typically include "a blessing," "opening remarks," "a prayer," "a sermon," or "a poem."

At the beginning of each calendar year, the Council staff prepares a schedule of City Council meeting dates and designates for each meeting a Councilor to invite an invocation speaker. The Council staff attempts to assign to each Councilor an equal number of opportunities to invite an invocation speaker, although this goal is not always met due to scheduling conflicts or limited availability. All invocation speakers must be invited by a City Councilor. The Council itself does not take requests to give an invocation, nor typically do individual Councilors.[2]

---

[1]     Before 1909, Boston had an alderman form of local government rather than a City Council, but invocations were still given.

[2]     There is some difference in views between the parties regarding whether Boston has received other requests to give an invocation, but the difference is not material to the issues before us. Boston states that TST is the only religious group to have ever requested an invitation to deliver an invocation before a City Council meeting. Councilor Annissa Essaibi-George testified during a deposition, "I don't think anyone's ever asked

The individual Councilors, and their respective staffs, have full discretion to select which invocation speaker to invite. There are no formal selection guidelines or rules regarding whom a Councilor may choose, nor is there a written selection policy. The Councilors and their representatives have stated that they choose invocation speakers based on their personal relationships with the speaker or the work the speaker does in the Councilor's district or with the Councilor's constituents.

The selected speakers are traditionally members of the clergy from the selecting Councilor's district "who are active in their neighborhood and engaged community members."  While most of the invocation speakers have been from Christian denominations, some have been representatives of other religions, laypersons, or "individual[s] from an organization that does work within the community."[3]  Multiple rabbis and at least one imam who spoke on

---

me . . . to offer remarks, a prayer, or a blessing before the city council" other than TST.   TST disputes this, arguing that "the government has refused to include at least two congregations from the list of invitees: TST (Satanists) and Rajan Zed (a Hindu leader)."   TST provides an email from Zed sent to then-Council President Kim Janey and other Boston Councilors and Council staff (not including Essaibi-George) on December 12, 2020, with the subject line "Invocation request."   Zed asks Janey "[w]ill you please schedule me to read invocation remotely in the next Boston City Council meeting; and inform me accordingly" and states "I am a Hindu leader."   No other information is provided regarding Zed's congregation or his connection to the Boston community.   There is no indication that any of the Councilors responded.

[3]     In its first amended complaint, TST alleged that "volunteers of TST dedicated substantial efforts into reviewing 233 invocations between January 3, 2011[,] and August 8, 2017."

two occasions have served as speakers.  Some speakers, including occasionally the City Clerk, Maureen Feeny, have read non-religious "poems and reflections" as their invocations.  According to a schedule provided by Boston, thirty-five speakers delivered an invocation between July 15, 2015, and June 29, 2016.  Of these speakers, two appear to have been from Jewish temples, one from a Unitarian Universalist organization, and the remainder from Christian churches or organizations.  A similar schedule shows eight invocations were delivered between July 13, 2016, and October

---

They found that 78.5% of the invocations were given by Christians, 4.7% by Muslims, and 4.3% by Jews.  TST alleged that these numbers were disproportionate relative to these religions' representations in the Boston metropolitan area, which it stated were 57%, 1%, and 4% of the population respectively, citing to a Pew Research Center article which it linked in its complaint.  See Pew Research Center, Adults in the Boston metro area, https://www.pewresearch.org/religious-landscape-study/database/metro-area/boston-metro-area/ (last visited June 7, 2024) [https://perma.cc/T9NN-W25T].  TST also found that one invocation was delivered by a representative of a secular organization and one by a Hindu leader, an underrepresentation of these groups compared to their share of the Boston metropolitan area population, which were 33% and 1% respectively, according to the same article.  No invocations were delivered by Buddhists, "Wiccans, other Pagans, [or] Native Americans," despite, the complaint alleges, the presence of members of these religious groups in the Boston area.

In its answer, Boston stated that it "lacks knowledge or information sufficient to admit or deny the[se] allegations."  Boston City Council Compliance Director and Staff Counsel Christine O'Donnell testified at her deposition that the City of Boston does not keep official statistics of its citizens' religious beliefs or preferences, nor does it track or consider the relative proportions of Boston's population that belong to particular religious groups.  O'Donnell did not dispute TST's position that "Christianity is, give or take, a 50 percent populous" of the city.

16, 2016, two of which were from Jewish speakers and the rest from Christian speakers.  At one point, invocation speakers received a stipend from Boston, but the practice of paying speakers was ended by 2017 by then-Council President Wu.  One invocation speaker testified to having received a $75 stipend in 2012.

City Council meetings are broadcast on local television and have been audio/video recorded and made available online since at least January 2011.  The record contains four YouTube videos of City Council meeting invocations, described here in chronological order:

(1) an invocation delivered by Alicia Adamson, a non-profit leader, divinity student, faith leader at the Christian church Greater Love Tabernacle, and resident of Roslindale, invited by Councilor Ayanna Pressley (Councilor At-Large), at the September 28, 2016, meeting[4];

(2) an invocation delivered by Rabbi Claudia Kreiman of the Jewish Temple Beth Zion, located in Brookline, Massachusetts, invited by Councilor Annisa Essaibi-George (Councilor At-Large), at the September 26, 2018, meeting[5];

---

[4]    Boston City Council Meeting September 28, 2016, YouTube,                (Sept.              28,              2016) https://www.youtube.com/watch?v=T1rDy1ioPnE.
[5]    Boston City Council Meeting September 26, 2018, YouTube,                (Sept.              26,              2018) https://www.youtube.com/watch?v=NTXFgOjpbTE.  TST presented this video for the first time in its reply brief before the district court, not in TST's statement of facts or in reply to Boston's

(3) an invocation delivered by Reverend Dr. Arlene Hall, an ordained minister in the Church of God and founder and lead pastor of Deliverance Temple Worship Center, invited by then-Councilor Wu (Councilor At-Large), at the August 18, 2021, meeting[6]; and

(4) an invocation delivered by Imam Taalib of the Masjid Al-Qur'an, invited by Councilor Tanya Fernandes Anderson (District Seven, which includes Dorchester), at the April 26, 2023, meeting.[7]

TST has alleged, and Boston does not dispute, that it is an "IRS-recognized atheistic religious corporation" which "venerates (but does not worship)" Satan "as a promethean icon against tyranny" and "a revolutionary antihero who stood up against impossible odds to seek justice and egalitarianism for himself and others." TST consists of both a "national organization" and "semi-autonomous local organizations called 'chapters,'" including a "Boston" chapter. TST's headquarters and principal place of business is located in Salem, Massachusetts, approximately twenty miles north of Boston. TST alleged its total national membership

---

statement of facts. See Satanic Temple, Inc., 684 F. Supp. 3d at 40 n.9.

[6] Boston City Council Meeting August 18, 2021, YouTube, (Aug. 19, 2021) https://www.youtube.com/watch?v=qb5iu6B1TxA.

[7] Boston City Council Meeting April 26, 2023, YouTube, (Apr. 26, 2023) https://www.youtube.com/watch?v=Ti7QMgpUK8Q.

exceeded 270,000, with members in every U.S. state, including 2,449 members "in the Boston metropolitan area," at the time that its first amended complaint was filed.  TST did not specify how many of its members were present in the City of Boston itself, and referred to Salem as "a suburb of Boston."  Its physical temple is located in Salem, not Boston.  TST points to no evidence that any Councilor knew of TST or knew any member of TST.

On October 6, 2016, Travis LeSaffre, Chapter Head of the TST "Boston Chapter" (based in Salem), emailed Councilor Mark Ciommo requesting to be "appoint[ed]" as Councilor Ciommo's "invited clergy member to perform an invocation."  After Councilor Ciommo did not respond, LeSaffre emailed then-Councilor Wu on October 11, 2016, with the same request.[8]  She responded by email the next day, October 12, 2016, and informed LeSaffre that each Councilor could invite only "2-3 faith leaders per year to deliver the opening invocation at one of our Council meetings," that these limited invitations "are often used to recognize faith leaders who are active in the community and organizations that are representative of their districts," that "[t]here is no restriction or criteria based on any Councilor's religious preferences," and that many Councilors "have a long list of folks

---

[8]     LaSaffre wrote in his email to then-Councilor Wu that he had also requested an invitation from a third Councilor, Tito Jackson.  There is no evidence that Councilor Jackson responded to this request.

we'd like to invite but haven't been able to accommodate." Then-Councilor Wu wrote further that "[e]veryone is welcome to attend the weekly City Council session, to testify at any City Council hearing, and to get involved in our policy work."

Also on October 12, 2016, Councilor Timothy McCarthy responded to a request for comment from the Boston Herald on TST's request to give an invocation with the following statement: "All of the clergy I have chosen in my three years of being in the city council have been personal friends, of all different faiths, beliefs and creeds. It is an honor for me to invite them, and I hope that they see it as an honor as well."

On August 17, 2017, LeSaffre sent another email to all current members of the Boston City Council at that time: Councilors Frank Baker, Andrea Campbell, Ciommo, Essaibi-George, Michael Flaherty, Tito Jackson, Salvatore LaMattina, Bill Linehan, McCarthy, Matthew O'Malley, Pressley, Wu, and Josh Zakim. His email expressed that "the Boston City Council . . . has instated what is essentially a default Christian prayer during government meetings" and "violate[d] the principles behind the First Amendment to the United States Constitution" through its invitation-based selection process for invocation speakers. He also stated that unless Boston "[a]llow[ed] all individuals equal opportunity to perform invocations" or else "[r]emove[d]

invocations from all future City Council meetings," Boston would be left "open . . . to litigation."

Between August and September 2017, some members of the public sent emails to all City Councilors, as well as then-Mayor of Boston Marty Walsh, expressing that they did not want TST to deliver an invocation because of TST's Satanic beliefs or identity as a Satanist organization.

On October 19, 2017, Councilor Essaibi-George's chief of staff sent her the following email "communicating what [thei]r response would be" to TST's request:

> It is absurd that this group feels entitled to being invited to give remarks at the beginning of the Council Meeting, and frankly it['s insulting to all of the amazing religious and secular leaders who are invited. They are invited because of all of the incredible work that they do across the City, work to end youth violence, work to provide shelter and stability to the homeless, or compassion and support for people in recovery. I will not give up the opportunity to highlight one of these amazing leaders who I am privileged to work with for the Satanic Temple. The City Council does important, serious work for the people of Boston and when we invite someone to participate in our meeting it is out of a profound respect, not a sense of obligation.

On the same day, in response to an inquiry from NBC Boston regarding whether he "would ever consider inviting [TST] to pray before the open[ing] of [a] city council meeting," Councilor McCarthy wrote:

I would not consider anyone that doesn't have a positive impact on my community, my constituents, my family and me personally. Every leader I have invited, they all check the[se] . . . boxes. This issue is not about the honor bestowed to a faith leader by a Boston City Councilor, this is a publicity stunt.

On October 2, 2018, Malcolm Jarry, a national TST co-founder, emailed Councilor Campbell, who was then serving as Boston City Council President, requesting an invitation for a TST member to give an invocation at an upcoming City Council meeting. The next day, October 3, 2018, Jarry spoke with Boston City Council Compliance Director and Staff Counsel Christine O'Donnell on the telephone. O'Donnell informed Jarry that Boston does not accept requests for an invitation to deliver an invocation, that Councilors decide whom to invite to speak, and that Boston did not have a written policy regarding invocations. On October 4 and 5, 2018, Jarry emailed O'Donnell alleging that Boston had violated the "Establishment Clause along with various other laws by not allowing a member of [TST] to deliver an invocation" and requesting a response. On October 9, 2018, O'Donnell emailed Jarry to "explain the Boston City Council's process for selecting individuals to give invocations prior to the start of City Council meetings." She wrote, "[e]ach City Councilor has the opportunity to invite an individual from the community either clergy or

laypeople to give the invocation," and "[t]he Councilors themselves do not offer the invocation."

Several other members of the public also sent emails in March and April 2019 to then-Councilor Wu and Councilor Ed Flynn requesting that the City Council not allow TST to give an invocation at a City Council meeting.

**B.**

TST filed its initial complaint in federal court on January 24, 2021, alleging violations of the Establishment Clause of the First Amendment, the Free Speech and Free Exercise Clauses of the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment.[9]  On April 26, 2021, TST amended its complaint (the operative complaint) to add a claim of violation of the Massachusetts Free Exercise Clause.[10]  Its operative complaint asked the court to (1) find Boston's legislative prayer practice unconstitutional; (2) "[o]rder Boston to afford TST an opportunity

---

[9]    On April 5, 2021, Boston filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of jurisdiction and failure to state a claim.  TST opposed the motion to dismiss on April 19, 2021.

[10]    Boston filed a motion to dismiss the amended complaint on May 10, 2021, which TST opposed on May 24, 2021.  On July 21, 2021, the district court dismissed TST's hybrid federal Free Speech and Free Exercise claim for lack of standing and its Equal Protection claim for failure to state a claim on which relief could be granted.  Satanic Temple, Inc. v. City of Bos., No. 21-CV-10102, 2021 WL 3079868, at *4, *7 (D. Mass. July 21, 2021).  Discovery proceeded on the remaining claims.  TST does not contest these dismissals on appeal.

to bless the Council's meeting within two weeks following entry of the order"; (3) "[i]ssue a permanent injunction that Boston shall not exclude TST or any other religious groups from an equal opportunity to bless the Council's meetings"; (4) "[i]ssue a permanent injunction that Boston shall create a mechanism for interested religious groups to obtain equal opportunity to bless the Council's meetings"; and (5) order Boston to compensate TST for costs and attorney's fees, as well as provide "all other relief to which TST may be entitled."[11]

On August 26, 2021, the parties filed a Local Rule 16.1 report in which they agreed to increase the number of depositions to fifteen (from the default number of ten) because "[t]here are 13 Councilors, each of which has discoverable knowledge for their reasons not to invite a representative from [TST]." On September 9, 2021, Boston produced to TST its initial disclosures, which identified forty-seven individuals, including then-Councilor Wu, likely to have discoverable information regarding the case.

On October 8, 2021, TST served discovery requests on Boston. Then on October 22, 2021, TST served a notice of

---

[11] When asked at oral argument before us what remedy TST seeks, TST's counsel said either to deliver an invocation before Boston's City Council or nominal damages of one dollar. TST's counsel said that if Boston produced written criteria for its selection process, this would not moot the case because "you can't undo the damage from 2016," but then acknowledged again that damages are "nominal, . . . just a decree that [TST's] rights were harmed."

deposition and subpoena for then-Councilor Wu to take place on November 2, 2021, which was Election Day for the Boston mayoral race in which she was a candidate. TST admitted it did this in an attempt to draw public attention to its litigation and to "increase[] the likelihood that [TST] would procure its sought-after invitation to participate in the prayer ceremony whether by judicial decree or by public pressure." On October 27, 2021, after counsel for the parties conferred pursuant to Local Rule 7.1 but were unable to reach a resolution, Boston filed an emergency motion for protective order and motion to quash the deposition on the grounds that then-Councilor Wu was a high-ranking government official not subject to being deposed absent a demonstrated need, which TST had not demonstrated, and that the deposition amounted to an undue burden and annoyance.

On April 6, 2022, the district court quashed the deposition, entered a protective order for then-Mayor Wu, and awarded attorneys' fees and costs to Boston. The court "f[ou]nd[] no need to delve into the issue of whether Wu is or was a 'high ranking government official'" and that its "ordinary obligations to limit discovery as per Rules 26 and 45 apply fully and sufficiently . . . and weigh in favor of the issuance of a protective order without reaching that definitional question." The court also found that the attempted deposition created "undue burden, annoyance, and oppression in violation of Rule 26(c)(1)."

On July 6, 2022, TST served on Boston a Rule 30(b)(6) deposition notice outlining thirty deposition topics on which it sought to elicit testimony from Boston.  Boston designated O'Donnell to testify on all of the topics except the individual Councilors' "subjective bases" (topics 8, 10, 12), "subjective understanding" (topics 17, 18, 20, 21), "subjective opinion[s]" (topic 29), and the statements that each Councilor had made (topic 30).  For these topics, Boston designated the chiefs of staff for all Councilors still sitting on the Council in July 2022, as well as then-Mayor Wu's former chief of staff.

TST chose to depose only three individuals during the discovery period: O'Donnell, Councilor Essaibi-George, and Anne Marie Rousseau, one of the invocation speakers.  TST did not attempt to take the depositions of any of the Councilors' chiefs of staff proffered by Boston or any other current or former City Councilors.

On August 31, 2022, despite the protective order, TST again served a notice of deposition for then-Mayor Wu to take place on September 12, 2022.  In response, Boston filed a motion to quash and request for sanctions on September 2, 2022.  On September 11, 2022, TST filed an opposition to Boston's motion to quash, and on September 14, 2022, TST served then-Mayor Wu with a subpoena scheduling her deposition for September 20, 2022.  Boston filed an emergency renewed motion to quash this deposition on September 15,

2022, which the district court granted on September 16, 2022, noting that "[i]n light of the Court's prior Orders . . . the deposition of Mayor Wu as noticed may not go forward" and that "[t]he proper avenue for Plaintiff to seek modification of the terms of the Protective Order is through a motion for reconsideration." Further, the court held that "any motion for reconsideration must state which additional facts, adduced through discovery in the intervening months, have materially changed the circumstances such that the deposition of Mayor Wu is now necessary." The court took no action regarding the motion for sanctions.

On September 30, 2022, TST filed a motion seeking the district court's recusal, which Boston opposed on October 13, 2022. TST also filed a motion for reconsideration of the protective order on October 6, 2022, which Boston opposed on October 20, 2022. In addition, on October 18, 2022, TST filed a motion to extend the discovery period by thirty days to November 25, 2022, which the district court granted.

The district court denied TST's motion for recusal on December 6, 2022, and denied TST's motion for reconsideration of the protective order on December 23, 2022. In denying TST's motion for reconsideration, the court emphasized that "'the practice of calling high ranking government officials as witnesses' is discouraged, absent 'extraordinary circumstances'" (quoting Bogan

v. City of Bos., 489 F.3d 417, 423 (1st Cir. 2007)), that TST "did
not depose the Rule 30(b)(6) representative whom [Boston]
designated as the person with knowledge of Mayor Wu's subjective
intent," and that it would "not modify its protective order in the
absence of evidence that [TST] has complied with its . . . order,
and that the Rule 30(b)(6) designee cannot provide specific
information that is necessary to the resolution of Plaintiff's
claims."

        TST then filed a motion for sanctions against Boston on
December 28, 2022, seeking the deposition of then-Mayor Wu as a
remedy.  On February 14, 2023, the court denied this motion.  TST
once more requested a deposition of then-Mayor Wu during a Joint
Status Report on March 10, 2023.  The district court denied this
request at the status conference on March 15, 2023, ruling that
discovery was officially closed.

## II.

        TST and Boston submitted cross-motions for summary
judgment on May 1, 2023, each of which was opposed.  In support of
its motion, TST filed an affidavit from its national co-founder
and co-director, Lucien Greaves, in which he stated that "TST
engages in charitable acts and community involvement within the
Boston community," more specifically organizing "drives to collect
tampons and sanitary napkins for Rosie's Place, a [Boston-based]
safe haven for LGBTQIA+ women," known as "Menstruatin' with Satan,"

which took place from November 2016 to December 2016, November
2019 to March 2020, and July 2021; organizing "Warmer than Hell,"
"a coat and winter clothing drive for Second Chances," an
organization that "provides clothing to homeless and very
low-income individuals in Cambridge and Somerville," in January
2017; and having a table at Boston Pride Parade and Festival from
2016 to 2019.[12]  TST pointed to no evidence that the scope of these
activities was such as to come to the attention of any City
Councilor.  The district court held a hearing on the cross-motions
on June 28, 2023.

On July 31, 2023, the district court granted Boston's
motion and denied TST's motion.  Satanic Temple, 684 F. Supp. 3d
at 25.  Regarding TST's Federal Establishment Clause claim, the
court found that TST had failed to show that Boston had

---

[12]    TST also filed in support of its motion various
other documents, including excerpts of Councilor Essaibi-George's,
O'Donnell's, and Rousseau's depositions; email correspondence
between Jarry and O'Donnell regarding TST's invitation request;
then-Councilor Wu's email correspondence with LeSaffre; Councilor
Campbell's statement on Boston's legislative invocation practice;
email correspondence regarding the plan of events during the
September 26, 2018, City Council meeting, including Rabbi
Kreiman's invocation; invitations from various Councilors to
potential speakers, as well as correspondence regarding these
invitations among members of Council staff; letters from the public
asking City Councilors not to allow TST to give an invocation;
Zed's email to Councilors; emails to City Councilors containing
what appear to be draft invocations; an excerpt from Councilor
O'Malley's introduction of Rousseau as a speaker at a City Council
meeting; and what appear to be records of Rousseau's donations to
various political candidates.

discriminated against TST on the basis of religion because TST had "provide[d] no evidence that the decision not to extend an invitation to TST was motivated by animus or bias" and Boston had "provide[d] evidence that it was, in fact, motivated by other, lawful reasons." Id. at 33. The court also found that Boston's legislative prayer practice was constitutional because it could not "say that 'the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief,' such that it 'promote[s] a preferred system of belief or code of moral behavior' in violation of the Establishment Clause." Id. at 41 (alteration in original) (first quoting Marsh v. Chambers, 463 U.S. 783, 794-95 (1983), and then quoting Town of Greece v. Galloway, 572 U.S. 565, 581 (2014)). The court further held that Boston's legislative prayer practice did not violate the Massachusetts Free Exercise Clause because it did not burden TST's right to exercise its religion. Id. at 42. TST timely appeals.

### III.

We review a district court's grant of a motion for summary judgment de novo, viewing the record in the light most favorable to the non-movant and resolving all reasonable inferences in the non-movant's favor. Perrier-Bilbo v. United States, 954 F.3d 413, 422 (1st Cir. 2020). "On an appeal from cross-motions for summary judgment, the standard does not change; we view each motion separately," reviewing issues of law de novo

and "draw[ing] all reasonable inferences in favor of the respective non-moving party." EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC, 6 F.4th 50, 57 (1st Cir. 2021) (quoting Roman Cath. Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013)).  We are not restricted to the district court's reasoning, but instead "may affirm a district court's decision on any ground supported by the record." Id.

Summary judgment should be granted where there is no genuine issue of material fact and the undisputed facts demonstrate that the movant is entitled to judgment as a matter of law. Mu v. Omni Hotels Mgmt. Corp., 882 F.3d 1, 5 (1st Cir. 2018); see also Fed. R. Civ. P. 56(a).  "'[G]enuine' means that the evidence is such that a reasonable factfinder could resolve the point in favor of the nonmoving party, and 'material' means that the fact is one that might affect the outcome of the suit under the applicable law." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).

> [T]he plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's

position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## IV.

### A.

Contrary to TST's claim, Boston's legislative prayer practice does not violate the Establishment Clause either on its face or as applied. "The First Amendment, as made applicable to the states by the Fourteenth, commands that a state 'shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'" Everson v. Bd. of Ed. of Ewing Twp., 330 U.S. 1, 8 (1947) (citation omitted); see U.S. Const. amend. I; U.S. Const. amend. XIV § 1.

TST challenges Boston's invocation speaker-selection process as unconstitutional under the Establishment Clause both on its face and as it has been applied to TST. The dividing line between its two types of attacks is not always clear. A law or policy is facially unconstitutional if it violates the Establishment Clause as written. See Bowen v. Kendrick, 487 U.S. 589, 600 (1988); see also Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 317 (2000) ("To properly examine [a] policy on its face, we 'must be deemed aware of the history and context of the community and forum.'" (quoting Capitol Square Rev. and Advisory Bd. v. Pinette, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring

in part and concurring in the judgment))). A law or policy can also violate the Establishment Clause through "the manner in which it ha[s] been administered in practice," regardless of whether it is facially unconstitutional. Bowen, 487 U.S. at 601.

A facial challenge is the "most difficult challenge to mount successfully." United States v. Rahimi, 602 U.S. __, __, 144 S.Ct. 1889, 1898 (2024) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)). Such a challenge "fails if the law is constitutional in at least some of its applications." Id. at 1903 n.2 (quoting Salerno, 481 U.S. at 745). "Facial challenges are disfavored for several reasons": they "often rest on speculation" and "[a]s a consequence, they raise the risk of 'premature interpretation of statutes on the basis of factually barebones records,'" Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450 (2008) (quoting Sabri v. United States, 541 U.S. 600, 609 (2004)); they "run contrary to the fundamental principle of judicial restraint," id.; and they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution," id. at 451; see also Jones v. Hamilton Cnty. Gov't, 530 F. App'x 478, 487 (6th Cir. 2013) (citing Wash. State Grange while denying a facial challenge to a legislative prayer practice). "As we have said in other contexts, '[w]hen legislation and the Constitution brush up against each other, [a court's] task is to

seek harmony, not to manufacture conflict.'" Rahimi, 602 U.S. at __, 144 S.Ct. at 1903 (alteration in original) (quoting United States v. Hansen, 599 U.S. 762, 781 (2023)).

"Few of our cases in the Establishment Clause area have explicitly distinguished between facial challenges to a statute and attacks on the statute as applied," Bowen, 487 U.S. at 600, including cases addressing legislative prayer practices, see Marsh, 463 U.S. at 785 (not distinguishing whether a member of the Nebraska Legislature brought a facial or as-applied challenge under the Establishment Clause where he sued under 42 U.S.C. § 1983 to enjoin the Nebraska Legislature's legislative prayer practice); Town of Greece, 572 U.S. at 572-73 (not distinguishing whether the Establishment Clause challenge brought by attendees of Greece, New York's, town board meetings seeking "an injunction that would limit the town to 'inclusive and ecumenical' prayers" at its invocation prayer practice was a facial or as-applied challenge). However, "[a]lthough the Court's opinions have not even adverted (to say nothing of explicitly delineated) the consequences of this distinction between 'on its face' and 'as applied' in this context," "[t]here is . . . precedent in this area of constitutional law for distinguishing between the validity of the statute on its face and its validity in particular applications." Bowen, 487 U.S. at 602.

Legislative prayer practices, "while religious in nature, ha[ve] long been understood as compatible with the Establishment Clause," Town of Greece, 572 U.S. at 575, because "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country," Marsh, 463 U.S. at 786, and "the Establishment Clause must be interpreted 'by reference to historical practices and understandings,'" Town of Greece, 572 U.S. at 576 (quoting Cnty. of Allegheny v. Am. C.L. Union Greater Pittsburgh Chapter, 492 U.S. 573, 670 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part), abrogated by Town of Greece, 572 U.S. 565). From the time of the First Congress, the practice of legislative prayer "was designed to solemnize congressional meetings, unifying those in attendance as they pursued a common goal of good governance." Am. Legion v. Am. Humanist Ass'n, 588 U.S. 29, 61 (2019) (plurality opinion). As the Marsh court wrote:

> In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with a prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgement of beliefs widely held among the people of this country. As Justice Douglas observed, "[w]e are a

> religious    people    whose    institutions
> presuppose a Supreme Being."

463 U.S. at 792 (alteration in original) (quoting <u>Zorach</u> v.
<u>Clauson</u>, 343 U.S. 306, 313 (1952)).

    As the post-<u>Marsh</u> decision <u>Town of Greece</u> requires, this
court's first "inquiry, then, must be to determine whether the
prayer practice in [Boston] fits within the tradition long followed
in Congress and the state legislatures." 572 U.S. at 577. We
reject TST's argument, quoting from <u>American Legion</u>, that a
legislative prayer practice "is constitutional only if it 'stands
out as an example of respect and tolerance for differing views, an
honest endeavor to achieve inclusivity and nondiscrimination, and
a recognition of the important role that religion plays in the
lives of many Americans.'" 588 U.S. at 63 (plurality opinion).
This quoted language is not the test for whether a legislative
prayer practice is constitutional; rather, it was used by the court
to <u>describe</u> the legislative prayer practice of the First Congress.
The full quote reads as follows:

> The practice [of legislative prayer] begun by
> the First Congress stands out as an example of
> respect and tolerance for differing views, an
> honest endeavor to achieve inclusivity and
> nondiscrimination, and a recognition of the
> important role that religion plays in the
> lives of many Americans. Where categories of
> monuments, symbols, and practices with a
> longstanding history follow in that tradition,
> they are <u>likewise</u> constitutional.

Id. (emphasis added).  The Court also stated that although "the specific practice challenged in Town of Greece lacked the very direct connection, via the First Congress, to the thinking of those who were responsible for framing the First Amendment, . . . what mattered was that the town's practice 'fi[t] within the tradition long followed in Congress and the state legislatures.'"  Id. (emphasis added) (quoting Town of Greece, 572 U.S. at 577).

In Town of Greece, the Court acknowledged that local governments share in the historical tradition of legislative prayer, specifically citing an invocation given before the Boston City Council in 1909 as evidence.  572 U.S. at 576 (citing Reports of Proceedings of the City Council of Boston for the Year Commencing Jan. 1, 1909, and Ending Feb. 5, 1910, pp. 1–2 (1910) (Rev. Arthur Little)).  The Court also emphasized in American Legion that "[t]he passage of time gives rise to a strong presumption of constitutionality" under the Establishment Clause for "retaining established religiously expressive monuments, symbols, and practices."  588 U.S. at 57.

TST's arguments, none of which succeed, follow three basic themes.  First, TST argues that Boston's invocation speaker-selection practice, under which each speaker is invited by a Boston City Councilor who has a limited number of invitations, and the Council does not accept requests for invitations, constitutes impermissible government control over prayer and

discriminates against unpopular religions like TST.  Second, TST argues that Boston exploits these invocation opportunities to proselytize because the City Council President sometimes directs the audience to stand for the invocation, the invocations are sometimes described as "sermons," and some invocations contain sectarian language.  Third, TST claims that Boston controls the content of invocations by controlling the speakers who are selected to give invocations and by reviewing the invocations beforehand.

**1.**

TST argues that "[u]nder the Establishment Clause, governments may not control prayer, not even surreptitiously by controlling who gives a customary blessing over government meetings."  It levies both a facial attack on the practice and an as-applied attack.  TST argues that Boston's discretion-based, invitation-only process for selecting invocation speakers "is anathema to the prohibition against government control over prayer" and thus is facially unconstitutional.  It further argues that Boston's Councilors discriminated against TST by making a "considered, purposeful, and intentional" decision not to invite TST to deliver an invocation.

As to the facial attack, the policy is itself facially neutral and Supreme Court and circuit court precedent doom this attack to failure.  In Marsh, the Court upheld the Nebraska Legislature's prayer practice, in which the legislature "beg[a]n[]

each of its sessions with a prayer offered by a chaplain who [wa]s chosen biennially by the Executive Board of the Legislative Council and paid out of public funds." 463 U.S. at 784-85. The same Presbyterian minister had been selected to serve as chaplain for sixteen years, with occasional guest speakers "officiat[ing] at the request of various legislators and as substitutes during [his] absences." Id. at 793. Marsh held that "the evidence indicate[d] that [the chaplain] was reappointed because his performance and personal qualities were acceptable to the body appointing him." Id. "Absent proof that the chaplain's reappointment stemmed from an impermissible motive," the Court held that this process did not violate the Establishment Clause. Id. at 793-94.

In the more recent case Town of Greece, the Court upheld as constitutional a municipal legislative prayer practice with a very different speaker-selection process. There, "[t]he town followed an informal method for selecting prayer givers" at its monthly board meetings. 572 U.S. at 571. "A town employee would call the congregations listed in a local directory until she found a minister available for that month's meeting." Id. "[E]ventually," the town "compiled a list of willing 'board chaplains' who had accepted invitations and agreed to return in the future." Id. "[N]early all of the congregations in town were Christian." Id. This selection process resulted in only Christian ministers serving as invocation speakers for Greece from 1999 to

2007. Id. at 571. However, "[t]he town at no point excluded or denied an opportunity to a would-be prayer giver." Id. at 571. "Its leaders maintained that a minister or layperson of any persuasion, including an atheist, could" speak. Id. For example, "[a] Wiccan priestess who had read press reports about the prayer controversy" after the Town of Greece plaintiffs initiated litigation against the town "requested, and was granted, an opportunity to give the invocation." Id. at 572.

The Court found that, because "[t]he town made reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one," the fact "[t]hat nearly all of the congregations in town turned out to be Christian d[id] not reflect an aversion or bias on the part of town leaders against minority faiths." Id. at 585. "So long as the town maintain[ed] a policy of nondiscrimination, the Constitution d[id] not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing." Id. at 585-86.

More pointedly, the Court held that a selection process should not seek "to promote 'a "diversity" of religious views,'" as such efforts "would require the town 'to make wholly inappropriate judgments about the number of religions [it] should sponsor and the relative frequency with which it should sponsor

each,' a form of government entanglement with religion that is far more troublesome than the current approach." Id. at 586 (quoting Lee v. Weisman, 505 U.S. 577, 617 (1992) (Souter, J., concurring)).

Boston's selection process differs significantly from those in Marsh and Town of Greece: it does not select each meeting's City Council invocation speaker from a list of religious organizations located within its city limits, see id. at 571, nor does an executive board appoint a paid chaplain to lead invocations for a two-year term, see Marsh, 463 U.S. at 784.  Instead, each Councilor has the authority to select an invocation speaker for the several Council meetings annually assigned to him or her, with no formal, written selection guidelines or rules regarding who each may choose.  Further, unlike the revised process in Town of Greece, the much larger City of Boston does not accept any speaker who seeks to deliver an invocation; each speaker must be invited by a City Councilor, and the Council does not take requests for invitations.

Insofar as TST argues that Councilors choose invocation speakers on the basis of religious affiliation, the record does not support this characterization.  In their testimony and in statements made to TST and to the public, City Councilors and their representatives have repeatedly stated that the Councilors choose invocation speakers in recognition of the speakers having

benefited the communities which the individual Councilors represent.[13]

The selection of invocation speakers based on this criterion is consistent with the Establishment Clause. In <u>Am. Legion</u>, a plurality of the Court described the legislative prayer practice of the First Congress as a tradition that is "an example of respect and tolerance for differing views, an honest endeavor to achieve inclusivity and nondiscrimination, and a recognition of the important role that religion plays in the lives of many Americans." 558 U.S. at 63 (plurality opinion). Selecting invocation speakers because of their contributions to the particular community that the legislator or legislative body

---

[13]    Boston has stated that invocation invitations are also "based upon personal relationships the Councilors have" with the speakers. However, the district court in its decision stated that

> [a]ll of the evidence submitted suggests that individual City Councilors invited speakers who served their constituents and were active in their communities . . . . [T]he City Councilors' primary motivation in inviting an invocation speaker, based on the evidence before the Court, has always been the individual or organization's involvement in the community.

<u>Satanic Temple</u>, 684 F. Supp. 3d at 33, 35. TST in its opening brief did not develop an argument that there is evidence in the record to suggest otherwise. Accordingly, our analysis focuses on Boston's practice of choosing speakers based on their works benefiting communities.

serves falls squarely within that tradition, for it is open to all religious adherents and acknowledges "the important role that religion plays" in many communities.  Id.  Indeed, in Town of Greece, a plurality of the Court stated that "civic recognition" of "religious leaders and the institutions they represent," which are often "provider[s] of social services for citizens regardless of their beliefs," is a permissible end to pursue in the legislative prayer context.  572 U.S. at 591 (plurality opinion). We thus see no basis for concluding that consideration of a religious adherent's or leader's contributions to the community is a permissible function of legislative prayer ceremonies but not a permissible selection criterion.

We also reject TST's contention that "Boston's custom wholly fails to conform to the Establishment Clause standard" because it "does not accept requests for an invitation," and its argument that "when governments begin their public meetings with a prayer ceremony, the opportunity to give the prayer must be made available equally to all interested participants."  The Constitution does not require that legislative bodies accept all speakers who request to give invocations.  Indeed, it is difficult to see how such a policy would be workable in Boston.  While the board in the small town of Greece, New York, accepted all those who requested to speak, the Court did not say this was mandated. Town of Greece, 572 U.S. at 572.  And the Supreme Court in Marsh

found it proper for the Nebraska legislature to limit its invocations to a single chaplain chosen by its executive board for sixteen years, with the occasional exception of guest chaplains who were also requested by legislators. <u>Marsh</u>, 463 U.S. at 793-94.

Our sister circuits agree that legislatures need not grant all would-be speakers' requests to give an invocation. In <u>Satanic Temple, Inc.</u> v. <u>City of Scottsdale</u>, 856 F. App'x 724 (9th Cir. 2021), for example, the Ninth Circuit rejected TST's claim about the denial of its request to give an invocation at a Scottsdale City Council meeting, where TST had argued "that the City ha[d] discriminated against them by refusing to permit their invocation simply because of their religious views." <u>Satanic Temple</u> v. <u>City of Scottsdale</u>, No. 18-CV-00621, 2020 WL 587882 at *1-2 (D. Ariz. Feb. 6, 2020), <u>aff'd</u> <u>Scottsdale</u>, 856 F. App'x at 726. The district court held after a trial that TST had not proven its claim because the denial was based on Scottsdale's unwritten but "longstanding" practice of "permitting invocations only by organizations that have substantial ties to the City." <u>Id.</u> at *7-8.

TST also argues that Boston's invocation speaker-selection process must be impermissible because "[t]here are no neutrality-enforcing safeguards and there is no effort to achieve inclusivity." It does not argue that Boston's policy must be written. While, on another record, the absence of written

neutrality measures might play some role in an as-applied attack asserting religious discrimination, Boston's process on this record is not unconstitutional. TST cites to <u>Rubin</u> v. <u>City of Lancaster</u>, 710 F.3d 1087 (9th Cir. 2013), a pre-<u>Town of Greece</u> decision from the Ninth Circuit, and argues that Lancaster's legislative prayer practice was "saved" only by "a litany of neutrality-enforcing safeguards," "proactive measures to deliver on its promise of inclusivity," and a disclaimer which stressed "nonsectarian aims." As the Ninth Circuit noted, Lancaster took "every feasible precaution . . . to ensure its own evenhandedness" in conducting its legislative prayer policy."[14] <u>Id.</u> at 1097.

As shown in <u>Town of Greece</u>, a city need not take every feasible precaution for its speaker-selection process to comply

---

[14] Lancaster's precautions included adopting an official written invocation policy outlining a two-step speaker-selection procedure. <u>Id.</u> at 1089. First, the city clerk was required to compile and maintain a database of established religious congregations in Lancaster, taking care to search multiple sources "for any local 'church,' 'synagogue,' 'temple,' 'chapel,' or 'mosque,'" and then to "mail[] all of the listed religious groups an invitation to open a city-council meeting with an invocation." <u>Id.</u> Second, the city clerk was required to schedule those congregations who responded to the invitation on "a first-come, first-serve[d] or other random basis." <u>Id.</u> at 1098. "No person who has volunteered to pray has been turned down, and no government official has ever attempted to influence the clerk's selection or scheduling of volunteers." <u>Id.</u> at 1089. Further, in support of the policy's stated intent "to acknowledge and express the City Council's respect for the diversity of religious denominations and faiths represented and practiced among the citizens of Lancaster," each congregation was allowed "only three, nonconsecutive invocations a year." <u>Id.</u>

with the Establishment Clause.  See 572 U.S. at 571, 585-86
(upholding an "informal" selection policy and requiring only that
legislatures maintain "a policy of nondiscrimination" in their
legislative speaker-selection processes).  That the Councilors
here exercised discretion is also facially permissible.  See Marsh,
463 U.S. at 793 (holding that "the evidence indicate[d] that [the
standing chaplain] was reappointed because his performance and
personal qualities were acceptable to the body appointing him"
(emphasis added)).

Though Boston's practice is constitutional on its face,
it is still possible that in practice it has led to Boston favoring
some religions over others, and so we turn to TST's claims that
this has happened.  These as-applied claims fail for many of the
same reasons.  TST has simply not shown evidence of discrimination
based on religious beliefs as to which speakers are invited, much
less evidence of intentional discrimination.

The record in this case is not at all like that of
Williamson v. Brevard Cnty., 928 F.3d 1296 (11th Cir. 2019), and
that case does not support TST's claims for many reasons.  In
Williamson, the Eleventh Circuit considered a speaker selection
process similar to Boston's, in which "members of the Brevard
County Board of Commissioners ha[d] plenary authority, on a
rotating basis, to invite whomever they want[ed] to deliver
invocations, with no consistent standards or expectation of

inclusiveness." Id. at 1299. Yet there the court concluded that
the Board of Commissioners had, in fact, exercised its plenary
authority to select invocation speakers in a way demonstrating "an
aversion or bias on the part of [county] leaders against minority
faiths." Id. at 1315 (quoting Town of Greece, 572 U.S. at 585).
All but one of the Commissioners "indicated that the specific
religious beliefs of a prospective invocation-giver would have a
real impact on whether they would be invited or permitted to give
an invocation or excluded from consideration," with some
Commissioners stating they would not invite, or expressing
hesitance about inviting, practitioners of Sikh, Hindu, Wiccan,
Islamic, Rastafarian, polytheistic, deist, and Native American
faiths. Id. at 1313-14. The Board had also passed a resolution
in response to the plaintiffs' -- a group of Secular Humanists and
atheists -- request to give an invocation, which the court held
"facially dr[e]w[] distinctions between preferred monotheistic
religions and disfavored others." Id. at 1316.

TST has not shown that any of the Boston City Councilors
have chosen invocation speakers based on the Councilors' own
religious preferences or biases or barred potential speakers from
delivering invocations that oppose the Councilors' religious
beliefs. The record shows rather that speakers were invited based
on their contributions to the Councilors' districts and to the
Boston community. For example, Councilor Kim Janey's speaker

invitation to Reverend Mary Margaret Earl of the Unitarian
Universalist Urban Ministry acknowledged that the congregation was
"deeply active in the Roxbury community."  Councilor O'Malley
invited Rousseau to speak every year from 2012 through 2020;
Rousseau was "very involved" in her community of Jamaica Plain,
the Boston neighborhood O'Malley represented, by serving as "an
on-call minister at Hope Central Church in Jamaica Plain" as well
as co-chair of the Ward 11 Democratic Committee and as a founder
of "JP [Jamaica Plain] progressives," "a local community-based
organization" concerned with "electing progressive candidates."
Councilor Pressley, in her introduction of Adamson at the September
28, 2016, City Council meeting, emphasized that Adamson was a
lifelong Boston resident of the Roslindale and Dorchester
neighborhoods and a leader at several non-profit organizations,
including the United Way of Massachusetts Bay and the Boston Debate
League.

TST argues in reply that it "is not receiving an invite
because of disagreement with [its] viewpoint."  Specifically, it
claims "[t]wo Councilors" -- Councilor Essaibi-George and
Councilor McCarthy -- "made public statements which articulate[d]
that [TST] will never have an opportunity to bless the ceremony so
long as they are in control of the prayer opportunity."  This

mischaracterizes the record.[15]  Councilor McCarthy said only that he "would not consider anyone that doesn't have a positive impact on [his] community, [his] constituents, [his] family and [himself] personally."

The email from Councilor Essaibi-George's chief of staff did express that the Councilor would "not give up the opportunity to highlight one of the[] amazing leaders who [she was] privileged to work with for [TST]," and Councilor Essaibi-George did testify that she "still would not invite TST" if she were still a Councilor and gave her reasons.  She repeatedly testified at her deposition that the "only reason" she did not invite TST was because she did not have a relationship with TST or knowledge of any service it provided to the Boston community.  When asked to "recite [her]

---

[15]    TST also argues that Boston's counsel made an admission in the form of an "official statement of policy as to who may give the prayer" that "specifically excludes a particular religion," TST.  TST mischaracterizes here as well.  For support TST cites to a status conference on March 15, 2023, at which the district court asked the parties whether they were interested in mediation.  TST's counsel replied, "I think both parties are not, Your Honor.  Plaintiffs are looking for an order, a decree that plaintiff can come in and give their prayer.  The City is refusing to do that.  There is no room to negotiate."  When the district court asked Boston's counsel if this was accurate, he responded, "[a]greed, Your Honor."  Boston's agreement that "[t]here is no room to negotiate" and that "[t]he City is refusing" to permit TST to "come in and give their prayer" is not a statement by Boston that it is refusing to permit TST to give an invocation because of who TST's adherents are or the contents of their beliefs.  Rather, in light of Boston's position that its selection process and criteria are constitutional, it is a statement that Boston refuses to permit invocations to be given by individuals who do not meet its criteria.

grounds for not inviting TST during [her] tenure" as a Councilor, Essaibi-George testified,

> I had no relationship with TST. Had no interaction with TST. And as the city councilor, I have very few opportunities to invite someone to offer either opening remarks or a blessing or a prayer prior -- before the start of a council meeting and utilized those opportunities for, you know, very specific folks and organizations that I wanted to do that with.

Further, she stated

> I would say there was never a decision made to invite or not invite. [TST] w[as] not on my radar. We did not have any work or overlapping work and my -- quite frankly, my dance card was very much full every year thinking about who I would invite to the few opportunities I had to invite someone to -- to kick off and start our council meetings.

When asked if she "perceive[d] a difference between TST and other religions," she testified, "I don't perceive a difference." She further stated, that, of the speakers she had invited, she "d[id]n't know any one of . . . th[eir] religious beliefs, their preferences, whether or not they had any." TST has not developed an argument that these statements by Essaibi-George represent impermissible criteria for choosing speakers.[16]

---

[16]    TST also argues that then-Councilor Wu changed the Boston City Council's policy of providing a small stipend to invocation speakers "[w]hen [TST] first asked for equal inclusion" because she "ascertain[ed] that Boston's then-prevalent custom of paying its invited ministers might result in a judgment for [TST]," and that this action demonstrates "intentional discrimination." This argument fails for at least two reasons. First, TST provides

The record shows that Councilors have invited speakers from a number of religious traditions, not just Christianity, including Judaism, Unitarian Universalism, and Islam. Councilors have also invited speakers to give non-religious invocations. Essaibi-George testified that she had "used [her] opportunity as a city councilor to invite lots of individuals and lots of organizations that have zero connection to religious organizations to the council to be recognized for the work that they're doing in our communities." When asked by TST at her deposition if it was "fair to say . . . that if TST had more members, then TST would have gotten an invitation," Essaibi-George stated, "No. That's incorrect." Further, although TST cites to "substantial public commentary sent to the publicly elected officials urging them to exclude [TST] from" giving an invocation, it has provided no evidence that the handful of emails included in the record caused any Councilors not to invite TST.

---

no evidence that the stipend policy was discontinued because of its request for an invitation. In the portion of O'Donnell's deposition testimony to which TST cites in support of its contention, O'Donnell never confirms nor denies that the change was implemented because of TST's request, simply stating that the stipend practice "was looked at and [it was] considered best practice to stop the stipend" around the time when TST made its request. Second, TST has not explained how this policy might result in a judgment in its favor. See Marsh, 463 U.S. at 794 ("Nor is the compensation of the chaplain from public funds a reason to invalidate the Nebraska Legislature's chaplaincy . . . .").

The record shows that there are many neutral, non-discriminatory reasons why TST has not been invited to give an invocation, including the following.  TST does not claim to have had a personal or working relationship with any Councilor on the basis of work it has done to benefit Boston communities.  When TST asked Essaibi-George how it could "go about creating this relationship" with her, she testified, "I would have [to have] knowledge of your work and I would have run across it in my work as an at-large city councilor."  For what it calls its "Boston Chapter," TST's physical temple is in Salem, Massachusetts, not the City of Boston, and at the time of its operative complaint, only 2,449 of its more than 270,000 national members lived in the "Boston metropolitan area."[17]  Boston is not required to "search beyond its borders" for invocation speakers, especially when its selection criteria focus on speakers' connections and service to

---

[17]    Not all of those invited to serve as speakers have been based in the City of Boston, but those mentioned in the record that were not Boston-based appear to have had personal relationships with the Councilor who invited them or to have made more significant Boston contributions.  For example, Lindsay Popperson, reverend of the United Church of Christ's congregation based in Marblehead, Massachusetts, was invited by Councilor O'Malley, with whom she had a "personal connection" because she serves as the chaplain of a nursing center where Councilor O'Malley's mother received care.  Councilor Essaibi-George also testified that Rabbi Kreiman's congregation is based in Brookline, Massachusetts, a town bordering Boston, and that they developed a relationship due to Rabbi Kreiman's congregation's literacy promotion group's work in Boston public schools.  TST has developed no argument to us that selection criteria of this sort are impermissible.

the Boston community.  See Town of Greece, 572 U.S. at 585-86.
TST also has not demonstrated the existence of other organizations
outside of Boston with minimal contributions to the Councilors'
constituents who were routinely invited, much less that TST was
not invited due to its beliefs.  Although TST has provided some
evidence that it has provided menstrual products to Rosie's Place
in Boston, TST has not provided any evidence that this contribution
took place in any specific Councilors' district, was known to the
Councilors, or was as significant as the contributions of those
invited to speak.  Further, not every religious organization
performing charitable work in any portion of the Boston community
would receive an invitation to speak.  As then-Councilor Wu
informed TST in her email response to its initial request to give
an invocation, many Councilors "have a long list of folks [they]'d
like to invite but haven't been able to accommodate."  Councilor
Essaibi-George likewise testified that "not every organization
gets invited" and that it was "[p]ossibl[e], but not likely," that
TST would have received an invocation if it "had more members who
were engaged in the community," again citing her limited number of
invitations and limited knowledge of TST.[18]

---

[18]    TST in its reply brief takes issue with Boston's
statement in its appellee brief that "[t]he decision" of whom to
invite to speak at invocation "is usually political."  However,
TST has not developed this argument, and so has waived any
contention to the district court's conclusion that there is no
evidence that Boston acted on the basis of "politics" or favored

**2.**

TST also argues that Boston's practice violates the Establishment Clause because "the prayer opportunity is exploited to proselytize"[19] and "sometimes takes the form of 'a sermon.'"  It points to statements Adamson made in her invocation, which TST attempts to characterize as "the government-approved speaker s[eeking] of the God of Abraham to 'order [the councilors'] steps' and to direct them 'how to pray.'"  (Second alteration in original.)  It also objects to the fact that the Council President sometimes, but not always, requests that the audience stand before the invocation and Pledge of Allegiance at City Council meetings.

The record does not establish any such pattern, or that the episodes cited cause constitutional issue.  None of these actions constitute impermissible proselytizing or coercion as those terms are used by the Supreme Court.  As <u>Marsh</u> stated, "[t]he content of the prayer is not of concern to judges" unless "the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief."  463 U.S. at

---

"political allies" when TST pressed that contention below.  <u>See</u> <u>Satanic Temple</u>, 684 F. Supp. 3d at 40.

[19]  TST argued this but did not make a claim in its operative complaint; instead, it specifically stated, "[t]his case is not a challenge to legislative prayers, generally; and it is not a challenge to offensive prayers, particularly.  We take no issue with the fact that the City permits many congregations to invoke Jesus before Council meetings.  We just want an equal opportunity . . . to invoke Satan."  We bypass TST's waiver.

794-95. The record establishes neither proselytizing nor disparagement. Sectarian prayer violates the constitution only "[i]f the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion," because at that point, the invocation "fall[s] short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort." Town of Greece, 572 U.S. at 583. No such impermissible "course and practice over time" has been shown here. Town of Greece made clear that legislative invocations of sectarian religious prayers are generally constitutional, noting than "[a]n insistence on nonsectarian or ecumenical prayer as a single, fixed standard is not consistent with the tradition of legislative prayer outlined in the Court's cases." Id. at 578.

Indeed, "[o]nce it invites prayers into the public sphere, government must permit a prayer giver to address his or her own God or gods, as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian." Id. at 582. "That a prayer is given in the name of Jesus, Allah, or Jehovah, or that it makes passing reference to religious doctrines, does not remove it from . . . tradition." Id. at 583. To the contrary, "[t]hese religious themes provide particular means to universal ends," which may include "seek[ing] peace for the Nation, wisdom for its lawmakers, and justice for its people, values that count

as universal and that are embodied not only in religious traditions, but in our founding documents and laws." Id. Even when "two remarks" in Town of Greece did veer into proselytization and disparagement of other religions, the Supreme Court held that they "d[id] not despoil a practice that on the whole reflects and embraces our tradition" of legislative prayer. Id. at 585.

The invocations included in the record fall well within the limits established by Town of Greece. While each speaker specifically referenced his or her religion -- Adamson and Hall, both Christian faith leaders, read verses from the Bible, ended their prayers in the name of "Jesus," and made references to God as "Christ Jesus," "the Lord," "Father," and the "Holy Spirit"; Mahdee, an imam, "greet[ed] the audience with the greetings that we give in the religion of Islam" and read two verses from the Qur'an; and Kreiman, a rabbi, spoke prayers in Hebrew and praised community volunteers for "bringing the three pillars of our Jewish tradition to life" -- these sectarian invocations "provide[d] particular means to universal ends." See id. at 583. For example, Adamson's invocation focused on promoting unity and removing division, with the theme of "one nation under God," and asked for divine guidance for City Councilors.

TST has not even sought to establish a "course and practice over time," as it must, but points only to Adamson asking God

> to encourage your people in this council to
> remember that nothing is too hard for you and
> that if they stop and humble themselves before
> you and repent and ask for forgiveness in your
> mercy, God, that you will order their steps,
> Lord, and you will . . . give them what to say
> and how to say it, God, give them how to pray
> before they vote, God.

Adamson's language is similar to invocations that Town of Greece explicitly held were permissible.[20] Adamson's invocation is also distinguishable from the pattern of sectarian prayers at issue in Lund v. Rowan County, which the Fourth Circuit found to be unconstitutional, for many reasons, including that Adamson did not

---

[20] Among the prayers Town of Greece cited as permissible was "[t]he first prayer delivered to the Continental Congress by the Rev. Jacob Duché on Sept. 7, 1774," which reads as follows:

> Be Thou present O God of Wisdom and direct the
> counsel of this Honorable Assembly; enable
> them to settle all things on the best and
> surest foundations; that the scene of blood
> may be speedily closed; that Order, Harmony,
> and Peace be effectually restored, and the
> Truth and Justice, Religion and Piety, prevail
> and flourish among the people.
>
> []Preserve the health of their bodies, and the
> vigor of their minds, shower down on them, and
> the millions they here represent, such
> temporal Blessings as Thou seest expedient for
> them in this world, and crown them with
> everlasting Glory in the world to come. All
> this we ask in the name and through the merits
> of Jesus Christ, Thy Son and our Saviour,
> Amen.

Id. at 583-84 (citing W. Federer, America's God and Country 137 (2000)).

imply that her faith "was superior to other faiths" nor did she "appear[] to implore attendees to accept" her religion.  863 F.3d 268, 273 (4th Cir. 2017) (en banc).

The Council President's asking the audience to stand for the invocation[21] also does not qualify as coercion, even impliedly. In Town of Greece, a plurality held that a coercion inquiry "remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed," finding that "[t]he principal audience for these invocations [wa]s not . . . the public but lawmakers themselves, who may find that a moment of prayer or quiet reflection sets the mind to a higher purpose and thereby eases the task of governing." Id. at 587-88. While it is true that Boston City Council meetings are televised, the invocations are directed towards the Councilors, asking that their decisions be guided by goodness and wisdom.  See also Fields

---

[21]    In two of the four City Council meeting videos in the record, the Council President asked the individuals present at the meeting to stand before the invocation and remain standing after the invocation for the Pledge of Allegiance.  In the other two meeting videos, no such request was made, though Mahdee did tell the audience, "you can sit down now," indicating that they had stood on their own accord.   TST also cites to the partial transcript of a fifth City Council meeting in which the Council President asked "all councilors, all guests, colleagues" to "please rise as Councilman O'Malley comes forward to give us an . . . invocation," after which Councilor O'Malley introduced Rousseau as the invocation speaker.   Councilor Essaibi-George testified that "there's an expectation that people generally stand during the prayer," but noted that the Council President does not always ask for individuals to stand and that individuals sometimes "stand[] on their own, if they're able."

v. Speaker of Pa. House of Reps., 936 F.3d 142, 161-63 (3d Cir. 2019) (holding that the request by the Speaker of the House of the Pennsylvania House of Representatives for all "guests" in the legislative chamber to stand during the invocation prayer, and a similar request by a posted sign, were not coercive and did not violate the Establishment Clause); Bormuth v. Cnty. of Jackson, 870 F.3d 494, 498, 517 (6th Cir. 2017) (en banc) (holding that "soliciting adult members of the public to assist in solemnizing the meetings by rising and remaining quiet in a reverent position" was not coercive); Am. Humanist Ass'n v. McCarty, 851 F.3d 521, 526 (5th Cir. 2017) (observing that "occasional[]," "polite requests" by school board members for the audience to "stand for the invocation" before school board meetings "do not coerce prayer").

Our earlier discussion makes clear that Boston also does not exercise unconstitutional control over the content of its invocation speakers' prayers.  We dispose of this claim quickly. Marsh held that "[w]e, no more than Members of the Congresses of this century, can perceive any suggestion that choosing a clergyman of one denomination advances the beliefs of a particular church." 463 U.S. at 793.  As Town of Greece held, "[t]hese ceremonial prayers strive for the idea that people of many faiths may be united in a community of tolerance and devotion" and that "[e]ven those who disagree as to religious doctrine may find common ground

in the desire to show respect for the divine in all aspects of their lives and being."  572 U.S. at 584.

TST mischaracterizes the record when it argues that "[t]o effectuate its control over prayer, Boston reviews prayers beforehand."  There is no such practice or pattern of review here by Boston or its Councilors.  The record shows that two emails were sent or forwarded to "boston.gov" email addresses, including those of several City Council members, containing drafts of what appear could be religious or spiritual invocations.  One email was sent by Rabbi Kreiman on September 26, 2018, at 10:09 AM, and forwarded to what appears to be the email address of Jessica Rodriguez, a member of Councilor Essaibi-George's staff, approximately forty minutes before Rabbi Kreiman gave her invocation.  There is no evidence that the other speakers in the record provided copies of their draft invocations in advance nor evidence that the Councilors guided the content of the invocations.  Rousseau, the only invocation speaker deposed, testified, "I usually write my invocations depending on what is going on or what time or year something is happening." (Emphasis added.)  Because we evaluate the legislative prayer practice as a whole, see Town of Greece, 572 U.S. at 585, the possible advanced review of one draft invocation by a Councilor's staff member is insufficient to demonstrate the practice is unconstitutional.

**B.**

TST's state constitutional Free Exercise claim fails as well.  For such claims, we apply a "balancing test," looking to whether the state action at issue "substantially burdens [the] free exercise of religion, and, if it does, whether the [government] has shown that it has an interest sufficiently compelling to justify that burden." Soc'y of Jesus of New Eng. v. Commonwealth, 808 N.E.2d 272, 279 (Mass. 2004) (first modification in original) (quoting Attorney Gen. v. Desilets, 636 N.E.2d 233, 237 (Mass. 1994)); see also Magazu v. Dep't of Child. & Fams., 42 N.E.3d 1107, 1117-18 (Mass. 2016).  "The party claiming an unconstitutional burden on the free exercise of religion 'must show (1) a sincerely held religious belief, which (2) conflicts with, and thus is burdened by, the state requirement.'" Soc'y of Jesus of New Eng., 808 N.E.2d at 279 (quoting Desilets, 636 N.E.2d at 237).  Only if the party is able to do so does "the burden shift[] to the state" to demonstrate "both that the (3) requirement pursues an unusually important government goal, and that (4) an exemption would substantially hinder the fulfillment of the goal." Id. (quoting Desilets, 636 N.E.2d at 237).

TST has failed even the first test to show that Boston's legislative prayer practice created a substantial burden on its exercise of its beliefs.  "[A] 'substantial burden' is one that is coercive or compulsory in nature." Magazu, 42 N.E.3d at 1119

(citing Curtis v. Sch. Comm. of Falmouth, 652 N.E.2d 580, 587 (Mass. 1995)).  Boston has neither "condition[ed] receipt of an important benefit on conduct proscribed by [TST's] religious faith," nor has it "denie[d] such a benefit because of conduct mandated by [TST's] religious belief[s]."  Curtis, 652 N.E.2d at 588.

### C.

TST also appeals two district court orders related to its attempts to take the deposition of former-Councilor, now-Mayor Wu: the court's grants of a protective order and motion to quash and its denial of TST's motion for reconsideration.

The pertinent facts are cited earlier.  We review a trial court's denial of discovery for abuse of discretion.  Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 91 (1st Cir. 1996).  "We will intervene in such matters only upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party."  Id. (quoting Mack v. Great Atl. & Pac. Tea Co., Inc., 871 F.2d 179, 186 (1st Cir. 1989)).  "Circumstances warranting appellate intervention in garden-variety pretrial discovery are infrequent."  Mack, 871 F.2d at 186.

The district court clearly did not abuse its discretion by granting Boston's emergency motions for a protective order and to quash when it determined that TST's deliberate decision to

schedule then-Councilor Wu's deposition on Election Day of her mayoral race "created an impermissible undue burden."  As the district court wrote, "[w]here the information sought in this case [wa]s . . . readily available from up to 47 other people," and the "subpoena at issue burdens [Boston's] highest-ranking official and was largely issued as a publicity stunt, it is not difficult to find undue burden in favor of a protective order."  TST made no effort to depose former-Councilor Wu's former chief of staff, who, along with other Councilors' chiefs of staff, Boston had designated to testify on the topics of Councilors' "subjective bases," "subjective understanding," and "subjective opinion," and statements each Councilor had made, in its response to TST's Rule 30(b)(6) motion.

The district court also did not abuse its discretion by denying TST's motion for reconsideration of its protective order. As the court stated, "any motion for reconsideration must state which additional facts . . . have materially changed the circumstances such that the deposition of Mayor Wu is now necessary," including "why the other witnesses [Boston] has identified cannot be sources of th[e] information" that TST seeks. The court properly concluded that TST had failed to do so.  See Bogan, 489 F.3d at 423; United States v. Morgan, 313 U.S. 409, 422 (1941).

**V.**

We close with this cautionary note, even as we reject TST's claims.  It is clear that Boston's customary invocation speaker practice is admittedly meant to serve the interests of incumbent City Councilors.  Those interests could in the future lead to Councilors favoring invitations only to those representing religious electoral majorities and explicitly proselytizing for those views or disparaging minority or unpopular groups.

The record before us shows Boston has taken no such action.  Should it do so in the future, courts may again be called on to enforce constitutional commands under the Establishment Clause.

**VI.**

For the above stated reasons, we **affirm**.

**-Concurring Opinion Follows-**

**BARRON**, <u>**Chief Judge**</u>, **concurring**.  The Satanic Temple, Inc. ("TST") alleges that the City of Boston's practice of inviting speakers to give religious invocations at the start of City Council meetings violates the Establishment Clause.  I agree that the City is entitled to summary judgment on TST's claims.  I write separately to address my concerns about one argument that the City advances to defend its process for selecting invocation speakers and some of the evidence in the record that bears on how that process may have worked in practice.

### I.

The City starkly sets forth the argument that causes me concern in its brief to us on appeal.  It contends -- seemingly unabashedly -- that the Establishment Clause permits City Councilors to choose invocation speakers based on how likely the selection is to earn them votes at the ballot box from certain religious communities.  "[A] Councilor might find it politically expedient to curry favor with a religious group and its constituent members by inviting it to say a prayer," the City explains.  It then reasons that such "currying" would be fine because "[i]t was the votes, and not the religion, that was the driving force behind the decision-making here."

I suppose the City is right that using invocations to attract political support from certain religious communities does

not constitute invidious religious discrimination. But I am dubious that the Establishment Clause blesses the practice that the City describes.

The Supreme Court of the United States has made clear that, under the Establishment Clause, a legislative body may choose to open an official lawmaking session with a prayer. See Marsh v. Chambers, 463 U.S. 783, 792 (1983). It has made clear, too, that the legislative body may choose who will give that prayer. See id. at 793-94.

For example, in Marsh v. Chambers, the Supreme Court upheld the Nebraska legislature's use of the Executive Board of the Legislative Council to choose a single standing chaplain for the legislature -- there, a Presbyterian minister. See id. at 784-85. It then also upheld that board's repeated decisions over more than a decade to reappoint the minister because the board found "his performance and personal qualities . . . acceptable." Id. at 793.

More recently, in Town of Greece v. Galloway, the Court approved a town's informal process for selecting individuals to give prayers to open town board meetings. See 572 U.S. 565, 585-86 (2014). In doing so, it approved the town's initial practice of calling religious "congregations" listed in a local directory until an available "minister" was found, at least given that the town modified that practice to accommodate requests to give an

invocation from seemingly anyone.  Id. at 571-72, 585-86.  The
Court explained that, because "[t]he town made reasonable efforts
to identify all of the congregations located within its borders
and represented that it would welcome a prayer by any minister or
layman who wished to give one," the town's legislative prayer
practice did not violate the Establishment Clause though "nearly
all of the congregations in town turned out to be Christian" and
would not so long as the "town maintain[ed] a policy of
nondiscrimination."  Id. at 585-86.

       In upholding the practice of legislative prayer,
however, the Court has acknowledged the potential risk that the
practice could conflict with our long-celebrated tradition of
religious pluralism.  See id. at 585 (noting the possibility of
invocations that "over time denigrate, proselytize, or betray an
impermissible government purpose").  In both Marsh and Town of
Greece, therefore, the Court was attentive to the means used to
select those who gave the prayer.  And, in neither case did the
Court hold that the Establishment Clause permits a government to
rely on any selection criterion so long that the government does
not invidiously discriminate against some religious beliefs.  Nor
did the Court in either case hold that the Establishment Clause
permits elected officials to base their selections on a crass
political assessment of the votes that those selections would
likely reap from adherents to certain religious beliefs.

In suggesting that the Establishment Clause may bar the nakedly political selection method that the City puts forward, I do not mean to sound naïve.  In some sense, "politics" lies behind any action that an elected official takes.  As one Councilor put it with respect to City's selection process here: "Politics always plays a role in every decision I make as a city councilor."  Indeed, the Councilors may well have decided to rely on the selection criterion that we uphold in this case -- performing good works in the Councilors' districts -- precisely because it is likely to produce results that voters will like.

There is a potential tension, however, between doing what the voters want and doing what the Establishment Clause permits.  See Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 297-98, 304 (2000) (stating that a process by which students voted by secret ballot on whether to have prayer at various school events and on who would deliver those prayers "d[id] nothing to protect minority views but rather place[d] the students who hold such views at the mercy of the majority").  We have a Bill of Rights because -- in a constitutional democracy -- majority rule is sometimes the problem rather than the solution.  See W. Va. Bd. of Educ. v. Barnette, 319 U.S. 624, 638 (1943) ("[F]undamental rights may not be submitted to vote; they depend on the outcome of no elections.").

Thus, what makes the "good works" criterion plainly permissible is not simply that it is facially neutral when it comes to religious belief.  It is that anyone in the community, no matter her religious beliefs, may perform "good works."  Because the criterion is open to all to satisfy, its use helps to ensure that the City's practice of legislative prayer will reflect "respect and tolerance for differing views, an honest endeavor to achieve inclusivity and nondiscrimination, and a recognition of the important role that religion plays in the lives of many Americans." Am. Legion v. Am. Humanist Ass'n, 588 U.S. 29, 63 (2019) (plurality opinion).

The political criterion that the City argues is as permissible as the "good works" criterion is quite different.  It may be neutral as to religion on its face.  But it is easily considered to involve the Councilor selecting speakers based on the political benefit to be gained from pleasing a specific religious community.  It therefore necessarily tends to favor those religious views that have the most adherents or that are least likely to be controversial in the eyes of the majority.  And, even when for idiosyncratic local political reasons it does not have that tendency, a concerted effort to win votes from some religious groups by letting one of their own give the invocation still makes "the risk of political division stemming from prayer practice conflict . . . no mere abstract matter" as "political division

along religious lines . . . is a threat to the normal political process." Lund v. Rowan Cnty., 863 F.3d 268, 282 (4th Cir. 2017) (en banc) (citation omitted).

The use of such a criterion thus risks conflicting with our tradition of religious tolerance in a way that the "good works" criterion does not. See George Washington, Letter to Newport Hebrew Congregation (Aug. 18, 1790), in 6 Papers of George Washington 285 (Mark A. Mastromarino ed. 1996) ("It is now no more that toleration is spoken of, as if it was by the indulgence of one class of people, that another enjoyed the exercise of their inherent natural rights. For happily the Government of the United States, which gives to bigotry no sanction, to persecution no assistance, requires only that they who live under its protection should demean themselves as good citizens."). The use of that selection criterion therefore risks transgressing the Establishment Clause in a way that the use of more inclusive criteria does not.

That the City of Boston argues otherwise concerns me. True, as the majority correctly explains, TST fails to develop an argument that the District Court erred in holding that no evidence supports the contention that the City was in fact relying -- or intending to rely -- on this vote-getting criterion. But it is also true that the City repeatedly concedes that it has no written criteria at all for how invocation speakers would be chosen. Thus,

the City's representations to our Court that such a criterion is constitutionally permissible raises the concern that the City and individual Councilors are under the impression that future selections may rest on such a political basis without raising any Establishment Clause concerns. Nothing in our opinion, as I read it, suggests that impression is warranted. Much in our constitutional tradition suggests that it is not. See Larson v. Valente, 456 U.S. 228, 245 (1982) ("The constitutional prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause. . . . Free exercise thus can be guaranteed only when legislators -- and voters -- are required to accord to their own religions the very same treatment given to small, new, or unpopular denominations.").

## II.

I also think it important to note a concern that certain evidence in the record raises about the basis for some past speaker selections. That evidence could be read to suggest that in the past some Councilors relied on the consideration of whether the speaker had a "personal relationship" with the Councilor, wholly apart from anything that the speaker had done for the benefit of the community.

For instance, TST's complaint alleges -- and the City then admitted in response -- that one Councilor had extended an invitation based on a "personal connection," in that the invitee

"serve[d] as the Chaplain for a nursing center where the Councilor's mother received care." Additionally, one Councilor provided a public comment that all the clergy that Councilor had invited in their three years as an elected official "ha[d] been personal friends." Other evidence similarly raises the concern that all that matters for selection is who a speaker knows, not what they have done.

It may be that these references to friends and family just reveal that there is overlap between those who do good works and those who have personal ties to the Councilors. But it may also reveal that the personal tie is the true qualification. If so, my concern is once again that the selection criterion, though formally neutral and not reflective of any invidious discriminatory intent, is not "an honest endeavor to achieve inclusivity and nondiscrimination." Am. Legion, 588 U.S. at 63 (plurality opinion). Given the limited circles that so many of us inhabit, a "friends and family" criterion is poorly suited to the task of ensuring that a practice of legislative prayer will not "symbolically plac[e] the government's 'official seal of approval on one religious view.'" Marsh, 463 U.S. at 792 (quotation omitted).

Nonetheless, TST develops no argument that the District Court erred in seemingly concluding that the City's asserted selection criterion of "personal relationships" is one and the

same as its "good works" criterion.  TST therefore has developed
no argument that the "personal relationships" standard refers to
anything other than a Councilor's familiarity and relationship
with an individual because of that individual's good work in, and
contributions to, the community.  Accordingly, I agree with our
conclusion that the "personal relationships" criterion here causes
no constitutional offense.

But, in light of the evidence I have just described,
this "personal relationship" criterion remains of concern to me
because there are no written guidelines for the City's seemingly
ad hoc selection process.  The passages in the City's brief that
seem to suggest that such a criterion would be perfectly consonant
with the Establishment Clause simply because it is not just based
on "religious preference" only enhance that concern.

### III.

To be clear, I write separately merely to raise concerns,
not resolve them.  Precisely because of the kinds of arguments
that TST makes to us, we do not have a fully joined dispute as to
the underlying legal issues.  And, while another challenge to the
City's legislative-prayer practice may come our way, it, too, may
not present them.  By then, the City may have ensured that its
selection process steers clear of considerations -- whether
crassly political or merely smacking of insider-ism -- that so
risk conflicting with the basic constitutional principle

articulated in a landmark Supreme Court case from this very Circuit: "The Establishment Clause prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community." Lynch v. Donnelly, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring). If that is the case, then the Establishment Clause will be no worse for not having been so tested.